## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### (BID PROTEST)

|  |  |  |
|---|---|---|
| SIERRA NEVADA CORPORATION, | ) | |
| | ) | |
| *Plaintiff,* | ) | **No. 14-994 C** |
| | ) | |
| v. | ) | **Judge Marian Blank Horn** |
| | ) | |
| THE UNITED STATES, | ) | **FILED UNDER SEAL** |
| | ) | |
| *Defendant.* | ) | |

## MEMORANDUM IN SUPPORT OF THE BOEING COMPANY'S OPPOSITION TO PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER

Scott M. McCaleb
WILEY REIN LLP
1776 K Street, N.W.
Washington, DC  20006
(202) 719-3193 (O)
(202) 719-7049 (F)
smccaleb@wileyrein.com
*Counsel of Record for Movant/Interested Party, The Boeing Company*

*Of counsel:*
Paul F. Khoury
Jon W. Burd
Samantha S. Lee
Gary S. Ward
WILEY REIN LLP

Dated:  October 16, 2014

# **TABLE OF CONTENTS**

**PAGE**

I. INTRODUCTION .................................................................................................. 1

II. BACKGROUND .................................................................................................. 7

    A.    National Space Transportation Policy, Laws, and Agreements ........................... 7

    B.    NASA's Reliance on Russia's Soyuz Rocket ...................................................... 10

    C.    NASA's Commercial Crew Program ................................................................. 11

    D.    Commercial Crew Transportation Capability Contracts .................................... 12

    E.    SNC's Protest, The Automatic Stay, and NASA's Override Decision .............. 14

III. ARGUMENT ...................................................................................................... 17

    A.    Standard of Review ........................................................................................... 17

    B.    SNC Is Unlikely to Prevail on the Merits of Its Challenge to the Legality and Reasonableness of NASA's Override Decision ................................................. 18

    C.    The Balance of the Harms Counsels in Favor of Denying SNC's Application .. 28

    D.    The Public Interest Weighs Against Enjoining Performance. ........................... 30

IV. CONCLUSION .................................................................................................. 32

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alion Sci. & Tech. Corp. v. United States,*
  69 Fed. Cl. 14 (2005) ........................................................................................27

*Automation Techs., Inc. v. United States,*
  72 Fed. Cl. 723 (2006) .......................................................................................18

*Beechcraft Defense Co., LLC v. United States,*
  111 Fed. Cl. 24 (2013) .......................................................................................18

*CHE Consulting, Inc. v. United States,*
  552 F.3d 1351 (Fed. Cir. 2008) .........................................................................24

*Cherokee Nation Technologies, LLC v. United States,*
  116 Fed. Cl. 636 (2014) .....................................................................................18

*Intel Corp. v. ULSI System Technology, Inc.,*
  995 F.2d 1566 (Fed. Cir. 1993) .........................................................................17

*KWV, Inc. v. United States,*
  108 Fed. Cl. 448 (2013) .....................................................................................18

*PGBA, LLC v. United States,*
  57 Fed. Cl. 655 (2003) .......................................................................................19

*Planetspace Inc. v. United States,*
  86 Fed. Cl. 566 (2009) .......................................................................................28

*PMTech, Inc. v. United States,*
  95 Fed. Cl. 330 (2010) .................................................................................18, 20

*Reilly's Wholesale Produce v. United States,*
  73 Fed. Cl. 705 (2006) ............................................................................ *passim*

*Samson Tug & Barge Co. v. United States,*
  695 F. Supp. 25 (D.D.C.1988) ...........................................................................19

*Savantage Fin. Servs., Inc. v. United States,*
  595 F.3d 1282 (Fed. Cir. 2010) .........................................................................24

*Topgallant Group, Inc. v. United States,*
  704 F. Supp. 265 (D.D.C.1988) .........................................................................19

*Vantage Associates, Inc. v. United States*,
   59 Fed. Cl. 1 (2003) ...................................................................................30

*WRH Group, Inc. v. United States*,
   115 Fed. Cl. 386 (2014) ..............................................................................28

**Statutes**

28 U.S.C. § 1491 .................................................................................... *passim*

31 U.S.C. § 3553.....................................................................................1, 19

42 U.S.C. § 18301......................................................................................2, 8

42 U.S.C. § 18311...................................................................................2, 5, 8

51 U.S.C. § 50131...................................................................................5, 9

51 U.S.C. § 70501......................................................................................8

**Appendices**

Ex. 1, Nick Kirkpatrick, Amid tensions over Ukraine, Russian Souyz space capsule returns three astronauts to Earth, Washington Post (May 14, 2014), http://www.washingtonpost.com/news/morning-mix/wp/2014/05/14/amid-tensions-over-ukraine-russian-soyuz-space-capsule-returns-three-astronauts-to-earth/ ....................... *passim*

Ex. 2, Override Determination (Redacted) ........................................................ *passim*

Ex. 3, National Space Transportation Policy ...................................................... *passim*

Ex. 4, ISS Memorandum of Understanding Between NASA and the Government of Japan........10

Ex. 5, ISS Memorandum of Understanding Between NASA and the European Space Agency ...10

Ex. 6, ISS Memorandum of Understanding Between NASA and the Canadian Space Agency ...10

Ex. 7, Julie Johnsson & Richard Clough, *Boeing-SpaceX Team Splits $6.8 Billion Space Taxi Award*, Bloomberg (Sept. 16, 2014), http://www.bloomberg.com/news/print/2014-09-16/boeing-spacex-team-split-space-taxi-award-lawmaker-says.html.....................................10

Ex. 8, NASA Office of Inspector General Report No. IG-13-019, NASA's Efforts to Maximize Research on the International Space Station (July 8, 2013) ...............................................10, 23

Ex. 9, CCtCap Fact Sheet ............................................................................11, 12

Ex. 10, *Commercial Crew Program*, NASA, http://www.nasa.gov/content/commercial-crew-program-the-essentials/#.VD2BivldVqP (last updated Oct. 3, 2014)...............................12, 26

Ex. 11, RFP Excerpts .........................................................................................12, 13

Ex. 12, CCtCap selection statement.................................................................13, 14, 30

Ex. 13, Stephanie Schierholz & Stephanie Martin, *NASA Chooses American Companies to Transport U.S. Astronauts to International Space Station*, NASA (Sept. 16, 2014), http://www.nasa.gov/press/2014/september/nasa-chooses-american-companies-to-transport-us-astronauts-to-international/#.VD2COvldVqM ..................................................................14

Ex. 14, Chris Bergin, *Dream Chaser suffers landing gear failure after first flight*, NASA Space Flight (Oct. 26, 2013), http://www.nasaspaceflight.com/2013/10/dream-chaser-landing-failure-first-flight/ ................................................................................................15

Ex. 15, Override Notification Letter to GAO .......................................................15, 19

Ex. 16, Notification of Authorization to Resume Performance ....................................15

Ex. 17, Chris Bergin, *Dream Chaser shows her flight – SNC protest CCtCap decision*, NASA Space Flight (Sept. 26, 2014), http://www.nasaspaceflight.com/2014/09/dream-chaser-fight-snc-protest-cctcap-decision/..............................................................................................29

Ex. 18, Testimony of Cristina T. Chaplain, Director of Acquisition and Sourcing Management, U.S. Government Accountability Office, "Challenges in Completing and Sustaining the International Space Station," GA0-08-581T, before the House Committee on Science and Technology, Subcommittee on Space and Aeronautics (April. 24, 2008).............................10

Ex. 19, Daniel Gordon, "NASA: Issues for Authorization, Appropriations, and Oversight in the 113th Congress," Congressional Research Service Report R43144 (July 11, 2013). .............10

Ex. 20, NASA Office of Inspector General Report No. IG-14-001, NASA's Management of the Commercial Crew Program (July 8, 2013) ...........................................................26

Boeing respectfully submits this Memorandum in Opposition to Plaintiff's Application for a Temporary Restraining Order (TRO).  Plaintiff has challenged NASA's considered judgment that urgent and compelling circumstances exist and it is in the best interests of the United States to proceed with efforts to end American reliance on Russia for human spaceflight to the International Space Station (ISS) as soon as possible.  For the reasons set forth below, NASA is uniquely well positioned as a matter of expertise and institutional competence to make that determination, and Plaintiff's arguments that it did so irrationally are simply wrong.  More to the point, as far as this particular filing is concerned, a TRO would be wholly inappropriate under the circumstances.  The Plaintiff has failed to demonstrate the compelling circumstances necessary to warrant such exceptional relief.  Not only has Plaintiff failed to show any likelihood of succeeding on the merits, it has shown no harm in the next several weeks that warrant the extraordinary remedy of a TRO while the Court addresses Plaintiff's requests for a declaratory judgment and preliminary and permanent injunctions.  Indeed, the absence of any immediate and irreparable harm is confirmed by the fact that it waited nearly a week before filing this action. Plaintiff's application should be denied.

## I.
## INTRODUCTION

On September 16, following a rigorous, multi-year, competitive procurement, the National Aeronautics and Space Administration (NASA) awarded Commercial Crew Transportation Capability (CCtCap) contracts to both The Boeing Company and Space Exploration Technologies (SpaceX), leaving Sierra Nevada Corporation (SNC) as the lone disappointed offeror.  Ten days later, SNC protested the award to the GAO, triggering the automatic stay of contract performance under the Competition in Contracting Act (CICA), 31 U.S.C. § 3553, preventing Boeing and SpaceX from performing critical work on an urgent

████████████████████████

contract to develop and certify new U.S. spacecraft in order to end the United States' current

dependence on Russian crew transport services to the International Space Station (ISS).  On

October 9, NASA overrode the CICA stay.  It was not until October 15—nearly a full week after

receiving NASA's written determination—that SNC filed its application for a TRO.

       This critical work is directed by Federal law, which requires NASA to rely on U.S.

commercial ISS crew vehicles "to the maximum extent practicable" and provides that it is

"essential" to develop a U.S. capability as "***rapidly***" and "***as soon as possible***."  42 U.S.C. §

18301(7), (10), (14).  The law states further that it is United States' policy to maintain an

"***uninterrupted capability for human space flight and operations***" as "an ***essential instrument***

***of national security***" and ***not*** to use foreign space capabilities (absent exceptional

circumstances).  *Id.* § 18311.  NASA is likewise required by agreements with the European

Space Agency, Canada, and Japan to "provide for or arrange for provision of crew rotation" and

"provide for or arrange for provisions of crew rescue capability."

       NASA's exclusive reliance since 2011 on the Russian Soyuz for transportation to and

from the ISS is untenable.  It does not meet United States needs because it cannot support a full

complement of seven astronauts for the ISS.  Moreover, in May 2014—just five short months

ago—"***Russia announced it will deny U.S. astronauts transportation to the [ISS]*** in response to

recent sanctions," with Russian Deputy Prime Minister Dmitry Rogozin stating: "After analyzing

the sanctions against our space industry, ***I suggest the U.S. delivers [sic] its astronauts to the***

***ISS with a trampoline***."  Ex. 1.  Mr. Rogozin stated further that "U.S. involvement is not

necessary for continued use of the station" and that "the Russian segment can exist

independently from the American one."  *Id.*  It is not difficult to understand, therefore, why both

the Legislature and the Executive have repeatedly determined that it is "critical" and "essential"

to develop "as rapidly as possible" a U.S. human spacecraft capability to shuttle U.S. and partner astronauts to the ISS.

In deciding to "override" the CICA stay here, NASA determined that it is plainly "in the best interests of the United States to continue performance" of the CCtCap contracts and "urgent and compelling circumstances exist that will significantly and adversely affect the interests of the U.S. unless the agency authorizes contract performance[.]"  Ex. 2 at 14.  Far from being "arbitrary and capricious," NASA's decision was based on extensive findings set forth in a 14-page, single-spaced document making clear that its decision to override the stay was the product of a rigorous, extensive consideration of all factors relevant to its decision.  They show that the override was essential to comply with Federal law, directing "that a United States capability be developed *as soon as possible*" for "human access to and from the ISS."  *Id.* at 2 (citing 42 U.S.C. § 18301).  NASA emphasized that suspending contract performance would jeopardize the development of a United States crew transport capability by 2017.  That would leave the United States in the unsustainable position of total dependence on the Russian Soyuz vehicle even after NASA's current contract with Russia for transportation services expires and at a time when procuring such services—a disfavored and challenging transaction under the best of circumstances—has become profoundly uncertain, given the international political environment.

Against this backdrop, SNC asks this Court to issue emergency injunctive relief, a declaration that NASA's determination was arbitrary and capricious, and a permanent injunction "prohibiting NASA from overriding the CICA stay . . . until such time as GAO has ruled on or otherwise resolved SNC's bid protest."  Compl. at 28 ¶ 4.[1]  SNC claims irreparable harm and

---

[1] This opposition addresses SNC's Application for a TRO on an expedited basis.  Upon issuance of the administrative record and a briefing schedule to address SNC's motion for a declaratory judgment and for a preliminary and permanent injunction, Boeing will provide further briefing.

asks this Court to set aside NASA's considered judgment that continued performance is vital to important national interests.  SNC has not only failed to offer any credible basis for challenging NASA's judgment, each of the factors relevant to the injunctive relief SNC has requested point in NASA's favor.

*First*, SNC cannot credibly show that NASA's exhaustive override determination is unlawful or irrational, as it must, to succeed on the merits of its claim.  That determination complies fully with the law, and SNC does not claim otherwise.  NASA's override decision also plainly passes the test of reason imposed by the APA's incorporation into the Tucker Act.  28 U.S.C. § 1491(b).  Indeed, NASA expressly—and thoroughly—addressed all of the factors identified in *Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705, 709 (2006), upon which some judges rely in examining override decisions.  Ex. 2 at 6-14 (examining significant adverse consequences, reasonable alternatives, cost considerations, and the impact on competition and the integrity of the procurement system).  NASA determined that urgent and compelling circumstances exist and the best interests of the United States are served by proceeding with performance for five principal reasons:

- Federal law requires "that a United States capability be developed as soon as possible" for "human access to and from the ISS" in order "to support full and complete utilization of the ISS," in which the United States and its partners have invested tens of billions of dollars, which capability shall be used "to the maximum extent practicable," *id.* at 2;

- "[A]ssured availability" of human space transportation is "essential for the safety of the international ISS crew" for medical and other reasons, and NASA currently does not have that capability; in addition, NASA's contract to use Russian Soyuz vehicles extends "only through the end of 2017," after which NASA will have no means of transportation to the ISS, *id.*;[2]

---

[2] Historically, it has taken roughly "three years to negotiate and prepare for launch" with Russia, and "[u]ncertainties in the international political environment may further complicate the ability to purchase future Soyuz services."  Ex. 2 at 3.

- Even today, with the lone Soyuz capability—which can transport only 3 people ███████████ and limits scientific research because it cannot bring experiments to earth—the ISS partners have a "single point of failure," which creates "significant risk to the safety of the crew . . . and to ISS mission assurance," requiring that "U.S. transportation vehicles [be] operational as soon as possible," *id.* at 3; indeed, NASA determined both contracts (not one) need to resume performance immediately in order to avoid the same risk, *id.* at 7;

- Because human spacecraft development and flight is "very complex and risky" and "historically has taken longer than anticipated," it is necessary to continue work immediately on the U.S. vehicles to enable readiness by the end of 2017, given the contractors' "compressed" schedules, *id.* at 3-5, 7; in fact, the key NASA review, from which the rest of the program flows (including the ability to order launches), must be completed in the first 90 days or there is virtually no chance of meeting the 2017 date, *id.* at 4-5;

- Without the new U.S. capability being operational after 2017, the United States risks breaching its obligations under international agreements to "provide or arrange for provision of crew rotation" and "crew rescue capability" for itself and its ISS partners (Japan, Europe, and Canada), *id.* at 9. [3]

In short, NASA's justification for commencing performance immediately, rather than waiting until 2015 for GAO to resolve SNC's protest, reasonably reflects NASA's and the Nation's needs and, indeed, makes clear that this is the only responsible approach for NASA to take. The penalty for delaying necessary work for three months (or likely considerably longer) would be unacceptable delays in fielding a domestic spaceflight capability until 2018 or later, the likely perpetuation of NASA's singular reliance on Russian space transport, and the breach of NASA's international obligations to its ISS partners.

---

[3] NASA considered (as an alternative to proceeding with performance of the underlying contract) the prospect of having to procure ISS crew transportation from Russia after 2017 but found it "uncertain" and "not a reasonable alternative" because that would be contrary to U.S. law and space policy, 51 U.S.C. § 50131(a); 42 U.S.C. § 18311, would require lead time of approximately three years, and would not accommodate a full complement of seven astronauts. Ex. 2 at 11. Moreover, given the international political environment, it would be inadvisable and contrary to the public interest for NASA to remain totally dependent on the Russian Soyuz for future crew transportation services.

████████████████████████████████████

*Second*, the balance of the harms plainly tips in favor of the United States, Boeing and SpaceX because enjoining performance now will compromise their ability to develop and certify a critical "crew transportation and emergency rescue capability as soon as possible, to ensure the safety of [the ISS] crew and [the U.S.] partners' crew, [to ensure] ISS mission assurance, and to meet [U.S.] international obligations." *Id.* at 1. The contractors must complete their respective Certification Baseline Reviews (CBR) within 90 days of award in order for the first mission to be authorized, and "[a]ll other work under the contract flows from this critical review." *Id.* at 8. "Delay in performing this work means the contractors will not meet the rest of the scheduled milestones that result in certification of the vehicles ready for ISS operational crew missions." *Id.* More specifically:

> A further 100 day delay in the CCtCap contract, especially when the critical milestone setting the foundation for certification of the vehicles is set to occur within the first 90 days of the contract, will result in a direct adverse impact on the crucial contract timeline. This delay also prevents obtaining long-lead items and requires workforce and subcontract stand-downs, which will create a more than day-for-day delay to restart and will impair the ability of the CCtCap contractors to meet NASA's needed mission dates. A massive effort will be necessary to expedite activities after the resolution of the protest to meet the 2017 schedule, which will be extremely difficult to achieve because the CCtCap contractors cannot expedite the acquisition and production of long lead items critical to both mission operations and launch of the crew vehicle. Failure to meet the planned ISS crew mission schedule significantly impacts the crew safety and operations of the ISS for the United States and its partners. This is not in the best interests of the United States.

*Id.* at 10-11. The harm from a performance injunction is plain.

Continued performance, on the other hand, permits the contractors to proceed with development work that has been ongoing since 2010 and keeps the entire Commercial Crew Program on schedule, increasing the odds that at least one of the current awardees will be able to meet NASA's 2017 goal (even in the unlikely event that GAO were to sustain SNC's protest and recommend corrective action that ultimately results in the displacement of one of the

Agreed-Upon Redacted Version

awardees).  SNC, in contrast, will suffer no harm, because NASA has expressly recognized that "a GAO decision could require re-competition," *id.* at 14, and if it did SNC would have the same opportunity to compete for award (if its protest is sustained) regardless of whether Boeing's and SpaceX's current development work under the CCtCap contract continues.  In the meantime, SNC continues its efforts under an extension of its Commercial Crew Integrated Capability (CCiCap) contract to verify, validate and mature its design, and it recently announced it will continue development in the hopes of winning a cargo-only role.

*Third,* and finally, the public interest lies in permitting performance to go forward.  Not only is it in the public interest for the Government to conduct procurements expeditiously and with as little judicial intrusion as possible into the government's discretion, the public interest in a new ISS spacecraft "as soon as possible" is articulated in Federal law, compliance with which is in the public interest.  By law, for example, this capability is "an essential instrument of *national security* and of the capacity to ensure continued United States participation in and leadership in the exploration and utilization of space."[4]  *Id.* at 3.  This weighs heavily against SNC's Application, as the Tucker Act mandates that this court "shall give due regard to the interests of national defense" in resolving protest-type cases like this one.  28 U.S.C. § 1491(b)(3).  SNC's request for a TRO should be denied.

## II.
## BACKGROUND

A.    **National Space Transportation Policy, Laws, and Agreements**

Congress passed the NASA Authorization Act of 2010—when the Space Shuttle was still operational—in which it made critical findings and policy pronouncements about the United States' commitment to human space transportation to the ISS.  Those findings include (a) the

---

[4] All emphasis is added unless otherwise noted.

commitment to rely on U.S. commercial ISS crew vehicles "to the maximum extent practicable,"

(b) that it is "essential" to develop a U.S. capability as "*rapidly*" and "*as soon as possible*," (c)

that U.S. policy is to maintain an "*uninterrupted capability for human space flight and*

*operations*" as "an *essential instrument of national security*," and (d) U.S. policy is *not* to use

foreign space capabilities (except in limited circumstances):

- "Crewmembers provide the essential component to ensure the return on investment from and the growth and safe operation of the ISS.  The Russian Soyuz vehicle has allowed continued human presence on the ISS for United States crewmembers with its ability to serve as both a routine and backup capability for crew delivery, rescue, and return.  With the impending retirement of the Space Shuttle, the United States will find itself with no national crew delivery and return system.  Without any other system, the United States and all the ISS partners will have no redundant system for human access to and from the ISS.  *It is therefore essential that a United States capability be developed as soon as possible*."  42 U.S.C. § 18301(7);

- "Congress restates its commitment . . . to the development of commercially developed launch and delivery systems to the ISS for crew and cargo missions. *Congress reaffirms that NASA shall make use of United States commercially provided ISS crew transfer and crew rescue services to the maximum extent practicable*." *Id.* § 18301(10); *see also* 51 U.S.C. § 70501(a)("POLICY STATEMENT.—It is the policy of the United States to possess the *capability for human access to space on a continuous basis*.").

- "The United States *must develop, as rapidly as possible*, replacement vehicles capable of providing both human and cargo launch capability to low-Earth orbit . . . ." 42 U.S.C. § 18301(14).

- "**(a) Use of non-United States human space flight transportation capabilities** It is the policy of the United States that reliance upon and use of non-United States human space flight capabilities shall be undertaken *only as a contingency* in circumstances where no United States-owned and operated human space flight capability is available, operational, and certified for flight by appropriate Federal agencies." *Id.* § 18311(a) (first emphasis in original).

- "**(b) United States human space flight capabilities** Congress reaffirms the policy . . . that the United States shall maintain an *uninterrupted capability for human space flight and operations in low-Earth orbit*, and beyond, as an *essential instrument of national security* and of the capacity to ensure continued United States participation and leadership in the exploration and utilization of space." *Id.* § 18311(b) (first emphasis in original).

Federal law likewise expressly requires the Government to procure ISS transportation from domestic, commercial providers, and to plan missions to accommodate those providers:

> **(a) In general.**--Except as otherwise provided in this section, the Federal ***Government shall acquire*** space transportation services from ***United States commercial providers*** whenever such services are required in the course of its activities.  To the maximum extent practicable, the Federal ***Government shall plan missions to accommodate*** the space transportation services capabilities of United States ***commercial providers***.

51 U.S.C. § 50131(a).  Exceptions exist in limited circumstances.

In November 2013—less than a year ago—the President set forth the National Space Transportation Policy (NSTP), the very first words of which are "[s]pace activities are critical to the ***Nation's*** technological advancement, scientific discovery, ***security***, and economic growth" and that "[s]pace transportation capabilities play a vital role in enabling these space activities by providing the United States with access to diverse regions of space." Ex. 3 at 1.  It mandates that the United States shall "[e]nable the capabilities to support human space transportation activities to and beyond low Earth orbit, ***including services to and from the [ISS]***." *Id.* at 2.  The NSTP provides further that NASA shall enter "partnerships with the private sector to develop safe, reliable, and cost effective commercial spaceflight capabilities for the transport of crew and cargo ***to and from the [ISS]***." *Id.* at 3.  It likewise requires agencies to "[p]urchase and use ***U.S. commercial space transportation*** capabilities and services . . . to the ***maximum extent practicable***." *Id.* at 4.

The United States also has entered a series of agreements with the European Space Agency, Canada, and Japan under which the United States is responsible for "crew rotation" and "rescue."  For example, its agreement with Japan requires that NASA will "provide or arrange for provision of crew rotation . . . to support [ISS] crew flight opportunities" and "provide or

Agreed-Upon Redacted Version

arrange for provision of crew rescue capability." Ex. 4, Japan Memorandum of Understanding (MOU) ¶¶ 6.1.a.22-23.  The United States is responsible for the same services with the European Space Agency, *see* Ex. 5, European Space Agency MOU ¶¶ 6.1.a.20-21, and Canada, *see* Ex. 6, Canadian Space Agency MOU ¶¶ 6.1.b.14-15.

**B.**    **NASA's Reliance on Russia's Soyuz Rocket**

Since the Space Shuttle was retired in 2011, NASA has been solely reliant on the Russian Soyuz vehicle to transport U.S. astronauts to the ISS, "an arrangement that . . . is entangled in tensions over the crisis in Ukraine."[5]  Soyuz missions are costly, at more than $75 million per seat, and that price has increased rapidly (from just $22 million in 2006).  Ex. 8 at 23.  And, as set forth above, the United States is contractually required to provide for (or arrange and pay for) transportation to the ISS for astronauts from Japan, Europe and Canada.  Ex. 2 at 14.  Russia's contract obligation to provide crew transportation services to the United States, however, extends only through 2017.  *See* Ex. 2 (passim).

The Soyuz has critical limitations that the CCtCap vehicles will not have.  The Russian Soyuz vehicles' "limited capabilities restrict the capacity of the station . . . and significantly limit the scientific research because the vehicles cannot bring experiments to earth for assessment." Ex. 18 at 13.  Indeed, the Soyuz can transport only three people, whereas the CCtCap minimum requirement is to transport 4 people.  *Id.* at 16.  While the ISS is designed to support a crew of up to seven astronauts, it currently operates at a maximum of six, so that the crew can be evacuated in an emergency using two Soyuz vehicles.  The CCtCap vehicles would permit the full complement of seven astronauts, which could "add about 33 hours of crew research time per week—nearly double the current amount."  Ex. 19 at 11.  Moreover, in order to permit payments

---

[5] *See* Ex. 7.

Agreed-Upon Redacted Version

to Russia for Soyuz flights, Congress was forced to extend a waiver of the Iran, North Korea, and Syria Nonproliferation Act (P.L. 106-178 as amended), which would need to be extended even longer if the United States were forced to try to contract for additional Soyuz launches after 2017—an alternative "[m]any policymakers consider . . . an inherently unattractive option."  *Id.* at 21.

In May 2014, moreover, "***Russia announced it will deny U.S. astronauts transportation to the [ISS]*** in response to recent sanctions," with Russian Deputy Prime Minister Dmitry Rogozin stating: "After analyzing the sanctions against our space industry, I suggest the ***U.S. delivers [sic] its astronauts to the ISS with a trampoline***."  Ex. 1.  Mr. Rogozin stated further that "U.S. involvement is not necessary for continued use of the [ISS]" and that "the Russian segment can exist independently from the American one. The U.S. one cannot."  *Id.*

**C.      NASA's Commercial Crew Program**

NASA's Commercial Crew Program (CCP) was formed to facilitate the development of a U.S. commercial crew space transportation capability with the goal of achieving safe, reliable and cost-effective access to and from the [ISS] and low-Earth orbit."  Ex. 9 (CCtCap Fact Sheet). The CCP will "accelerate" commercial transportation capabilities and "reduce the gap in American spaceflight capabilities" by combining NASA's expertise with efficiencies and best practices from the private sector, facilitated by NASA investment.  *Id.*

Beginning in 2010—the year NASA's Authorization Act established that it is ***essential that the United States establish an uninterrupted capability for human space flight and operations to the ISS "as rapidly" and "as soon as possible"***—NASA entered a series of Space Act Agreements with several commercial companies, including Boeing, SpaceX and SNC, to stimulate private development and demonstration of safe, reliable and cost-effective crew transportation capabilities.  These included two rounds of Commercial Crew Development

Agreed-Upon Redacted Version

agreements and a Commercial Crew Integrated Capability (CCiCap) agreement for the

companies to pursue the development of fully integrated manned spaceflight systems, including

tests to verify, validate and mature their designs.  *See* Exs. 9-10.  All told, NASA invested more

than $1.5 billion in these Space Act Agreements to incubate commercial capabilities.  In

December 2012, NASA issued Certification Products Contracts (CPC), representing Phase 1 of

the current CCP, to Boeing, SpaceX and SNC to develop data products to implement the

agency's flight safety and performance requirements for their space system solutions, including

the spacecraft, launch vehicle, and ground and mission operations.  Ex. 10.  The critical public

need for a domestic crewed spaceflight capability was reaffirmed in the November 2013 NSTP.

Ex. 3.

**D.**     **Commercial Crew Transportation Capability Contracts**

        On November 19, 2013, NASA issued Solicitation NNK14467515R (Solicitation) for

CCtCap, "the second phase of a phased acquisition strategy to develop a U.S. commercial crew

space transportation capability to achieve safe, reliable and cost effective access to and from the

[ISS] with a goal of ***no later than 2017***."  Ex. 11 (RFP excerpts) at 1.  ***The RFP emphasized the***

***importance of satisfying the 2017 goal time and again***:

- In the CCtCap "Contract Executive Summary" that was issued in the cover letter
  to offerors with the Solicitation, the introductory sentence informed offerors that
  "[t]he [CCtCap] contract is the second phase of a phased acquisition strategy to
  develop a U.S. commercial crew space transportation capability to achieve safe,
  reliable and cost effective access to and from the International Space Station (ISS)
  with ***a goal of no later than 2017."  See id.***, RFP Executive Summary.

- Section C.1 of the Solicitation, "Specifications/Statement of Work," stated that
  "[t]he purpose of the [CCP] is to facilitate the development of a U.S. commercial
  crew space transportation capability with the goal of achieving safe, reliable and
  cost effective access to and from low Earth orbit (LEO) including the
  International Space Station (ISS) ***no later than 2017***."  *Id.* § C.1.

- Section L instructed offerors to show in their proposals "how they will advance the Design, Development, Test, and Evaluation (DDTE), production and operational aspects of certification through the required Certification Milestone Reviews, which lead to NASA's certification of the CTS with a ***goal of NLT 2017***." *Id.* § L.20-1, TA01(a).

- In Section M, the Solicitation informed offerors that it would evaluate "[t]he Offeror's technical approach to obtain NASA certification of a Crew Transportation System (CTS) with a goal of ***NLT 2017***." *Id.* § M.2.I.  It also stated that the evaluation "will consider the Offeror's approach to meet contract requirements and objectives to achieve NASA certification with a ***goal of NLT 2017***." *Id.* § M.2.I, TA01(a).

SNC understood the importance of having a certified space vehicle by 2017; indeed, it proposed to do just that.  Ex. 12, CCtCap Source Selection Statement at 21.

The Solicitation requested proposals for the final Design, Development, Test, and Evaluation activities necessary to achieve NASA flight certification, along with a minimum of two, and up to six Post Certification Missions.  Ex. 11.  NASA established three evaluation factors:  Mission Suitability, Price, and Past Performance.  *Id.* § M.  Mission Suitability and Past Performance, when combined, were equal to Price; Price was more important than Mission Suitability, which was more important than Past Performance.  *Id.*

On September 16, 2014, NASA selected Boeing and SpaceX as the two CCtCap contract awardees.  In an exhaustive, 29-page selection decision prepared by one of NASA's most senior and experienced administrators (William H. Gerstenmaier, the Associate Administrator for the Human Exploration and Operations Directorate), NASA determined that Boeing's and SpaceX's proposals represented the best value to the Government.

Boeing received the highest ratings of any offeror in the Mission Suitability and Past Performance factors.  The SSA determined that Boeing proposed the "most useful inherent capabilities for operational flexibility" because its space vehicle could transport more crew and cargo than either competitor.  Ex. 12 at 28.  Boeing also proposed a mature design and "the most

well-defined plan" for addressing design, development and certification issues, leading the SSA to conclude that Boeing proposed the least schedule risk.  *Id.*  Despite Boeing's higher price than SNC, the SSA concluded that "Boeing's superior proposal" was "worth the additional price in comparison to the SNC proposal."  *Id.* at 29.  SpaceX proposed a substantially lower price and had the same overall ratings as SNC in Mission Suitability and Past Performance.

SNC was viewed by the SSA as presenting material risks that undermined its ability to satisfy NASA's goal of certifying SNC's proposed system no later than 2017.  Not only did the SSA view SNC's proposed design as the most "complex," SNC had the lowest-rated Mission Suitability proposal and the "lowest level of maturity" for its proposed system.  *Id.*  SNC not only proposed "the longest schedule for completing certification," it also had the most schedule risk, leading the SSA to find that SNC was "likely to further extend its schedule beyond 2017." *Id.*  Given these technical and schedule risks, SNC was not viewed as a better value than Boeing or SpaceX; indeed, NASA's award announcement expressed its confidence both Boeing and SpaceX (unlike SNC) will succeed in relieving the nation's dependence on Russia by 2017:

> From day one, the Obama Administration made clear that the greatest nation on Earth should not be dependent on other nations to get into space," NASA Administrator Charlie Bolden said at the agency's Kennedy Space Center in Florida.  "Thanks to the leadership of President Obama, the hard work of our NASA and industry teams, and support from Congress, today we are one step closer to launching our astronauts from U.S. soil on American spacecraft and ending the nation's sole reliance on Russia by 2017. Turning over low-Earth orbit transportation to private industry will also allow NASA to focus on an even more ambitious mission – sending humans to Mars.

Ex. 13.

### E.    SNC's Protest, The Automatic Stay, and NASA's Override Decision

On September 26, 2014, SNC filed a protest challenging NASA's awards to Boeing and SpaceX at GAO.  Throughout its "kitchen-sink" protest—which spans 92 pages and challenges virtually every aspect of NASA's comprehensive evaluation process—SNC repeatedly

Agreed-Upon Redacted Version

substitutes its own judgment for that of NASA's experts, claiming that it proposed a superior design,[6] ***despite the SSA's explicit findings to the contrary***.  After GAO notified NASA of the protest, NASA implemented CICA's "automatic stay" and issued stop work orders to Boeing and SpaceX.  This brought design, development, testing and certification work under the Commercial Crew Program to a halt for both contractors.

On October 9, 2014, NASA exercised its discretion under CICA to override the stay of performance and permit Boeing and SpaceX to continue their contractual design and development efforts, which had been ongoing since 2010.  NASA determined both that urgent and compelling circumstances existed and that it was in the best interests of the United States to override the automatic stay as permitted by CICA, 31 U.S.C. 3553(c).  Ex. 2.  The override was executed on October 9, 2014, and NASA notified GAO of the override, Ex. 15, and lifted the stay, Ex. 16.

The override determination first lays out the pressing need for a U.S. commercial crew transportation capability.  Ex. 2 at 1-3.  It identifies the investment of tens of billions of dollars in the ISS and the NASA 2010 Authorization Act's policy of "full and complete utilization of the ISS," which requires a redundant system for human access to and from the ISS independent of the Russian Soyuz, stating that it is "essential that a United States capability be developed ***as soon as possible***" to ensure "ISS mission assurance and safety."  *Id.* at 2.  It quotes further the 2010 Act's mandate that "NASA shall make use of United States commercially provided ISS crew transfer and crew rescue services to the ***maximum extent practicable.***"  *Id.*  NASA also cites its international agreements that require the United States to provide human crew

---

[6] SNC alleges issues with Boeing's and SpaceX's offerings, but it nowhere acknowledges its own landing gear failure in October 2013 that resulted in the craft flipping over on the runway upon landing.  Ex. 14.

Agreed-Upon Redacted Version

transportation to and from the ISS for both itself and for Japan, Europe and Canada.  *Id.*

Moreover. Congress and the President have directed the designation of the ISS as an

"international scientific research lab," which requires an expanded crew size that the Soyuz

cannot meet but that the CCtCap vehicles can meet.  *Id.* at 7.

      The determination emphasizes that the U.S. currently has no crew transportation vehicle,

and that Russia's obligation to provide transportation on the Soyuz ends in 2017, after which

there are no existing ISS crew transportation means.  *Id.*  While it is possible to seek additional

Soyuz "rides," they do not meet the Government's needs, have taken three years to negotiate and

to prepare, and they are not authorized unless a domestic capability is unavailable.  *Id.* at 2-3.

(Here, both SpaceX and Boeing are expected to have capabilities by 2017.)  Moreover, even the

present reliance on the Soyuz perpetuates the current "single point of failure" environment,

which is "unacceptable for safe operation of the ISS."  *Id.* at 3.  Thus, "it is necessary and in the

Government's best interests to ensure other, U.S. transportation vehicles are operational ***as soon***

***as possible***."  *Id.*

      NASA states that given the complexity and risk inherent in human spaceflight,

development, production and testing, it "historically has taken longer than anticipated."  *Id.*

Indeed, NASA has strict safety standards to which the vehicles must be certified.  Therefore, it is

"necessary and in the Government's best interests to continue work immediately on the U.S.

vehicles to enable their readiness when needed by the U.S. and its ISS partners."  *Id.*  This is

especially true given the mandate in the 2010 Authorization Act that the United States "shall

maintain an uninterrupted capability for human space flight and operation in low-Earth orbit, and

beyond, as an ***essential instrument of national security***."  *Id.* (citing 42 U.S.C. § 18311(b)).

Agreed-Upon Redacted Version

At bottom, "[c]ontinued performance of the CCtCap contract is ***critical*** to ensure the safety of the ISS crew, the operation of the ISS, and to meet international obligations." *Id.* at 6. This is especially true where, as here, "production schedules for the CCtCap contractors are very compressed and very challenging," such that "[w]ork must begin immediately on critical path activities in order for the vehicles to reach the point in the certification process where service missions can be ordered and to complete the safety certification in time for missions to launch after 2017." *Id.* at 7. "Given the lead time required . . . , there is no reasonable alternative to continuing with CCtCap performance that will meet the ISS needs." *Id.* On October 10, 2014, the United States, SpaceX and Boeing consented to the release of a lightly redacted version of the determination to SNC. This action followed.

**III.**
**ARGUMENT**

**A.** **Standard of Review**

SNC seeks a TRO (as well as a declaratory judgment and preliminary and permanent injunctive relief). *See* Compl. at 28. It seeks not just a declaration that the override decision at issue here is arbitrary and capricious, it asks this court to issue a TRO and ultimately a permanent injunction "***prohibiting*** NASA from overriding the CICA stay of performance of the CCtCap contracts to Boeing or SpaceX or otherwise permitting Boeing or SpaceX to commence or continue performing the contract." *Id.* ¶ 4. In other words, SNC asks this Court to hold that there are literally no circumstances under which NASA could override the automatic stay.

Injunctive relief, such as a TRO, is a "drastic and extraordinary remedy that is not to be routinely granted." *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993). The Court must determine whether SNC has shouldered its burden to establish entitlement to injunctive relief by assessing: (i) whether it is likely to prevail on the merits; (ii) whether it will

suffer irreparable harm absent an injunction; (iii) whether its harms outweigh those of the

Government and relevant third parties; and (iv) whether the public interest favors injunctive

relief.  *See Cherokee Nation Techs., LLC v. United States*, 116 Fed. Cl. 636, 639 (2014).

Because injunctive relief is an unusual and burdensome remedy, a plaintiff must "demonstrate

that its right to such relief is clear."  *Reilly's Wholesale Produce*, 73 Fed. Cl. at 709.  In an

override case like this one, the Court reviews the Agency's justification and rationale for

overriding the stay, not the merits of the GAO protest.  *PMTech, Inc. v. United States*, 95 Fed.

Cl. 330, 348-39 (2010).  Because SNC has not satisfied its burden to show that the Court should

find in its favor on any of the four factors, its Application should be denied.

**B.      SNC Is Unlikely to Prevail on the Merits of Its Challenge to the Legality and
          Reasonableness of NASA's Override Decision.**

SNC must show that it is more likely than not to succeed on the merits to obtain a TRO.

*KWV, Inc. v. United States*, 108 Fed. Cl. 448, 455 (2013).  In rendering this assessment, the

Court applies the APA's standard, so that it may set aside an agency's determination only if it is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *E.g.*,

*Beechcraft Def. Co. LLC v. United States*, 111 Fed. Cl. 24, 30 (2013).  Stated simply, the court

reviews whether the decision is unlawful or irrational; that is, whether it "was based on a

consideration of the relevant factors and whether there has been a clear error in judgment by the

agency."  *Automation Techs., Inc. v. United States*, 72 Fed. Cl. 723, 727 (2006) (internal

quotations omitted).  Because SNC has not made this showing, the Court should deny its

Application.

First, there can be no legitimate question that NASA's exercise of its discretion to

override the stay complied with the law.  Indeed, ***SNC does not claim otherwise.***  CICA permits

an override when the procuring agency makes the determination that (1) continued performance

is in the "***best interests*** of the United States"[7] or (2) "***urgent and compelling*** circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest."  31 U.S.C. § 3553(d)(3)(C).  Here, the duly executed override determination rested on both grounds. Ex. 2 at 14.  NASA also is required to notify GAO of the override in order to reauthorize performance, which it did.  Ex. 15.  The override complies fully with the law.

It likewise satisfies the test of reason.  In fourteen single-spaced pages, Messsrs. McNally and Gerstenmaier set forth the urgent need for a U.S. spaceflight capability:

- Federal law mandates that "capability . . . as soon as possible" to enable the "full and complete utilization of the ISS," in which the United States and its partners have invested tens of billions of dollars, Ex. 2 at 2;

- That capability, which NASA currently does not have, is "essential for the safety of the international ISS crew," and NASA's reliance on Russian Soyuz vehicles extends "only through the end of 2017," after which NASA will have no means of transportation to the ISS—moreover, negotiations with Russia (and preparations for Soyuz launches) take roughly three years and likely would be complicated by political "[u]ncertainties," *id.* at 2-3;

- Even with the Soyuz, there is still a "single point of failure," creating "significant risk to the safety of the crew . . . and to ISS mission assurance," requiring a U.S. capability to be "operational as soon as possible," *id.* at 3;

- While both Boeing and SpaceX are expected to have certified space transportation vehicles in 2017, given the complexity and risk of human spacecraft development, and the fact that it usually "take[s] longer than anticipated," CCtCap performance

---

[7] The justiciability of a challenge to an agency's determination to override a stay on the basis of the "best interests" of the Government has been unsettled.  *Compare Topgallant Group, Inc. v. United States*, 704 F. Supp. 265, 266 (D.D.C.1988) (finding that an override decision was "based upon a discretionary determination of the best interests of the United States, and as such, is not reviewable in this Court") *with Samson Tug & Barge Co. v. United States*, 695 F. Supp. 25, 27 (D.D.C.1988) (finding that a decision to continue with contract performance was subject to review because there were meaningful standards against which to judge the agency's exercise of discretion).  Although the Court of Federal Claims in *PGBA, LLC v. United States*, 57 Fed. Cl. 655, 659-60 (2003), held that such determinations are justiciable, Boeing respectfully submits that they are not because they are committed to agency discretion.  Regardless, even if "best interests" determinations are justiciable, NASA's determination here plainly satisfies the arbitrary and capricious standard.

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

is necessary immediately to enable readiness by the end of 2017, given the contractors' "compressed" schedules and the fact that the key CBR review, on which the rest of the program depends, must be completed in the first 90 days or there is no chance of meeting the 2017 goal, *id.* at 3-5;

- With the possibility that neither the Soyuz nor a U.S. capability will be available after 2017, the United States risks breaching its international obligations to "provide or arrange for provision of crew rotation" and "crew rescue capability" for itself and its ISS partners (Japan, Europe, and Canada), *id.* at 9.

NASA aptly concluded: "In summary, . . . failure to provide the CCtCap transportation service as soon as possible poses a safety risk to the ISS crew, jeopardizes continued operation of the ISS, would delay meeting critical crew size, and may result in the U.S. failing to perform the commitments it made in its international agreements." *Id.* at 7. This assessment not only satisfies the test of rationality, it is plainly correct.

NASA went even further, however, analyzing the four factors identified in *Reilly's Wholesale Produce*, 73 Fed. Cl. at 711,[8] which some COFC judges assess when considering whether an Agency has reasonably exercised its discretion to override the automatic stay:

- <u>Significant adverse consequences if the stay is not overridden</u>: The Determination lays out numerous reasons that, absent immediate performance, there is a strong likelihood of a delay in a new ISS crew spacecraft beyond 2017—including the failure to perform in the first 90 days the CBR activities that will permit the ordering of launches that have lead times of 2-3 years. This jeopardizes the safety of ISS astronauts, prolongs reliance on a single point of failure (the risk of which is compounded by political uncertainties with Russia), and "jeopardizes United States' compliance with its existing, binding international agreements." Ex. 1 at 7-11.

- <u>Reasonable alternatives to the override</u>: The agency explained that this is "not a situation where the Government has an existing contract with an incumbent

---

[8] The *Reilly's Wholesale* factors are not based in statute, which requires only that an agency's override decision be grounded in law and reason, 28 U.S.C. § 1491(b), nor has the Federal Circuit held that they are mandatory. *See, e.g., PMTech, Inc.*, 95 Fed. Cl. at 349 ("[T]he court found nothing in CICA, or in relevant FAR provisions, to indicate that Congress identified any specific factors that an agency may not consider when deciding whether or not to override a CICA stay on the basis of 'urgent and compelling circumstances.'"). Regardless, NASA thoroughly and rationally analyzed these factors here.

Agreed-Upon Redacted Version

contractor that could be used or extended as a bridge contract until the CCtCap protest is resolved," and it determined that procuring additional Soyuz launches from Russia is uncertain and not a reasonable alternative because (a) it is contrary to U.S. law and space policy, (b) contract negotiation and launch preparation takes approximately three years (and likely would be complicated by political "uncertainties"), and, (c) it could not accommodate the full ISS crew complement. Moreover, the Orion vehicle, which is currently under development, will not be "operational for human missions until 2021." *Id.* at 11-12.

- Potential cost of proceeding with the override: The agency considered the impact of a sustained protest versus the benefits of continuing performance and determined the benefits outweighed those costs because funding at this point is limited, which will limit any termination liability.  Further, the costs of having to restart the competition in the event GAO makes that recommendation "are outweighed by the benefits to the Government and avoidance of the adverse consequences" NASA identified.  Likewise, even if NASA could contract for more Soyuz flights, the cost would be extremely high ($76.3M per astronaut) and be paid to Russia rather than American companies, which is not in the nation's interest.  *Id.* at 12-13.

- Override impact on competition and integrity of the procurement system: The agency acknowledged the importance of the CICA stay provision, but it also recognized the critical nature of the CICA override provision pertinent here, "where an agency will necessarily face significant adverse consequences if contract performance is suspended." It concluded that "the benefits of avoiding the adverse consequences [cited], and the best interests of the United States in ensuring ISS crew safety and operations consistent with its international obligations, outweighs  the impact on the procurement process and potential monetary and programmatic consequences of overriding the contract suspension." *Id.* at 13-14.

*See Reilly's Wholesale Produce*, 73 Fed. Cl. at 711.  In short, NASA considered all relevant factors and made a highly technical and highly discretionary judgment to override the stay, which it has described in a thorough and well-reasoned document.

SNC's arguments challenging the merits of the Agency's override determination are shockingly tone deaf and repeatedly ignore the fundamental purpose and goal of the entire CCtCap mission and years of U.S. space policy.  SNC belittles the urgency of NASA's objectives by advancing a series of allegations that merely disagree with NASA's reasonable conclusions and substitute SNC for the role of National Science and Foreign Policy Director.

None of SNC's repeated disagreements with NASA's judgment, however, demonstrates that NASA's exercise of this judgment was arbitrary, capricious, or a clear error in judgment:

> **1.    Continued reliance on Russian Soyuz launches is not a "reasonable" alternative.**

A serial thread in SNC's Complaint and Application is that NASA has a reasonable alternative to overriding the stay because it can extend its reliance on Russian Soyuz rides to preserve access to the ISS in 2018 and beyond.  Indeed, the premise of SNC's argument is that the goal of achieving safe, reliable and cost effective access to and from the ISS by no later than 2017, a goal it proposed to meet, is actually unachievable.  *See, e.g.*, Complaint at 11 ¶ 34 ("The only prudent course for NASA, now, is to use the statutory authority it has to obtain additional flights using the Russian Soyuz vehicle so that it covers the at-risk period after 2017 and before the CCtCap spacecraft can be employed . . . .").  Even if NASA could contract with Russia for seats on the Soyuz beyond 2017, however, that does not mean that continued reliance would be a reasonable alternative to developing NASA's own domestic capability.  NASA clearly concluded that continued reliance on Russia any more than is absolutely necessary was ***not*** a reasonable alternative and was not in the national interest.  *See* Ex. 2 at 11 (continued reliance on Soyuz "is uncertain and is not a reasonable alternative").

The Agency expressed concern that "[u]ncertainties in the international political environment may . . . complicate the ability to purchase future Soyuz services."  Ex. 2 at 3.  Indeed, less than six months ago the Deputy Prime Minister of Russia indicated amid international tension that the United States should "deliver its astronauts to the ISS with a trampoline," instead of Russia continuing to agree to ferry them to the ISS on Soyuz.  Ex. 1.  Furthermore, Russia continues to exact increasingly higher prices from the United States each time NASA is forced to renegotiate—approximately $56 million per seat in 2014, up to

approximately $60 million in 2015, and up to $76.3 million under the current agreement, which is more than triple the cost ($22 million) that Russia charged in 2006.  Ex. 8 at 23; Ex. 2 at 13.

Even at those prices, however, the Soyuz does not meet the Government's needs. Because it only permits three astronauts per flight, two Soyuz vehicles can accommodate only a total ISS crew of six astronauts, instead of the full complement of seven.  The CCtCap vehicles, on the other hand, would accommodate a full crew.  Moreover, Congress and the President have instructed that the ISS function as an international research lab, which requires a greater crew size that the Soyuz cannot accommodate.  With just one more astronaut on the ISS, scientific research will double.

NASA and its contractors expect fully to have certified platforms in 2017, which will relieve the United States of its reliance on the Soyuz and eliminate the significant risk attendant on uncertainties in U.S. relations with Russia.  But, this is a development program, and an 87-day performance delay will push that certification into 2018, which is totally incompatible with the urgent and compelling need—reflected in Federal law—to have a certified spacecraft "as rapidly" and "as soon as possible" and no later than 2017; and such a delay certainly is not in the United States' interests.

**2.      Continued reliance on a single point of failure is not a "reasonable" alternative.**

SNC does not dispute that reliance on Soyuz missions poses the risk of a single point of failure to NASA crew and missions.   Instead, SNC advances the *non sequitur* that it will be fine for NASA to continue to rely on the Soyuz capability for years to come, because that is the same position that NASA has already been forced to accept for the last three years.  *See* SNC Application at 14-15; 16 n.7 ("[A]ll of the ISS partners, NASA included, have successfully relied upon Russia's Soyuz vehicle as the single source for ISS crew transport for years.").  Nonsense.

Agreed-Upon Redacted Version

The fact that NASA has been captive to a flawed, single point of failure solution since the

retirement of the Space Shuttle does not mean that continuing in that position is a reasonable

alternative to NASA's statutory mandate to pursue a new, redundant capability to relieve the

nation's dependence on a single point of failure "as soon as possible."  Nor does NASA have to

point to an historic failure to substantiate this risk.  *See Savantage Fin. Servs., Inc. v. United

States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (quoting *CHE Consulting, Inc. v. United States*, 552

F.3d 1351, 1355 (Fed. Cir. 2008) ("As we have held, an agency 'has no obligation to point to

past experiences substantiating its concerns in order to survive rational basis review . . . as CICA

does not require the agency to supply a historical record of failures to substantiate a risk.'");

*CHE Consulting, Inc. v. United States*, 552 F.3d 1351, 1355 (Fed. Cir. 2008) (explaining that

agencies have "a responsibility to assess risks and avoid them before they become a historical

fact").  SNC's contention that there is no reason "why this longstanding practice must change" is

at odds with national policy, statute, and NASA's concern regarding continued safety and

mission assurance under the status quo.

> **3.      A delay of 87 days—and likely many more—is not "brief" and it would
> frustrate NASA's compliance with its statutory mandate.**

A delay of 87 days would frustrate the federal mandate to obtain a commercial crew

capability "as soon as possible."  While SNC repeatedly suggests that the delay is brief in

comparison to the length of the overall program, suggesting that the 3-month period of the

automatic stay would be *de minimis*, that is far from the case.  NASA concluded that work must

begin immediately in order for the program to meet NASA's 2017 certification milestones, Ex. 2

at 7, and SNC does not dispute that conclusion.  While SNC believes that the Court should

minimize the impact of the 3-month automatic stay period, the impact of the stay would be

absolute: ***no contractor*** would be able to achieve the 2017 target if work is stalled through

January 2015.  Even if there were only a day-for-day schedule slip, that would still be a 3-month delay out of a total development period of only 39 months until the end of 2017.  Losing the critical three-month period before January 5 would push every initial program milestone into 2015, leaving fewer than 36 months to complete the work.

While SNC suggests that contractors could accelerate their work or recapture schedule losses to make up the lost time, the opposite is actually true, as NASA determined.  Stalling performance has a perverse impact on the schedule that imposes far more than a day-for-day schedule slip.  The contractor cannot simply pick up on January 5 (or some other day) at the same point it leaves off when a stop-work order is issued.  After the stay is lifted, contractors must reengage suppliers and renew orders for long-lead items; program personnel that have been terminated, furloughed, or reassigned during the stop-work period must be rehired (or replaced), recalled, or returned to assignment; launch windows for test flights must be renegotiated and rescheduled; and the list goes on.  *See, e.g.*, Ex. 2 at 10-11 ("This delay . . . will create a more than day-for-day delay to restart . . . .").  Hence, the overall schedule impact of a stay of performance on a program like this would be far more severe than just the 87 days of the stay.

### 4.     NASA Has Not Delayed Efforts To Develop A Commercial Crew Capability.

SNC repeatedly contends that NASA's "decade-long approach to manned spaceflights" undermines its justification that the override is in the best interests of the United States and is, in fact, an urgent need.  *See, e.g.*, SNC Application at 14 ("If the need for a U.S. crew transportation capability was truly so acute, NASA would have acted long ago and not . . . chosen to rely on the Soyuz vehicle for years.").  This allegation is belied by the record of NASA's years-long development effort, which shows that NASA has aggressively pursued a domestic crew capability, all the more so once federal statute in 2010 made the rapid acquisition of such a capability a national priority.  NASA's advance planning commenced as early as 2005,

when NASA "created the Commercial Crew and Cargo Program Office." Ex. 20 at 1. Since

2010, NASA has invested nearly $1.5 billion in Space Act agreements to incubate a commercial

capability, and moved rapidly to FAR-based contracts for Phase I of the CCtCap program (the

Certification Products Contract), where it invested another $30 million to sponsor development

by Boeing, SpaceX and SNC of data products that would be necessary to implement NASA's

flight safety and performance requirements. [9] *See* Ex. 10. SNC seems to suggest that the current

CCtCap contract is a new stand-alone response to a problem that has been a decade in the

making, arguing that NASA should have initiated CCtCap earlier if it had "genuine" concerns

about the lack of a domestic transport capability. But the long history of NASA's significant

investment in commercial development belies that allegation, and confirms that CCtCap is not

the first, but rather the *last* step in an aggressive effort to revitalize American crewed spaceflight

capabilities.

Nor is there any merit to SNC's suggestion that NASA "bears some responsibility for the

present situation" because it announced the award ten months after initial proposal submission.

SNC Application at 18 and n.8. To the contrary, following the receipt of proposals, NASA

engaged in a rigorous evaluation that included multiple rounds of discussions and exchanges

with offerors. Moreover, the evaluation coincided with NASA's evaluation and feedback to the

offerors on the Phase I Certification Products submissions, which NASA furnished to offerors

during the summer (June-July), for the offerors to address in their Final Phase II CCtCap

proposals. Finally, the CCtCap contract awards coincided with the expiration/completion of the

---

[9] This aggressive investment in a domestic capability also belies SNC's contention that historic
Congressional funding does not support NASA's justification for the override. See SNC
Application at 16. SNC points to the fact that Congress "provided $300 million less than the
Administration's request" in 2012-2013, but that is hardly surprising in the era of fiscal restraint,
sequester, and political debate over government spending writ large during the same period.
Nearly all federal programs, regardless of significance, experienced budget reductions or
received less-than-optimal funding.

Phase I contracts, which ended the same week that Phase II began.  In other words, there is no merit to SNC's suggestion that NASA manufactured a need to override the stay by stalling the Phase II contract award.

**5.    SNC's contention that the final contract milestones may be years away does not diminish the importance of work and milestones that lie immediately ahead.**

In a similar vein, SNC alleges that there is no urgency or interest to the United States in pursuing contract performance now, because there may be "billions of dollars and years of activity" before the contractors achieve flight certification milestones.  SNC's disagreement does not overcome NASA's reasonable conclusion that there are critical path milestones in the near term that must be accomplished to permit the contractors to commence further work towards later milestones.  *See, e.g.*, *Alion Sci. & Tech. Corp. v. United States*, 69 Fed. Cl. 14, 26-27 (2005) (upholding override even though critical meeting requiring contractor service was two years away, where key interim work was required to successfully meet the agency's mission needs).

**6.    SNC exaggerates the cost and undermines the benefits of the override.**

SNC argues that the aggregate potential cost impact of the stay would be $258.6 million because GAO could recommend that it would "be necessary to cancel both the Boeing and SpaceX contracts."  SNC Application at 23.  This exaggeration is inconsistent with SNC's concession that it is seeking to displace only *one* of the two current awardees.  SNC Application at 3 ("SNC believes that NASA should have chosen it as one of the two U.S. commercial crew providers.").  By overriding the stay, NASA retains the possibility that, even in the event GAO sustains SNC's protest, NASA has a reasonable chance of having at least one contractor achieve NASA's 2017 milestone.  The consequences of the alternative are clear: NASA could potentially save, at most $129.3 million by staying performance in the event that GAO sustains the protest,

corrective action is taken, **and** one of the two current contractors is displaced.  But, NASA would forego the possibility of having *any* contractor achieve the 2017 milestone.  NASA has carefully considered this cost/benefit tradeoff and determined that it is in the nation's interest to continue to invest in both contractors, regardless of the outcome at GAO.  *See* Ex. 2 at 12-13.  That risk is functionally no different from the one that NASA previously assumed when it invested nearly $360 million in SNC's "Dream Chaser" from 2010 to 2014.  *See* SNC Application at 5.

SNC's effort to second-guess NASA's judgment should be denied.  *See Planetspace Inc. v. United States*, 86 Fed. Cl. 566, 568 (2009) (upholding NASA's override justified by "reference to Presidential policy decisions concerning the shuttle program and international commitments pertaining to the space station").  This is especially true here, where SNC could hope, at best, to displace only one of the two awardees, yet the automatic stay halted ***all work*** on both Boeing's and SpaceX's CCtCap contracts, effectively stalling the last leg of a vital development program that NASA has vigorously pursued for more than four years.  SNC is unlikely to prevail in its challenge.

C.      **The Balance of the Harms Counsels in Favor of Denying SNC's Application.**

"In considering the balance of the hardships, this court weighs the ***irreparable harm*** plaintiffs would suffer absent an injunction against the harm such an injunction may inflict on defendant and defendant-intervenors."  *WRH Grp., Inc. v. United States*, 115 Fed. Cl. 386, 404 (2014).  Here, the harms to the United States, Boeing and SpaceX far outweigh any potential harm to SNC for at least three reasons.

First, the harm from enjoining performance is pronounced.  The CBRs would not be completed in the first 90 days, delaying the ability of NASA to order launches, which would push them at least into 2018, after the expiration of Russia's obligation to provide Soyuz vehicles to ferry astronauts and cargo to the ISS.  This would extend NASA's total dependent on Russian

Agreed-Upon Redacted Version

transportation and could cause NASA to breach its international obligations by failing to furnish

any transportation (let alone transportation for the larger crew that will be accommodated under

the CCtCap contracts) for itself and its partners to and from the ISS.  This compromises the

safety of ISS crew and overall ISS mission assurance and is not in the nation's interests.

Second, an injunction would prevent Boeing and SpaceX from obtaining long-lead items

and would require their workforces and subcontractors to stand-down.  This will create a greater

delay in restarting the program at the conclusion of the GAO protest because the contractors and

their subcontractors will have to re-deploy (and in some cases re-hire) personnel that have been

placed on other projects or had to be let go (or hire replacement personnel where terminated

personnel are no longer available to be re-hired).  That will further impair the ability of the

contractors to meet NASA's needed mission dates.  No matter how hard the contractors try to

accelerate activities after the resolution of the protest to meet the 2017 schedule, it will be

extremely difficult to achieve because the contractors cannot expedite the acquisition and

production of long lead items critical to both mission operations and launch of the crew vehicle.

Third, any harm to SNC is neither irreparable nor outweighs the harm to NASA, Boeing

and SpaceX.  SNC is not enjoined from continuing its development effort; indeed, it continues

those efforts under its CCiCap extension and has announced that it will continue development in

the hopes of winning a cargo-only role.  Ex. 17.  If its GAO protest does not prevail, it will have

suffered no harm at all.  Even if SNC's protest does prevail, however, NASA has already

recognized that GAO could recommend that NASA re-open the competition, in which case SNC

will have a chance to win one of the two contracts for the amount of its proposal, displacing one

current contractor while the other contractor can proceed in an effort to satisfy the 2017

milestone.  Ex. 2 at 14.  In other words, regardless of whether Boeing and SpaceX continue

Agreed-Upon Redacted Version

performance, SNC would have an opportunity to receive a contract in its proposed amount if re-opening the competition is appropriate and would, by definition, have suffered no harm at all, irreparable or otherwise.  The harm to NASA and its contractors far outweighs any purported harm to SNC.

SNC also complains that if the Court does not impose a stay of contract performance, Boeing and SpaceX "will make progress in their design and engineering work, which will make it even harder for SNC to have any fair competitive opportunity should GAO sustain its protest." SNC Application at 27.  This contradicts SNC's alternative argument that any progress made by the awardees during a stop-work period would be "insignificant" in the context of the entire developmental effort.  *Id.* at 17-18, 20-21.  Moreover, SNC has always been a laggard in the funding for the Commercial Crew Program—indeed, SNC still has not completed its requirements under CCiCap.  This was reflected in SNC's CCtCap proposal, as the SSA concluded that SNC's "Dream Chaser" has an "overall lower level of integrated design maturity" and is "at the lowest level of maturity" among the three offerors.  *See* Ex. 12 at 29.  To the extent that SNC complains that it will lag behind Boeing and SpaceX if both are permitted to continue development work while the protest is pending, that concern is already a *fait accompli* that it cannot rely on the Court to avoid.

**D.**     **The Public Interest Weighs Against Enjoining Performance.**

The Government's ability to conduct procurements "expeditiously and with as little judicial intrusion as possible into the government's discretion" is critical.  *Vantage Assocs., Inc. v. United States*, 59 Fed. Cl. 1, 9 (2003).  In particular, according to the Federal law and the NSTP, "Space activities are ***critical to the Nation's*** technological advancement, scientific discovery, ***security***, and economic growth."  Ex. 3 at 1.  The key activity supporting that policy is to "[e]nable the capabilities to support human space transportation activities to and beyond low

Agreed-Upon Redacted Version

Earth orbit, including services to and from the [ISS] . . . ."  *Id.* at 2.  The public interest in new ISS spacecraft "as soon as possible" is articulated in Federal law and identifies this capability as "an essential instrument of **national security** and of the capacity to ensure continued United States participation in and leadership in the exploration and utilization of space."  Ex. 2 at 3 (citing 42 U.S.C. § 18311(b)).

In short, this court need not strain to identify the public interest here because Congress and the President (unrelated to this litigation) have stated that "space activities"—especially the development of a new spacecraft to access the ISS, which jettisons our reliance on Russian Soyuz rockets to shuttle astronauts to and from the ISS—are "critical" and "essential" to "national security."  Ex. 3 at 1; Ex. 2 at 3.  Because this court is charged with giving "due regard" to such interests, 28 U.S.C. § 1491(b)(3), that weighs heavily against SNC.  Indeed, it plainly is not in the public interest to remain reliant on Russia for human access to the ISS—especially where its Deputy Prime Minister has already threatened not to shuttle U.S. astronauts on the Soyuz any longer.  Nor is the public interest advanced by risking the U.S. ability to fulfill obligations to our ISS partners reflected in international agreements.  It is plain: the public interest lies in denying SNC's Application.

**IV.**
**CONCLUSION**

For the reasons set forth above, a Temporary Restraining Order would be wholly

inappropriate under the circumstances.  Therefore, for the foregoing reasons, Boeing respectfully

requests that the Court deny SNC's Application for Temporary Restraining Order.

Respectfully submitted,

s/ Scott M. McCaleb
Scott M. McCaleb
WILEY REIN LLP
1776 K Street, N.W.
Washington, DC  20006
(202) 719-3193 (O)
(202) 719-7049 (F)
smccaleb@wileyrein.com
*Counsel of Record for Movant/Interested Party, The*
*Boeing Company*

*Of counsel:*
Paul F. Khoury
Jon W. Burd
Samantha S. Lee
Gary S. Ward
WILEY REIN LLP

Dated:  October 16, 2014

Agreed-Upon Redacted Version

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day, I caused copies of the foregoing to be served on the

following in accordance with the electronic-filing procedures established by this Court:

Daniel S. Herzfeld, Esq.
U.S. Department of Justice – Civil Division
1100 L Street, N.W.,
Washington, DC 20005
*Counsel for Defendant United States of America*

Neil H. O'Donnell, Esq.
Rogers Joseph O'Donnell
750 9th Street NW, Suite 710
Washington, DC 20001
*Counsel for Plaintiff Sierra Nevada Corporation*

Richard Vacura, Esq.
Morrison & Foerster LLP
1650 Tysons Boulevard
Suite 400
McLean, VA 22102-4220
*Counsel for Interested Party, Space Explorations Technologies Corp.*

<u>s/ Scott M. McCaleb</u>
Scott M. McCaleb
WILEY REIN LLP
1776 K Street, N.W.
Washington, DC  20006
(202) 719-3193 (O)
(202) 719-7049 (F)
smccaleb@wileyrein.com
*Counsel of Record for Movant/Interested Party, The Boeing Company*

Dated:  October 16, 2014