## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### (BID PROTEST)

| | |
|---|---|
| SIERRA NEVADA CORPORATION, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) No. 14-994 C |
| v. | ) |
| | ) **Judge Marian Blank Horn** |
| THE UNITED STATES, | ) |
| | ) **FILED UNDER SEAL** |
| *Defendant,* | ) |
| | ) |
| and | ) |
| | ) |
| THE BOEING COMPANY, | ) |
| | ) |
| *Intervenor-Defendant,* | ) |
| | ) |
| and | ) |
| | ) |
| SPACE EXPLORATION | ) |
| TECHNOLOGIES CORPORATION, | ) |
| | ) |
| *Intervenor-Defendant.* | ) |

## SUPPLEMENTAL MEMORANDUM IN
## SUPPORT OF THE BOEING COMPANY'S OPPOSITION TO
## PLAINTIFF'S MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF

Scott M. McCaleb
WILEY REIN LLP
*Counsel of Record for*
*The Boeing Company*

*Of counsel:*
Paul F. Khoury
Jon W. Burd
Samantha S. Lee
Gary S. Ward
WILEY REIN LLP

Dated:  October 20, 2014

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

I.      SNC's Mere Disagreement With NASA's Judgment On Matters of National Security and Federal Policy Is Not A Valid Basis For The Court To Second-Guess Or Overturn The Override Decision. ........................................................................................... 4

II.     NASA Reasonably Determined That Delaying Performance Would Negatively Impact The Contractors' Ability To Complete Certification Milestones As Soon As Possible And No Later Than 2017. ................................................................................................... 10

III.    NASA Reasonably Determined That It Was In The Nation's Best Interests To Incur The Costs (and Risks) of Continued Contract Performance During the Protest. ................... 14

IV.     Conclusion ................................................................................................................ 18

## <u>TABLE OF AUTHORITIES</u>

<u>PAGE(S)</u>

**Cases**

*Alabama Aircraft Industries, Inc. v. United States*,
    586 Fed. Cir. 2009 .................................................................................9, 10

*Automation Technologies, Inc. v. United States*,
    72 Fed. Cl. 723 (2006).....................................................................................5

*Beechcraft Defense Co., LLC v. United States*,
    111 Fed. Cl. 24 (2013) .....................................................................................8

*Emery Worldwide Airlines, Inc. v. United States*,
    264 F.3d 1071 (Fed. Cir. 2001).....................................................................17

*Linc Government Services, LLC v. United States*,
    96 Fed. Cl. 672 (2010)......................................................................................9

*PMTech, Inc. v. United States*,
    95 Fed. Cl. 330 (2010) .................................................................................7, 8

*Savantage Financial Services., Inc. v. United States*,
    595 F.3d 1282 (Fed. Cir. 2010).......................................................................6

**Statutes**

28 U.S.C. § 1491................................................................................................2, 5, 9

42 U.S.C. § 18301................................................................................................2, 4

42 U.S.C. § 18311................................................................................................4, 9

**Other Authorities**

*AST Anlagen-und Sanierungstechnik GmbH*, ASBCA No. 42118, 92-2 BCA ¶ 24,961 ..............16

Defense Contract Audit Manual .................................................................................16

FAR 52.233-3 ...............................................................................................................16

John Cibinic Jr. & Ralph C. Nash, *Administration of Government Contracts* (4th Ed. 2006)......16

*Raytheon STX Corp.*, GSBCA No. 14296, 00-1 BCA ¶ 30,632.......................................16

**Appendices**

Ex. 1, Declaration of ███████████████████████████████
█████████████ for The Boeing Company ................................................. *passim*

Ex. 2, Solicitation (Excerpts) ...........................................................................10

Ex. 3, Boeing Model Contract (Excerpts) ........................................................11, 14, 15

Ex. 4, SNC Model Contract (Excerpts) ...............................................................15

This is no ordinary procurement and no ordinary override challenge.  The override with which Sierra Nevada Corp. (SNC) takes issue is both uniquely well-suited to the discretionary judgment of the responsible executive branch authority, NASA, and uniquely unsuited to judicial scrutiny.  SNC believes that extending the United States' dependence on the Russian Soyuz capsule to provide the sole means of access to the International Space Station (ISS) is a matter of no great concern.  NASA—consistent with multiple pronouncements by the President and the Congress—disagrees.  SNC believes that development of a domestic human spaceflight capability is so unlikely to succeed by 2017 that NASA should not be permitted to make the attempt.  NASA disagrees.  Finally, SNC believes that achieving this urgent federal policy as soon as possible is not worth the cost of Boeing's and SpaceX's continued performance over the next 75 days.  Again, NASA disagrees.  SNC's challenge is no more and no less than an effort to use this Court to substitute SNC's judgment for NASA's on important national questions of foreign affairs, national security, and space policy—matters specially committed to the Executive and to NASA.

Among the principal reasons NASA has determined that this override is necessary is the fact that "[p]rocuring additional ISS crew transportation services from Russia . . . is uncertain and is not a reasonable alternative," for several reasons, including both that such purposes are inconsistent with clear federal policy and that "[u]ncertainties in the international political environment may further complicate the ability to purchase future Soyuz services."  ECF No. 15, Override Decision at 3.  SNC trivializes NASA's concerns over the Nation's continued, total dependence on Russian crew transport capability for access to the ISS.  Indeed, SNC has blithely assured the Court that the Russians can be relied on to provide U.S. access to the ISS indefinitely—and not to politicize or leverage U.S. dependence on that access.  This,

notwithstanding recent attempts by Russian Deputy Prime Minister Rogozin, whose responsibilities include aerospace and defense, to do just that.

But SNC does not get to decide for the United States whether that is a risk worth taking. To the contrary, SNC's views on the current state and likely development of United States relations with Russia are entitled to no weight at all. NASA—not SNC—is the Executive Branch agency charged with implementing the clear and urgent federal policy to develop domestic alternatives to foreign crew transport capability. And NASA—not SNC—is responsible for deciding whether ending the United States' reliance on Russian capabilities sooner rather than later is in the national interest and justifies additional expense. Indeed, it is precisely these sorts of judgments related to national security to which Congress has clearly directed courts to "give due regard" in exercising jurisdiction over procurement decisions. 28 U.S.C. § 1491(b)(3).

NASA's decision that continued performance is in the national interest and that it does justify additional expense should be no surprise. Restoring the nation's domestic human spaceflight capability has been, by law, an urgent federal policy since before the retirement of the Space Shuttle in 2011. *See, e.g.*, 42 U.S.C. § 18301. Since then, NASA has spent billions of dollars in an effort to accomplish this policy as rapidly as possible. While there are significant costs associated with NASA's decision to allow Boeing and SpaceX to continue performing over the next 75 days, those costs are far less than what NASA has already incurred in its quest to achieve crew transport capability as soon as possible and no later than 2017. Indeed, NASA awarded $1.17 billion in funding on just one of the four preceding phases—the Commercial Crew Integrated Capability (CCiCap) phase—to Boeing, SpaceX, and SNC, just to ensure that these contractors could rapidly develop their respective designs to be able to compete for the

CCtCap contract awards currently under dispute.  And, it is worth noting that this demonstrated urgency has only increased over time, with the cooling of relations between the United States and Russia, as well as the impending expiration of NASA's contract for Russian transportation services.

NASA has consistently demonstrated its conviction that development of domestic human spaceflight capability as soon as possible is sufficiently urgent that substantial resource commitments, including funding commensurate to the task, are justified.  Not only does SNC ask the Court to join it in second-guessing that judgment, ***it is asking this Court to order NASA not to meet its goal of developing a domestic human spaceflight capability by 2017 and not to fulfill its statutory mandate of developing that capability as "rapidly" and "as soon as possible."***  In fact, as specifically explained in the declaration of Boeing's ███████████ ████████████████████████████, if the Court orders NASA to stay performance, Boeing ***will*** be delayed ████████████████████ the 2017 certification.  Ex. 1, ███████ Decl.  If contract performance continues, both Boeing and SpaceX have the opportunity to meet their proposed schedules and achieve NASA's goal; if performance is stayed, most assuredly neither contractor can do so.

At bottom, SNC's case boils down to an invitation for the Court to adopt SNC's judgment over the Executive Branch's with respect to important questions of foreign policy and national security, and to defer to SNC's technical judgment rather than NASA's with respect to both the importance of the Nation's interest in domestic human spaceflight capability and the likely effects of a stay halting performance towards that goal.  The Court should decline SNC's invitation.  The issues at the heart of NASA's decision to override the stay are uniquely committed to the Executive Branch's discretion and judgment under the law.  NASA has

reasonably exercised that judgment, and there is nothing arbitrary and capricious about NASA's

decision to meet its statutory obligations, after carefully weighing all of the relevant factors.

There simply was no error in judgment—much less the "clear error in judgment" SNC would

have to show to prevail.  Accordingly, for the reasons articulated in Boeing's initial

Memorandum, discussed during the Court's October 17 Hearing, and explained more fully

below, the Court should deny SNC's Application and Motion.[1]

## I.   SNC's Mere Disagreement With NASA's Judgment On Matters of National Security and Federal Policy Is Not A Valid Basis For The Court To Second-Guess Or Overturn The Override Decision.

It is even more clear after the Court's Hearing that SNC is asking the Court to second-

guess the judgment that NASA reasonably exercised in deciding to pursue contract performance

of the CCtCap contracts while SNC's protest is pending at GAO.  NASA has determined that

continued program performance is in the best interests of the United States and is necessitated by

urgent and compelling circumstances, for the following reasons:

- Since 2011, the United States has had no independent, domestic capability to transport astronauts to the ISS, and there is a legislative and Executive mandate to develop this "essential" domestic capability as "rapidly" and "as soon as possible" as a matter of "national security," 42 U.S.C. § 18301(7), (10), (14), (15);

- NASA's contract for the Russian Soyuz to provide transportation to and from the ISS extends only through 2017, and while all three offerors (SNC, Boeing and SpaceX) proposed to have a certified vehicle by 2017, NASA evaluated only the Boeing and SpaceX proposals as realistically being able to achieve that milestone;

- While it is theoretically possible to attempt to negotiate and contract for more Soyuz services beyond 2018, that is not a reasonable alternative because: (a) it is contrary to law given that a commercial U.S. capability is scheduled to exist, *id.* §§ 18311, 18301(10); (b) it historically takes three years to do so; (c) political uncertainties with U.S.-Russia relations—including the Deputy Prime Minister's May 2014 statement that Russia would no longer transport U.S. astronauts to the ISS—render it

---

[1] Boeing's initial Memorandum addresses all key issues that the Court must reach to make this determination.  This supplemental memorandum addresses further the issues raised during the Hearing on which the Court appeared to focus.

unreasonable to rely on the Soyuz as the sole source of transportation capability; (d) the Soyuz cannot support a full ISS crew complement of seven astronauts (because the Soyuz holds three passengers at most, and two docked Soyuz capsules can therefore evacuate a total of only 6 ISS astronauts) or scientific research (because it cannot bring the experiments back to the earth); (e) it is very expensive ($76 million per seat), and Russia keeps raising prices significantly with each negotiation; and (f) the Soyuz still constitutes an untenable "single point of failure";

- If performance continues, NASA and its contractors expect both Boeing and SpaceX to meet the 2017 certification milestone, but if performance is delayed pending the GAO protest, it is virtually certain neither will meet that milestone;

- NASA recognizes that GAO could recommend a re-competition where SNC could conceivably displace SpaceX or Boeing, in which case NASA would have to pay termination costs to the displaced contractor in addition to milestone payments already paid during the protest period, and NASA determined it was worth it to continue performance knowing at least one contractor would meet the 2017 date; and

- While CICA's stay is an important element of the bid protest process, equally important is CICA's override provision, which permits agencies to allow performance to continue where (as here) urgent and compelling circumstances exist and/or it is in the nation's best interests to continue performance.

Under the relevant Administrative Procedure Act (APA) standard of review that applies, 28 U.S.C. § 1491(b)(4), the Court's review of NASA's decision is not *de novo* or based on what the Plaintiff or the Court may believe would be the best or most prudent course of action. Instead, it is a narrow review "to determine if the override was based on a consideration of the relevant factors and ***whether there has been a clear error in judgment by the agency.***" *Automation Techs., Inc. v. United States*, 72 Fed. Cl. 723, 727 (2006) (quotation omitted); *see also* SNC Application at 10 (court's review is a "narrow" one "to determine whether the agency considered the relevant factors or has made ***a clear error in judgment***").[2]  SNC's Complaint, its Application, and its oral argument have not shown that NASA failed to consider any relevant factors or that ***there is any "clear error in judgment by the agency" that could justify***

---

[2] All emphasis is added unless otherwise noted.

***overturning NASA's decision involving*** matters of international space policy and mission

effectiveness, which are uniquely entrusted to NASA's expertise and authority.

SNC does not debate the significance of the program or NASA's need to develop a

domestic crewed spaceflight capability "as soon as possible," as mandated by federal law.  *See,*

*e.g.*, Hearing Tr. 15:23-16:2 ("[T]here's no disagreement [from SNC] that the issues are

important and . . . the national objective is shared that the United States develop and deploy, as

soon as possible, American launch systems that can carry astronauts to and from the [ISS].").  In

fact, at every turn, SNC concedes that NASA addressed the relevant inquiries that should go into

the "override" determination, but it contends that NASA should have exercised ***different***

***judgment*** to arrive at a ***different conclusion*** that SNC would have preferred.

For example, despite NASA's goal of ending its sole reliance on the Russian Soyuz

vehicle, SNC derides NASA's concerns that the Soyuz will no longer be available, and

minimizes the fact that, even assuming continued availability of Soyuz transportation, each

additional mission will cost at least $76 million per astronaut.  *See* Hearing Tr. at 29:4-24 ("So,

there are reasonable alternatives. . . .  We are at a period of time where the relationship between

the U.S. and Russia is strained over The Ukraine, among other topics . . . .  [but] the record

simply does not support the proposition that today there has been any – any interference in the

commercial and technical relationship between the United Stations and Russia to support the

ISS.").[3]  SNC also speculates that NASA should not count on the CCtCap contract to fulfill its

needs beyond 2017, because SNC does not think that is viable:  "And this is not a situation

---

[3] That, of course, is not the standard.  "[A]n agency 'has no obligation to point to past
experiences substantiating its concerns in order to survive rational basis review . . . as CICA does
not require the agency to supply a historical record of failures to substantiate a risk.'"  *Savantage*
*Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (ellipsis in original)
(quoting *CHE Consulting, Inc. v. United States*, 552 F.3d 1351, 1355 (Fed. Cir. 2008)
(explaining that agencies have "a responsibility to assess risks and avoid them before they
become a historical fact")).

where we can attribute any certainty to the impact of the 79-day delay. . . . Many things could

happen, good or bad, but history tells us these programs will run late anyway."[4]  *Id.* at 30:11-19;

*see also id.* at 20:5-22 (calling completion by 2017 a "remote and speculative contingency").

The former is a foreign policy judgment; the latter is a technical programmatic judgment.  Both

were within NASA's discretion and expertise.  Neither is properly within SNC's.

This is the quintessence of mere disagreement and judgment substitution, and SNC has

not identified any "clear error" in NASA's findings or in the exercise of its unique technical

expertise.  Instead, SNC offers its view as a substitute for NASA's reasoned judgment,

attempting to support its challenge with its position that the automatic stay is the be-all and end-

all of CICA, regardless of the express provision for an agency to exercise its discretion to

override the stay, as NASA has done here, based on urgency and the nation's best interests.  *See,*

*e.g.*, *id.* at 16:3-5 (suggesting that SNC's challenge to NASA's override "***is not about the***

***Commercial Crew Program and it is not about the policy interest***"); *id.* at 30:11-18 (suggesting

that NASA's concerns about the urgency of the CCtCap mission are outweighed by "respect for

CICA, the stay, and the GAO protest process").  In CICA, however, Congress created the

opportunity for agencies to exercise discretion to override the automatic stay when an agency

concludes that the nation's best interests, or urgent and compelling circumstances, warrant an

override.  Thus, the "override" is every bit as much a part of CICA's statutory scheme and policy

as is the automatic stay, and the Court gives no less deference to an agency's override decision,

and it applies no different standard of review—the APA applies.  *PMTech, Inc. v. United States*,

---

[4] Of course, both contractors have schedule margin to ensure certification in 2017, but given
their "compressed" schedules and the fact that developmental programs like this one often
witness delays, NASA (based on its institutional expertise and judgment) concluded that it was
necessary to continue performance now in order to increase the likelihood that at least one
contractor would satisfy the 2017 milestone.

95 Fed. Cl. 330, 342 (2010) ("[T]he arbitrary and capricious review of CICA stay override decisions, like this court's review of other procurement decisions, is fairly straightforward. *The scope of review is narrow, deference to the agency is high, and the focus is on the coherence and rationality of the override decision.*").

Ultimately, this case devolves to SNC's contention that NASA has a reasonable alternative to pursuing immediate contract performance and program progress because NASA can continue to purchase "rides" on the Russian Soyuz space vehicle in 2018 and beyond, and NASA's decision to pursue the override will be too costly.  NASA expressly considered both points, however.  It determined that sole reliance on the "Soyuz" alternative was not a reasonable solution and that it would not be consistent with U.S. law, NASA's mission needs, or domestic space policy to plan to utilize the Soyuz any longer than absolutely necessary.  That is a judgment to which the Court must defer.  *See, e.g.*, *Beechcraft Def. Co. v. United States*, 111 Fed. Cl. 24, 31-32 (2013) (upholding override determination) ("The Air Force's analysis of potential adverse consequences was not arbitrary or capricious.  Other ongoing gaps in the capabilities of the AAF do not show that adverse consequences will not result from the lack of air-to-ground capability.  In a matter of this nature, the Court defers to the expertise and judgment of the Air Force's analysis of military capabilities.").

As for the cost, NASA understood that overriding the stay could have significant financial consequences—based on the size of the contractor milestone payments earned during the protest period, and any potential termination costs if either contract was subsequently terminated—and determined those costs were justified by the benefits of achieving 2017 certification milestones (with greater capability) and avoiding the perils of maintaining the status quo of exclusive reliance on the Russian Soyuz.  Given the benefits of achieving NASA's goal of

a domestic spaceflight capability certified for flight by 2017, the risks and additional costs of

continuing to rely on Soyuz flights beyond 2017, and the ISS mission limitations imposed by

continued reliance on Soyuz, NASA's considered judgment in this regard was both well-

reasoned and rational.  It is also entirely consistent with NASA's investment in the program's

objective to date, including its award of $1.17 billion in CCiCap funding to Boeing, SpaceX, and

SNC, just to ensure that these contractors could rapidly develop their respective designs.  *See*

Boeing Oppn. Ex. 10, Commercial Crew Program, at 3.  Indeed, NASA has invested $363

million in SNC's effort to develop a spacecraft that (as things stand now) will not be used.  *Id.*

Finally, SNC's allegations fail even to consider the additional deference that the Court

must give to agencies in bid protest cases that implicate issues of national security.  Pursuant to

28 U.S.C. § 1491(b)(3), the Court, "[i]n exercising jurisdiction under this subsection . . . ***shall***

***give due regard to the interest of national defense and national security*** and the need for

expeditious resolution of the action."  *See Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl.

672, 702 (2010) (internal quotation marks omitted) (noting that where national security interests

are implicated, "the public interest factor gains inflated importance in the court's balancing of

the equities").  Here, the national security implications of NASA's decision are clear: Congress

has already established ***as a matter of law*** that "uninterrupted capability for human space flight

and operations" is "***an essential instrument of national security***" and that foreign space

capabilities should be utilized "only as a contingency."  42 U.S.C. § 18311.  It is not difficult to

grasp the significant national security risks that are inherent in the United States' current reliance

on Russian Soyuz launches as its sole gateway to and from the ISS.  If anything, the recent

political tensions with Russia mentioned in NASA's override decision ████████████████

████████████████████████████████████████████████████████

██████████████████████████

On this record, there is simply no basis for the Court to second-guess NASA's judgment or overturn its decision to override the automatic stay.  *See, e.g.*, *Ala. Aircraft Indus., Inc. v. United States*, 586 F.3d 1372, 1376 (Fed. Cir. 2009) (reversing trial court's "impermissible substitution of the court's judgment for the agency's").

## II.   NASA Reasonably Determined That Delaying Performance Would Negatively Impact The Contractors' Ability To Complete Certification Milestones As Soon As Possible And No Later Than 2017.

NASA's Solicitation repeatedly emphasized its goal for the CCtCap contractor(s) to achieve final NASA certification "no later than" 2017.  *See, e.g.*, Boeing Opp. at 12-13 (citing RFP sections); Ex. 2, Solicitation Excerpts, § C.1; *id.* § L.20-1, TA01(a) (requiring offerors to describe their approach to NASA Certification Milestone Reviews "which lead to NASA's certification of the CTS with a goal of NLT 2017"); *id.* § M.2.I, TA01(a) (requiring NASA to evaluate each offeror's "approach to meet contract requirements and objectives to achieve NASA certification with a goal of NLT 2017").  Boeing proposed to meet this 2017 objective, and in the underlying evaluation NASA determined that Boeing's approach is "based on a spacecraft design that is fairly mature in design," and that Boeing "has the most well-defined plan for addressing the specific issues" that remain in its design effort.  Boeing Opp. Ex. 12, CCtCap Source Selection Statement at 28.  Consequently, NASA perceived "less schedule risk" in Boeing's design and approach than the other offerors.  *Id.*

By contrast, SNC proposed a certification schedule that would have achieved certification at the end of 2017, but NASA expressed concern that SNC's "more complex system," "lower level of integrated design maturity," and the degree of "technical work and critical design decisions to accomplish" meant that SNC had more schedule risk to its approach.  *Id.* at 29.

███████████████████████████████████

Indeed, counsel for SNC repeatedly suggested that SNC has a low overall level of confidence that it would actually be able to achieve certification by 2017.  *See, e.g.*, Hearing Tr. 14:4-25 (noting that the systems are new and asserting that "the history of spacecraft development programs, whether crewed or uncrewed is one that is characterized almost uniformly by difficulties experienced in the course of development and by delays"); *id.* 20:5-22 (calling completion by 2017 a "remote and speculative contingency").

Unlike SNC, Boeing and NASA both have high confidence in Boeing's ability to achieve the 2017 objective.  Boeing's ability to meet this milestone, however, would be fatally compromised if contract performance is delayed until after the GAO bid protest process is completed.  Boeing has specific development and certification milestones that it has committed to achieve in its Milestone Acceptance Criteria and Payment Schedule, which was incorporated into the Contract as Attachment J-03, Appendix A.  In that milestone schedule, Boeing committed (as was required) to complete its first milestone, the Certification Baseline Review (CBR), within 90 days of contract authorization to proceed (ATP).  *See* Ex. 3, Boeing Model Contract Att. J-03, App. A at 4-8 (providing for completion of the CBR in ▓▓▓▓▓▓).  Boeing's CBR will occur ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 1 ¶ 13. [5]  This CBR milestone is an especially critical mandatory prerequisite to NASA's authority to proceed for the first post-certification mission and as the foundation for the remainder of Boeing's design work.  *See id.* ¶ 13.  As noted in ▓▓▓▓▓▓ Declaration, many long-lead items have already been procured and are in the process of being manufactured or delivered.

---

[5] This supplemental memorandum is accompanied by the declaration of ▓▓▓▓▓▓▓▓▓ for Boeing.  ▓▓▓▓▓▓ declaration responds to the Court's request for detailed information from technical experts regarding the scope of the immediate work under the CCtCap contract, and why the short-term efforts are crucial to achievement of the program's long-term goal.

CBR also operates as a gate to the ████ succeeding milestones ██████████████████ ██████████████████████. Ex. 3 at 9-16. Only after these ████████████ milestones are achieved, along with ██████████████████ work, can Boeing proceed to ██████████████████████, *a mandatory prerequisite to NASA's ability to order Post-Certification Mission Launches under CLIN 2 (i.e., actual crewed CCtCap service missions to the ISS)*. Ex. 1 ¶ 19. Boeing's current schedule should permit Boeing to achieve the ████████████████████████, at which time NASA can order and Boeing can begin planning missions. In order to prepare for CBR, Boeing has engaged in critical design, development, and other activities and compiled and submitted data and analysis compiled to NASA for review and evaluation, including:





*See id.* ¶ 14.

If performance is stayed until January 2015, however, not only would this work be left uncompleted and the 2017 certification date rendered unachievable, the ultimate impact to the

schedule would be far greater than a mere day-for-day extension.  Boeing estimates that there

would be at least an additional ██████████ delay to its current schedule (for a total of roughly ██

██████████████ ), *see id.* ¶ 31, in the event of a performance interruption and stand-down:

- Boeing would have to reengage suppliers to renew orders, including for long-lead items.
  Boeing would need to evaluate the schedule impacts throughout its supply chain and
  renegotiate contract changes (with both cost and schedule impacts).  Boeing would have
  to undertake the significant effort to revise its own execution schedule through
  negotiation with the dozens of suppliers necessary to support this program.  *Id.* ¶ 20, 33.

- Specific projects would be disproportionately delayed, including (for example) Boeing's
  preparation for and actual production of the ████████████████████████████████ —and
  ██████████ activities.  Due to ██████████████, Boeing will not have ████████
  ████████████████████████████████████. There is a long
  window between now and January 2015 when Boeing can perform ████████████████
  ██████████ activities without ██████████. If work does not
  begin until after January 2015, completion would slip from ██████████████ to no earlier
  than ██████████, delaying ground system integration and testing necessary for the
  uncrewed and crewed flight tests.  *Id.* ¶ 22-26.

- Boeing anticipates that it would need to furlough or reassign hundreds of employees
  currently working on CCtCap, including many with institutional knowledge based on
  their years of experience working on the Commercial Crew Program and valuable space
  station and shuttle experience.  It would take time to recall and reassign those employees.
  There would also be employee attrition if those employees found other permanent
  employment (while furloughed) or became embedded in new programs (during
  reassignment), and it would take months to recruit, hire, and train new employees.  These
  delays would be followed by continuing schedule impacts due to lost efficiencies and
  learning curve challenges for new hires.  *See id.* ¶ 27-29, 33.

Because Boeing's key milestones are interdependent, delaying initial milestones has a cascading

impact on successor tasks and milestones, so that design delays lead to manufacturing delays,

which in turn delay system integration, testing and eventually flight testing milestones.  *Id.* ¶ 19,

31-32.  Based on all of these factors, if contract performance is stayed until January 5, Boeing

anticipates that would cause a schedule delay of at least ██████████████, which would

compromise Boeing's ability to achieve final certification by the end of 2017.  *Id.* ¶ 31-32.

**III.     NASA Reasonably Determined That It Was In The Nation's Best Interests To Incur The Costs (and Risks) of Continued Contract Performance During the Protest.**

In its Application, SNC complains about the costs that NASA will incur to fund the Boeing and SpaceX contracts during the protest period, and it alleges that NASA has not reasonably weighed the risks associated with the incurrence of those costs against the "benefits gained by the stay."  SNC Application at 22-24.  That contention is belied, however, by the plain text of  NASA's override decision, which expressly and reasonably considered the potential financial risks associated with pursuing contract performance during GAO's bid protest process and determined that the benefits of continued performance justified that risk.

NASA understood that there would be cost risks to continue performing both Boeing's and SpaceX's contracts, because NASA might fund performance only to have GAO "sustain the protest and recommend termination of the contracts."  ECF No. 15 at 13.  First, NASA relied on the contract structure, the manner in which the contracts are funded and the contract payment terms to limit NASA's financial risk.  NASA noted that the contracts contain a Limitation of Funds clause (H.4) that "[l]imit[s] . . . the amount of funding currently obligated on the contracts."  *Id.*  The initial funding limitation in each contract that was in place when NASA executed the override decision was $129.3 million, although NASA also made clear that additional funding would be required.  *Id.*

Second, NASA understood that CLIN 1 relies on fixed milestone-based financing payments set forth in the contracts, which the contractors earn when they complete each milestone.  Accordingly, in the override decision, NASA explained that "[a]dditional funding would be necessary to complete the milestones currently on the contracts between now and the resolution of the protest."  *Id.*  For Boeing, its contract milestone schedule requires Boeing to complete the first milestone, the Certification Baseline Review, "within ninety (90) days of

contract start," and the associated milestone payment will be ████████. Ex. 3, Boeing

Model Contract Attachment J-03, App. A at 4.  Due to a later contract award date (September

16) than Boeing had assumed in its proposed milestone payment schedule (████████), and a two-

week stop-work period after SNC filed its GAO protest, Boeing is scheduled to complete its

████████████████████████████████████████████████████████████

████████ later than projected in its Milestone Acceptance Criteria and Payment Schedule, but it

still anticipates ████████████████████████████████[6] *See* Ex. 1 ¶ 12. ████████████

████████████████████  ████████████████████████████████████

████████  ████████████  ████████████  ██  ████████████████.[7] *See* Ex. 3 at 9-16.

        To be sure, this is a large, capital-intensive program.  The nature of the space systems

that the contractors will design, test, build and operate under the contract require significant up-

front investment in long-lead items that are necessary to complete testing and production in time

to meet NASA's certification objectives.  NASA understood when it overrode the stay that it

would incur substantial costs during the protest period, based on the contractors' milestone

payment schedules, but it determined that the benefits to be gained, and the avoidance of adverse

consequences, outweighed any cost risks.  ECF No. 15 at 13.  NASA also considered the costs of

purchasing additional seats on the Russian Soyuz vehicle, which are $76.3 million each under the

existing contract, *id.*, but have risen at a rate of nearly 8% per year and could be $80 million or

higher in another round of negotiations.  *See* Boeing Memo at 22-23.  Moreover, it is significant

in that a ████████ or more delay in Boeing's and SpaceX's performance—whenever that delay



[6] ████████████████████████████████████████████████████████████
████████████████████

[7] ████████████████████████████████████████████████████████████
████████████████████

████████████████████████████████████████████

occurs—would likely result in multiple additional purchases of Soyuz seats than would otherwise be necessary.  Clearly, "paying tens of millions of dollars on a Russian contract rather than on contracts with American companies" is not in the nation's interest.  ECF No. 15 at 13.[8]

The only argument that SNC raises in rebuttal is that the potential cost is too great.  But, that is not SNC's determination to make.  SNC simply ignores the Agency's explicit consideration of the potential costs, risks, and benefits associated with the override, and cavalierly states that NASA "says nothing about how these costs will produce any value" if the GAO protest is sustained.  SNC Application at 23.  That allegation is contrary to the whole of the override decision, which identifies the opportunity to relieve American reliance on Russian space vehicles—a single point of failure, and an undersized and inadequate alternative space vehicle that is fraught with political and security risk—as quickly as possible as the principle benefit of NASA's decision.  The dollars associated with a program of this size are not insignificant, but

---

[8] NASA would likely incur significant contract costs to Boeing and SpaceX, even if the stop work order remains in place during the GAO protest period.  The standard FAR Protest After Award clause, FAR 52.233-3, permits the contractor to seek an equitable adjustment to the contract price for costs related to the stop work period.  While the contractor must take steps to minimize the Government's costs during this period, it often cannot avoid them altogether, and may recover unavoidable costs related to management and idle employee expenses (for critical employees who cannot be transitioned or furloughed), severance pay for terminated employees, idle facility costs, startup and remobilization costs, unabsorbed overhead, etc., and reasonable profit.  *See, e.g.*, John Cibinic Jr. & Ralph C. Nash, *Administration of Government Contracts* 734-36 (4th Ed. 2006) ("In some cases, good business judgment will indicate that a contractor should keep labor or equipment available to continue performance of the work once the delay or disruption has ended."); *see also* Defense Contract Audit Manual § 12-802.7 (Profit) (noting that profit is specifically excluded only under FAR 52.242-14 and -17); *AST Anlagen-und Sanierungstechnik GmbH*, ASBCA No. 42118, 92-2 BCA ¶ 24,961 (actual costs for salaries and overhead for idled workers during a suspension due to a bid protest were recoverable); *Raytheon STX Corp.*, GSBCA No. 14296, 00-1 BCA ¶ 30,632 (contractor entitled to recover idle workforce costs during stop-work period during government shutdown, where the Government "stopped work for an uncertain time frame but expected appellant to maintain its work force and resume work immediately after the shutdown").  Boeing estimates that if the stop work order were imposed through January 5, it could be entitled to an adjustment of as much as ███████.  *See* Ex. 1 ¶ 34.

Agreed-Upon Redacted Version

NASA concluded that the risks of operating without a domestic spaceflight capability for any longer than absolutely necessary justified the expense.

This is not a case where NASA failed to consider relevant factors.  Indeed, ***SNC has articulated no cost-related factor that NASA failed to address.***  NASA exercised its judgment based on its knowledge of and expertise in the ISS, national space priorities, and the unique technical, political, and mission assurance risks of the Soyuz alternative.  SNC cannot substitute its judgment for NASA's about important questions of policy and national security, and cannot overrule NASA's technical judgment with respect to the effects of a stay.  The Court should decline SNC's invitation to do so itself.  *See, e.g.*, *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1085 (Fed. Cir. 2001) (citation omitted) (finding agency's decision to award sole source contract to be rational) ("Under this [APA] standard, the agency's action is entitled to a 'presumption or regularity' and the agency's action must be upheld as long as a rational basis is articulated and relevant factors are considered.").

## CONCLUSION

For the foregoing reasons, and those set forth in Boeing's October 16 opposition brief,

Boeing respectfully requests that the Court deny SNC's Application for Declaratory and

Injunctive Relief.

Respectfully submitted,

<u>s/ Scott M. McCaleb</u>
Scott M. McCaleb
WILEY REIN LLP
1776 K Street, N.W.
Washington, DC  20006
(202) 719-3193 (O)
(202) 719-7049 (F)
smccaleb@wileyrein.com
*Counsel of Record for Defendant-Intervenor, The
Boeing Company*

*Of counsel:*
Paul F. Khoury
Jon W. Burd
Samantha S. Lee
Gary S. Ward
WILEY REIN LLP

Dated:  October 20, 2014

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day, I caused copies of the foregoing to be served on the

following in accordance with the electronic-filing procedures established by this Court:

Daniel S. Herzfeld, Esq.
U.S. Department of Justice – Civil Division
1100 L Street, N.W.,
Washington, DC 20005
*Counsel for Defendant United States of America*

Neil H. O'Donnell, Esq.
Rogers Joseph O'Donnell
750 9th Street NW, Suite 710
Washington, DC 20001
*Counsel for Plaintiff Sierra Nevada Corporation*

Richard Vacura, Esq.
Morrison & Foerster LLP
1650 Tysons Boulevard
Suite 400
McLean, VA 22102-4220
*Counsel for Defendant-Intervenor, Space Explorations Technologies Corp.*

<u>s/ Scott M. McCaleb</u>
Scott M. McCaleb
WILEY REIN LLP
1776 K Street, N.W.
Washington, DC  20006
(202) 719-3193 (O)
(202) 719-7049 (F)
smccaleb@wileyrein.com
*Counsel of Record for Defendant-Intervenor, The Boeing Company*

Dated:  October 20, 2014