**REDACTED VERSION** <sup>1</sup>

1          UNITED STATES COURT OF FEDERAL CLAIMS

2

3

4    SIERRA NEVADA CORPORATION,              )

5              Plaintiff,                    )

6                  vs.                       ) Case No.

7    THE UNITED STATES OF AMERICA,           ) 14-994C

8              Defendant.                    )

9                                            )

10

11              ***TRANSCRIPT UNDER SEAL***

12

13                   Courtroom 7

14         Howard T. Markey National Courts Building

15              717 Madison Place, N.W.

16                 Washington, D.C.

17              Friday, October 17, 2014

18                   10:00 a.m.

19               Bid Protest Hearing

20

21

22       BEFORE:  THE HONORABLE MARIAN BLANK HORN

23

24

25    Linda Metcalf, CER, Digital Reporter

```
1    APPEARANCES:

2    ON BEHALF OF THE PLAINTIFF:

3            ROBERT S. METZGER, ESQ.

4            NEIL HALL O'DONNELL, ESQ.

5            Rogers Joseph O'Donnell, PC (DC)

6            750 Ninth Street, NW

7            Suite 710

8            Washington, DC 20001

9            (202) 777-8950

10           nodonnell@rjo.com

11

12

13

14   ON BEHALF OF THE DEFENDANT:

15           DANIEL HERZFELD, ESQ.

16           KIRK T. MANHARDT, ESQ.

17           U.S. Department of Justice

18           P.O. Box 480

19           Ben Franklin Station

20           Washington, D.C. 20044

21           (202) 616-0344

22           daniels.herzfeld@usdoj.gov

23

24

25
```

```
1    APPEARANCES (Continued):

2

3    ON BEHALF OF THE DEFENDANT-INTERVENOR (BOEING):

4            JON W. BURD, ESQ.

5            SAMANTHA S. LEE, ESQ.

6            PAUL F. KHOURY, ESQ.

7            SCOTT M. MCCALEB, ESQ.

8            Wiley Rein, LLP

9            1776 K Street, NW

10           Washington, DC  20006

11           (202)719-3193

12           smccaleb@wileyrein.com

13

14   ON BEHALF OF THE INTERVENOR-DEFENDANT SPACEX:

15           RICHARD VACURA, ESQ.

16           STEVE CAVE, ESQ.

17           CATHERINE L. CHAPPLE, ESQ.

18           Morrison & Foerster, LLP

19           1650 Tysons Boulevard

20           Suite 400

21           McLean, Virginia  22102-3915

22           (703)760-7729

23           cchapple@mofo.com

24

25
```

1    APPEARANCES (Continued):

2

3    ALSO PRESENT:

4        KAREN REILLEY, ESQ., NASA

5        SCOTT W. BARBER, ESQ., NASA

6        WILLIAM GERSTENMAIER, ENGINEER, NASA

7        SUZETTE W. DERREVERE, ESQ. BOEING

8        PADRAIC B. FENNELLY, ESQ., BOEING

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2                    -    -    -    -    -

 3          (Proceedings called to order, 10:05 a.m.)

 4          THE COURT:  All right, the case on the docket is

 5  Sierra Nevada Corporation against the United States, Case

 6  Number 14-994C.  And this is a protest in the nature of an

 7  issue regarding an override in the contract that we're going

 8  to be talking about in a moment.  That, of course,

 9  circumscribes why we're here today and that is literally to

10  deal with the override issue, not to deal with the merits of

11  the evaluation, which is still pending at the GAO.

12          What I'd like to do first is have everybody in the

13  courtroom introduce themselves.  We have, out of an abundance

14  of caution, sealed the courtroom.  What I need you to tell

15  me, also, is when we're about to hit information that might

16  be sensitive so that we can be sure that any of the observers

17  who shouldn't be here are, in fact, not here.  The folks that

18  walk in with me are all members of my office staff, either

19  interns or law clerks, and, so, they are automatically

20  available to be part of the proceedings.  And I'm going to

21  turn to the rest of you with respect to identifying the

22  people you've brought with you, including anybody who may be

23  in the gallery.

24          Mr. O'Donnell?

25          MR. O'DONNELL:  Good morning, Your Honor, Neil
```

 1    O'Donnell, Rogers Joseph O'Donnell, for the Plaintiff.  We

 2    are a Nevada corporation.  With me is my partner, Robert

 3    Metzger, and Mr. Metzger will be arguing for the Plaintiff.

 4              THE COURT:  Very good, thank you, sir.

 5              Mr. Herzfeld?

 6              MR. HERZFELD:  Good morning, Your Honor.

 7              THE COURT:  Good morning.

 8              MR. HERZFELD:  Dan Herzfeld for the Department of

 9    Justice.  With me, I have my colleague, Kirk Manhardt, from

10    the Department of Justice, Assistant Director.  I also have

11    agency counsel, Karen Reilley, Scott Barber from NASA.

12    Additionally, we have in the audience, William Gerstenmaier

13    who is the Associate Administrator for Human Exploration.

14              THE COURT:  Which is where?  Sir, thank you.  I

15    understand you've taken a hard travel to get here, and we

16    appreciate that.

17              MR. GERSTENMAIER:  Hopped on several plans from El

18    Paso yesterday.

19              THE COURT:  Not an easy place to get to or from

20    apparently.

21              MR. HERZFELD:  And that is the extent of our team,

22    Your Honor.

23              THE COURT:  All right.  Mr. McCaleb?

24              MR. MCCALEB:  Yes, Your Honor, Scott McCaleb from

25    Wiley Rein for the Boeing Company.  With me at counsel's

1    table is my partner, Jon Burd, and in the gallery, there are

2    several other people, all of whom are admitted to the

3    protective order at the GAO.  Obviously, we have dealt with

4    the protective order admissions here, but they're all

5    admitted.  And there's Paul Khoury from Wiley Rein.

6              THE COURT:  I know Mr. Khoury.

7              MR. MCCALEB:  Suzette Derrevere and Padraic

8    Fennelly who are both in-house litigation counsel from the

9    Boeing Company.

10             MR. FENNELLY:  Good morning, Your Honor.

11             THE COURT:  Good morning.

12             MR. MCCALEB:  And then two of our associates,

13   Samantha Lee and Gary Ward.

14             THE COURT:  All right, very good.  And on the

15   phone?

16             MR. VACURA:  Good morning, Your Honor, this is

17   Richard Vacura for Space Exploration Technologies Corporation

18   with -- in the courtroom are my colleagues from Morrison and

19   Foerster, Steven Cave and Catherine Chapple.

20             Your Honor, we have not yet filed our unopposed

21   motion to intervene, but we have that ready and can file it

22   shortly.

23             THE COURT:  All right.  So, I think I do want the

24   formal papers, but let's take care of the intervention

25   motions right now.  And if you don't mind a sort of

1    formalistic motion, sir, you could make it right now orally

2    and we'll take care of it.

3         MR. VACURA:  Yes, Your Honor, thank you.  On behalf

4    of SpaceX, we move to intervene.  SpaceX is one of the

5    awardees in the case and -- for the contested contracts and

6    is an interested party and has interests that cannot be

7    adequately represented unless SpaceX is allowed to intervene.

8    So, we'd formally move to intervene in the case.

9         THE COURT:  All right.  If you would, sir, just

10   follow up with the written motion so we have it in the record

11   and on the docket sheet.

12        MR. VACURA:  Yes, Your Honor.

13        THE COURT:  Mr. McCaleb, we do have your papers, so

14   we can deal with both of them now at once.

15        Mr. Herzfeld, any objection?

16        MR. HERZFELD:  No objection, Your Honor.

17        THE COURT:  How about you, Mr. O'Donnell or Mr.

18   Metzger?

19        MR. O'DONNELL:  No objection, Your Honor.

20        THE COURT:  Very good.  So, both of those motions

21   are granted and both parties are now formally part of the

22   case and we can proceed in that way.

23        The next question procedurally before we get to

24   what we're really going to talk about is the question of what

25   is sealed, what is not, and you obviously all are under a

1    protective order at the GAO.  The way the case has been filed

2    at this point here in the Court, it has been filed as -- part

3    of it is sealed, but the entire case is not sealed at the

4    moment, but various documents that you have filed are sealed.

5    Is that the way in which you think we ought to proceed or is

6    there some other basis that makes more sense?

7            Now, bear in mind, I got this yesterday.  I know

8    much less about this case than all of you do and I certainly

9    don't know what is sensitive information at this point.  I

10   mean, sometimes it jumps off the page at you, but for the

11   most part, you've got a much more sophisticated understanding

12   of that issue than I do at this point.

13           Mr. O'Donnell, what's your take on this question?

14           MR. O'DONNELL:  Your Honor, I think in an abundance

15   of caution, we should proceed as though the entirety of the

16   record is sealed.  But at this point, there are a few words

17   only in the override decision which the agency has indicated

18   should be redacted and the parties have agreed should be

19   redacted.  There are instances, though, when there will be --

20   and I think they'll be relatively rare -- but there will be

21   instances when there will be references to, for example, the

22   source selection documents of the agency.

23           THE COURT:  Well, I mean, we could proceed one of

24   two ways and that's really what I'm asking you.  Obviously,

25   we deal in an open court environment and the default position

1    is that everything is open and we seal just what we have to

2    seal.  That's sort of the position of the Courts in general

3    and the position of our rule of law system.  But if you're

4    telling me it's a rarity than you all can take of it and we

5    can just seal those things we need to seal.  But I guess we

6    ought to turn to the Government and see what they feel about

7    this.

8           MR. HERZFELD:  Your Honor, I just wanted to confer

9    with counsel.  I think our position is, you know, as a

10   prophylactic matter, we may want to keep it sealed for today

11   and then have the parties go through and decide what can be

12   released and just redact the parts out, if that makes sense

13   to the Court.

14          THE COURT:  That's fine with me.  I mean, we do

15   live in this open court environment.  So, there's a

16   reluctancy, in general, to seal everything if we don't have

17   to.  We did it for now just because we didn't know what we

18   were dealing with frankly.  And when I -- you know, I gather

19   from the override decision that there's not classified

20   material in it, but there is protected material in it.

21          MR. HERZFELD:  I believe that's correct, Your

22   Honor.

23          THE COURT:  Well, that's what it's marked, so --

24          MR. HERZFELD:  Yes.

25          THE COURT:  -- I assumed that you were serious

1    about that.

2              MR. HERZFELD:  Yes.

3              THE COURT:  So, let's do that, and then if you

4    would confer fairly quickly with Mr. O'Donnell and then,

5    obviously, now also with the Intervenors, we can work that

6    way.  I'm not one who has any interest in opening up

7    protected information or classified information.  I've been

8    at this for too long to want to go in that direction.  So,

9    you know, I'm happy to work with you and seal what really

10   ought to be sealed, but I think we probably ought to work in

11   an open environment.

12             There's obviously a great deal of interest in this

13   case.  One of the things we did was take a look at how much

14   there is, and it's out there.  And if we don't have to seal

15   everything, I think that's probably the appropriate way to

16   go.

17             MR. HERZFELD:  We would concur, Your Honor.

18             THE COURT:  Yeah.  I'm not eager to have a lot of

19   attention paid to us either while we're working through the

20   issues, but I don't think we can avoid it, so...

21             MR. HERZFELD:  Thank you, Your Honor.

22             THE COURT:  All right.  So, with that I think

23   nothing else preliminary.  Anything from anybody on a

24   preliminary nature and we'll start talking about the

25   override?

1              (No response.)

2              THE COURT:  No?  Hearing nothing, we shall proceed.

3              All right, Mr. O'Donnell, you and Mr. Metzger,

4    whichever of you wishes to speak, let's let you do that.

5              MR. O'DONNELL:  Thank you, Your Honor.

6              MR. METZGER:  Thank you, Your Honor.  I'm Bob

7    Metzger, Rogers Joseph O'Donnell, and we represent the

8    Plaintiff in this action, Sierra Nevada.

9              This case is about CICA, the Competition in

10   Contracting Act, and the mandatory stay that was imposed by

11   operation of law.  As the Court is aware, on September 26th,

12   Sierra Nevada filed a protest at the GAO.  A stay came into

13   operation automatically.  Thirteen days later, NASA made a

14   determination to override the stay, and as the clock has

15   ticked, we now find ourselves in a situation where 79 days

16   remain in the stay period.

17             THE COURT:  Okay, 79 from?

18             MR. METZGER:  As of today's date.

19             THE COURT:  We counted differently, that's why I'm

20   curious.

21             MR. METZGER:  It was 87, Your Honor, as of the date

22   that NASA issued the stay on the 9th.  It was received by

23   Sierra Nevada on the 10th, and we gave the requisite 24-hour

24   notice on the first working day after Columbus Day and then

25   filed on the following day.

1           THE COURT:  So, you're saying it's 79 as of today?

2           MR. METZGER:  That's my understanding, Your Honor.

3           THE COURT:  Any disagreement from the Government?

4           MR. HERZFELD:  To be honest, Your Honor, I haven't

5     actually calculated the amount of days left, but I'll defer

6     to the Court and Mr. Metzger.

7           THE COURT:  All right.  So, both the stay and the

8     protest concerned NASA's commercial crew program.  It is a

9     very important program.  It seeks to achieve important

10    national objectives.  My client has participated over the

11    course of the commercial crew program for some years and it

12    is one of the three companies that submitted proposals for

13    award of the current phase.  That current phase called CCtCap

14    intends to complete the decision development test and

15    engineering for qualification of commercial space flight

16    systems to serve low orbit missions and to carry crew,

17    American and otherwise, to the International Space Station.

18           As the Court is undoubtedly aware, this is a

19    sizable program.  The potential award value of the contract

20    at issue is $6.8 billion.  Boeing and SpaceX were the

21    recipients of NASA's selection for award and Sierra Nevada is

22    a disappointed bidder.

23           This is the first ever commercial program, the

24    first time that NASA has ever relied upon commercial sources

25    to undertake the challenging mission of both lifting off via

1    a rocket booster and then operating in proximity to the Space

2    Station successfully delivering crew there and bringing them

3    back.

4         The goal of the program, supported undoubtedly by

5    all of the participants, including Sierra Nevada, is to have

6    this capability ready by the end of 2017.  And as NASA itself

7    recognizes, unquestionably, as is expressed in the override

8    memorandum, as has been promised to Congress, it is essential

9    that the commercial crew capability be employed for missions

10   only when it is safe to do so.  And these are new systems.

11   They do not exist today.  There's been design and development

12   activity to date, but it will take at least three years to

13   complete design and development.  Several test flights may be

14   necessary before the vehicles are ready to be certified as

15   safe for flight and operation.

16        And as NASA has explained many times and correctly

17   in the override memorandum, the history of spacecraft

18   development programs, whether crewed or uncrewed is one that

19   is characterized almost uniformly by difficulties experienced

20   in the course of development and by delays.

21        So, in this particular action, rather in the

22   underlying protest, the merits of that, of course, are not

23   relevant here.  If the GAO stays on the schedule that it has,

24   it must complete its decision, as the Court knows, by January

25   5th or sooner.  The merits of that protest are not relevant.

1    Of course, the Court will naturally presume that Sierra

2    Nevada brought the protest because it believes that its

3    vehicle should have been selected for award.  It believes

4    that it is in the national interest for NASA to collect

5    Sierra Nevada's winged vehicle approach.

6         Sierra Nevada believes that that is a more flexible

7    and reliable approach for the mission at hand and Sierra

8    Nevada's approach also -- and this information is

9    confidential -- would cost NASA approximately $900 million

10   less than the award value that has been granted to Boeing.

11   And that potential savings ought to figure, at least to some

12   extent, in the calculus as to the override.

13        The override was prepared by Mr. Gerstenmaier who

14   is, for good reason, widely respected, if not more so among

15   the space community.  He has a distinguished history.  He

16   certainly is a very knowledgeable person.

17        The override goes at great length to assert that it

18   is in the best interest of the United States to dispense with

19   the CICA stay, and it has something of a footnote, it also

20   asserts that there are urgent and compelling reasons to --

21   for NASA to proceed with the current contract awards

22   irrespective of the stay.

23        As I mentioned, there's no disagreement that the

24   issues are important and there is no disagreement that the

25   national objective is shared that the United States develop

1    and deploy, as soon as possible, American launch systems that

2    can carry astronauts to and from the Space Shuttle [sic].

3    But this -- the action before this Court is not about the

4    commercial crew program and it is not about the policy

5    interest to be third when this laudable objective eventually

6    is obtained.

7            It is about the 79 days that remain in the stay and

8    it is about the relationship between a clear Congressional

9    mandate established by the Competition in Contracting Act

10   that obligates agencies to stay performance of award when a

11   protest is timely filed that -- and on the one hand, against

12   the assertion of NASA that it is national interest to proceed

13   with performance of those awards despite a pending protest

14   and irrespective of the stay.

15           The override, as you know, is subject to judicial

16   scrutiny.  There have been a series of cases over the years

17   which have articulated different ways to apply that scrutiny.

18   The general proposition, again, as the Court undoubtedly

19   knows, the Administrative Procedure Act provides the

20   framework for the review and the fundamental challenge that

21   we make under the APA is to assert that the override is

22   arbitrary and capricious and abuse of discretion and not in

23   accordance with law.

24           There have emerged many different approaches that

25   Courts have taken to assess the legality of an override.

1    Your Honor, I believe one of your decisions recognized, as

2    have many others, that deference is given to the agencies in

3    the override, but the deference is not without

4    qualifications.

5             THE COURT:  That's an old case.

6             MR. METZGER:  Yes, yes, it is.  I will refrain from

7    commenting on its wisdom.

8             THE COURT:  It's before a number of other things

9    that are probably more relevant, so...

10            MR. METZGER:  Yes.  Even in the Automation case

11   that you decided, you recognized then that these are fact-

12   specific cases, and I believe it's fair to say of the

13   subsequent juris prudence that most of the decisions, also,

14   earn a careful examination of the facts.  No decision, with

15   perhaps one exception, grants a presumption that merely

16   because an agency has declared the override to be in the

17   national interest or asserted that the circumstances are

18   urgent and compelling, that's not been found to be enough.

19            That is because the override, by definition,

20   eliminates the operation of the stay, which has become a

21   fundamental nature of our bid protest system.  When Congress

22   enacted CICA, it was true then now as well as it.  Congress

23   was well aware of the practice of agencies prior to enactment

24   to get awardees to work so that the GAO would be essentially

25   under some influence or concern, and if it made a decision,

1     it would be costing the agency a great deal of money.

2           Congress decided that the national law and policy

3     recognizing there would be disruption and delay was to impose

4     a stay.  No application is necessary for a stay.  No bond is

5     required.  No factors must be met.  The stay comes into

6     place, comes into being and operates in every situation for

7     any agency, for any type of requirement when a GAO protest is

8     timely filed.

9           And, of course, this means that the override is an

10    exception to that statutory mandate, and that is the reason

11    that many judges on this Court, through different

12    articulations, have found ways to assess carefully whether an

13    override is sustained, and in some cases, it is, of course,

14    and in some cases, it is not.  Each case is different.

15          One of the more significant decisions, as the Court

16    undoubtedly recognizes, was that of Judge Allegra a few years

17    ago in Reilly's Wholesale.

18          THE COURT:  Reilly's.

19          THE COURT:  Reilly's Wholesale is significant

20    because of the thoughtful articulation that it gives to the

21    question of what factors the Court should consider in

22    evaluating an override.  Reilly's Wholesale articulates four

23    factors, and those happen to be the same four factors that

24    NASA employs in its override.  Those are the adverse

25    consequences of the stay, the presence of reasonable

1      alternatives to an override, a comparison of the cost of the

2      override to the benefits that are realized through the stay,

3      and the impact on competition, as well as on the integrity of

4      the public contracting system.  I appreciate very well that

5      not all courts apply Reilly's in the same way that Judge

6      Allegra did.  It is --

7              THE COURT:  Now, are you saying those are good

8      standards, valid standards, the wrong standards?  What are

9      you saying?

10             MR. METZGER:  I think they are useful standards,

11     Your Honor.  They're not talismanic.  One cannot trace those

12     standards, as I'm sure you are aware, back to anything in

13     CICA.

14             THE COURT:  But they're very broad, obviously.

15             MR. METZGER:  They're broad.  They are helpful ways

16     to organize the requisite analysis.  They provide a useful

17     framework.  I see them as appropriate for guidance.  I do not

18     see them as necessarily controlling.

19             THE COURT:  So, in your particular argument to

20     oppose the override, where do you think the agency went

21     wrong, in using these standards or in how they used them?

22             MR. METZGER:  In how they used them and, more

23     accurately, in the outcome of their use.  I think the agency

24     asked the correct questions.  To us, the flaw is in the

25     outcome; that is, how the agency assembled the facts and

1    reasoned the application of these principles to those facts.

2            THE COURT:  Okay.  So, let's figure out then what

3    facts you think are relevant and whether or not the agency

4    used those facts or misused them according to you.

5            MR. METZGER:  Let's turn to the first of the four

6    factors, and that is the severity of the adverse

7    consequences.  The agency goes to great length to state that

8    the United States -- the interest of the United States will

9    be harmed unless the new commercial crew capability is

10   available before the end of 2017, when the present U.S.

11   contracts with Russia for seats on the Russian's Soyuz

12   vehicle expire.

13           THE COURT:  So, we're talking about timing here?

14           MR. METZGER:  Timing is important.  The adverse

15   consequences issue distills to this, I think.  NASA says that

16   the United States would violate its own law and its own

17   policy, as well as international obligations, and the

18   override even suggests that there could be jeopardy to the

19   operations or even to the safety of the crew if the override

20   -- or the stay remains in place.  But where this analysis

21   comes apart is that it relies upon -- initially that relies

22   upon a remote and speculative contingency.

23           The award that was made on September 26th, that's

24   subject to the current protest, calls for a program that will

25   take over three years to complete, if it stays on schedule,

1    and will cost many billions of dollars.  Tens of thousands of

2    hours of engineering and other work will be required.  During

3    the first 100 days, the same period as the protest, there is

4    one milestone, this baseline review that is schedule.  It is

5    a significant milestone, but it is one of many.  It is a

6    weight point at the start of a long and complex program.

7           So, we believe that on the record -- even the

8    record contained within the override memorandum itself, it is

9    accurate to say that NASA has overstated the consequences of

10   respecting the CICA stay.  It is not that these 79 days are

11   trivial.  We don't contend that.

12          THE COURT:  So, what, in your view, precisely

13   happens in those 79 days?

14          MR. METZGER:  Well --

15          THE COURT:  We've got this one baseline review.

16   What else?

17          MR. METZGER:  As I understand it, NASA -- and this

18   is from reading the override memorandum -- NASA expects the

19   awardees to engage in initial design activities to do launch

20   and mission planning.  And, again, from the override

21   memorandum, NASA says that the awardees will make capital

22   expenditures and enter into long-lead committees.  NASA has

23   said that its termination liability for each of the awardees

24   is $129.3 million during this period, a non-trivial sum.

25          These are important objectives to secure, but is it

1    true that the consequence to the program is as NASA asserts?

2    NASA says that if the stay is reinstated, the United States

3    will not have launch vehicles available after the end of the

4    current contractual coverage with Russia.  But this is

5    contradicted, frankly, not only by information in the

6    override memorandum, but by actions that NASA has taken with

7    Congress and without.

8            In March of this year, the NASA administrator

9    testified to the House Science Committee -- this is Mr.

10   Bolden -- and he told the House Science Committee -- and

11   we've provided this as an exhibit -- that -- in effect, that

12   NASA recognizes the risk that the new vehicles may not be

13   ready and that NASA plans to continue to contract with the

14   Russian Space Agency, Roscosmos, to buy additional Soyuz

15   missions.

16           Also, in the FY 2015 budget submission that NASA

17   submitted to Congress, again, the expectation is asserted

18   that the U.S. crew capability may or will not be ready and

19   that the U.S. will continue to need to buy launch services

20   from Russia.  This should not come as a surprise to anyone

21   since the International Space Station has been an exercise in

22   civil space cooperation since an intergovernmental agreement

23   was entered into among roughly 15 nations, including the

24   United States and Russia in 1998.  That agreement has the

25   force and effect of being a treaty.

1          By that agreement, the United States and Russia and

2     the other nations have cooperated consistently and through

3     many different periods of variation in the East-West

4     relationship.  Although there are tensions in and

5     occasionally disruptions to the relationship between the

6     United States and Russia, I believe it is accurate to say

7     that, at no time, has there ever been a suspension, failure

8     or disruption to the cooperation between the United States

9     and Russia as concerns the ISS.

10          The Soyuz vehicle has flown more Americans to the

11    ISS than did the Space Shuttle.  It has been the only source

12    of transportation since the retirement of the Space Shuttle,

13    and although it is not the preferred source -- we, of course,

14    agree with that since we seek to perform that role ourselves.

15    It is not the preferred source, but it remains available, and

16    NASA goes too far in attempting to say in the override

17    memorandum that at the end of 2017, there will be no way to

18    transport crew to the Space Station because there will be,

19    and it knows it, and NASA has said so to Congress.

20          Moreover, NASA goes too far in the -- in relying

21    upon a premise that it surely recognizes cannot be correct.

22    That premise is that if these 79 days are saved, one or both

23    of SpaceX and Boeing, in fact, will have safety certified,

24    ready-to-launch commercial crew capability by 2018.  Your

25    Honor, they might.  It's possible.

1          But the RFP that led to this award never set an

2     initial crew capability in 2018 as a requirement.  Never.  It

3     was only a goal.  Never has NASA told Congress that it will

4     have U.S. crew capability in 2018.  It has said it hopes to,

5     and that's a quote.

6          NASA repeatedly, throughout the override

7     memorandum, recognizes the historical truth that even less-

8     demanding spacecraft programs or launch vehicle programs

9     historically are subject to significant delays.  This program

10    is more difficult than most because it is the first time that

11    a commercial provider will be relied upon both for the launch

12    vehicle and the in-orbit systems and forward turn.

13         So, on the issue of adverse consequences, our

14    position is that the record does not support the -- I'm

15    sorry.  The record does not support the assertions of NASA

16    that there are so many and so serious consequences.  There

17    are consequences to the stay, of course.  It would delay this

18    program, but that will be -- that delay, we think, in the end

19    will prove to be subsumed among many other sources of delay.

20         THE COURT:  So, you're saying the 79 days is de

21    minimis?

22         MR. METZGER:  I want to be accurate and to respect

23    the challenge.  It's more than de minimis.  But the adverse

24    consequences are one of four factors, and I think they need

25    to be considered in combination and the interplay needs to be

1    recognized.  The program would proceed more quickly if there

2    was not a stay.  But the stay exists to serve another

3    important purpose, and distilled to its essence, that purpose

4    is to have the maximum assurance that NASA chose the right

5    contractors to perform this mission.

6          THE COURT:  What about the second test in Reilly?

7    And, again, I agree with you, Reilly is not the end-all and

8    be-all and it is useful and it is a very fact-specific

9    determination.

10         MR. METZGER:  Right.

11         THE COURT:  But the second standard or test, or

12   whatever we want to call it, of whether reasonable

13   alternatives to the override exist that would adequately

14   address the circumstances presented, there really isn't an

15   alternative, is there?  That's not the most significant

16   factor here, clearly.  I think there is a difference between

17   the important of each of these factors and how you balance

18   them.  But what, if any, alternative are you suggesting there

19   is here?

20         MR. METZGER:  Well, I -- with respect, I would

21   disagree in part.

22         THE COURT:  Feel free.  That's what we're here for.

23         MR. METZGER:  There are two ways to look at the

24   issue of reasonable alternatives.  One is, is there a

25   reasonable alternative to the end consequence that NASA

1    associates with the stay.  That end consequence is the

2    unavailability of the capability to transport crew from the

3    earth to the station and back.

4              THE COURT:  Well, as I think about this particular

5    factor, and it's not the only example, but I think a typical

6    example is you're able to do a bridge contract in an ongoing

7    situation.  That's not the case here.  So, when we talk about

8    reasonable alternatives, what can we summon from your

9    perspective to support your argument.

10             MR. METZGER:  Your Honor, I believe, in fact, that

11   there are reasonable alternatives.

12             THE COURT:  Tell me.

13             MR. METZGER:  And I believe that there is a bridge.

14   In the conventional case, you might have an incumbent

15   contractor where you could extend their performance.

16             THE COURT:  That's the easy one, right.

17             MR. METZGER:  But there is an incumbent contractor

18   here.  It has the benefit of receiving these awards sole

19   source since the Space Shuttle was retired, but it has

20   faithfully performed crew transportation missions since

21   roughly 2001.

22             THE COURT:  We're talking about the Russian

23   alternative here.

24             MR. METZGER:  The Russian is an alternative.  These

25   contracts are authorized by U.S. law.  Here's something

1    that's important --

2            THE COURT:  Well, let me ask you a question before

3    you move on.  There is some mention in some of the papers

4    that in order to continue the Russian alternative, for lack

5    of a better descriptive term, that you actually have to order

6    that three years in advance.  Do you happen to know, and

7    obviously the Government is going to know better than you do,

8    but do you happen to know whether that's either taken place

9    or in contemplation?

10           MR. METZGER:  I can comment on that.  First, the

11   requirement of the three-year order is to give the recipient

12   of the order time to build, integrate, test, and prepare the

13   launch vehicle.  The same three-year order period will apply

14   to the new U.S. commercial vehicles, and NASA says so in the

15   override.

16           So, this -- and it is not new that there's a three-

17   year --

18           THE COURT:  It's not new, but, I mean, has there

19   been anything done in that respect, do you know?

20           MR. METZGER:  Yes.  First and most important, in

21   order for the United States to use a Russian launch vehicle

22   under any circumstance, there is a legal regime called

23   INKSNA, which concerns sanctions that apply to Iran nuclear

24   activity, Syria.  Unless there is a statutory exception to

25   INKSNA, it is either impossible and requires a presidential

1      decision to do -- to deal with Russia for these launch

2      services.  INKSNA applied through the end of 2016 until

3      December of 2012 when Congress passed a law that was enacted

4      in January of 2013 that extends the waiver of INKSNA for

5      purchase of Russian launch services until 2020.  That's an

6      objective event that exists as a matter of statute.  And, of

7      course, I have the cite for you if you care to look.

8              And in addition, I mentioned earlier that the NASA

9      administrator said several times to the House Space

10     Committee, the authorizing committee, that NASA was expecting

11     to and therefore must be planning for the placement of

12     additional orders.  I agree that it is not preferred that we

13     buy any more launch services from Russia.  I agree.  Sierra

14     Nevada agrees completely that this mission should be

15     performed entirely -- or at least predominantly -- by U.S.

16     sources when they are ready.  But it is not correct to

17     suggest that there is no alternative.

18             Since 2011, the only way to fly cosmonauts or

19     astronauts or Japanese or Canadian or German or French

20     participants to the ISS has been through Soyuz, and it has

21     performed those missions, in fact.  As recently as September

22     25th of this year, Soyuz mission TM-14 A took off from

23     Kazakhstan and docked with the Space Station, carrying an

24     American and a Russian astronaut and cosmonaut, and they

25     docked there September 26th and they are there.

1           NASA knows that it has the ability to order more

2    missions from Roscosmos.  They are not cheap.  They may

3    actually cost less than eventual missions from U.S. sources,

4    but that ability is there.  So, there are reasonable

5    alternatives.  Indeed, if there was not such an alternative,

6    NASA would have no way to support the Space Station and

7    neither would anyone else.  And Russia has a great deal,

8    perhaps nearly as much invested in the Space Station as the

9    United States.

10           I need to emphasize this.  We are at a period of

11   time where the relationship between the U.S. and Russia is

12   strained over The Ukraine, among other topics.  The sanctions

13   that have actually been imposed against Russia are limited

14   and they are targeted.  They affect the financial industry;

15   they affect certain aspects of oil and gas exploration and

16   production for certain projects; and that's it.

17           This is not a situation where there is a broad

18   trade war, even though members of Congress and some U.S.

19   officials and some Russian officials have said things that

20   they might do or threats that they could exact.  The record

21   simply does not support the proposition that today there has

22   been any -- any interference in the commercial and technical

23   relationship between the United States and Russia to support

24   the ISS.

25           THE COURT:  And I don't want to make a foreign

1    policy statement here, but the question to you, obviously, is

2    in terms of the urgency of proceeding and the override

3    question, which is all we're here to talk about, is there an

4    urgency essentially to get out from under as quickly as

5    possible?  I mean, that's going to be one of the factors

6    here.

7              MR. METZGER:  Yes, of course.  This is a complex

8    program, and I -- if you will indulge me -- I think a nuanced

9    answer is appropriate.

10             THE COURT:  That's fine.

11             MR. METZGER:  Time does matter, but so does the

12   right selection.  And so does the respect for CICA, the stay,

13   and the GAO protest process.  And this is not a situation

14   where we can attribute any certainty to the impact of the 79-

15   day delay.  That's because these programs will take three

16   more years and cost several billions of dollars.  Many things

17   could happen, good or bad, but history tells us these

18   programs will run late anyway.

19             And, so, there is urgency --

20             THE COURT:  Well, none of us can see the future, of

21   course.  So, it's hard to say they -- that it will

22   necessarily go into an overrun time or cost status.  A lot of

23   contracts do; a lot of contracts don't.  It's hard to tell.

24   Bigger contracts do more often than smaller contracts.  I

25   mean, those are all the things -- I've been in this business

1    since the '70s, so it's been a long time since I've been in

2    government contracting, doing even formation work.

3            But you see patterns over time, but at the same

4    time, up front, are we in a situation where we want to

5    potentially delay it further?  That's really the heart of the

6    question.

7            MR. METZGER:  We have to take that into context of

8    other factors, but on the immediate question, I would say

9    this.  NASA says the override, that it takes three years from

10   ordering for Russia to have a Soyuz available.  And NASA also

11   says in the override that time is necessary to negotiate the

12   contracts.

13           Suppose that NASA did not -- suppose that the

14   override doesn't -- does not become lifted and the stay

15   remains in place.  The question is whether NASA in three

16   months or six months or a year will be so certain that these

17   as-yet untested, unflown, unassembled, new commercial

18   vehicles -- will they be so certain that they will, in fact,

19   be available and safe and certified after 2017 that they

20   would not, as a matter of ordinary prudence, as a hedge,

21   order another C -- a Soyuz?  I think not.  I think the

22   urgency is --

23           THE COURT:  I think the answer to your question is

24   they can't be certain, but I wonder if that's the standard.

25           MR. METZGER:  There will be things accomplished

1    during this interval, but it's the first milestone of many.

2    And it does not have the decisive certainty as to the

3    availability of U.S. space flight capability that NASA would

4    attribute to it.

5            THE COURT:  So, if we were later in the contract

6    and this had been a phased contract, for example, would the

7    answer be different?

8            MR. METZGER:  Yes, because you'd have more of a

9    baseline of knowledge of accomplishment in design and

10   development to give you confidence.  NASA says in the

11   override memorandum, Your Honor, that it's not going to order

12   any crew missions until safety certification is achieved.

13   And that is not going to even be possible, even if we were on

14   schedule, until sometime in 2017.

15           And would you really proceed for the next three

16   years, hoping that Boeing or SpaceX will be ready and

17   certified on the promised dates?  Would you really do that

18   and not purchase a Soyuz-C just in case?  I think not.  And

19   that's why the NASA administrator has told Congress that he

20   expects that they will purchase more Cs from Roscosmos.  And,

21   in fact, in an interesting exchange, also a matter of public

22   record, the administrator blamed Congress in part, saying

23   that the ability of the United States to get its own flag

24   launch capability by 2017 has been impacted adversely by the

25   refusal of Congress to fully fund the commercial crew

1    program.

2              THE COURT:  That must have been a fun hearing.

3              MR. METZGER:  It was an interesting hearing.  So,

4    you know, Congress supports the program, but Congress has not

5    fully funded it either in 2012 or 2013.  And Congress surely

6    is aware that if the date of 2017 is not met that the only

7    way to support the station is to continue to rely upon the

8    Soyuz until the U.S. capability is present.

9              Should we turn to the third factor?

10             THE COURT:  How the potential costs impact this

11   all.

12             MR. METZGER:  It does start with the potential

13   start of the override.  It's clear, you know, in thinking

14   about CICA and, in fact, some of the legislative history

15   anticipates this.  The potential cost that has to be

16   considered is what would it cost the Government if it becomes

17   necessary after the GAO sustains a protest to terminate an

18   award.  And in this particular case, Sierra Nevada has

19   challenged the awards to Boeing and to SpaceX.  And I'm not

20   going to speak about the merits of the protest at all, but we

21   can at least identify several scenarios.

22             One scenario is, of course, that the protest will

23   be dismissed.  Another scenario would be corrective action

24   recommended perhaps even before the 100 days are over.  Still

25   another scenario would be that the GAO decides that award to

1    Boeing or SpaceX was improper, and since Sierra Nevada was

2    responsive, responsible, qualified, and eligible, the award

3    could be directed to it and the other awardee would be

4    terminated.

5            But it's also possible, Your Honor, that the GAO

6    could find some fundamental flaw in the solicitation, in

7    which case it could, perhaps, order a new evaluation or even

8    a new competition.

9            THE COURT:  Let me ask a question, and I know that

10   we're not here to talk about the merits of the GAO protest.

11   But as I understand briefly, the protest at -- and very

12   briefly, understand, because I don't have a lot of the

13   information.  The protest at GAO is fundamentally an

14   evaluation protest, is that correct, or are there other

15   things in it?

16           MR. METZGER:  Fundamentally an evaluation protest,

17   but the agency record has not yet been produced, and

18   experience both here and at the GAO indicates that there may

19   be other issues that emerge based on the review of the agency

20   record.

21           THE COURT:  And the evaluation protest is based on

22   what, price as not being considered enough?

23           MR. METZGER:  I may need to ask my counsel, because

24   my focus, frankly, Your Honor, has been on the override.

25           THE COURT:  Is on the -- yeah.  Sure.

1          MR. O'DONNELL:  Yes, Your Honor.  It's really

2    broad-based.  It has a fundamental element, which is that the

3    evaluation took place not respecting the evaluation criteria,

4    which were -- which were in the solicitation.

5          THE COURT:  A 50 percent price consideration?

6          MR. O'DONNELL:  Well, there's the question of how

7    price was taken into account; how the question of the 2017

8    was taken into account.  So, there are a variety of issues in

9    that, as well as questions about evaluation.  So, Mr. Metzger

10   has correctly, in my view, stated the possibilities here.

11   Even on the basis of the record known so far, they could

12   include that, for example, if NASA believed -- and this

13   proceeding has certainly emphasized that -- the 2017 -- that

14   having this done by 2017 was absolutely essential, then it

15   should have done something other than say there was a goal of

16   reaching of 2017.  And its internal processes should have

17   consistently given that message, which we allege that it did

18   not.

19          So, the point is that we may have a situation here

20   where there is a disconnect between what the solicitation

21   says and what the agency's needs were.  And the way to deal

22   with that is to have a correction of the actual solicitation

23   document and the parties' opportunity to bid to the actual

24   requirement.

25          THE COURT:  Okay.  Thank you.

1          MR. METZGER:  So, potentially, the cost -- let's

2     consider the cost incurred and the cost or the savings

3     foregone.  On the point of incurred costs -- I'll wait for

4     your --

5          THE COURT:  No, I'm with you.

6          MR. METZGER:  On the point of incurred costs, NASA

7     has already told us that it has a limitation of funds amount

8     of $129.3 million for each contract.  So, in theory, if each

9     of the awardees spends all of the money that they can, and

10    they are told to make capital investments and to make long-

11    lead commitments, those are irrevocable, or at least

12    cancellation comes at a high price.  They could spend more

13    than a quarter-billion dollars in the period that's subject

14    to the stay.  And in the event -- under the scenario that the

15    GAO order a new competition, half of that could be lost

16    completely if one of the awardees is displaced.  And in

17    theory, perhaps with a little less likelihood, all of that

18    could be lost.  That's a lot of money.

19         And let's also think about the other side of it.

20    The argument of Sierra Nevada is that it offers a better

21    solution than either Boeing or SpaceX.  We're not here to

22    debate that.  But as I said, the price that Sierra Nevada

23    proposed on a fixed price basis was $900 million less than

24    Boeing.  And, so, if the effect of the override was to

25    prejudice a renewed competition, and we'll talk about that

1    next, then that could have the effect of denying the United

2    States the benefit of the substantial savings that it would

3    realize if, in fact, Sierra Nevada's vehicle was chosen.

4              THE COURT:  You may want to turn to your co-counsel

5    again with this next question, and certainly that's fine.  On

6    the technical side, there's obviously a big difference in the

7    type of vehicle that's being offered by your company and the

8    other two.  To what extent did that play into it or how close

9    were the technical evaluations?  Mr. O'Donnell?

10             MR. O'DONNELL:  The technical evaluations actually

11   were in the narrow range.  Out of a thousand points, I

12   believe the final score difference between SpaceX and Sierra

13   Nevada was 20 points.

14             THE COURT:  Did that take into account the

15   advancement of the development?  I think that was one of the

16   issues, that there was some concern about the ability of your

17   client to be able to meet the deadlines because of the stage

18   at which they were?

19             MR. O'DONNELL:  All three companies, Your Honor,

20   had schedules which called for completion in 2017 at various

21   points.

22             THE COURT:  Right.  But on the way.

23             MR. O'DONNELL:  And there was -- one of the

24   evaluation factors which resulted in that point differential

25   was on scheduled risk.  And there was concern expressed in

1    the source selection authority's statement as to whether

2    there was more risk that Sierra Nevada would go beyond 2017.

3              Without getting into the merits, Your Honor,

4    obviously we have disagreements to that.  But more important,

5    I think that it shows again that 2017 -- completion by

6    2017 -- played a critical role in this determination role of

7    how that applies to what an offeror would reasonably expect.

8              THE COURT:  All right, thank you.

9              Okay, back to you, sir.

10             MR. METZGER:  So, at least financially, there is a

11   potential loss to the United States of as much as a quarter-

12   billion dollars depending on what the GAO does.

13             THE COURT:  Or depending upon either Boeing or

14   SpaceX (inaudible) contractually.

15             MR. METZGER:  Yes, that's right.  If one takes

16   seriously the -- and we must -- if one credits NASA with the

17   description of the work it expects from Boeing and SpaceX,

18   they will spend a great deal of that money.  NASA has the

19   money authorized and available, and rare are the contractors

20   who do not take advantage of such a situation to spend the

21   money as fast as they can.

22             So, we know there will be a cost, and then the

23   question is lets compare that to the benefit, well, you know,

24   the benefit here takes us back, to some extent, to the

25   consequences inquiry and also to the issue of alternatives.

1    What is the benefit of overriding this?  Sorry, what is the

2    benefit of the override?  The benefit of the override is that

3    NASA will be 79 days ahead of where it might have been if the

4    GAO took the full 100 days and the stay was in place.

5            As I've said, I don't propose to trivialize what

6    will be done in those 79 days.  It's significant, but it's

7    just the first of many important milestones at the start of a

8    program where, as I've said, billions of dollars and tens of

9    thousands of hours of engineering and other time will be

10   expended after this baseline review that is to occur within

11   this period.

12           So, our view is that there is a known and

13   substantial cost and a significant opportunity cost that's

14   compared to a benefit that is possible but ultimately

15   conjectural.  And that, if you're satisfied, takes us to the

16   last of the factors, which is the impact of the override on

17   competition and on the integrity of the procurement process.

18           And we believe this is actually perhaps the area

19   that we have the strongest argument to make.  All three

20   companies participated in several years of non-FAR Space Act

21   agreements, coming to the point of this FAR competition for

22   contracts that at their award value amount to $6.8 billion, a

23   sizable program.

24           Sierra Nevada was, as my colleague mentioned, very

25   close in evaluation, and as I've said was certainly

1    accredited as being eligible for award.  If the purpose of

2    the stay, as has been established by Congress at the time of

3    enactment and reaffirmed through many decisions of this

4    Court, the purpose of the stay is to make sure that the bid

5    protest mechanism can operate independent of any influence

6    that could occur by reason of the GAO's knowledge that

7    agencies are proceeding with performance irrespective of the

8    protest.

9            This contract is exactly the kind where it is most

10   important to respect that purpose, and that is because the

11   work that will be done by the awardees during the period of

12   the stay would give them an enormous head start, really an

13   unreachable advantage, an unbridgeable advantage in the event

14   of a new competition.

15           There is a finite number of engineers who are

16   capable.  There are limits to the supply chain that can be

17   engaged to support such an activity as this.  There are only

18   a few launch slots that are available.  If SpaceX and Boeing

19   receive $129 million each, they will have a funding

20   advantage, and more important, they will have accomplished

21   work towards mission planning, design, vehicle configuration,

22   operations planning.  They will have secured arrangements

23   with their supply chain.  They will have blocked out some

24   suppliers to others.

25           And, so, if there would be a competition, would the

1    playing field be level?  It would not.  It could not be.

2    They would have such an advantage that it would be

3    practically, if not impossible, virtually impossible for

4    Sierra Nevada to compete on an actual -- on an equal footing.

5    And once they've spent this money and done this work, they

6    become infused with knowledge and equipped with

7    accomplishment that can't be taken away from them.

8           And Sierra Nevada would be in the cold even if its

9    protest were sustained and even if the GAO were to order a

10   new competition with revised specifications or evaluations

11   criteria.  But as more, even in the unlikely event that

12   Sierra Nevada could succeed in displacing one of the two

13   awardees in a new competition, you have to recall that the

14   commercial crew program actually has two phases in the

15   contract that's here being challenged.

16          The first phase is the DDT&E, design, development,

17   test and engineering.  That gets you to the point that you

18   have a certified -- vehicle that's been certified by NASA as

19   safe.  After the point of certification, CLIN 2 comes into

20   operation.  CLIN 2 is the ability of NASA to order crew

21   flights from either of the qualified suppliers.  This would

22   begin at the earliest in 2017, more likely at some point

23   later.

24          So, if Boeing and SpaceX receive 100 days of work

25   and $129 million of money, they'll be ahead in performance.

1    And even if SpaceX is inserted -- sorry, even if Sierra

2    Nevada is inserted by the GAO at the 100th or the 200th day,

3    supposing there was a new competition, the head start that

4    the awardee received would prejudice, I think, the

5    opportunity of Sierra Nevada to compete for or to win

6    missions once its vehicle was certified.

7              So, that's an impact to competition, but there's

8    also an impact to integrity, which is significant here, too.

9    Let's think about the implications of the stay and the

10   override in their whole context.  NASA's made it very clear

11   in the override memorandum that it expects a lot to be done

12   by the two awardees during the first 100 days and it's

13   prepared to pay a lot.

14             From my vantage point, if the stay remains in place

15   and the GAO decides to require a new evaluation or a new

16   competition, for all practical purposes, NASA is immunized

17   from any outcome other than the same one it already has.  And

18   that's because the advantages that will have accrued to the

19   awardees during this first 100 days will be so great that

20   irrespective of any relief the GAO recommends, Sierra Nevada

21   will have no practical chance of prevailing in a new

22   competition.

23             I'm not suggesting that NASA designed it that way,

24   but I am sure -- I'm quite confident that the practical

25   outcome of lifting the stay will be to assure NASA that

1    irrespective of any decision that GAO makes it will remain

2    under contract with Boeing and SpaceX.  And that could be the

3    correct outcome if the GAO rejects the protest, but that's

4    not the reason that the CICA stay exists.  The stay is put in

5    place to protect and respect the protest process.  If we give

6    respect to that process, we need to enable the GAO to make a

7    decision without having the putative contractors receive so

8    many benefits in funding and performance during the protest

9    interval that there's no practical alternative other than

10   continuing to use them.  That is essentially defeating the

11   purpose of the stay through an indirect route.  But the

12   impact is the same.

13          THE COURT:  Certainly you've articulated your

14   argument very well, and I thank you for that.

15          MR. METZGER:  Thank you.

16          THE COURT:  I guess I'm not sure if we're talking

17   about the supply chain contracts and we're talking about

18   employees that obviously are fungible goods and go back and

19   forth between contractors all the time in the same field.  If

20   the GAO were to sustain the protest and either order

21   something changed or order a resolicitation or whatever, I

22   assume those very same supply chain contractors and employees

23   are still fungible to some extent at a cost, no doubt, to

24   Boeing and SpaceX, but nonetheless are not completely

25   unavailable.  You've portrayed it as completely unavailable,

1    and I'm not sure that's a fair description.

2         MR. METZGER:  I wouldn't want to say anything in

3    absolutes.  I can't say that they're completely unavailable.

4    I understand from talking to our client that they have great

5    concern that there are certain critical subcontractors and

6    vendors, certain specially significant technical resources

7    and employees, and that in their belief there would be an

8    impact that would be difficult, potentially impossible, to

9    overcome if their rivals have this 79-day advantage.

10        THE COURT:  The more likely scenario in practical

11   terms is subcontractors or some people just bolting back to

12   your client.  I mean, I don't think we can say for sure that

13   there's a total unavailability there, is what I'm suggesting.

14        MR. METZGER:  No argument.

15        THE COURT:  I think that would be overstated.  The

16   other question I have for you, and it's a tactical one that

17   I'm sure you've thought of.  If, in fact, I were to sustain

18   the override -- and don't read too much into this -- we're

19   doing hypotheticals here -- if I were to sustain the

20   override, would your next move simply be to file in this

21   Court and then be talking about an injunction, which then

22   would consider the likelihood of success on the merits?

23        That's always the dilemma here, because that's what

24   we see happening, particularly in big contracts.

25        MR. METZGER:  Very interesting question.  Well, the

1    way I understand your question is to present a scenario that

2    you would decide against a declaratory judgment, leaving open

3    the possibility we would seek injunction.

4                THE COURT:  It's automatically open.  And the

5    reason I'm asking you that question is because you've titled

6    your complaint for declaratory judgment, or in the

7    alternative, injunctive relief.  And really only the --

8    there's one case which discussed that sort of dichotomy but

9    never answered it in that particular case.  And that's the

10   DynCorp case.  But I'm not sure what you're asking me here

11   for when you add in injunctive relief.  This doesn't fit

12   neatly.

13               MR. METZGER:  Well, because -- we don't have the

14   benefit of Court of Appeals or the Federal Circuit --

15               THE COURT:  No, we don't.

16               MR. METZGER:  -- guidance on this, and there is

17   some diversity among the many decisions the judges on this

18   Court have made.

19               THE COURT:  Absolutely.

20               MR. METZGER:  So, as a matter of prudence, we

21   elected to seek both declaratory relief, as well as

22   injunctive relief.  Our preference and our -- our preference

23   based upon analysis is that declaratory relief is the right

24   decision, and here is why.  The situation that prompts this

25   lawsuit is, first, the operation by law of an automatic stay,

 1    followed by an act of an agency to override.

 2           In seeking a declaratory relief, we ask for a court

 3    of competent of jurisdiction to decide that the act, namely

 4    the override, is illegal, arbitrary and capricious.  And if

 5    the Court makes the decision that the agency's act of

 6    override is illegal, that has the effect of removing the

 7    impediment to the ordinary operation of the statute.  There's

 8    no mandate that the Court must give to NASA as would

 9    accompany an injunction.  Instead, if the Court says I decide

10    this override is unlawful, then the only impediment to the

11    ordinary operation of the statute, namely the stay, is

12    removed.

13           We believe that's correct analytically.  And we

14    also believe, although, you know, we haven't discussed it in

15    our papers, we also believe that it is arguably inappropriate

16    to apply the four-factor test that accompanies a preliminary

17    injunction.  And the reason is that the four-factor test

18    usually arises when one party is seeking a coercive order

19    from the Court to require another party to do something that

20    may impair a property right or other benefits of either

21    another party or an intervenor.

22           But this is not that case.  You know, this is a

23    case where there is -- you know, there is an expectancy on

24    the part of Boeing or SpaceX.  They are a putative awardee,

25    but they have no property right to keep the contract

1    irrespective of the protest process.  And, so, our view is

2    that getting into questions about the probability of success

3    on the merits, on the balance of hardships, on irreparable

4    injury, those are beside the point for declaratory relief.

5              THE COURT:  Fair.  Keep going.

6              MR. METZGER:  Sure.  So, you know, it is -- perhaps

7    this is a long answer to your question, but we think that --

8    we think that the appropriate action for this Court is to

9    grant a declaration that the agency's action was unlawful.

10   And we also believe that time is of the essence; every day

11   counts.  All of the harms that we have described, all of the

12   monies that would be spent, they occur hour by hour.

13             Time counts.  Time really is of the essence here.

14   And, so, if we were to postpone the ultimate decision to

15   require an injunctive process, we get into a variety of

16   complications, however expedited, that will essentially

17   defeat the purpose of the stay while we run through those

18   gates.

19             THE COURT:  Well, here's the end question of this

20   issue.  Does that mean that the standard for an override

21   decision, of just an override decision, is different and

22   lesser than for an injunctive request if you were to file in

23   the Court for a TRO permanent injunction -- permanent

24   injunction?

25             MR. METZGER:  The way that we have thought about it

```
1    is that we have should be able to meet both.  We believe our
2    case is sufficient to meet the higher standard.
3            THE COURT:  But I'm not empowered under this
4    scenario to review projected success on the merits or
5    probability of success on the merits.  So, I'm looking at a
6    different set of much more -- for lack again of a better
7    technical term -- wishy-washy standards.  Does that reduce
8    the burden for the Government?
9            MR. METZGER:  I believe it does.
10           THE COURT:  That's the tough one here for me --
11           MR. METZGER:  And I say that --
12           THE COURT:  -- figuring that out.
13           MR. METZGER:  -- obviously my interest is in
14   persuading you --
15           THE COURT:  But it's not --
16           MR. METZGER:  -- that we have satisfied our burden.
17           THE COURT:  Right.
18           MR. METZGER:  But, you know, from an analytic
19   standpoint, there are advantages and disadvantages from the
20   Petitioner's standpoint to the two remedies.
21           THE COURT:  Well, so, if I were to -- in terms of
22   protecting your rights under contracting, FAR standards, CICA
23   standards, if I were to -- and I'm not minimizing the
24   decision.  I mean, the Government has to do this properly,
25   obviously, to issue an override.  And there are consequences
```

1    for the Government in issuing an override, too.  They get to

2    talk about it up on that Hill that's down the street from us.

3              MR. METZGER:  Right.

4              THE COURT:  Because that's part of the override

5    process, which is mandatory reporting.  If I were to sustain

6    the override, your client would not entirely be deprived of

7    its right to seek relief under the government contract scheme

8    that we have in place, namely to come to this Court for an

9    injunction.

10             MR. METZGER:  I believe that's correct if time

11   would -- first, you know, we --

12             THE COURT:  Which means whoever gets the case,

13   whether -- has to move very fast.

14             MR. METZGER:  And we believe, although it's

15   certainly not, you know, resolved dispositively in any of the

16   decisions I've read, we believe that the applicable record to

17   an override decision is what we have, the override.  NASA had

18   13 days to prepare.  It's very thorough.  And we sought to

19   comment on the override, relying only upon materials that

20   reflected public acts, NASA's own decisions, NASA's own

21   publications and the like.

22             The clock is always ticking in the review of an

23   override decision.  So, to employ the process for a TRO or a

24   preliminary injunction essentially defeats the purpose of the

25   stay every day that the process continues.

1          THE COURT:  So, each day there are consequences to

2     not deciding the override decision.  And then each day, if

3     you were -- your client were to choose to file for injunctive

4     relief in this Court for -- straight injunctive relief, each

5     day would continue that ticking clock, so to speak.

6          MR. METZGER:  Absolutely.

7          THE COURT:  Okay.  Well, thank you.

8          MR. METZGER:  Thank you very much.

9          THE COURT:  Mr. Herzfeld.

10         Mr. Vacura, are you still with us?

11         MR. VACURA:  Yes, Your Honor, I am.

12         THE COURT:  All right.

13         MR. VACURA:  I was on mute, not to disturb you from

14    background noise.

15         THE COURT:  That's fine.  We don't want to lose

16    you.  That's all.

17         So, the Government's getting up there now, and then

18    we'll turn to the two intervenors and see if we can't address

19    this.

20         MR. VACURA:  Thank you, Your Honor.

21         MR. HERZFELD: May it please the Court.  Obviously

22    we're here and we oppose the motion, whether it's for

23    declaratory relief or TRO.  Of course -- kind of starting

24    with the last point first, I guess if we're not here for a

25    TRO, it's kind of questionable why are we here for a

1    declaratory judgment action.  If you're here for declaratory

2    judgment, usually --

3            THE COURT:  I would see it the other way.  If we're

4    not here for a TRO, then we're not here for the injunctive

5    relief piece of it.

6            MR. HERZFELD:  Correct.  Well, I agree, and -- but

7    the point being that in a declaratory judgment action,

8    normally you have a record.  In a TRO, you don't always have

9    a record.  You know, we don't really have a record here.  We

10   have the override decision, but the Department of Justice,

11   the United States, would like to prepare a record, if we

12   could.

13           THE COURT:  Well, let me ask you this.

14           MR. HERZFELD:  Sure.

15           THE COURT:  We have the override decision.  To what

16   extent does the override decision have to have a lot of

17   explanation, enough explanation, what is enough explanation

18   in the override decision?  You've got a relatively lengthy

19   one for override decisions.

20           MR. HERZFELD:  Sure.

21           THE COURT:  But some of it's pretty general and

22   nonspecific, potentially, as opposed to what you would have

23   in a record.  Tell me why it's sufficient.

24           MR. HERZFELD:  Why it's sufficient or insufficient

25   or --

1        THE COURT:  Sufficient, because you're defending

2    it.

3        MR. HERZFELD:  Well, I -- well, on its face,

4    obviously, we think it is sufficient.  Obviously we'd like to

5    have the background documents that were used to compile this,

6    but I'll table that for now.  And, obviously, I think, first

7    of all -- I mean, I think starting with the broader view of

8    CICA and the override itself, I mean, one thing in the

9    Plaintiff's papers that we see is an over-regard for the CICA

10   stay itself and an under-regard, I think, for the override

11   procedure itself.

12        While Congress obviously saw fit and thought it was

13   important to make sure that the GAO process didn't create

14   some type of fait accompli where, you know, by the time GAO

15   ruled there would be no new competition, there was no real

16   relief that GAO could provide.  While on the one hand that

17   was important, Congress also saw fit to make sure that it was

18   in the best interest of the agency or if it was an urgent and

19   compelling need, there was the override provision.

20        THE COURT:  There clearly is a provision for

21   overrides in the appropriate circumstances.

22        MR. HERZFELD:  Right.

23        THE COURT:  What we're here to decide is whether

24   this is the appropriate circumstance.

25        MR. HERZFELD:  Correct, Your Honor.  And -- but I

1    think it does sometimes get lost, I think, in translation.

2              THE COURT:  It's not lost.

3              MR. HERZFELD:  Well -- okay.  But I would say that

4    the position of Plaintiff's counsel on argument, his first

5    and primary focus was we have to -- the stay is almost

6    immovable.  It's not.

7              THE COURT:  He didn't say that.

8              MR. HERZFELD:  Well, he said -- he said that it's a

9    very important part of the record, of the --

10             THE COURT:  It is an important part of it, yes.

11             MR. HERZFELD:  We would concede that, yes.

12             THE COURT:  Let's move on.

13             MR. HERZFELD:  Okay.  Fair enough, Your Honor.  I

14   think, first, one concern that the Government has, in part,

15   is perhaps starting from the end of our -- of the memo, of

16   the override memo, it's not clear what the prejudice or the

17   harm to the Plaintiff is here.  He's tried to articulate it.

18             THE COURT:  No, I think you heard.  And I guess

19   that's part of my question.

20             MR. HERZFELD:  Yes.

21             THE COURT:  What is it that the Government expects

22   to happen in the next 79 days?

23             MR. HERZFELD:  Well, I mean -- good answer, Your

24   Honor, or it's a good question and it's one that -- what's

25   going to happen is the first milestone for both Boeing and

1    SpaceX and that consists of the certification baseline

2    review.

3            And that is fundamentally the starting point for

4    when orders can take place.  And while Plaintiff has

5    regularly stated that those orders can't take place until

6    there's certification and until that -- that can't happen

7    until 2017.

8            THE COURT:  I didn't hear that.  But --

9            MR. HERZFELD:  It's in the papers, Your Honor.

10           THE COURT:  Not quite that way.  What they said

11   was, if I understand it and I don't want to put words in

12   anybody's mouth, but I do need to understand it.  So, I'm

13   happy to be corrected from either side here.

14           What I understood was that you have the

15   certification baseline review, but you also have the

16   opportunity during these 79 days -- opportunity is what I

17   heard -- to commit a certain number of funds.  And from the

18   Plaintiff's perspective that could put their client at a

19   particularly -- well, the Protestor, I shouldn't call them

20   Plaintiffs, I do that a lot -- but the Protestor's

21   perspective that those commitments could run into a great

22   deal of money.  And if GAO or the Court were to act in a way

23   to avoid any part of the evaluation or whatever, those

24   commitments will be made, that money would be spent.

25           In this 79-day period, other than the review, what

1    does the Government anticipate would happen, in terms of

2    actual fiscal commitments?

3              MR. HERZFELD:  I think as we stated in our -- the

4    override decision -- I mean, we're talking about what has

5    been committed, I think it's 123.5 for each was what we

6    stated in the override determination.  So, that's what's

7    committed and that's -- the expectation is that potentially

8    could be spent.

9              THE COURT:  Could be spent?  Is it your

10   anticipation that it would be spent?

11             MR. HERZFELD:  It's probable that it will be.

12             THE COURT:  It's allowable to be spent?

13             MR. HERZFELD:  Allowable.  Yes, Your Honor.

14             THE COURT:  All right.

15             MR. HERZFELD:  That is probably the best term.

16             THE COURT:  So, if Boeing and SpaceX decided to

17   hedge their bets a bit, given the fact that there's going to

18   be a protest somewhere that's going to have to be considered,

19   would that not meet the milestone requirements of the

20   contract for the next 79 days?

21             MR. HERZFELD:  I don't understand your question.

22             THE COURT:  In other words, we've got 79 days.

23   We've got this certification baseline milestone review.

24             MR. HERZFELD:  Yes.

25             THE COURT:  I don't even know what's involved in

1    that, I don't know what that means.  Does that mean that they

2    have to commit funds in order to have certain things in

3    place?  Or do they have to commit those funds in these 79

4    days?  They're allowed to, but do they have to, to meet the

5    certification review?

6              MR. HERZFELD:  When you're saying "do they have to

7    commit," are you talking about the contract --

8              THE COURT:  I'm talking about Boeing and SpaceX.

9              MR. HERZFELD:  Well, they don't -- they are

10   required as part of their contract to -- the initial -- the

11   first 90 to 100 days of the contract is when this particular

12   milestone has to be completed.

13             THE COURT:  Okay.  But in that 100 days, or 79 days

14   that we are more interested in out of 100, do they have to

15   spend a great deal of money or not?

16             MR. HERZFELD:  They do.

17             THE COURT:  They do have to, to meet the

18   requirements of the contract?

19             MR. HERZFELD:  Yes, Your Honor.

20             THE COURT:  Because?

21             MR. HERZFELD:  Because this is a very intensive

22   process and it is -- it is the -- kind of the fundamental

23   milestone --

24             THE COURT:  Do they breach the contract if they

25   don't line up the suppliers and don't line up all these

1    things at this point?  How much hedge factor is there in

2    there?

3              MR. HERZFELD:  I know that it -- I think it is a

4    contractual commitment.  I haven't actually seen the

5    contracts myself, but my understanding is that it is a

6    contractual commitment.  Now, would they be in breach -- a

7    material breach if they failed to meet --

8              THE COURT:  Well, Mr. McCaleb and Mr. -- you need

9    to tell me what's really going to happen in this period of

10   time, because I think that becomes an issue.

11             We've been told that they can spend it.  You've

12   used the term "allowable".

13             MR. HERZFELD:  Yes.  I think it is likely they will

14   spend it.

15             THE COURT:  Well, has any of it been spent?

16             MR. HERZFELD:  I believe so, Your Honor.  I think

17   it has been.

18             THE COURT:  Spent before the stay was in place?

19             MR. HERZFELD:  No, not -- well, I know it's been

20   spent after the stay was lifted.  I don't know before the

21   stay.  I can't speak to that.  But as to --

22             THE COURT:  But the real critical question for me

23   is do they have to in these 79 days?

24             MR. HERZFELD:  I think that it's possible --

25             THE COURT:  Can your agency folks help you?

 1    Somebody's read the contract here.

 2              MR. HERZFELD:  I can ask.  Yes, well, that's true,

 3    Your Honor.  I've only had about 48 hours to get up to speed

 4    on this, Your Honor.

 5              THE COURT:  Well, I understand.  That's why we have

 6    agency counsel.  And as a former solicitor of the Department

 7    of Interior, I like using agency counsel.

 8              MR. HERZFELD:  My understanding, Your Honor, is

 9    that it is a contractual requirement.  If they fail to

10    achieve it, they fail to achieve it, they potentially would

11    be subject to termination.

12              THE COURT:  So, they have to line up all these

13    people during this period of time?

14              MR. HERZFELD:  That's correct, Your Honor.

15              THE COURT:  Okay.

16              MR. HERZFELD:  That is our understanding.  And it's

17    -- the fundamental basis and the reason to do this

18    certification baseline review is so in early 2015, the launch

19    orders can actually occur.  That's when that happens.  The

20    actual certification of the launch vehicles and the rockets

21    and the other systems that are a part of this don't have to

22    happen immediately before NASA can actually order.  So --

23              THE COURT:  So, tell me what the harm to the United

24    States is if we don't let you all work during these 79 days.

25              MR. HERZFELD:  Yes.  I think that the harm to us,

1    Your Honor, is -- and I think it's something that has gotten

2    -- something that's not even mentioned in the papers by the

3    Plaintiff, but, obviously, was mentioned in our override

4    determination.

5              One of the things that is in our best interest and

6    why it's urging and compelling is it's been compelled by

7    Congress.  Congress, in the 2010 Authorization Act, something

8    that's not mentioned in Plaintiff's papers at all, said we

9    need a U.S. presence.  In the override at page 2, we cite

10   Section 2 of the Authorization Act.  It says that we don't

11   have a redundant system, we need a redundant system.  And it

12   says, in fact, I'll quote, "It's essential that a United

13   States capability be developed as soon as possible."  That's

14   Congress speaking, not NASA.  Congress and the President in

15   the Authorization Act.

16             It says, "Use of U.S. crews for the International

17   Space Station should be done at the maximum extent

18   practicable."  It also states that it's a matter of national

19   security.  That's in the Act, that's not us making

20   conjecture, that's not even us making findings on behalf of

21   the Agency.  This is the United States Congress saying this

22   is a matter of national security.

23             THE COURT:  Did you discuss national security in

24   the override?

25             MR. HERZFELD:  I believe we do actually cite it,

1    Your Honor.  We cite it at page 3.  In the last paragraph, we

2    mentioned it, I believe, on that page.  And I will quote, "As

3    stated in the 2010 Authorization Act, it is essential to have

4    another ISS human transportation capability, specifically a

5    United States capability, as soon as possible."  As further

6    stated in the Authorization Act, Section 201b, quote, "The

7    United States" -- and this is from the Authorization Act --

8    quote, "The United States shall maintain an uninterrupted

9    capability for human space flight and operation in low earth

10    orbit and beyond, as an essential instrument of national

11    security and of the capacity to insure continued United

12    States participation in and leadership in the exploration and

13    utilization of space."

14          That's the United States Congress talking, and

15    that's what we're quoting from.  And, of course, as you know,

16    the Court, under Section 1491(b)3, has to take national

17    security and national defense issues into consideration in

18    the relief it forms here.  And we hope that the Court will

19    take that into account, given Congress' mandate, because that

20    is the foundation of what the best interest and the urging

21    and compelling circumstances of this override are based on.

22          THE COURT:  So, is this date of 2017 a target date

23    or a requirement date in the solicitation?

24          MR. HERZFELD:  I believe it is a requirement by

25    contract.  It is stated as a quote/unquote "objective" in the

 1    solicitation.

 2              THE COURT:  Okay.  So, the contract --

 3              MR. HERZFELD:  There are commitments from the

 4    contractors to meet those dates, including, I believe, Sierra

 5    Nevada.

 6              THE COURT:  Okay.  Distinguish for me then, the

 7    solicitation was or was not incorporated into the contract?

 8              MR. HERZFELD:  It was, but it was a statement of

 9    objectives.  It was not, for example, you know, do this by

10    this date, do this.  It said, the objective is to do this by

11    2017.  Give us your plan.

12              THE COURT:  Okay.  And the contract document is

13    where and how and who signed it, at this point?

14              MR. HERZFELD:  The contract document for?

15              THE COURT:  You say it's in the contract, but not

16    in the solicitation.  So, distinguish for me the contract

17    document.

18              MR. HERZFELD:  Well, the objective -- the language

19    I -- I guess, I -- well, let me consult with counsel if I

20    may.

21              THE COURT:  That's fine.  I'm happy to have counsel

22    speak, too.

23              (Brief pause.)

24              MR. HERZFELD:  As I had stated, there is a

25    statement of objectives and that's where the objective of

1    2017 is stated.

2              THE COURT:  Right.

3              MR. HERZFELD:  That has been incorporated as part

4    of the contract.  However, in addition to that, the actual

5    statements by the contractors and the commitments to meet

6    that date are now contractual requirements.

7              THE COURT:  That they've signed to?

8              MR. HERZFELD:  That they've signed to.

9              THE COURT:  Yes, no, maybe?

10             MS. REILLEY:  Yes.

11             THE COURT:  Yes?  Ms. Reilley?

12             MS. REILLEY:  Yes.

13             THE COURT:  All right.  And if they do not meet the

14   2017 date, SpaceX and Boeing at this point, then they are in

15   breach technically?

16             MR. HERZFELD:  If they do not meet those

17   requirements, they would be in breach.

18             THE COURT:  To complete this certification by 2017?

19             MR. HERZFELD:  They would potentially be in breach,

20   yes, Your Honor.

21             THE COURT:  Yes or no?  Agency?

22             MS. REILLEY:  Yes, Your Honor.  They would not be

23   compliant.

24             THE COURT:  So, what's been incorporated into the

25   contract?  An actual commitment to do this by 2017 or the

1    schedule that they've offered to the Government, which

2    includes the 2017 date?  What's in the contract?

3                MR. HERZFELD:  I hate to do it, but I haven't

4    actually seen the contract documents, so --

5                THE COURT:  That's fine, that's fine.  That's why

6    we have agency counsel.  They know more about it than the

7    lawyers do in almost every instance.  So -- and that's fair.

8    Certainly when you're working this fast.  Yes?

9                MS. REILLEY:  Yes, Your Honor.  The RFP has a

10   statement of objectives.  It says, this is what we need to do

11   these service missions.  That objective is 2017.  That

12   statement of work, that statement of objectives, becomes part

13   of the contract and then each contractor has their own

14   particular plan, their own performance work statement of

15   exactly how they are going to do that.

16               THE COURT:  With dates?

17               MS. REILLEY:  With dates, with specific milestones,

18   for the particular events that they will be doing throughout

19   the period of the contract.

20               THE COURT:  And the 2017 date is in that calendar

21   of milestones?

22               MS. REILLEY:  Yes, they will -- yes, the objective

23   says 2017.  They each have their own statement of work with

24   the particular events, with particular dates, and they each

25   have when in 2017 they will meet those dates and be ready to

```
 1    fly.

 2                THE COURT:  And they're no longer in that calendar

 3    statement objectives, they're actual firm dates?

 4                MS. REILLEY:  What becomes part of the contract is

 5    that statement of objectives that's in the contract.  But

 6    also in the contract is the particular performance or

 7    statement of work, for lack of a better word, that does

 8    become a contract commitment.

 9                THE COURT:  Okay.  But what I'm asking is that in

10    that statement of work with the dates, the term "objective"

11    is gone?  Yes, no?

12                MS. REILLEY:  I believe it is.  I'd have to look at

13    both of their statements of work to see what it actually

14    says.  If it has firm dates in there, here all the dates

15    for all of these --

16                THE COURT:  Mr. McCaleb, do you know the answer for

17    your client?

18                MR. MCCALEB:  I can't be sure, but I know that they

19    have a schedule where they are expecting to meet

20    certification in 2017.                          And

21    that the Government --

22                THE COURT:  Well, we've got that little word

23    "expected".  Expected?

24                MR. MCCALEB:  Right.

25                THE COURT:  Mr. Vacura, do you know?
```

1              MR. VACURA:  Your Honor, my understanding is that

2        by the contract being signed and incorporating the proposal

3        that the -- as far as the statement of work, then that

4        becomes a firm date that the contractors must meet.

5              THE COURT:  Okay.  Thank you.

6              MR. O'DONNELL:  Your Honor, may I provide an

7        answer?

8              THE COURT:  You certainly can.

9              MR. O'DONNELL:  My understanding is that the

10        commitment that the contractors made, they did provide a

11        schedule, is a commitment to meet the objective of achieving

12        2017.  In other words --

13              THE COURT:  Well, that's a different answer, so I

14        don't know what that means now.

15              MR. O'DONNELL:  But let me -- but I deliberately

16        said that because I think it's different.

17              THE COURT:  Of course you did.

18              MR. O'DONNELL:  But there's one other important

19        point, Your Honor, which is that if there is a stay, there's

20        a day-for-day extension of the time that the contractors

21        have, to the extent that they can show an impact.

22              THE COURT:  That's actually in the contract?

23              Mr. O'DONNELL:  Yes.  It's in every contract.

24        There's a provision that says that in the event of a stay --

25        in the event of a protest with a stay, there's a day-for-day

1    extension of the time.

2            THE COURT:  So, the only issue that would remain

3    for us, in that respect, would be the urgency of completion,

4    as opposed to the penalty to the contractor.

5            MR. O'DONNELL:  Right.  The contractor is not going

6    to -- the stay will not put the contractor --

7            THE COURT:  In jeopardy.

8            MR. O'DONNELL:  -- at risk of termination.

9            THE COURT:  Right.

10           MR. O'DONNELL:  Whether or not.

11           THE COURT:  But the urgency of completing the

12   requirement remains.

13           MR. O'DONNELL:  That's still an issue.  Yes, Your

14   Honor.

15           THE COURT:  Mr. Metzger?

16           MR. METZGER:  May I also add one point, Your Honor?

17           THE COURT:  Yes.

18           MR. METZGER:  There's a difference between a

19   requirement where if you miss it, you are in breach.  In the

20   milestone, where if you don't make it, you don't get paid.

21           THE COURT:  No, I understand that.

22           MR. METZGER:  These are milestones.

23           THE COURT:  That's what I was trying to get at, but

24   I'm getting somewhat unclear answers.  And I realize that

25   we're two days into filing this request for an override.  So,

1    I'm not at all being critical.

2            MR. HERZFELD:  All the more reason to have a

3    record, Your Honor, so we can put some of those contractual

4    provisions in, it's something that I think will be reflected

5    in the record and it's something that I think we're going to

6    probably have as part of the record.

7            THE COURT:  All right.  Go ahead.

8            MR. HERZFELD:  Thank you, Your Honor.  Obviously,

9    the Agency used Reilly's Wholesale factors, and we'll go

10   through that as well.

11           THE COURT:  Match them totally.

12           MR. HERZFELD:  Pardon?

13           THE COURT:  Match them totally.

14           MR. HERZFELD:  That's right, Your Honor.  So, we'll

15   go ahead and use that, even though we would -- obviously, we

16   would agree with Mr. Metzger that they're not the end-all,

17   be-all.

18           THE COURT:  Right.

19           MR. HERZFELD:  And that they're not necessarily

20   required.  But for the purposes of today, they certainly can

21   be used as a baseline.

22           THE COURT:  So, tell me -- let's get the easy ones

23   out of the way.  Reasonable alternatives, any?

24           MR. HERZFELD:  There are none, Your Honor.  The

25   Plaintiff has made the statement that the United States can

1    use the Soyuz capsule.  We can't.  Under law, I think as we

2    quoted in our determination override, one reason we can't use

3    the Soyuz now is because, in fact, we do have contracts with

4    Boeing and SpaceX.  And under current law, it states that if

5    we have a contract with a U.S. contractor, we cannot contract

6    with Russia.  So, that's the first point.

7            THE COURT:  So, how does that put us in now with a

8    three year in advance contracting requirement?  Has the

9    Government or will the Government go into a three year in

10   advance contract with the Russians?

11           MR. HERZFELD:  We are not negotiating with the

12   Russians.

13           THE COURT:  So, you don't have anything in place

14   and you have no plans to put it in place?

15           MR. HERZFELD:  That is correct, Your Honor.  I

16   mean, obviously --

17           THE COURT:  Willing to risk a gap?

18           MR. HERZFELD:  We may have a -- and, in fact, I

19   should point the Court to something that Plaintiff has

20   made -- and actually has a snippet from Director Bolden's

21   fiscal year 2015 budget hearing.

22           THE COURT:  Right.

23           MR. HERZFELD:  And, in fact, he was asked during

24   that hearing, well, what happens if they can't meet 2017 or

25   whatever, are you going to go back to Russia?  And I'll

1   quote, this is a snippet from that as well.

2          "So, Mr. Administrator, back to the issue with

3   Russia and our ability to get the International Space

4   Station, what would be the consequences to the operational

5   capabilities of the Space Station if within the next year

6   Russia refuses us -- denies us access and is no longer

7   allowing us to hitch a ride on their rockets."

8          Director Bolden, "As I mentioned before, because we

9   provide navigation, communications and power, as I responded

10  to somebody else, the station would probably -- I hate to

11  deal in conjecture -- the partners would probably have to

12  shut the Space Station down."

13         So, that's what we're looking at, because Russia is

14  at a point where they have increased the cost every time

15  we've renegotiated.  Negotiations have taken longer, and

16  we're not doing that right now.  And we have taken a new

17  approach since the 2010 Authorization Act to move towards

18  U.S. ability to do this since we retired the Space Shuttles

19  in 2011.  NASA has progressed rapidly in doing

20  this.

21         And, in fact, at one point, for example, Your

22  Honor, you mentioned, you know, it's almost as if the

23  contract will be done in a phased approach.  In fact, the

24  contract has been done in a phased approach.  This is phase

25  two.  The contracts that were awarded to SpaceX and Boeing is

1      phase two.  And this procurement was done in the process

2      while phase one was still going on.

3              So, NASA has moved as expeditiously as possible to

4      meet that time line so they will not have to rely on Russia

5      anymore because it's not even -- it's possible we may not be

6      able to.

7              And I think even Plaintiffs, you know, quote some

8      language from Russia over the summer where it says that they

9      may very well deny us the ability to do that and said that if

10     we want to get there, you know, we'll have to -- you know, if

11     we have no rockets ourselves, we may have to use a

12     trampoline.

13             So, you know, that's what the Russian -- I think

14     the Foreign Minister said --

15             MR. MCCALEB:  The Deputy Prime Minister.

16             MR. HERZFELD:  The Deputy Prime Minister said that.

17     So, that's kind of the environment we're dealing with.  It

18     stated in the override that given the political environment,

19     that's one of the reasons why we're doing this, and we hope

20     the Court will take that into consideration as it rules on

21     this override.  These are not small or, you know, unimportant

22     issues.  These are big issues.  And this is why we're doing

23     this.  We have an act behind us and that's why we're doing

24     it.  So, there really are no alternatives at this point.

25             Costs of the override versus the benefits,

1    obviously, the benefits are having a U.S. crew and a U.S.

2    ability to do this.  This is, again, something that was

3    required.

4              THE COURT:  Well, even your opponent didn't

5    belittle that need.

6              MR. HERZFELD:  Yes.

7              THE COURT:  It's just a question of balancing

8    everything here.

9              MR. HERZFELD:  I under -- and I understand.  I

10   think, to a certain extent, we think that the agency has

11   bounds.  We think that in the override it has taken into

12   account it's going to cost money to do this and we may have

13   to go back to scratch in doing it, but we think we need to do

14   whatever we can to meet this requirement.  And, in fact, you

15   know, obviously, our presumption and one of the reasons why

16   we don't think there's necessarily any harm is that we don't

17   think they will be harmed -- and I'll get to that in a moment

18   -- by this override because they will be put back into the

19   competition and be able to start their contract from the

20   beginning.  They'll be able to do their certification

21   baseline review and they'll be able to get up and running.

22             But -- and one reason I think we think that's the

23   case is the costs here have been taken into account, and

24   we're kind of on a glide path to do this.

25             THE COURT:  So, let's talk about costs.

1          MR. HERZFELD:  Yes.

2          THE COURT:  The numbers are large just because of

3     the nature of the program.  In the next 79 days, what do you

4     think the numbers are really going to look like in terms of

5     potential costs and, also, what has the Government thought

6     about with respect to the what if GAO or a court were to say

7     there's been a foul in the evaluation and award process?

8          MR. HERZFELD:  Well, I think we presume -- I think

9     we presume in the override determination that we could lose.

10    I think that is a presumption.

11         THE COURT:  Acknowledge rather than presume.

12         MR. HERZFELD:  Well, thank you, Your Honor.  Thank

13    you for the correction.  Yes, I think we acknowledge that

14    it's a possibility.  In fact, actually, for the purpose of

15    this, we're just going with a presumption.  Let's just take

16    it off the table.  We're not even going to bring whatever the

17    merits are of the GAO protest and let's just assume for the

18    sake of argument that we lose.

19         THE COURT:  It could happen.

20         MR. HERZFELD:  And it could happen.

21         THE COURT:  Yeah.

22         MR. HERZFELD:  And, you know, this isn't like, for

23    example, in other cases where an agency has weighed whether

24    or not they're going to win or they're going to lose.  NASA

25    has been straightforward in its statement and has said, if we

1   lose, we will put them back and we will do what GAO

2   recommends.  We have stated that.

3          THE COURT:  Well, you sort of have no choice, so

4   that's fine, at that point.

5          MR. HERZFELD:  Well, no, we do have a choice.  I

6   mean, I --

7          THE COURT:  You can ignore GAO?

8          MR. HERZFELD:  You can.

9          THE COURT:  And then you'll be here.

10          MR. HERZFELD:  In fact, Mr. Metzger has written an

11   article -- a whole article about how agencies should do it

12   more.  So, it's the statute, they can do it.  They just have

13   to report to -- they just have to report to Congress about

14   it.  It's in the statute.  That's also part of CICA.

15          THE COURT:  Right.

16          MR. HERZFELD:  It's just a recommendation.  It's

17   not an injunction or an order as this Court would enter.  So,

18   you know, as a matter of course, you know, the long and short

19   of it is that --

20          THE COURT:  I want to know what the fiscal

21   consequence is here.

22          MR. HERZFELD:  Well, I think it would be the amount

23   of money that was stated.

24          THE COURT:  Yeah, okay.

25          MR. HERZFELD:  And I think that that's the full

1    commitment.  But they will make Sierra Nevada whole.  I mean,

2    that's the bottom line is, at the end of the day, we're

3    willing to take that risk and spend that money, and if we

4    have to spend it again, we will do it.  I mean, that's the

5    commitment we have made in this override.

6            THE COURT:  And that is a risk that is

7    discretionary with the agency, is that what you're saying?

8            MR. HERZFELD:  I think it is absolutely, Your

9    Honor.  That is our decision that we have determined that's

10   what is in the best interests of the United States and what

11   is in -- and given the urgent and compelling needs of the

12   agency, given the lack of services in 2017.

13           THE COURT:  So, talk a little bit more about the

14   urgency and the compelling nature.

15           MR. HERZFELD:  Yeah, we don't -- I mean, I think a

16   lot of the override determination talks -- it's probably more

17   geared to the best interest --

18           THE COURT:  Right.

19           MR. HERZFELD:  -- analysis, which, mind you, under

20   GAO -- under the CICA, that's where GAO can make any

21   recommendation.  That's one reason why we did it, to make

22   sure we were deferring to GAO in this circumstance.  That's

23   why we kind of put more of the weight there, so GAO would not

24   feel confined by the override.

25           But for urgent and compelling, it's the same --

1   it's really the same basis as we've really been talking

2   about, the fact that we don't have an alternative come 2017,

3   and that we do need to get this program up and running and

4   that we have been very diligently doing so for the last four

5   years since Congress and the President came together and

6   authorized us to do so.  So, that's what's really been going

7   on.  So, that -- it is urging and compelling that we get this

8   moving because, absent this, it is more likely than not that

9   the milestones won't be reached and that we won't be able to

10  ████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████

12  Soyuz, which is statement of policy by the United States and

13  Congress in an act.

14              Beyond that, Your Honor, I also want to address one

15  or two things with regard to the impact of the override on

16  competition and the integrity of the procurement system.

17  There's kind of a parade of horribles that Plaintiffs have

18  noted.  I think you were correct that -- I think maybe while

19  the employees are fungible, per se, it is likely that they

20  will find a home.  This is pretty standard in service

21  contracts with the United States when you have highly

22  specialized people.

23              THE COURT:  All the technical contracts,

24  absolutely.

25              MR. HERZFELD:  Yes, yes.  I mean, I think you were

1    absolutely right, Your Honor.  I think that's a good point.

2            There's also a statement that they won't be able to

3    secure launch slots, and I just want to read something from

4    Sierra's proposal.  They state the following:

5            "By procuring the last available launch slot, SNC

6    has reduced risk to NASA by flying its first orbital test

7    flight in time to adequately execute prudent flight test risk

8    reduction and form the subsequent test flight in 2017."

9            What this means, at least to me, and as it was

10   explained to me by counsel, my agency counsel, is they've

11   already secured the slots.  And as --

12            THE COURT:  They being Sierra?

13            MR. HERZFELD:  They being Sierra Nevada.  Or at

14   least that's what they stated in their proposal, unless their

15   proposal is no longer accurate.  I don't know.  They can

16   probably speak to that, but that's what they stated in the

17   proposal.  But they, in fact -- so, that is not a basis.

18   They're not going to lose out

19   on --

20            THE COURT:  How about the supply chain?

21            MR. HERZFELD:  The supply chain, you know, again,

22   you know, that, of course, weighs on both sides, obviously.

23   But at the end of the day, we will give them the opportunity

24   to get their supply chain up and running, and that's the

25   bottom --

1          THE COURT:  The suppliers probably wouldn't mind a

2     little double payment there either.

3          MR. HERZFELD:  Pardon?

4          THE COURT:  The suppliers probably wouldn't mind a

5     little double payment as well.

6          MR. HERZFELD:  That's --

7          THE COURT:  They get it from the breach and then

8     they get it from the new contractor.

9          MR. HERZFELD:  That's probably right, Your Honor.

10    And, you know, so, I don't know that that is necessarily a

11    harm that outweighs the override determination in the best

12    interest of the United States.

13          I think, also, to address the question of

14    declaratory judgment finally and the question of why, you

15    know, a TRO and injunctive relief -- it's something that I

16    probably stumbled over when I started.  You know, I think --

17    actually, let me step back before I take that -- just on the

18    last point.

19          Because NASA has promised to make Sierra Nevada

20    whole if the protest is sustained and they ultimately are

21    awarded the contract, you know, again, from the United States

22    standpoint, it's not clear to us, you know, where there's

23    even injury or where there's harm.

24          THE COURT:  You've promised to -- not you, but the

25    United States has promised to make the protestor whole with

1   respect to bid preparation costs, but what does that mean?

2               MR. HERZFELD:  No, not bid preparation, to  --

3               THE COURT:  No, I mean, everything up to this

4   point.

5               MR. HERZFELD:  Up to this point.

6               THE COURT:  All right.

7               MR. HERZFELD:  So, if they win -- if they win the

8   award, they will start from ground zero and they'll get to do

9   everything that SpaceX and Boeing are doing right now.  No

10  difference.  They will get a complete contract and they will

11  be able to meet their milestones as required by the contract

12  no differently.  That's going to be exactly the same.  The

13  only difference is that it will be a few months later, and

14  it's -- you know, while there's been some statement and

15  speculation that they'll have lost out on some expertise and

16  some knowledge, it's not clear to me that that would be taken

17  into account in any reevaluation.  I think, presumably, the

18  same standards of review will be used by the agency in any

19  reevaluation and, ultimately, we think there isn't going to

20  be any harm because they will be made whole.

21              THE COURT:  And how do you make that promise to

22  keep them whole?  You'd have to go through an additional

23  preparation.  I assume you've only got enough to do what

24  you're doing now.

25              MR. HERZFELD:  I think we have -- while we have

```
1    committed --

2              THE COURT:  Don't think here.

3              MR. HERZFELD:  Well --

4              THE COURT:  Check with agency counsel, please.

5              MR. HERZFELD:  Okay.

6              (Brief pause.)

7              THE COURT:  Mr. Vacura, we're allowing

8    consultation.  We haven't lost you.

9              MR. VACURA:  Thank you, Your Honor.

10             MR. HERZFELD:  One more moment, Your Honor.  I'm

11   sorry.

12             (Brief pause.)

13             MR. HERZFELD:  I think, obviously, we can't foresee

14   what the appropriations will be, but we've made that

15   commitment and we're also talking about a $7 billion program.

16   I think the commitment is to go forward with two contractors

17   and the money --

18             THE COURT:  Two not three.

19             MR. HERZFELD:  Well, three, but there may only be

20   two.  We're not going to award three.  If there's a

21   reevaluation, one of them might be displaced.

22             THE COURT:  So, what's the commitment to two as

23   opposed to three?  So, you just want two companies to do

24   this?

25             MR. HERZFELD:  We want two companies because there
```

1    is the concern for redundancy that's stated in the statute.

2            THE COURT:  Right.

3            MR. HERZFELD:  We want at least two U.S.

4    contractors to be kind of on a path to giving us --

5            THE COURT:  But there is currently now

6    appropriation to cover the money that's being spent now --

7            MR. HERZFELD:  Right.

8            THE COURT:  -- in the event that Sierra should

9    prevail on one of its grounds.

10           MR. HERZFELD:  I believe -- I don't know the answer

11   to that, Your Honor.

12           THE COURT:  So, that's sort of a promise.

13           MR. HERZFELD:  It's -- obviously, any government

14   contract is subject to appropriations.

15           THE COURT:  I did a lot of anti-deficiency work in

16   my day, so --

17           MR. HERZFELD:  Yes, Your Honor, yes.  So, I'm not

18   going to commit our contracting officer to violate that, but

19   -- and this -- we'll all end up in jail, but I -- the

20   commitment is there.  If the appropriation is there, we will

21   believe they will be because this is, again, a $7 billion

22   program, and our commitment is absolutely to have --

23           THE COURT:  What kind of money do you have?  Do you

24   have no-year money, one-year money, two-year money?

25           MS. REILLEY:  Two-year.

1          THE COURT:  Two-year money?

2          MS. REILLEY:  Yes.

3          MR. HERZFELD:  So, again, that would encapsulate,

4    presumably, the time frame even if there was a reevaluation.

5    So, that is our commitment and that's why I'm not sure that

6    we believe there's any harm here.

7          THE COURT:  All right.  Now, you said you wanted to

8    do an administrative record.  What are you talking about in

9    terms of time here?

10         MR. HERZFELD:  Well, the time, I think we could

11   probably have it done sometime next week is probably what

12   we're looking at, perhaps early next week, like Tuesday,

13   Wednesday, is what we're looking at, and then briefs, you

14   know, in the next week and a half.  It's actually a --

15         THE COURT:  That takes away 20 days of your 79 and

16   then I get to look at this stuff theoretically?

17         MR. HERZFELD:  If we want to go faster, Your Honor,

18   we can.  We never got to the point where we got to an

19   agreement.  You know, counsel obviously wanted to argue a

20   TRO/declaratory judgment today.  So, that's what the focus

21   was.  And while I had talked with the Intervenors' counsel as

22   well --

23         THE COURT:  You've got a GAO record at this point

24   or not?

25         MR. HERZFELD:  No.  The agency report is not due

1    until next week.

2              THE COURT:  When?

3              MR. HERZFELD:  The 27th, Friday.

4              THE COURT:  Okay.  Well, Mr. Vacura, you want to

5    add anything here?

6              MR. VACURA:  Just very briefly, Your Honor.  We've

7    been going quite a while and, of course, you've heard the

8    theories in terms of the legal arguments.  I think what I

9    would like to emphasize is from my client's perspective, what

10   happens during the first hundred days of performance.

11             We've heard Mr. Metzger describe, at one point,

12   that -- they make it sound like there's very little that's

13   actually  happening, so there would be no adverse

14   consequences during the first hundred days.  In fact, you

15   asked him if it could be characterized as de minimis.  He

16   wouldn't go that far.  But he essentially minimized the

17   amount of activity that would go on during the first hundred

18   days in terms of the importance to the overall program.

19             But then contrary to that, when he was talking

20   about the harm to his client, he said that if we're allowed

21   to proceed during the hundred days that it would -- that

22   Sierra Nevada would never catch up, that that work is so

23   critical and so important, that they'd be at such a

24   competitive disadvantage that they would never be able to

25   compete.

1          But, needless to say, those first hundred days are

   critically important, the way my client

9

10          It is -- we also have --

11          THE COURT:  What do you think really would be --

12   let me interrupt you for a moment before we get too far away

13   from it.  What do you think would be the harm to your client

14   in being able to progress if the automatic stay were -- or

15   let me put it differently -- if the override were to be not

16   sustained and the stay would be in place?

17          MR. VACURA:  Well, Your Honor, my understanding is

18   that first milestone, the certification baseline review,

19   essentially lays the foundation.  It's all the planning,

20   design and development that lays the foundation for all the

21   work that follows.  So, to the extent that doesn't occur, if

22   that all stops for 100 days essentially, when they would then

23   -- let's say that the protest is denied at GAO and they can

24   start work again.  It's not a day-for-day slip as Mr.

25   O'Donnell stated in terms of impact, because it has a ripple

1    effect where they've lost that time, that essential planning

2    time, design time, hiring key personnel, doing long leads and

3    so forth, that it has more of a ripple effect to their

4    schedule and it isn't just a simple one-for-one day push out.

5              THE COURT:  Is it your client's intention to go

6    ahead and spend all the money available or phase it or what

7    would be your client's intention here?

8              MR. VACURA:  Your Honor, my understanding is that

9    the activity during this first hundred days is so intense

10   that it's likely that they would spend most of that money.

11   You know, that would be the plan, that's the budget.  They

12   need that money to be able to perform the necessary work

13   during that first hundred days.

14             THE COURT:  Okay.  Anything else, sir?

15             MR. VACURA:  Your Honor, I just would also like to

16   emphasize that at least, from our perspective, what it sounds

17   like Mr. Metzger is asking you to do is for the Court to

18   substitute the judgment of NASA and, of course, NASA is the

19   experts, they have made this well-reasoned, well-documented,

20   well-thought out decision, and it's their judgment that the

21   stay must be lifted.  And I would encourage you -- the Court,

22   of course, to consider all the facts, but also not do as Mr.

23   Metzger asks, which is to second guess NASA's judgment.

24             THE COURT:  All right.  Mr. McCaleb?

25             MR. MCCALEB:  Thank you, Your Honor.

1          THE COURT:  And then we'll go back to you, Mr.

2    Herzfeld, since these folks are supposed to be supporting

3    you.

4          MR. HERZFELD:  Although we do have different

5    interests, obviously.

6          THE COURT:  Or independent -- they have independent

7    judgment, but they are in your support camp.

8          MR. MCCALEB:  Thank you, Your Honor.  Let me

9    address --

10          THE COURT:  Let's make sure that we not repeat

11   things.  If it's been done, we don't need to go back to it.

12          MR. MCCALEB:  I'm going to do my darndest to

13   streamline this.

14          THE COURT:  Yes, please.

15          MR. MCCALEB:  Your Honor, on the issue that you've

16   raised about declaratory judgment or TRO or whether they

17   would come back in the event that you denied any sort of

18   declaratory judgment, it's our understanding from reading

19   their papers, which, you know, it's a complaint for

20   declaratory judgment and injunctive relief, they have before

21   the Court in this case asked for a TRO, a preliminary

22   injunction and a permanent injunction, and indeed, if you

23   look at page 28, 2, 3, and 4, that's what they're asking for,

24   not just a --

25          THE COURT:  But while it's at GAO, my jurisdiction

1    is the override.

2              MR. MCCALEB:  That's right, and we're talking only

3    about the override.

4              THE COURT:  Right.

5              MR. MCCALEB:  And the preliminary injunction and

6    TRO that they are asking you for deal only with the override.

7    So, I think that the distinction is that -- that they are

8    trying to draw is that they want a declaratory judgment, but

9    they really want to make sure, as they say in paragraphs 2,

10   3, and 4 on page 28, for relief, they want either a TRO, PI

11   or permanent injunction prohibiting NASA from overriding the

12   stay of performance of the contracts to Boeing and SpaceX or

13   otherwise permitting Boeing or SpaceX to commence or continue

14   performing the contract.

15             The distinction, of course, is that a declaratory

16   judgment, if you were to declare -- just theoretically, if

17   you were to declare that the override here was arbitrary and

18   capricious, that would -- the way the case law -- and you

19   know the case law, you've done this.  The way the case law

20   operates is that they it would be viewed as void and the stay

21   would be reinstated.  But that's very different from saying

22   that NASA can't ever come up with an override determination

23   that would pass the APA standard.

24             What they're asking you to do in asking for a TRO,

25   a PI and a permanent injunction is to determine that under no

1   circumstances would NASA be able to make the case for an

2   override if the Court determined here that the override

3   determination did not pass APA muster.

4          So, that's why when we came here today, I thought

5   we were really going to be arguing the TRO issue.  And, so, I

6   think we've all kind of -- it's gotten a little bit jumbled

7   and I'm trying to --

8          THE COURT:  Well, it is jumbled by virtue of the

9   situation.

10          MR. MCCALEB:  Right.

11          THE COURT:  But, I mean, I think all I can do --

12   and I notice Mr. Metzger has risen to respond to you, which

13   you'll have an opportunity to do, sir -- but I think all I

14   can do is figure out whether the override, at this particular

15   point in time, is appropriate or not.  There may well be,

16   depending on what GAO were to do, if it stays at GAO, another

17   protest.  If one of you, SpaceX or Boeing, are removed, I

18   would assume that you all would go do what you needed to do

19   either at GAO or here and you get an automatic stay again if

20   you go in to GAO.  And, so, all we're talking about is today

21   and the environment that we're talking about in these 79 days

22   now, is the override appropriate or not?

23          MR. MCCALEB:  Yes and no.  Yes, that's what we're

24   talking about, but we're also talking about whether you would

25   -- their asking you to enjoin NASA from doing any override.

```
1              THE COURT:  Ever?

2              MR. MCCALEB:  In the -- until the GAO issues its

3    opinion.  That's what they're asking you to do.

4              THE COURT:  For 79 days?

5              MR. MCCALEB:  That's right.  And, so, it's --

6              THE COURT:  Yeah.

7              MR. MCCALEB:  And, so, on the one --

8              THE COURT:  I think we're really dancing on the

9    head of a pin here, but --

10             MR. MCCALEB:  We may or may not be.  First of all,

11   I think we may be in the sense that we think that the

12   decision plainly passes the test of reason and that there's

13   no clear error in judgment.

14             THE COURT:  Well, obviously, you're --

15             MR. HERZFELD:  But setting that aside --

16             THE COURT:  -- you're supporting the stay -- the

17   override of the stay.

18             MR. MCCALEB:  Right.

19             THE COURT:  Mr. Metzger, what were you going to

20   say?

21             MR. METZGER:  I was only going to say that -- as I

22   said before, that we think a declaratory judgment is both the

23   appropriate and expedient way to make a decision in a time-

24   sensitive matter.  I, at no point, took the position, nor did

25   we suggest in our paper that a declaratory judgment of this
```

1    override and its rationale would preclude some other future

2    agency action that might have --

3              THE COURT:  That it would or would not?

4              MR. METZGER:  Would not.

5              THE COURT:  It would not preclude it.

6              MR. METZGER:  It would not.

7              THE COURT:  I agree.

8              MR. METZGER:  Thank you, Your Honor.

9              MR. MCCALEB:  And, so, the reason that there's a

10   disconnect then is because that's not reflected in the form

11   of relief they've requested in the complaint.

12             THE COURT:  I mean, that's how I've been proceeding

13   and that's how what I'm authorized to do.

14             MR. MCCALEB:  Okay.

15             THE COURT:  So, I don't think I would be looking at

16   no stays ever, ever, ever.  I'd be looking at whether this

17   particular override is appropriate or not.  We have a very

18   specific override that we're looking at with an override

19   defense memorandum, and that's what we're looking at.

20             MR. MCCALEB:  Understood.  And I think what the

21   case is saying -- if we need -- if you want further briefing

22   on this, we can provide it --is that where a declaratory

23   judgment, if we ever got this far, where there's a

24   declaratory judgment that operates as an injunction that you

25   can or do take account of the other three factors.  And, so,

1    if we get to that point, I think that we --

2             THE COURT:  I don't think there's anything clear on

3    that.  I mean, Judge Bruggink's decision nibbles at it, but

4    really doesn't get to the end.

5             MR. MCCALEB:  We certainly -- if the Court got

6    there, I think it would be worth the Court's time to allow us

7    to brief that.

8             So, with that, let me move to the --

9             THE COURT:  If this is as urgent as you say and Mr.

10   Herzfeld says and Mr. Vacura says, then we shouldn't be --

11   doing very interesting, albeit, legal issues.  We should be

12   worrying about the urgency of the procurement.  You know, I

13   teach law, too.

14            MR. MCCALEB:  Right.

15            THE COURT:  So, it is academically fascinating.

16            MR. MCCALEB:  That's right.

17            THE COURT:  And Mr. Metzger also said what an

18   interesting question, but that's not what we're here to do.

19            MR. MCCALEB:  Right.  So, let me go to what matters

20   here right now and that is -- and I want to kind of just

21   restore us to -- quickly to the standard.  What we're really

22   looking at is is there a clear error of judgment and did NASA

23   consider the relevant factors.

24            THE COURT:  So, let's run through them very quickly

25   with you, to the extent that you have something to add to

1    what Mr. Herzfeld said and what we've heard earlier.

2    Significant consequences to the interests of the United

3    States.  We worry about your client supporting the interests

4    of the United States, but we don't worry about your client in

5    this one so much as what about the interest of the United

6    States.

7              MR. MCCALEB:  Yeah, I think the adverse

8    consequences are laid out in detail.  You start with what the

9    law says, not -- let's set aside what NASA says; what

10   Congress and what the President said in the National Space

11   Transportation Program.

12             THE COURT:  So, we're talking about national

13   security.  We're talking about the urgency of having some way

14   to deal with someone that we may put up there and hopefully

15   not leave there.

16             MR. MCCALEB:  There are four --

17             THE COURT:  Yeah.  And we're talking about having a

18   U.S. ability to do this.  What else?

19             MR. MCCALEB:  Right.  One, the mandate for an

20   uninterrupted capability to get to the Space Station.

21             THE COURT:  Right.

22             MR. MCCALEB:  Two -- that's, as you say, an element

23   of national security.  Two, that it's essential to rapidly

24   and as soon as possible, get that capability established.

25   That's Congressionally mandated.

1          Three, that the use of U.S. commercial vehicles is

2    to be used to the maximum extent practicable, and, four, the

3    U.S. policy not to use foreign capabilities with limited

4    exceptions.

5          THE COURT:  So, it's not specifically in Judge

6    Allegra's four points, but I think it's probably incorporated

7    into the last of his four points, although it certainly could

8    be broken out independently.  The impact on competition

9    encompasses, I think, the balancing of the harm to the

10   protestor, in this case, Sierra Nevada.  What's -- how do you

11   balance that harm to Sierra Nevada in this case?

12         MR. MCCALEB:  Sure.  So, let's start with the harm

13   to Sierra Nevada then.  I couldn't agree with the Government

14   more.  There is none.  What happened the day after the

15   override?  Nothing.  What happened the day after when they

16   did not, you know, send in a notice that they're going to

17   file here?  Nothing.  The day before they filed and Wednesday

18   when they did file, what is the harm that occurred on that

19   day where the world was ending for Sierra Nevada?  Nothing.

20         At the end of the day, we're talking about -- the

21   standard here is irreparable harm, not that necessarily

22   Sierra Nevada is disappointed that there's an override; it's

23   irreparable harm.

24         THE COURT:  So, you're talking about the time

25   period from September 16th to October 9th.

1          MR. MCCALEB:  That's right.  After the -- since the

2     -- no, since the override, which just happened.  The override

3     happened last Wednesday or Thursday.

4          THE COURT:  Okay.  But the protest wasn't filed.

5     We're talking about relevant dates in that time period is

6     what I'm trying to say.

7          MR. MCCALEB:  Sure.

8          THE COURT:  So, the GAO protest was filed ten days

9     after the procurement award.

10          MR. MCCALEB:  Correct.

11          THE COURT:  So, there are ten days in there --

12          MR. MCCALEB:  Right.

13          THE COURT:  -- that you think -- you're asking what

14     happened there?

15          MR. MCCALEB:  No.  What I'm saying is that the

16     agency -- they're here protesting the override decision.  The

17     day that NASA overrode the stay, there was no irreparable

18     harm that they came screaming into court about and there

19     isn't any irreparable harm.  And, indeed, SNC, Sierra Nevada,

20     is continuing its development

21     efforts now under a NASA contract.  It's called the CCiCap

22     contract and they've already stated publicly that they are

23     going to continue that and hope to get a cargo role on this

24     program.  And ultimately --

25          THE COURT:  But it's not this portion of the

1    operation.

2              MR. MCCALEB:  Correct.

3              THE COURT:  But they are continuing to perform

4    right now under a NASA contract, the CCiCap contract.  Now,

5    if the protest fails at GAO, there would have been no harm to

6    them.  If the protest prevails, on the other hand, then NASA

7    has already recognized that there is a remedy in which they

8    would reopen the competition, if that's what GAO recommended,

9    and they would get a contractor in the amount of their

10   proposal.  What SNC --

11             THE COURT:  What about the employee personnel issue

12   and the tied up contract for supply chain?

13             MR. MCCALEB:  Well, so, two points on that.  On the

14   supply chain and the employee personnel, the harms, I think,

15   plainly favor the contractors there.  The harm from a stop

16   right now is that the employees are going to have to stop

17   working, the subcontractors and suppliers are going to have

18   to stop doing their thing.  We aren't going to be able to get

19   long-lead items beginning to go.  And it is not a day-for-day

20   extension or a day-for-day impact.  It's far greater, and the

21   override determination recognizes that fact.

22             The reason is, on January 5th, assuming GAO denies

23   the merits of the protest, at that point in time, you don't

24   just start at day one.  The contractor and its subs and

25   suppliers are going to have to go out and try and find --

1    redeploy the people who are working on the program, rehire,

2    hire new people if the people that they had hired aren't

3    available.  They will have to get -- they will have to

4    negotiate with suppliers about schedule, revised schedules.

5    They will have to try and get new launch dates for the

6    revised schedule because there's going to be a schedule

7    impact.

8            Now, so, the harm to Sierra Nevada -- to Boeing and

9    SpaceX is material.  It's material harm because -- and it's

10   not going to be a day-for-day -- a day-for-day impact as

11   Sierra Nevada emphasizes.  The harm to them is wholly

12   speculative, that what they're saying is, well, geez, we're

13   not really sure what suppliers are going to be around if and

14   when we need them.  That is conditioned on, number one, that

15   they win their protest at GAO; number two, that in a

16   recompetition, they again win -- they actually win the

17   contract and displace one of the two contractors; and, number

18   three, at that point in time, which could be a year or more

19   away, who will be available for them to go hire at that time.

20   It's completely conjectural and speculative.  And, so, the

21   harms there, I think, dealing with the employees and supply

22   chain, plainly favor the contractors and the Government.

23           On the merits, moreover, at the end of the day,

24   what we know is this, Your Honor.  We know that if there's --

25   if the override is allowed to proceed and we are allowed to

1    perform, SpaceX and Boeing, what we know is that both have
2    offered -- have proposed schedules to meet the 2017
3    certification milestone.  The Government evaluated both of
4    those and, indeed, Sierra Nevada also proposed to meet the
5    2017 milestone.  The Government evaluated those.  They said,
6    Boeing and Space X, we've looked at the risks associated with
7    your approach, we think you're going to meet the 2017
8    milestone.  Sierra Nevada, we think that you're relatively
9    and comparatively immature and there are additional risks
10   that we think we are going to push your program out into
11   2018.
12            So, where things stand right now is if there's no
13   -- if the override is allowed to proceed and performance is
14   allowed to proceed, we expect -- Boeing expects, SpaceX
15   expects and NASA expects we're going to meet the 2017
16   certification milestone.  What we know for certain is that if
17   this Court were to strike the override and say that the stay
18   is reinstated, what we know for certain is that that
19   milestone will not be met.  It will not be met.
20            So, that's the real trade here.  We have evaluated
21   schedules that meet the 2017 milestone, that NASA and the
22   contractors agree are going to be met.  And Sierra Nevada,
23   itself, says, yeah, sure, they might be able to meet them.
24   On the other hand, if we strike this override and the stay is
25   reinstated, it doesn't get met.  It doesn't get met.

1          Now, what's the impact?  Well, the impact is pretty

2     plain.  What Sierra Nevada says is, well, you can always go

3     get, you know, another Soyuz launch if you can't -- if the

4     stay is put in place and we can't meet the 2017 certification

5     deadline.  And that, of course, is completely inconsistent

6     not just with the override, but with the entire CCtCap

7     program and years of U.S. space policy, the law is clear that

8     we need the -- that we need the capability certified as soon

9     or as rapidly as possible.

10          The Government identified uncertainties in dealing

11     with Russia and those materialized in May of this year when

12     the Deputy Prime Minister said that they were not going to

13     continue to shuttle U.S. astronauts to the Space Station.  We

14     know that there are higher prices and each year that we

15     negotiate with Russia -- each time we negotiate, they go

16     higher, higher, higher.

17          And we also know that the Soyuz does not meet

18     capabilities that the Government has.  It does not -- it

19     cannot support a full complement of seven astronauts to the

20     Space Station.  It only can support six.  And it cannot

21     support scientific experimentation because it can't bring the

22     experiments back.  So, it doesn't meet the requirements.  It

23     is inconsistent with U.S. policy.

24          And what SNC is asking this Court to -- asking NASA

25     to basically do is say -- ███████████████████████████████

2                                                   Well, not only

3    is it not clear of error for NASA to have determined

4    otherwise; it would be wholly irresponsible of NASA to have

5    taken that approach.

6           The other thing that Sierra Nevada says, Your

7    Honor, is, well, geez, it's -- you know, it's only 87 days,

8    and in the big scheme of things, what's 87 days, or now it's

9    down to 79.  Well, that plainly -- whether it's one day, four

10   days, 87, 79 or 150 days, the point is that those days, in

11   the context of this program, will frustrate the mandate to

12   have the capability as soon as possible, as rapidly as

13   possible, and by 2017.

14          THE COURT:  Is there a specific day in 2017 by

15   which you have committed?

16          MR. MCCALEB:  No -- yeah, as I was saying

17   earlier --

18              THE COURT:  There is.

                MR. MCCALEB:  -- I believe


22

23          THE COURT:  So, the Congressional target is the end

24   of 2017, but you've got an earlier --

25          MR. MCCALEB:  Right, right.  And as far as the --

1  on the cost issue, let me just touch on that briefly, because

2  Sierra Nevada, respectfully, exaggerates the costs and the

3  discounts of the -- and discounts the value of the override.

4  The claim -- they claim that the impact of the override would

5  be 256 million bucks, right, so 129 to each contractor.

6  That's at least -- at a minimum, that's overstated by double,

7  at a minimum, because they're not going to -- if they win the

8  GAO protest, they're not going to then displace both

9  contractors.  At most, they win, they get another shot at

10  award, and at most, they might displace one contractor.

11      So, you're talking about, you know, up to not 256

12  but $129 million.  The benefit of the override --

13      THE COURT:  If there has to be a resolicitation,

14  both of them --

15      MR. MCCALEB:  That's right.  That's right.  Well,

16  it could be -- I could conceive where -- and this actually

17  happened -- I could conceive a situation where -- and,

18  actually, we've moved to dismiss the complaint, that the

19  protest, as it pertains to the challenge to the Boeing award,

20  because we don't think that they've made allegations that

21  rise to the level of any sort of prejudicial error.

22      So, it could be the case, Your Honor, that GAO

23  would say, you know, the Boeing or the SpaceX award is clean

24  and go back and do a recompetition; we recommend a

25  recompetition, you know, of the other award.

```
1            THE COURT:  Yeah, well, we don't know what they're
2       going to do, obviously.
3            MR. MCCALEB:  No.  No.
4            THE COURT:  Yeah.
5            MR. MCCALEB:  But what we do is that -- so, you've
6       got the 129 at most on the one hand; on the other hand,
7       you've got the benefit of the override is the ability to
8       satisfy that 2017 date and get rid of reliance on the Russian
9       Soyuz engine.  And if this Court were to strike down the
10      override decision, NASA might save that $129 million, but
11      they would forego the opportunity to make -- make that 2017
12      deadline.
13           NASA considered this risk.  They evaluated it.
14      They identified the numbers.  And they said, you know what,
15      it's worth it to us to take that risk.  And in the big scheme
16      of things, yes, they're high dollars; yes, they're big
17      dollars; but in the big scheme of things, comparatively
18      they're not.  The costs for one -- one American astronaut to
19      go on the Soyuz is $76 million.  So, that's less than two
20      Soyuz at -- two astronauts going up on the Soyuz.
21           It also is considerably less -- it also is
22      considerably less than the $360 million that NASA has
23      invested in the Dream Chaser over the last -- which is
24      Sierra Nevada's vehicle -- over the last four years,
25      which -- that that investment is not going to be
```

1    realized -- is not going to realize the fruit for which the

2    investment was made.  So --

3              THE COURT:  But that's the nature of R&D, so...

4              MR. MCCALEB:  Sure.

5              THE COURT:  Anything else?

6              MR. MCCALEB:  No, Your Honor, unless the Court has

7    questions that I can answer.  I'd be happy to answer them,

8    otherwise, that will complete my argument.

9              THE COURT:  Okay.

10             Mr. Vacura, you still with us?

11             MR. VACURA:  Yes, Your Honor, I'm here.

12             THE COURT:  Good.  All right.

13             So, Mr. Herzfeld, anything final from you?  Don't

14   repeat yourself, please.

15             MR. HERZFELD:  Thank you, Your Honor.  I don't

16   know, I would just -- I'll come up just briefly.  I'll be

17   very brief.  And I think just to close out one thing just

18   from the harm standpoint for the Government, I think it's

19   been mentioned that there will be more than a day-to-day

20   delay.

21             THE COURT:  It's a cumulative -- cumulative is

22   what --

23             MR. HERZFELD:  Cumulative is probably accurate, and

24   our estimate would be about a four-to-six-month delay,

25   roughly in the --

```
 1                THE COURT:  Based on anything in particular, or is

 2      that just a randomized -- you've got the expert sitting in

 3      the back.

 4                MR. HERZFELD:  Yes, and that's --

 5                THE COURT:  Is that his or yours?

 6                MR. HERZFELD:  -- that was based on consultation

 7      with Mr. Gerstenmaier, so --

 8                THE COURT:  He's nodding his head, good.  I'd

 9      rather hear that from someone who really is an expert than

10      from a lawyer.

11                MR. HERZFELD:  Yes.  Well understood, Your Honor.

12                THE COURT:  All right.

13                MR. HERZFELD:  Yes, yes, I know.  Enough said, Your

14      Honor.  And we also --

15                THE COURT:  I'm only a lawyer, too, so...

16                MR. HERZFELD:  Yeah.  Not only the harm to

17      obviously the contractors if the stay is put back in place,

18      but obviously we would have termination costs potentially now

19      for the Government.  It would start at roughly about 40

20      million and probably go up.

21                THE COURT:  Yeah, but that's the cost of doing

22      business if that -- if that were to happen, so --

23                MR. HERZFELD:  Understood, but that should at least

24      be weighed, obviously --

25                THE COURT:  As part of the process.
```

1          MR. HERZFELD:  Yes, absolutely, Your Honor.

2          THE COURT:  All right.

3          MR. HERZFELD:  And then, also, just adverse

4    consequences, one other thing that we haven't mentioned

5    before that we state in our override determinations, not only

6    U.S. interest, but we also make it as internationally as part

7    of treaties and memorandums of understanding.  Japan, Canada,

8    and Europe could fly their astronauts, and that's part --

9          THE COURT:  On the U.S.-based vehicles.

10         MR. HERZFELD:  Correct.  Correct.  So, we have no

11   way to get up there in 2017 because we can't use the Soyuz,

12   we have a commitment that we're supposed to get them up

13   there, so that's in addition to also USS.

14         THE COURT:  All right.

15         MR. HERZFELD:  And with that, if you have no other

16   questions.

17         THE COURT:  Mr. Metzger or Mr. O'Donnell?  And

18   again, nothing repeated.

19         MR. METZGER:  Thank you, Your Honor.

20         THE COURT:  Just hold on one second.

21         All right.

22         MR. METZGER:  Your Honor, counsel for Boeing stated

██  ████████████████████████████████████████████████████

██  ██████████████████████████████████████████

25  ███████████████████████████████████      ██████████████

1   not mention and may not know is that both Boeing and Sierra

2   Nevada intend to boost the crew vehicle that is the subject

3   of this contract using the Atlas 5 rocket.

4           And the only propulsion system that is used by the

5   Atlas 5 is the Russian-built RD180 engine.  And NASA is very

6   much aware that the launch vehicle, the Atlas vehicle,

7   depends upon this Russian-sourced engine.  In fact, in the

8   source selection document at page 21, it says, "However,

9   these launch vehicles might not be available because of

10  engine availability.  Launch vehicle availability was

11  considered but did not factor into my decision.  NASA looks

12  to the providers to be able to accommodate launch vehicle

13  changes during the time of this contract, and the offerors

14  provided mitigation strategy."

15          The author of the source selection statement is Mr.

16  Gerstenmaier.  It is true, as I said, that there are issues

17  in the U.S./Russia relationship, but it remains true, as I

18  said, and has not been contradicted by anything said by any

19  of the parties, that Russia continues to supply the RD180

20  engines on which Boeing and SNC depend and that Russia has

21  continued to make available the Soyuz vehicle to carry

22  international crew, U.S. crew, and Russian crew.  As I

23  mentioned, the most recent example of that occurred less than

24  a month ago.

25          It also seems to have escaped the knowledge of

1    Boeing counsel, or at least this recognition, that the Atlas

2    5 launch vehicle is produced by a joint venture called United

3    Launch Alliance, of which Boeing is one of the joint venture

4    partners.

5           So, I would submit that perhaps it's not so

6    irresponsible as has been characterized either to expect that

7    the RD180 engine will continue to be made available to Boeing

8    or to expect that, if necessary --

9           THE COURT:  So, what are you saying, that it will

10   be available more likely than not?

11          MR. METZGER:  I believe that the record speaks for

12   itself.  The engine has been made available.  There has been

13   a dramatization of the statutory obligation of the United

14   States and an exaggeration of what that obligation means.

15   The language of the statute obligates the United States to

16   accelerate the ability to carry crew from a U.S. launch

17   vehicle, and we support that and recognize it.  But that

18   obligation is when -- is subject to the condition that it be

19   possible.  And that obligation is also subject to other laws.

20   And the other law that is relevant here is CICA.  So --

21          THE COURT:  Oh, I understand all that.  I guess I'm

22   not sure I get your point on the Atlas mechanism.  Are you

23   saying that because it also relies on some Russian capability

24   or technology that that makes it just as insecure as relying

25   on the Soyuz capability?  Or what are you saying?

1           MR. METZGER:  Actually -- no, I'm sorry if I caused

2    a misunderstanding.  What I'm saying is the risks that are

3    associated, either with availability of Soyuz or availability

4    of the engine, our, Boeing's commercial crew vehicle, has

5    been exaggerated and overstated.

6           And I think it's worthwhile on this question of the

7    statute in Congress to read what the NASA administrator said

8    to Congress on a hearing on the 2015 budget in March of this

9    year.  And this is a direct quote from the prepared

10   statement:  "If Congress fully funds our fiscal year 2015

11   request, I believe we can do this by the end of 2017."

12   "This" being commercial crew capability.

13          And I continue, "Unfortunately, due to the reduced

14   funding the past few years for the President's Launch from

15   America plan, NASA may need to extend our current contract

16   with the Russians and purchase more seats on the Soyuz

17   space" --

18          THE COURT:  We heard that earlier, right.

19          MR. METZGER:  Right.  But, Your Honor, you also

20   heard that it would violate U.S. law and would contravene the

21   expectations or demands of Congress if this program were to

22   be closed to accommodate the GAO protest.

23          THE COURT:  I expect both sides to exaggerate on

24   some of these points.  So, I get it.  Anything else?

25          MR. METZGER:  Yes, just briefly.  We heard of the

1    supposed consequences to the agency and to the awardees, but

2    I want to make sure that the Court understands that the

3    contract clause that was referenced by my colleague, Mr.

4    O'Donnell, in fact, anticipates exactly that there would be

5    financial impact from a stay and reimburses the contractors

6    affected for all of the costs that they might incur.

7           Finally, some suggestion was made by Boeing counsel

8    that Sierra Nevada could continue with its Space Act

9    agreement, the CCiCap program.  It's a fundamentally

10   different agreement.  It's not for design, development and

11   test for the new manned spacecraft.  Our argument remains

12   that there would be extreme prejudice to the competitive

13   opportunity of Sierra Nevada if the stay is -- remains

14   overridden and our argument is not that the GAO would be

15   forestalled from opening a new competition.  The GAO can

16   recommend what it wants.

17          Our argument is that the competition would lack

18   meaning, where our rivals would receive $128 million each

19   within the 100 days after award.  And for all the questions

20   that have been asked, Your Honor, as the technically trained

21   employees, for long lead items, for the supply chain, money

22   talks.  And the Government and the contractors have agreed

23   that they will spend that $260 million.

24          THE COURT:  I understand that.  I do understand

25   that.

 1                MR. METZGER:  Thank you.

 2                THE COURT:  Thank you.

 3                All right, so, where do we go from here?  The

 4      Government has suggested that what they'd like to do is file

 5      the administrative record and take about two weeks or more to

 6      get this process briefed and then give me half an hour to

 7      make a decision, which doesn't work real well here, I don't

 8      think.  The half-hour doesn't work, but more than that, if I

 9      were to take it and consider it as this case appropriately

10      deserves, it wouldn't be a half an hour.

11                So, I think what we have to do is do everything on

12      an extraordinarily expedited schedule.  I do believe that the

13      Government and Boeing are entitled to a shot at some written

14      materials and to some of the record materials, but I also

15      have to take into account various schedules here.

16                We eat up part of the time, obviously, which is

17      detrimental to the protester here, because right now there is

18      an override in place until I were to declare otherwise or

19      not.  And I assume, Mr. Herzfeld, and you can correct me if

20      I'm wrong here, progress is continuing and the Boeing company

21      and SpaceX are both committing funds and doing the work to

22      meet the baseline review.  Is that correct?

23                MR. HERZFELD:  Correct, Your Honor.

24                THE COURT: All right.  So, if we're to be

25      receptive to the protester's concerns, we really have to move

1     very fast.  So, what I'm proposing for you to do is that we

2     target next Tuesday as a date to get back together, at which

3     point I will give you an oral decision.  If you all

4     subsequently need a written decision, obviously that's going

5     to follow.

6             That is, I think, the only way in which we can get

7     this done for you in a quick fashion.  But that also means

8     that you are going to have to get the documents that you

9     intend to theoretically have in an administrative record

10    exchanged with each other by tomorrow, end of the day.  And I

11    am not one who usually says you have to work weekends, but

12    this is one of those situations.

13            I'm on a plane Wednesday on another matter, and

14    although I can work remotely, and if we need more time, I can

15    certainly do that, but I'm holding a couple-day hearing at

16    the end of the week, and it's not here in D.C.  So, we need

17    to accommodate that, as well, because these folks have

18    prepared massively and they've actually provided me with a

19    massive document to read that is my plane reading

20    opportunity.  It's a long enough flight.  But we're going to

21    try to do it before I go.  If we can't, then we'll do it

22    remotely and we'll get it done.

23            But I don't want to eat into the 79 days.  I don't

24    think that makes a lot of sense.  So, the documents that

25    you're going to be attaching to whatever written material you

1   give us, you'll have to attach, not as an administrative

2   record so much, but as attachments to your individual

3   documents.  I would like you to work together in the interim

4   to exchange documents so we don't get massive surprises here,

5   but I don't know that there would be surprises.  I mean, the

6   base document that we're working with here is the record of

7   the override decision that was -- that we all have and that

8   was submitted by the agency.

9            Frankly, and I don't expect a whole lot of

10   documents other than the relevant contract sections, the

11   relevant solicitation sections as they are incorporated into

12   the contract, and anything that might -- I mean, if the whole

13   thing was incorporated, then we need those two documents in

14   the record, and I need for you to flag the relevant sections

15   very clearly so we don't feel we necessarily have to read

16   every word, although we will look at every word, at least on

17   a casual basis.

18            So, we need to stagger this.  By the end of today,

19   Mr. Herzfeld, you need to get us copies electronically of the

20   contract and the solicitation.

21            I assume, Mr. O'Donnell, you've got those.

22            MR. O'DONNELL:  We do, Your Honor.

23            THE COURT:  All right.

24            MR. O'DONNELL:  I'm sorry, we have the

25   solicitation.  We don't have copies of the contract --

1             THE COURT:  All right, so we issued a protective

2      order yesterday, so you're bound by the protective order.

3             MR. O'DONNELL:  Yes.

4             THE COURT:  You can't share the contracts.  And I

5      think in this instance, frankly, the evaluation is not

6      relevant for the override decision.  If you think otherwise,

7      then you need to figure it out amongst yourselves and contact

8      us here at the Court.  We'll be here all day.  We'll even

9      give you some numbers if you need it to contact -- well,

10     actually, all you need to do is send an email to either

11     myself or to Mr. Matson and to the Chambers email, which

12     is -- or to mine, and I'll give you my email that goes into

13     my -- and I'll see it.


16                                                      Either

17     Mr. Matson or I will pick it up, and we'll resolve whatever

18     we need to do telephonically.

19             We'll take your numbers with us.  And if the

20     numbers that we have on your pleadings are good, that's fine;

21     if not, call Mr. Matson this afternoon and give him whatever

22     numbers we would need if we have to contact you at some point

23     over the weekend.

24             MR. O'DONNELL:  Your Honor, for what it's worth,

25     it's not Plaintiff's position that the evaluation materials

 1    are relevant.

 2            THE COURT:  All right, so that's probably a non-

 3    issue, but there may be other issues coming up, and if there

 4    are, we'll deal with it.

 5            We get whatever attachment materials and whatever

 6    briefing materials you want to add.  I think we've had a very

 7    thorough discussion of the issues, and I certainly think that

 8    that, you know, is a pretty good statement of everybody's

 9    positions.  I know that lawyers like to be very careful and

10    lay it out even more carefully, and I'm sure Mr. Vacura --

11    and I appreciate your sense of timing here -- you know, made

12    much less of a statement then he would normally, but it's all

13    out there at this point.

14            So, I think you can write succinct submissions,

15    which will be due by noon on Monday, which then will get us

16    to be able to talk to you Tuesday afternoon.  I'm going to

17    have to juggle that with some other things and change some

18    schedules, actually.  But my anticipation would be that we'd

19    have you all here at 2:30 on Tuesday and bring this to a

20    close.  If you'd rather participate by phone, that's fine, as

21    well, just let Mr. Matson know.

22            I apologize for the brevity of the schedule, but I

23    think even if I were not traveling, I would probably do

24    exactly the same thing because of the 79-day clock ticking.

25    And there is real urgency here.  There's obviously real

1    interest here.  And by the time we get this done, you know,

2    each of you can, Plaintiff, Defendant, Intervenors, give us

3    what you think we should have, that you have available.

4          I'm less worried about the record, frankly, being

5    developed, because you all have been working on the record to

6    be submitted to GAO.  If it's due next week, you know what's

7    in it at this point, or you really have fallen down on the

8    job somewhere.  So, I think you've got what you need.  And

9    we'll take a look at it.  Clearly, we'll be working Monday

10   night.  And we'll get back.

11         Yes, Mr. McCaleb?

12         MR. MCCALEB:  Can I raise one issue, Your Honor?

13         THE COURT:  Yeah.

14         MR. MCCALEB:  You mentioned producing the

15   contracts.  They're, I think, relatively voluminous.  Is

16   there something in particular you want, because --

17         THE COURT:  We want them text-searchable on email.

18         MR. MCCALEB:  On a particular issue?  Or you --

19         THE COURT:  Anything that's relevant here.  I don't

20   want -- I don't think we need the statement of work.  I don't

21   think -- you know, I don't think we need anything that's not

22   relevant here.  I don't need the contract as a whole.  I need

23   the relevant sections.

24         The one thing I worry about, and that's why I think

25   each of you probably need to produce that separately, is you

1    may not agree on what's relevant.  So, I don't want it just

2    to come from the Defendant.  I think, Mr. O'Donnell, you're

3    going to have to identify the sections, as well, because you

4    may or may not agree.  And, frankly, Mr. McCaleb, you and Mr.

5    Vacura may have a difference of a view from what the

6    Government thinks are the relevant sections.

7              I don't want everything.  I don't want the labor

8    standards; I don't want the Buy America Act standards; I

9    don't want all of that.  I just want the relevant sections.

10   Timing, end dates, obviously, is part of it here.  You know,

11   you can make a judgment.

12             MR. MCCALEB:  Okay, thank you.

13             THE COURT:  All right.  With that said, we're all

14   going to be really busy, because obviously we're going to be

15   working on this, as well, over the weekend, with the benefit

16   of today's hearing, which I think was very helpful, very well

17   articulated, and I appreciate that.  And we'll see if we

18   can't get you an answer by Tuesday.  There will be some

19   people who are in the room working pretty hard, I think, but

20   it is what it is.

21             Any questions, anybody?  Very good.  Thank you.

22             ALL COUNSEL:  Thank you, Your Honor.

23             (Whereupon, the hearing was adjourned at 12:40

24   p.m.)

25

1                    CERTIFICATE OF TRANSCRIBER

2

3            I, Sara J. Vance, court-approved transcriber,

4     certify that the foregoing is a correct transcript from the

5     official electronic sound recording of the proceedings in the

6     above-titled matter.

7

8

9     DATE:  10/18/14              /S/ Sara J. Vance

10                                 SARA J. VANCE, CERT

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25