1

**REDACTED VERSION**

1           IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2

3     SIERRA NEVADA CORPORATION,        )

4                 Plaintiff,            )

5           vs.                         )  Case No. 14-994C

6     THE UNITED STATES OF AMERICA,     )

7                 Defendant.            )

8     --------------------------------)

9

10                  ***TRANSCRIPT UNDER SEAL***

11

12                         Courtroom 7

13          Howard T. Markey National Courts Building

14                  717 Madison Place, N.W.

15                     Washington, D.C.

16                 Tuesday, October 21, 2014

17                        2:30 p.m.

18                       Bench Ruling

19

20          BEFORE:  THE HONORABLE MARIAN BLANK HORN

21

22

23

24

25    Susanne Bergling, RMR-CRR-CLR, Reporter

```
 1    APPEARANCES:

 2

 3    ON BEHALF OF THE PLAINTIFF:

 4            ROBERT S. METZGER, ESQ.

 5            NEIL HALL O'DONNELL, ESQ.

 6            Rogers Joseph O'Donnell, PC

 7            750 Ninth Street, N.W.

 8            Suite 710

 9            Washington, D.C.  20001

10            (202) 777-8950

11            rmetzger@rjo.com

12            nodonnell@rjo.com

13

14    ON BEHALF OF THE DEFENDANT:

15            DANIEL HERZFELD, ESQ.

16            KIRK T. MANHARDT, ESQ.

17            U.S. Department of Justice

18            P.O. Box 480

19            Ben Franklin Station

20            Washington, D.C.  20044

21            (202) 616-0344

22            daniel.herzfeld@usdoj.gov

23

24

25
```

```
 1    ON BEHALF OF THE DEFENDANT-INTERVENOR (BOEING):

 2            SCOTT M. MCCALEB, ESQ.

 3            JON W. BURD, ESQ.

 4            SAMANTHA S. LEE, ESQ.

 5            GARY S. WARD, ESQ.

 6            Wiley Rein, LLP

 7            1776 K Street, N.W.

 8            Washington, D.C.  20006

 9            (202) 719-3193

10            smccaleb@wileyrein.com

11

12

13    ON BEHALF OF THE DEFENDANT-INTERVENOR (SPACEX):

14            RICK VACURA, ESQ.

15            STEVEN W. CAVE, ESQ.

16            CATHERINE L. CHAPPLE, ESQ.

17            Morrison & Foerster, LLP

18            1650 Tysons Boulevard

19            Suite 400

20            McLean, Virginia  22102-3915

21            (703) 760-7729

22            rvacura@mofo.com

23

24

25
```

```
1    ALSO PRESENT:

2              KAREN REILLEY, ESQ., NASA

3              SCOTT W. BARBER, ESQ., NASA

4              WILLIAM GERSTENMAIER, ENGINEER, NASA

5              SUZETTE W. DERREVERE, ESQ., BOEING

6              PADRAIC B. FENNELLY, ESQ., BOEING

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                   P R O C E E D I N G S

 2                    -    -    -    -    -

 3           (Proceeding called to order, 2:41 p.m.)

 4           THE COURT:  Go ahead and be seated.

 5           Okay.  Let's figure out who's here and whether we

 6    have an issue or not.  We still have sealed the

 7    courtroom.  You all were supposed to let me know what

 8    was sealed or not sealed.  We haven't really gotten that

 9    far.  You were all on a pretty quick Chinese fire drill,

10    so I understand that, but I think we need to figure out

11    whether we continue to keep everything sealed.

12           As I said the last time, the assumption has to be

13    that -- and is -- that court proceedings are open unless

14    there's a justified reason for sealing individual items

15    or sealing the whole thing.  There's not a lot in this

16    record that we've created so far that strikes me as

17    sealworthy.  There may be a few statements that the

18    agency would prefer the international community not to

19    see.  There may be some numbers.  There may be various

20    issues, but, of course, we're not into the evaluation

21    here, so there isn't a lot.

22           I think we're going to have to go through that

23    exercise.  I'd note, by the way, that I have no idea

24    why, now that we're under a protective order, some

25    documents were filed by the Government under seal and
```

1    still, nonetheless, redacted.  That's an oxymoron

2    somehow.

3         MR. HERZFELD:  I can explain it if you would

4    like, Your Honor.

5         THE COURT:  I would.  I'm curious.

6         MR. HERZFELD:  I think it was part of the

7    negotiation among the parties that took a little longer.

8    It was determined that given the timeline of the GAO

9    protest, they wanted to kind of keep that walled off, so

10   the parties would deal with all the numbers when they

11   got to GAO, and we wanted to provide mainly the numbers

12   that were necessary dealing between now and when the

13   stay would end on January 5th, if GAO went to ruling.

14   So, that's why the numbers weren't provided.

15        THE COURT:  So, I wasn't trustworthy.

16        MR. HERZFELD:  No, it wasn't you, Your Honor.  I

17   think it had to do with the parties in the GAO

18   proceeding.

19        THE COURT:  I'm being facetious.  You shouldn't

20   even have answered that.  All right.

21        The next comment that I need to make,

22   Mr. Herzfeld, is, of course, directed at you, and it's

23   in order to share with all the parties what occurred.  I

24   very, very deliberately gave everybody equal time to

25   respond, and the briefs, although certainly a very quick

1      turnaround, but given the nature of what we're dealing

2      with here on the override and the consequences as

3      alleged by the Protestor with taking more time each day

4      was represented as somewhat critical, but by both sides

5      for different reasons, and yet the Government did not

6      file in time and didn't even file within the time that

7      they said they were going to file when they didn't file

8      on time.

9              Now, we're in a government contracts arena.  The

10     last time I checked, I've issued opinions, too, saying

11     late is late.  That's not okay.  We did not grant you an

12     extension, because to do that would have been unfair,

13     and when you indicated, well, we're going to need three

14     more hours, you didn't even make that.  Now, granted, it

15     was only slightly over the three hours, but that's not

16     okay.

17             And I'm sure that your colleagues and the other

18     parts of your table and the opposing table would have

19     been quite happy to have three more hours, and certainly

20     some of the associates that were working on the cases at

21     the various firms would have definitely appreciated

22     that.  You know, we managed to ruin everybody's weekend,

23     including mine and Mr. Matson's, but that's okay.  What

24     is not okay is to self-take additional time, and I think

25     that's an important comment to make.

1          The consequences in this particular instance are

2      probably not terrible since we're dealing with a very

3      limited record, and I have had a chance to read

4      literally everything that was submitted on my own and to

5      come to conclusions as a result of it, and with the help

6      of the briefs that were filed, and I did read your

7      briefs.  But that's not the way it should happen.  So,

8      I'm not sure what the reason for that is.

9          I understand there are a lot of reviews and a lot

10     of coordinations, but everybody was working with the

11     same kind of problem, and in the case of the private

12     parties, with their clients.  So, hopefully, we can not

13     see that again.

14          MR. HERZFELD:  Your Honor, I do want to

15     apologize.  I do -- it is -- I'm relatively new at the

16     Department of Justice, so getting integrated and

17     figuring things out, so that falls on my shoulders.  I

18     want to apologize to the Court for that and will do

19     better in the future.

20          THE COURT:  What's done is done.  I don't look

21     backwards, I only look forwards, but I think it's only

22     fair that it be on the table.

23          All right.  Let's get to what we're here to

24     figure out.  The Protestor, Sierra Nevada Corporation,

25     filed a protest on a very limited basis in this kept

1    Court; namely, to have the Court review the override

2    decision.  What today's proceeding concludes is not a

3    decision on the merits of the evaluation, not a decision

4    on the merits of the award, but merely a review of

5    whether or not the agency acted properly when they

6    overrode the automatic GAO stay upon filing of the case

7    at GAO.

8            Now, as I looked at the timetable, we have the

9    award of the contract on the 16th of September, 2014;

10   the protest to the GAO about 13 days later, on the 29th

11   of September; the override decision about ten days after

12   that on the 9th of October; and the filing in the Court

13   of Federal Claims six days thereafter on the 15th of

14   October, 2014.  So, things have been moving relatively

15   rapidly.

16           The date that we looked for but couldn't quite

17   find was the debriefing date.  When was that,

18   Mr. O'Donnell?

19           MR. O'DONNELL:  It was, Your Honor, I believe

20   five days before the date of the -- of the protest.

21           THE COURT:  Okay.  All right.  So, basically,

22   things moved relatively rapidly here on all sides.  The

23   longest period of time occurred between the protest to

24   GAO and the override decision.  If we're talking about a

25   debriefing date on the 21st and the protest to GAO on

1     the 29th, that was about a ten-day period between the

2     protest to GAO filing and the override decision by the

3     agency.  But all in all, things have moved with

4     reasonable speed here.

5             So, we're not talking about, you know, major

6     delays that would change any of the date of valuations

7     that we would come up in terms of the time used, the ten

8     days between GAO protest and the override perhaps being

9     the longest period of time.  And, again, coming out of

10    an agency practice and knowing how far up the chain of

11    command this probably had to go, ten days is a little

12    longer than you would like perhaps, but -- in order to

13    give everybody a fair chance to keep this thing moving,

14    but certainly not totally unreasonable.  Given that,

15    there is no impact, then, on what we're about to do, I

16    think, from this schedule.

17            The contracts at issue, I think everybody

18    recognized -- and the Protestor even acknowledged during

19    the hearing we had last Friday -- that essentially this

20    is an important contract.  There is some urgency to it.

21    Different evaluations by the Protestor, the awardees,

22    and the Government as to the impact of what the -- now

23    what are about 75 days left in the GAO time, if I'm

24    correct.  The agency protest, Mr. Herzfeld, I think you

25    represented was due to the GAO on Friday.  Is that

1    correct?  Monday?

2              MR. HERZFELD:  It's Monday.

3              THE COURT:  Monday?  Okay, my mistake.  Monday.

4    And so at that time, certainly assuming that's the way

5    this goes, there's a much broader exchange of

6    information and the Protestor will have a great deal

7    more information at that point as well, but that's

8    directed at the merits of the protest with respect to

9    the evaluation, which is, of course, not what we're

10   doing here.  It just then gives the Protestor more

11   information to decide how to proceed in the event that

12   the override were to be sustained.

13             So, where are we here on the override?  The

14   agency met its requirements to give an override decision

15   in writing, and in accordance with, they chose, the

16   Reilly factors, which comes out of the case decided by

17   Judge Allegra, a 2006 case, so some age on it, but it

18   seems to be what all the parties here agreed was a good

19   starting point and what the agency and many other

20   agencies, for that matter, are using as the format for

21   their decision.  And, of course, the GAO override

22   decision tracks the Reilly factors almost one for one.

23             The Reilly factors are whether there's

24   significant and adverse consequences which will

25   necessarily occur if the stay is not overridden; whether

1     reasonable alternatives to the overrides exist that

2     would adequately address the circumstances presented;

3     how the potential cost of proceeding with the override,

4     including the costs associated with the potential that

5     GAO might sustain the protest, compare to the benefits

6     associated with the approach being considered for

7     addressing the agency's needs; and, four, the impact of

8     the override on competition and integrity of the

9     procurement system.

10          We all recognize and both parties agreed at our

11    earlier hearing that even with this construct, it is a

12    very factually based decision on the particular facts

13    that are presented by the particular protest override

14    and underlying case that will direct how to decide on

15    whether the override meets the criteria to be sustained

16    or not.

17          The standard of review -- and I am summarizing

18    here so that you'll have an oral decision with which to

19    work, and we'll talk about what happens next in a

20    moment -- but basically the standards are the arbitrary,

21    capricious, abuse of discretion or not otherwise in

22    accordance with the law or without observance of

23    procedure required by law.  It's the APA review

24    standards which have been found to apply to the override

25    situation, and the question becomes also whether or not

1    there's clear error here that would drive you to a

2    decision that the override decision was arbitrary,

3    capricious, an abuse of discretion, or otherwise not in

4    accordance with law or procedure.

5          It's very clear that using that standard of

6    arbitrary, capricious, et cetera, a reviewing court

7    should not substitute its judgment for that of the

8    agency but should review the basis for the agency

9    decision to determine if it was legally permissible,

10   reasonable, and supported by the facts.  We have lots of

11   cases for that, obviously.  I'm reading out of Motor

12   Vehicles Manufacturers Association vs. State Farm Mutual

13   Auto Insurance Company, issued by the Supreme Court.

14         There's really boilerplate law that we all use to

15   get to this point.  That's the easy stuff.  We're pretty

16   clear as to what the standards are, we're pretty clear

17   who bears the burden of proof -- namely the Plaintiff --

18   and we go forward from that point of view.  And now we

19   get to talk about the facts in this case and how that

20   plays out.

21         The interesting thing about the Reilly case, of

22   course, is that after setting out the standards, that

23   case really doesn't elaborate on the standards a whole

24   lot, and the reason it doesn't, of course, is because in

25   Reilly, there were so many things that were not done

 1    properly that it was very easy to sort of get to an end

 2    result without having to go into the nuances of what

 3    some of these standards implicate.  There's some

 4    suggestions about various things, but it's not a --

 5    beyond setting out the standards, it's not going to help

 6    us a whole lot, which leaves a lot of room for how we

 7    interpret this.

 8              There are some interesting facts in this case

 9    that I think are pretty undisputed as to what is

10    happening here with the Space Program during the interim

11    time that there is no American capability, which there

12    is not at the moment.  The Russians are providing the

13    capability under contract.  The contract runs out at a

14    particular point in time which matches up the target

15    date for capability under the contracts at issue with

16    Boeing and SpaceX at the moment, and there is I think an

17    understanding on the part of everybody that the goals

18    are perhaps attainable but ambitious and subject to the

19    vagaries of life.

20              These are complex contracts.  Everybody agrees

21    with that.  The complexity also suggests that we can't

22    predict an absolute target date, although there are

23    contractual dates that, as we've sorted out, are in the

24    proposals by the contractors, who are currently SpaceX

25    and Boeing, and the hope, the goal, the current contract

1    suggests these 2017 dates are on the table but

2    ambitious, and ambitious does not, however, translate

3    into their not being realistic dates.

4           There is a definite difference between the

5    parties on the impact and the catastrophic or not

6    catastrophic nature of the impact.  Both parties see a

7    very, very serious impact on their sides.  And when I

8    say "both parties," I'm, of course, talking about the

9    Defendant and the Defendant-Intervenors whose interests

10   align here at least for purposes of the override, maybe

11   not always aligning with each other at the GAO, since we

12   did hear that the Government could terminate one and not

13   the other or terminate both and proceed, depending upon

14   when GAO decides, or not terminate anybody, which

15   obviously would be the Intervenors' hope.  Right now,

16   your interests, I think, align pretty perfectly to

17   defending the override.

18          The Boeing briefs -- which were very helpful and

19   I appreciate that and I think very pointed -- that brief

20   argues, "This is the quintessence of mere disagreement

21   and judgment substitution, and the Intervenor has not

22   identified any clear error in NASA's findings or in the

23   exercise of its unique technical expertise, instead

24   offers its view as a substitute for NASA's reasoned

25   judgment, attempting to support its challenge with its

1    position that the automatic stay is the be-all and

2    end-all of CICA, regardless of the express provision for

3    the agency to exercise its discretion to override the

4    stay, as NASA has done here based on urgency and the

5    nation's best interests."

6         That fourth Reilly factor, which is, in part,

7    what this addresses, although it, of course, addresses

8    the first Reilly factor as well, and there is an

9    intersection, obviously, between the factors, and that's

10   part of why the Reilly factor is a good construct, but

11   it's not an end-all and be-all, because they are not all

12   separate; they are interdependent.

13        If I end up not substituting my own judgment, I

14   really have to find something that weighs so heavily in

15   the Protestor's favor on one of these or more of these

16   factors.  Let's talk, therefore, about the first factor

17   and then we'll just go through them.

18        In the override decision, the United States

19   notes, "The delay in the availability of a certified

20   U.S. crew transportation system necessary for emergency

21   rescue capability as well as for planned crew rotations

22   jeopardizes the safety of the American and international

23   partners astronauts who serve on the International Space

24   Station."  And I'm not necessarily reading sequentially;

25   I'm taking selections out here.

1          "Work must begin immediately on critical path

2     activities in order for the vehicles to reach the point

3     in the certification process where service missions can

4     be authorized and to complete the safety, certification,

5     and flight tests in time for missions to launch after

6     the override."

7          And on the certification and flight tests, I

8     would note that there are repeated references in the

9     NASA override decision to the fact that safety

10    certification of flight test standards are not the

11    standards of the companies involved but actually the

12    NASA standards, which may or may not be higher than the

13    company standards.  I'm not implying that the companies

14    would fly an unsafe vehicle, but it is a level of

15    degree, or at least impliedly so, above and beyond

16    commercial certification, potentially.

17         "The override also notes that both Boeing and

18    SpaceX must complete their certifications baseline

19    review within 90 days of contract award, which then

20    becomes the framework for the certification approach for

21    the entire contract, including the baseline

22    certification plan, as well as verification and

23    validation plan that is traceable to NASA's

24    requirements.

25         "New space vehicle production is an inherently

1    high-risk enterprise with a high probability of delay."

2    And we've all acknowledged that.  That works, of course,

3    in both sides' favor.  The probability of delay here,

4    which NASA acknowledges, suggests -- if that were an

5    isolated issue, which it's not -- that 75 more days

6    shouldn't make a difference.  So, we're really focused

7    on 75 more days, but the delay that could occur will not

8    necessarily occur, and the question is, do you stop

9    everything for those 75 days, assuming GAO is on time?

10          This is not an uncomplicated protest, so I know

11   they have 180 days to do it, but sometimes you get

12   extensions on that.  And I'm not sure that this is the

13   case for it, I'd rather suspect not, but they do try

14   very often to send their cases in to a form of mediation

15   before they get to the final decisions.  That would, of

16   course, delay it as well.

17          So, I don't know that there's a lot of room here

18   for a mediation, but -- I'm guessing there really is

19   not, but there are all kinds of probabilities that you

20   can hypothesize on.  For instance, what will happen at

21   GAO is no different than hypothesizing about what will

22   happen anywhere else, and we really don't know that

23   there will be a delay, even though NASA acknowledges

24   that that's a possibility and experience tells you that

25   the larger the contract, the more likely there is some

1    kind of a probability of that, but it doesn't have to

2    happen.

3              And I think we have to assume that the

4    contractors are anticipating meeting their obligations,

5    that the agency is anticipating enforcing the

6    obligation, and that's the basis on which we have to

7    proceed.  But it is a point that certainly makes us stop

8    and think about it with respect to the Protestor's

9    position as well as the agency position.

10             Right after saying that "New space vehicle

11   production is an inherently high-risk enterprise with a

12   high probability of delay," the agency continues -- and

13   this is back-to-back sentences -- "a further 100-day

14   delay" -- and, of course, now we know it's 75 at this

15   point -- "in the contract, especially when the critical

16   milestone setting the foundation for certification of

17   the vehicles is set to occur within the first 90

18   days" -- which is now less than that, too -- "will

19   result in a direct adverse impact on crucial contract

20   timeline.  This delay also prevents obtaining long lead

21   items and requires workforce and subcontractor

22   stand-down, which will create a more than four-day delay

23   to restart and will impair the ability of the

24   contractors to meet NASA's needed mission dates.

25             "A massive effort will be necessary to expedite

1    activities after the resolution of the protest to meet

2    the 2017 schedule, which will be extremely difficult to

3    achieve, because the contractors cannot expedite the

4    acquisition and production of long lead items critical

5    to both mission operators' launch of the crew vehicle."

6              Here is where I think it is a difficult balance,

7    but even if there were to be delay, if you delay the

8    contract still further, you're almost guaranteeing that,

9    if not making it more likely, although not necessarily.

10   Maybe the contractors can double up and run up -- you

11   know, run together like hamsters in a little turn thing

12   and make it happen.  But the question really for the

13   Court is, do we jeopardize that 2017 date even further

14   by rejecting the override?

15             The Protestor certainly questions a lot of things

16   in the override decision, and the one that is the most

17   viable for me, although I think the least critical,

18   frankly, in whether or not to overturn the override, is

19   this question of the Government has a position that

20   talks about how delay and the availability of the

21   contract in an operational forum would violate U.S. law,

22   specifically the Authorization Act of 2010, and would be

23   in violation of legally binding international

24   agreements.

25             The international agreements aside for a moment,

1    we're -- you know, the Government is now using

2    capability on the Soyuz -- to reach Soyuz from the

3    Russians.  It takes a waiver, we all acknowledge that,

4    to utilize that capability.  It may even take some long

5    lead time, and I think that's more of a problem,

6    frankly, but you have a waiver now.

7            The better part of that discussion, it seems to

8    me, in terms of why this is an urgent contract has more

9    to do with the vagaries of international diplomacy and

10   some of what's going on in the world right now.  And

11   there's much more going on than any of us in this room

12   have any understanding of, I'm sure of that, having

13   sniffed around the international diplomacy world in

14   various jobs that I've had over the years.  We don't

15   have any idea.

16           We do know from the popular press that our

17   relationship is not good.  We do know that we have shut

18   down various things on behalf of our hosts who take us

19   to the Soyuz at this point, and we do know that that is

20   an ongoing and developing situations.  We can even say,

21   as of today's date, with new elections coming up in the

22   Ukraine very shortly, that is even more uncertain than

23   usual, and who knows what it will be like in 2017.

24           We may be the best of friends, we may be the

25   worst of friends, but certainly that, to me, is more

1    serious than whether or not you have to or try to, A,

2    obtain further contracts, B, obtain the waiver that you

3    need to do it, because you are doing it now.  So, yes,

4    technically, you might be violative of the statute, but

5    as a practical matter, that means that you have to go do

6    what you're doing right now.

7           The international issues and the national

8    security, perhaps a bigger issue, and the override

9    statement that I think bears on that is the one that

10   says, "As stated in the 2010 Authorization Act, it is

11   essential to have ISS human transportation capability,

12   specifically the United States capability, as soon as

13   possible.  As further stated in the Authorization Act,

14   Section 201(b), the United States shall maintain an

15   uninterrupted capability for human space flight and

16   operation in lower earth orbit and beyond as an

17   essential instrument of national security and of the

18   capacity to ensure continued United States participation

19   in and leadership in the exploration and utilization of

20   space."  That seems more pressing to me in terms of

21   urgency than whether or not you've technically violated

22   the statute and need to get another waiver.

23   ███████████████████████████████████████

24   ███████████████████████████████████████████

25   ███████████████████████████████████████████

1   ████████████████████████████████████████████

2   ████████████  ███████████████████████████████

3   ███████████, and that is, to me, a very deliberate

4   statement.  There are several deliberate statements by

5   parties in this case that I think bear very heavily on

6   what we're doing, and that's one of them.

7          The other one, which we will get to when we talk

8   about reasonable alternatives -- and we can talk about

9   it now, actually -- or cost is the one where the

10  Government said that they will make the Protestor whole,

11  not just bid preparation costs, because I specifically

12  asked that question at the earlier hearing, but, in

13  fact, if, in fact, GAO overturns the award, that there

14  will be a competition, and if Sierra Nevada were to gain

15  a position at the table through that competition, then

16  they will be caught up, so to speak, on the costs spent

17  during the override period.

18         That reduces the potential harm dramatically to

19  Sierra Nevada.  Those two statements, the Boeing

20  statement and the Government's statement, I think weigh

21  heavily in what we're talking about today as to the

22  validity of the override decision.  I understand why the

23  Protestor, Sierra Nevada, feels a sense of urgency, but

24  at the same time, if they were to win a protest at the

25  GAO or if, later on, it comes to this Court, there is a

1   promise here to catch them up, and that's a pretty

2   significant representation by the Government.

3          Let's talk about consideration of reasonable

4   alternatives.  There is certainly no incumbent

5   contractor sitting there who can be offered a bridge

6   contract.  That is not the situation with the Russians.

7   That's very different and not a good alternative.

8          Defendant claims that NASA considered other

9   alternatives but concluded that it had none.  I haven't

10  heard here, during the very expedited proceedings that

11  we've had, anybody offer an alternative, and even the

12  Protestor conceded that it was not ideal to continue to

13  use the Russians to reach the space vehicle.

14         It's not a question of whether it's critical to

15  meet a congressional mandate.  It's a question of

16  whether it's critical to national security, to

17  protection of our astronauts.  I'm not suggesting you

18  all go out there and violate statutory obligations, but

19  this one is in a slightly different context, I think.

20         The cost considerations, NASA has represented --

21  and, again, I don't really have numbers here to work

22  with, and I don't have any point/counterpoint.  There

23  have been suggestions that the Protestor has made that

24  really these numbers are understated when we talk about

25  some of the costs back and forth, but it's not solid

1    numbers that I have to really assess that.

2         NASA has represented that they considered the

3    potential costs of terminating the contracts if the

4    protest were to be sustained and that they've considered

5    what the various data points are for how much money's

6    been obligated, what is potentially at risk here, and

7    that these contracts are coming in sort of capsules, the

8    money is coming in capsules, and represented that it's

9    the $129.3 million on each contract that's the current

10   capsule that would be at risk.

11        Frankly, the number part of it, I almost have to

12   take the Government representation unless controverted,

13   and I'm not seeing the controverting except in very

14   general terms.  Now, that may be a hazard of this kind

15   of expedited procedure, but once you say to Sierra

16   Nevada that we'll keep you whole, again, the cost

17   considerations -- you know, that's up to the Government.

18   If they want to -- it's kind of like if the Government

19   wants to spend its money doing that, then that's their

20   choice, and they've probably balanced this all out.

21        The Protestor very clearly states that "The NASA

22   facts -- the facts on which NASA relies" -- and I'm

23   quoting -- "for the cost consideration sections of its

24   override memorandum are either wrong or so incomplete as

25   to be misleading," and claims that NASA would be

1    underestimating its termination cost liability.

2         The costs also have to be compared, as suggested

3    by some, with what happens if there is no American

4    capability and the contract with the Russians has to be

5    renegotiated.  That cost per seat of $76.3 million is

6    pretty big.  I don't know how many seats we would want,

7    but, again, that's part of why it's hard to calculate

8    the numbers here.  But there also you have got the

9    problem of having to negotiate three years in advance,

10   and 2017 is about three years or less than three years

11   away.

12        The impact on competition and the integrity of

13   the procurement system, any time there's an override,

14   there is an impact on one side.  That's a given.

15   Keeping the Protestor whole in this situation seems to

16   do a great deal towards keeping this Protestor in the

17   competition.  The first step, obviously, is the GAO

18   decision, but that will allow the Protestor to catch up,

19   so to speak.

20        There is an intangible, and I recognize that the

21   Protestor raised it, saying, you know, then Boeing and

22   SpaceX will then have an advantage, because they will

23   know more about the contract.  Particularly after that

24   certification review date, there's going to be an

25   exchange of information.  I would and I have to believe

1        that if Sierra Nevada were to gain a seat at the table

2        at somebody's expense, whoever, if that were to happen,

3        the agency's best interest is to catch up Sierra Nevada

4        pretty darn quick to an information stability level that

5        allows them to perform.

6               So, again, yes, there probably will be some

7        information exchanged; at the same time, number one,

8        from a financial perspective, they will theoretically be

9        kept whole, according to the agency, and from an

10       information perspective, certainly if they were to get

11       the contract, they will.  And it really will depend on

12       how the agency were to recompete as to whether there is

13       an information advantage, but that's not my issue now.

14              So, if the agency decides to simply evaluate

15       based on the proposals that they have now -- and I'm not

16       telling you how to do this, this is not in the form of a

17       declaratory anything -- but if the agency were to simply

18       reevaluate the proposals that are in, then nobody has an

19       advantage.  If the agency decides to recompete with

20       either negotiation or updated proposals, then I think

21       you do have a challenge at the agency level to make sure

22       that it's an equal playing field.

23              But that's on the agency's head at that time.

24       It's so far down the road from what we're doing here

25       today that it's not something I should be considering,

```
 1    and that would be the subject, potentially, of another
 2    protest.  I'm sure this is not over.  These contracts
 3    are for too much money, too important, too interesting,
 4    and basically the core of what each of the companies
 5    involved does.  So, you know, this is not over, but
 6    that's not an issue for us today.  It is a valid point,
 7    potentially, but it's not an issue for today.
 8              And let me just read into the record the
 9    statement made by the Government with respect to the
10    statement about making Sierra Nevada whole.  Government
11    counsel unconditionally stated that "If Sierra Nevada
12    wins the award, they will start from ground zero and
13    they will get to do everything that SpaceX and Boeing
14    are doing right now, no difference.  They will get a
15    complete contract, and they will be able to meet their
16    milestones as required by the contract no differently.
17    That's going to be exactly the same.  The only
18    difference is that they will be a few months later, and
19    it's -- you know, while there's been some statement and
20    speculation that they will have lost out on some
21    expertise and some knowledge, it's not clear to me that
22    that would be taken into account in any reevaluation.  I
23    think presumably the same standards of review will be
24    used by the agency in any reevaluation.  Ultimately, we
25    think there isn't going to be any harm, because they
```

1    will be made whole."

2            And I specifically asked the question, "Are you

3    dealing with bid preparation costs?"  And government

4    counsel specifically said no to that question.

5            Given the statements by government counsel, the

6    relative advantage seems to be more minimized actually

7    than in many other situations.  Is it zero?  Of course

8    not, but the Government seems to have made a commitment

9    to catch Sierra Nevada up if, in fact, they get that

10   seat at the table.

11           The bottom line, I am not going to override --

12   not going to override the override -- I shouldn't say it

13   that way.  Let's scratch that.  Let's start at the

14   bottom line again.

15           Bottom line, this Court will not void the

16   override issued by NASA, and you all are back to your

17   GAO protest at this point, with the agency report due on

18   Monday.  So, let's turn to the future, then.

19           You have a couple of choices here on behalf of

20   the Protestor, obviously.  The Government is free to

21   proceed, Boeing is free to proceed with the Government,

22   SpaceX is free to proceed with the Government on the

23   contracts that have been issued.

24           Mr. O'Donnell, do you have any idea of what your

25   next steps are, just so we can talk logistics for a

1    moment?

2              MR. O'DONNELL:  I don't, Your Honor.

3              THE COURT:  Okay.  Obviously, you have to talk to

4    your client.

5              MR. O'DONNELL:  I do.

6              THE COURT:  In the event that you proceed with

7    GAO, and whatever they do they do, then, of course, you

8    have to make some decisions.  In the event that you

9    decide not to proceed with GAO but to file a substantive

10   merits bid protest here at the Court, just be sure that

11   you mark it as a related case so that we don't run

12   afoul, you know, of some mixup there.  We've done a lot

13   of work already, and it doesn't make sense for one of my

14   colleagues to have to start all over.

15             And I think I indicated to you that I am doing a

16   proceeding out of town, but that is -- I could be

17   reached by tomorrow afternoon.  I'll be on a plane for a

18   couple hours in the morning, and any time from tomorrow

19   afternoon, I am reachable.  Even tomorrow morning

20   Mr. Matson is reachable in chambers, and we will jump on

21   it as quickly as we've jumped on this one and make sure

22   that you aren't penalized by any extra time.

23             The difference, of course, is we will have to

24   have an administrative record on the evaluation material

25   that we don't have now, because we haven't gotten any of

1    that, didn't need it for this proceeding, but I'm

2    assuming that would not be much of a problem, because

3    you have to file one at the GAO anyway, and I assume

4    you're preparing that for filing when?

5            MS. REILLEY:  Monday.

6            THE COURT:  Monday, too.  That's what I would

7    have assumed.

8            All right.  So, the administrative record, the

9    only thing that you -- if you decide to come here and

10   stop the GAO proceeding -- and I'm not telling you to do

11   that by any means.  You do what you do.  That's totally

12   your choice.  We are here, ready to serve, but whatever

13   you do you do in the best interests of your client,

14   quite clearly.

15           What I would say to you is that you and

16   Mr. Herzfeld should jump very quickly on talking about

17   anything you need beyond the administrative record so

18   that by the time we -- that's at GAO, so any

19   supplementation to that record.  I'm assuming we will

20   have the same Intervenors, so you might as well start

21   talking to them and make sure that -- that that does not

22   become a problem eating up time, because that would be,

23   I think, inexcusable.  We should be able to figure that

24   one out very quickly.

25           And then we would set, again, a very, very quick

1    briefing schedule.  My intention would be to eat up as

2    few of the remaining 75 days as humanly possible,

3    understanding that obviously each day does matter to the

4    Protestor, even if it is, when you take all the facts

5    and balance it all out, I think appropriate to sustain

6    the override.

7              Any questions, Mr. O'Donnell?

8              MR. O'DONNELL:  No, Your Honor.  Thank you.

9              THE COURT:  Very good.

10             Mr. Herzfeld?

11             MR. HERZFELD:  No, Your Honor.

12             THE COURT:  Boeing?

13             MR. MCCALEB:  Just I'm sure all counsel agree

14   that we appreciate the Court's and the entire chambers'

15   devotion of time over the weekend to this matter.  I

16   know it was inopportune, but thank you.

17             THE COURT:  It was no different than what you had

18   to do, right?

19             MR. MCCALEB:  That's true.

20             THE COURT:  SpaceX?

21             MR. VACURA:  We would echo that.  We appreciate

22   the Court's diligence in responding.  We have nothing

23   further.  Thank you, Your Honor.

24             THE COURT:  Mr. O'Donnell, anything?

25             MR. O'DONNELL:  Nothing, Your Honor.

1           THE COURT:  Very good, thank you.  And I

2   appreciate, in return, the expedited briefing that you

3   all did, the working, you know, that we all had to do to

4   get ready for the first hearing and then get ready for

5   today.  So, I thank you all.  It's been a very pleasant

6   and easy process.

7           There is a couple -- two last questions,

8   actually, one that I think we probably ought to -- which

9   I didn't -- I was eager to jump right into it, so I did

10  not get counsel to represent who they were, and we'll

11  put that into the record.

12          Mr. O'Donnell?

13          MR. O'DONNELL:  Neil O'Donnell, Rogers Joseph

14  O'Donnell, for Plaintiff Sierra Nevada Corporation.

15          THE COURT:  And Mr. Metzger?

16          MR. METZGER:  Bob Metzger, Rogers Joseph

17  O'Donnell, also for Plaintiff Sierra Nevada Corporation.

18          THE COURT:  And definitely, Mr. Metzger, I thank

19  you for your presentation at the first hearing.  It was

20  very helpful, because that really got us all into the

21  case.

22          MR. METZGER:  Thank you very much, Your Honor.

23          MR. HERZFELD:  Your Honor, Dan Herzfeld for the

24  United States Department of Justice.  With me, my

25  colleagues, Karen Reilley, Scott Barber from NASA, and

1   my colleague from the Department of Justice, Kirk

2   Manhardt, and again, today, Mr. William Gerstenmaier,

3   Associate Administrator for Human Exploration Operations

4   Directorate from NASA.

5           THE COURT:  All right.  And Mr. McCaleb?

6           MR. MCCALEB:  Yes, Scott McCaleb from Wiley Rein

7   on behalf of Boeing.  With me, Jon Burd from our firm,

8   as well as Gary Ward and Samantha Lee.  Also with me are

9   three in-house counsel from Boeing who are admitted to

10  the protective order at GAO, Suzette Derrevere, Patrick

11  Fennelly, and Steven Cowan.

12          THE COURT:  Mr. Vacura?

13          MR. VACURA:  Your Honor, Rick Vacura from

14  Morrison Foerster --

15          THE COURT:  I mispronounced it.  I apologize.

16          MR. VACURA:  That's okay, that happens a lot.  I

17  answer to anything.  No problem, Your Honor.

18          -- for Space Exploration Technologies Corporation

19  from Morrison Foerster, and with me are my colleagues

20  from Morrison Foerster, Steven Cave and Catherine

21  Chapple.

22          THE COURT:  Okay, thank you.

23          All right.  Finally, we obviously have given this

24  to you orally because we did not have a finished written

25  opinion.  The question is whether you all want a written

1    opinion, think it's necessary, or on this fast-moving

2    track, whether the transcript of today's proceeding is

3    sufficient for you.

4              Mr. O'Donnell?

5              MR. O'DONNELL:  Your Honor, tentatively, I think

6    we do want a written opinion.  If, after consultation

7    with my client, we conclude otherwise, I will let you

8    know.

9              THE COURT:  Well, then, you are going to have to

10   tell us quickly so we can get it out quickly.

11             MR. O'DONNELL:  I understand.

12             THE COURT:  All right.  Mr. Herzfeld, what's your

13   thought?

14             MR. HERZFELD:  Your Honor, we -- you know, it's

15   up to the Court.  We do not need one.

16             THE COURT:  All right.

17             Mr. McCaleb?

18             MR. MCCALEB:  We echo that.  We do not need a

19   written opinion.

20             MR. VACURA:  We agree, Your Honor.

21             THE COURT:  Okay.  So, Mr. O'Donnell, I guess

22   it's in your court.

23             MR. O'DONNELL:  Thank you, Your Honor, and I will

24   make every effort to let you know.

25             THE COURT:  And honestly, you know, it probably

1   should be balanced by what you decide to do.

2            MR. O'DONNELL:  That's correct, Your Honor.

3            THE COURT:  There is only one of me and only one

4   of Mr. Matson, so it will impact the schedule,

5   obviously.

6            MR. O'DONNELL:  I understand, Your Honor.  Thank

7   you.

8            THE COURT:  All right, very good.  Thank you.  We

9   stand adjourned.

10           (Whereupon, at 3:34 p.m., the proceedings were

11  concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF TRANSCRIBER

 2

 3

 4          I, Susanne Bergling, court-approved transcriber,

 5   certify that the foregoing is a correct transcription

 6   from the official digital sound recording of the

 7   proceedings in the above-titled matter.

 8

 9

10

11

12   DATED:  10/22/2014        s/Susanne Bergling

13                             SUSANNE BERGLING, RMR-CRR-CLR

14

15

16

17

18

19

20

21

22

23

24

25
```