**REDACTED VERSION**

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

## BID PROTEST

| | |
|---|---|
| SIERRA NEVADA CORPORATION, | ) |
| | ) |
| Plaintiff, | ) Case No. 14-994C |
| | ) |
| v. | ) Judge Marian Blank Horn |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## SUPPLEMENTAL MEMORANDUM IN SUPPORT OF

## PLAINTIFF'S APPLICATION AND

## MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF

## TABLE OF CONTENTS

Page

I.    INTRODUCTION..................................................................................................1

II.   THE OVERRIDE IS ARBITRARY AND CAPRICIOUS AS IT IS
      CONTRARY TO THE EVIDENCE...............................................................................2

III.  NASA HAS OVERSTATED AND FAILED TO SUPPORT CLAIMS
      OF ADVERSE CONSEQUENCES AND THERE IS A
      REASONABLE ALTERNATIVES AVAILABLE ...................................................6

      A.    No Law Will Be Violated Should NASA Find It Becomes
            Necessary (For Any Reason) To Commence U.S. Crewed
            Missions After 12/31/2017. ..................................................................6

            1.    The NASA Authorization Act of 2010 Does Not Require
                  Crewed Missions by the End of 2017. ...................................6
            2.    NASA Will Not Violate ISS Cooperation Agreements
                  with Russia, ESA, Japan or Canada .......................................8
            3.    Congress has Acted to Provide NASA Authority to
                  Order Soyuz Flight Services After 2017...................................9
            4.    Congress Has Not Fully Funded the Commercial Crew
                  Program Despite NASA's Warnings That Failure to do
                  so Would Delay Availability of a U.S. Crew
                  Transportation Capability........................................................9
            5.    National Security Considerations are Not Present.................11

      B.    The U.S. Has the Ability To Purchase Additional ISS Flights
            From Russia Until ISS Missions Can Be Flown By The U.S.
            Commercial Providers .......................................................................12

      C.    The U.S. And Russia Continue To Cooperate In Civil Space
            Because Of Mutual Dependencies And Mutual Advantages ..........................14

      D.    In Fact, NASA Knows That Further Seats On Soyuz May Be
            Required Until U.S. Crewed Capability Is Ready – And Plans
            Accordingly ......................................................................................19

IV.   NASA'S CONCLUSIONS ON THE COST-BENEFIT
      COMPARISON UNDERSTATE THE COSTS TO NASA OF A
      TERMINATION AND OVERSTATE THE BENEFITS OF THE
      OVERRIDE........................................................................................................21

      A.    NASA Seriously Understates Its Termination Liability...................21

      B.    The Contractors Cannot Be Terminated For Default, And Will
            Be Fully Compensated If They Are Delayed, Because Of The
            Stay ..................................................................................................25

      C.    NASA Overstates The Impact Of An Override...............................26

## TABLE OF CONTENTS

Page

V.   THE OVERRIDE WILL SERIOUSLY HARM THE PROSPECTS
     FOR ANY MEANINGFUL FUTURE COMPETITION AND DENY
     SNC ANY GENUINE OPPORTUNITY TO COMPETE FAIRLY
     SHOULD THE GAO RULE FAVORABLY ON ITS PROTEST .............................27

VI.  CONCLUSION .............................................................................................30


I.   INTRODUCTION....................................................................................................1

II.  THE OVERRIDE IS ARBITRARY AND CAPRICIOUS AS IT IS
     CONTRARY TO THE EVIDENCE...........................................................................2

III. NASA HAS OVERSTATED AND FAILED TO SUPPORT CLAIMS
     OF ADVERSE CONSEQUENCES AND THERE IS A
     REASONABLE ALTERNATIVES AVAILABLE ......................................................6

     A.   No Law Will Be Violated Should NASA Find It Becomes
          Necessary (For Any Reason) To Commence U.S. Crewed
          Missions After 12/31/2017. .......................................................................6
          1.   The NASA Authorization Act of 2010 Does Not Require
               Crewed Missions by the End of 2017. ........................................6
          2.   NASA Will Not Violate ISS Cooperation Agreements
               with Russia, ESA, Japan or Canada ...........................................8
          3.   Congress has Acted to Provide NASA Authority to
               Order Soyuz Flight Services After 2017 ....................................9
          4.   Congress Has Not Fully Funded the Commercial Crew
               Program Despite NASA's Warnings That Failure to do
               so Would Delay Availability of a U.S. Crew
               Transportation Capability.........................................................9
          5.   National Security Considerations are Not Present.................11
     B.   The U.S. Has the Ability To Purchase Additional ISS Flights
          From Russia Until ISS Missions Can Be Flown By The U.S.
          Commercial Providers ..............................................................................12
     C.   The U.S. And Russia Continue To Cooperate In Civil Space
          Because Of Mutual Dependencies And Mutual Advantages ........................14
     D.   In Fact, NASA Knows That Further Seats On Soyuz May Be
          Required Until U.S. Crewed Capability Is Ready – And Plans
          Accordingly ...............................................................................................19

IV.  NASA'S CONCLUSIONS ON THE COST-BENEFIT
     COMPARISON UNDERSTATE THE COSTS TO NASA OF A
     TERMINATION AND OVERSTATE THE BENEFITS OF THE
     OVERRIDE.........................................................................................................21

     A.   NASA Seriously Understates Its Termination Liability...............................21
     B.   The Contractors Cannot Be Terminated For Default, And Will
          Be Fully Compensated If They Are Delayed, Because Of The
          Stay ............................................................................................................25
     C.   NASA Overstates The Impact Of An Override...............................................26

## TABLE OF CONTENTS

Page

V.    THE OVERRIDE WILL SERIOUSLY HARM THE PROSPECTS
      FOR ANY MEANINGFUL FUTURE COMPETITION AND DENY
      SNC ANY GENUINE OPPORTUNITY TO COMPETE FAIRLY
      SHOULD THE GAO RULE FAVORABLY ON ITS PROTEST ..............................27

VI.   CONCLUSION ................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Advanced Sys. Dev., Inc. v. United States,*
72 Fed. Cl. 25 (Fed. Cl. 2006) ................................. 3

*Dyncorp Intern'l v. United States,*
113 Fed. Cl. 298 (Fed. Cl. 2013) ............................... 3

*E-Management Consultants, Inc. v. United States,*
84 Fed. Cl. 1 (2008) ...................................... 2, 4, 28

*Lisbon Contractors, Inc. v. United States,*
828 F.2d 759 (Fed. Cir. 1987) ............................... 20

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.,*
463 U.S. 29 (1983) ........................................... 3, 21

*PM Tech, Inc. v. United States,*
95 Fed. Cl. 330 (Fed. Cl. 2010) ............................... 4

*Reilly's Wholesale Produce v. United States,*
73 Fed. Cl. 705 (Fed. Cl. 2006) ...................... passim

*Space Exportation Technologies, Corp. v. United States,*
No. 14-354 (*available at* 2014 WL 1860048).... 17, 18

*Supreme Foodservice GMBH v. United States,*
109 Fed. Cl. 369 (Fed. Cl. 2013) ...................... 1, 2, 4

*URS Federal Servs., Inc. v. United States,*
102 Fed. Cl. 674 (Fed. Cl. 2011) .......................... 2, 4

**FEDERAL STATUTES**

5 U.S.C. § 706(2)(a) ..................................................... 3

31 U.S. C. § 3553(c)(l) ....................................... passim

50 U.S.C. § 1701 n .................................................... 9

51 U.S.C. § 50131(b)(2) ............................................. 9

CICA ............................................................. passim

Commercial Space Act of 1998, 51 U.S.C. § 50131(a) ... 9

Competition in Contracting Act of 1984 ("CICA"),

Russia under the Commercial Space Act, 51 U.S.C. § 5031(a)    6

**OTHER STATUTES**

Pub. L. 109-155, § 501(a) (Dec. 30, 2005) ............. 6, 7, 8

Pub.L. 111-267, § 201(b) (Oct. 11, 2010)........... 6, 7, 8, 9

Pub.L. No. 112-273.................................................... 14

**OTHER AUTHORITIES**

112th Congr., 2d Ssn., Jan 3, 2013, and Bill Summary, available at
    https://www.congress.gov/bill/112th-congress/house-bill/6586/actions  14

H.R. 6586 .................................................................. 14

## OTHER REGULATIONS

FAR § 52.249-2 ........................................................ 24

FAR § 52.249-2(g)(2) ............................................... 24

FAR § 52.233-3 ........................................................ 25

Plaintiff Sierra Nevada Corporation ("SNC") respectfully submits this supplemental memorandum in support of its application for declaratory and injunctive relief.

## I.   INTRODUCTION

This case challenges the action of the National Aeronautics and Space Administration ("NASA" or "Agency") overriding the statutory stay of contract performance imposed by the Competition in Contracting Act of 1984 ("CICA"), 31 U.S.C. §3553(c)(l) in connection with an award of two International Space Station ("ISS") Commercial Crew Transportation Capability ("CCtCap") contracts. The automatic stay was triggered on September 26, 2014, when SNC brought a protest to the Government Accountability Office ("GAO").  On October 9, 2014, NASA issued the override determination (the "Override Memo") which presents the agency's justification for this action.  *See* Exh. 1, Override Memo.[1]

NASA asserts that it needs to override the stay so that Boeing and SpaceX can gain additional days to perform the challenged CCtCap contracts and achieve spacecraft certified for crewed missions before the end of 2017.  As of the date of submission of the Supplemental Memorandum, 76 days remain of the original stay period.

SNC has moved for both declaratory and injunctive relief.  As explained during the oral argument of October 17, 2014, Plaintiff believes that declaratory relief is sufficient and is the correct remedy in this action.  *See Supreme Foodservice GMBH v.*

---

[1] For the convenience of the Court and the parties, SNC here uses the same Exhibit references as in its initial Memorandum In Support Of Plaintiff's Application And Motion For Declaratory And Injunctive Relief, where applicable, and assigns new Exhibit numbers to materials that accompany this Supplemental Memorandum and were not previously provided.

*United States,* 109 Fed. Cl. 369, 396-97 (Fed. Cl. 2013) (because the CICA stay arises by operation of law upon a timely GAO protest, and without requiring a showing of the factors ordinarily necessary for injunctive relief, an override may be found arbitrary and capricious, and void, without satisfaction of injunctive relief requirements).  For this reason, it is unnecessary for the Court to apply the "four factor" test for injunctive relief but, if these factors were applied in this case, they would support issuance of a preliminary injunction. *Cf. URS Federal Servs., Inc. v. United States,* 102 Fed. Cl. 674, 676 (Fed. Cl. 2011).

Although the review of NASA's Override Memo is under the deferential APA standard, that deference is tempered by the observation that CICA makes the stay "automatic" upon the timely filing of a GAO protest.  Thus, CICA presumes that the stay is appropriate, and that overrides will be the exception.  Even 20 years after CICA's enactment, many override opinions continue to explore the powerful policy supporting the stay provision – preserving the integrity of the federal procurement process through a bid protest mechanism that can provide meaningful relief.  *See, e.g., Supreme Foodservice,* 109 Fed. Cl. at 385-86; *E-Management Consultants, Inc. v. United States,* 84 Fed. Cl. 1, 5-6 (2008). Here, then, NASA may override the general rule that the stay of the CCtCap contracts is in the public interest "only where [NASA] can establish 'urgent and compelling' or 'best interest' circumstances justifying imposition of an override." *URS Federal Servs.,* 102 Fed. Cl. at 677.

## II.    THE OVERRIDE IS ARBITRARY AND CAPRICIOUS AS IT IS CONTRARY TO THE EVIDENCE

The Court's review of the NASA override is to be addressed using the Administrative Procedure Act standard of review.  *RAMCOR Servs. Grp., Inc.*, 185 F.3d

2

354671.1

1286, 1289-90 (Fed. Cir. 1999).  Under the APA, a reviewing court can set aside agency

action found to be "arbitrary, capricious, an abuse of discretion or otherwise not in

accordance with law."  5 U.S.C. §706(2)(a).  How the APA review is applied to override

cases has evolved through decisions over time.  In *Advanced Sys. Dev., Inc. v. United States*,

72 Fed. Cl. 25, 30 (Fed. Cl. 2006), the Court described its role as being to determine whether

an override was based "on a consideration of the relevant factors and whether there has been

a clear error in judgment by the agency."  The court's role was to ascertain if the agency

relied on factors not intended by Congress; failed entirely to consider an important aspect of

the problem; offered an explanation which is not supported by the evidence; or whether the

agency's decision is so implausible that it cannot be explained.  *Id.* at 30, citing *Motor*

*Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.,* 463 U.S. 29, 43 (1983).

Even if this Court were to go no further than to adopt and employ the *Motor*

*Vehicle Mfrs. Ass'n* standards, it should find that the CCtCap override is arbitrary and

capricious.[2]  NASA's Override Memo, at various junctures, suffers from misstatement,

mischaracterization and exaggeration, and at times relies upon conjecture.  As demonstrated

below, assertions upon which NASA relies to justify the override are contradicted by

objective facts.  While NASA certainly is entitled to deference in areas within its special

technical expertise, that deference is not a license to take agency actions upon reasoning that

is contrary to the evidence.  *Reilly's Wholesale Produce v. United States,* 73 Fed. Cl. 705,

712 (Fed. Cl. 2006) (stating that it "appear[ed] that many of the critical findings made by [the

---

[2] *Cf. Dyncorp Intern'l v. United States*, 113 Fed. Cl. 298, 302 & n.4 (Fed. Cl. 2013)
(declining to apply *Reilly's,* but noting that their application would not produce a different
result).

agency] in support of its override decision ran counter to the evidence in the administrative record," and proceeding to discuss examples in voiding the override); *E-Management Consultants,* 84 Fed. Cl. at 8 (finding that the override memorandum "state[d] a conclusion that appears counter to the discussions in the [Administrative Record]," and voiding the override).  Nor should NASA be immunized where its explanation is selective or fractional and becomes misleading by reason of omission of material fact.  Below, SNC shows the multiple instances where the public record refutes either the Override Memo or the conclusions reached by NASA in reliance upon those conclusions.  By "public record," we refer not to matters of opinion or speculation, but to objective evidence of facts, events, actions or conditions, much of which is from NASA or other official, governmental sources.

Since 2006, *Reilly's* has guided many decisions of this Court on APA review of agency actions to override a CICA stay.  *E.g., Supreme Foodservice,* 109 Fed Cl. at 386; *URS Federal Servs.,* 102 Fed. Cl. at 676.  It has been recognized that the utility of the factors varies from case to case, *PM Tech, Inc. v. United States,* 95 Fed. Cl. 330, 345 (Fed. Cl. 2010), but NASA has chosen to organize the explanation of its override using the factors.  SNC here will refer to the *Reilly's* factors, though we focus upon the key propositions of NASA's override justication, several of which apply across individual *Reilly's* factors.

CICA imposes a 100-day stay upon procurements that are subject to a GAO post-award protest, subject to two exceptions.  One is where an agency asserts that performance of the contract is in the "best interests of the United States."  31 U.S.C. § 3553(d)(e)(C)(i).  NASA relies on this exception, as it mentions "urgent and compelling"

as a justification only in the second to last sentence of the Override Memo.  NASA's "best

interests" argument is distilled on the first page of the override:

> "It is in the best interests of the United States to have its own reliable crew
> transportation and emergency rescue capability as soon as possible, to ensure
> the safety of its crew and international partners' crew, for ISS mission
> assurance, and to meet its international obligations."

Override Memo, Exh. 1, at 1.

As a company that competed for the CCtCap contracts, and that believes its

crew transportation system is the best solution for ISS mission needs, SNC supports NASA's

objectives completely and without reservation.  But, on the record here, these objectives are

not sufficient to justify an override to the statutory norm of the stay on performance that

occurred when SNC filed its GAO protest.  That protest asserts that SNC earned selection as

one of the two CCtCap contractors.  It is in the "best interests" of the United States to allow

the protest to proceed as Congress intended, via CICA, with a stay in place, just as the

national interest will be advanced if the result of the GAO protest leads to award to SNC.

SNC's proposal was $900 million less expensive than one awardee.  GAO should have the

opportunity to evaluate and, if appropriate, effectively act upon, SNC's claim that it offers

superior mission flexibility, in comparison to either awardee, and would reduce operational

risk by employing a lifting body crew vehicle capable of landing on any conventional

runway.  The speculative short delay that may occur in the certification of CCtCap vehicles

as a result of reinstating the stay for 76 days does not offset these compelling interests.

354671.1

### III.   NASA HAS OVERSTATED AND FAILED TO SUPPORT CLAIMS OF ADVERSE CONSEQUENCES AND THERE IS A REASONABLE ALTERNATIVES AVAILABLE

#### A.   No Law Will Be Violated Should NASA Find It Becomes Necessary (For Any Reason) To Commence U.S. Crewed Missions After 12/31/2017.

The Override Memorandum indicates that *any* delay in the availability of

CCtCap U.S. crewed spaceflight would violate U.S. law, specifically the NASA

Authorization Act of 2010, at Section 2, and would cause NASA to be in violation of

"legally binding international agreements" owed to other partners for support of the ISS.

Override Memo, Exh. 1, at 2, 9.  And NASA states that it is not authorized to negotiate a

further contract with Russia under the Commercial Space Act, 51 U.S.C. § 5031(a), unless a

domestic capability is not available.  *Id.* at 3.  At the hearing of October 17, counsel for both

the United States and for Boeing said that to delay the CCtCap capability would violate U.S.

law and policy.  Transcript, at 75:7-13; 92:1-4; 97:5-9, 17-23.  The facts do not support any

of these contentions.

#### 1.   The NASA Authorization Act of 2010 Does Not Require Crewed Missions by the End of 2017.

The Override Memo seeks to convey the impression that it would violate the

NASA Authorization Act of 2010 to stay the CCtCap procurement during the GAO protest.

Counsel for the Government and for Boeing made the same contentions during the October

17 hearing.  Transcript, at 59:5-22; 60:1-15.  This is demonstrably wrong.  Upon

examination, it is evident that Congressional policy with respect to crew transport to the ISS

is unchanged since the NASA Authorization Act of 200<u>5</u>.  The 2010 Act does not, in fact,

354671.1

establish that the override is critical to meeting a congressional mandate much less that failure to certify U.S. crewed space vehicles by the end of 2017 violates any U.S. law.

NASA references the "Findings" in Section 2 of the 2010 Act.  Override Memo, Exh. 1, at 2.  From these, NASA emphasizes the "as soon as possible" phrase from Section 2(7).  *Id.* at 1, 2, 3, 4, 7.  Section 2(7) states that it is "essential that a United States [ISS crew transport] capability be developed as soon as possible."  While they set forth laudable goals, the "Findings" are not a legally binding requirement that NASA develop this capability by the end of 2017.  Indeed, these "Findings" are virtually unchanged from those of the NASA Authorization Act of 2005.  At that time, as now, it was the policy of the United States "to possess the capability for human access to space on a continuous basis." Pub. L. 109-155, Section 501(a) (Dec. 30, 2005).

The 2010 Act explicitly references the earlier statute, as it "reaffirms the policy stated in section 501(a) of the [NASA] Authorization Act of 2005."  Pub.L. 111-267, Section 201(b) (Oct. 11, 2010).  And in that time period, despite these general findings, the U.S. Government decided to and did retire the Space Shuttle.[3]  There is nothing either in the language or the history of Section 2 of the 2010 Authorization Act that speaks to any requirement that U.S. ISS crew mission capability is to be in place by the end of 2017.  Nor is there language that would imply that Congress was so determined to accelerate U.S. crew capability that the CICA stay should be ignored for the $6.8 billion CCtCap awards.  The

---

[3]  The Government was demonstrably incorrect in asserting that NASA "[has] taken a new approach since the 2010 Authorization Act to move towards U.S. ability to [transport crew to the ISS] since we retired the Space Shuttles in 2011."  Transcript 69:16-19.  NASA has actively sought to develop new domestic ISS crew transport capability since five years *before* the space shuttles were retired.

policies articulated by the Authorization Act of 2010 are the same as those set nine years ago, in 2005, when the Space Shuttle Program was active.[4]

NASA does not establish that anything in the 2010 Authorization Act renders it illegal for the United States to complete 2017 without CCtCap crewed vehicles certified as safe to fly ISS missions in 2018.

### 2.    NASA Will Not Violate ISS Cooperation Agreements with Russia, ESA, Japan or Canada

NASA claims that it is responsible for providing ISS crew transport under the Inter-Governmental Agreement (IGA) for the ISS and various implementing agreements. Override Memo, Exh. 1, at 9.  The U.S. and the cooperating nations entered into a treaty, the Space Station Agreement, on January 29, 1998.  Signatories were U.S., the Russian Federation, Canada, the European Space Agency (ESA) and Japan.  (The Space Station Agreement is available at http://www.state.gov/documents/organization/107683.pdf) At Article 12, "Transportation," the Agreement merely states that the ISS member nations will cooperate and make transport systems available to each other.  The Agreement is accompanied by various Memorandum of Understanding (MOUs), also executed on January 29, 1998, with each of the Russian Space Agency, ESA, Canada and Japan.  (These are available on NASA's web site, e.g.,

http://www.nasa.gov/mission_pages/station/structure/elements/nasa_esa.html.)

---

[4] NASA cites Section 501(a) of the 2010 Act to establish that U.S. policy is "to support full and complete utilization of the ISS."  Override Memo, Exh. 1, at 2).  NASA omits that the Act states that this policy shall obtain "through at least 2020."  P.L. 111-267, Section 501(a). But this Section cannot be read to require anything in the way of crewed spaceflight, use of U.S. vehicles specifically, much less require NASA to develop the capability to launch crewed missions to the ISS by the end of 2017.

To the extent that the United States has agreed under these MOUs to "provide or arrange for provision" of ISS crew transport for other members, the U.S. has met and will continue to meet these obligations through its MOU with Russia.  The U.S.-Russia MOU (available at http://www.nasa.gov/mission_pages/station/structure/elements/nasa_rsa.html) requires Russia to provide crew rotation and rescue capability.  U.S.-Russia MOU at Section 6.2.b.16-17.  Russia has done so.  Exh. 6.

3.    **Congress has Acted to Provide NASA Authority to Order Soyuz Flight Services After 2017**

The Override Memo contends that continuing to acquire crew transport from Russia will require a waiver under the Commercial Space Act of 1998, 51 U.S.C. § 50131(a). (Override Memo at 11).  This is no real impediment, however, as NASA rightly states that such a waiver is authorized when no domestic commercial provider is available.  See 51 U.S.C. § 50131(b)(2).  Presumably, the NASA Administrator has issued such waivers since the last space shuttle mission to the ISS in July 2011, and could do so indefinitely. Moreover, in 2013, Congress specifically extended, from July 1, 2016 to December 31, 2020, the provision that directs that payments to Russia for support of the ISS will not violate the Iran, North Korea, and Syria Nonproliferation Act (INKSNA).  50 U.S.C. § 1701 note, INKSNA § 7(1)(B); see P.L. 112-273, Section (4)(2) (Jan. 14, 2013).

4.    **Congress Has Not Fully Funded the Commercial Crew Program Despite NASA's Warnings That Failure to do so Would Delay Availability of a U.S. Crew Transportation Capability**

As noted, among the Findings of the NASA Authorization Act of 2010 is the proposition, expressed in Section 2(7), states that it is "essential that a United States [ISS crew transport] capability be developed as soon as possible."  Congress, however, has not

funded the Commercial Crew Program (which encompasses the current CCtCap contracts) to

the extent of NASA's requests.  The results are shown by the following table

| Fiscal Year | CCP Request | Actual | Shortfall |
|---|---|---|---|
| 2011 | $500 Million | $307 Million | $193 Million |
| 2012 | $850 Million | $392 Million | $458 Million |
| 2013 | $830 Million | $525 Million | $305 Million |
| 2014 | $821 Million | $696 Million | $125 Million |
| 2015 | $848 Million | | |

Over the four-year period between FY 2011 – 2014, the gap between NASA's budget request

for U.S. commercial crew capability and NASA's authorization amounts to **$1081 billion**.[5]

NASA Administrator Charles Bolden acknowledged to Congress, on March 28, 2014, that

reduced funds have hurt the ability of the U.S. to achieve its own crew launch ability.  He

said:

> "If Congress fully funds our Fiscal Year 2015 request, I believe we can do this
> [send astronauts to the ISS from the U.S.] by the end of 2017.  Unfortunately,
> **due to the reduced funding the past few years for the president's Launch
> From America plan, NASA may need to extend our current contract with
> the Russians and purchase more seats on the Soyuz spacecraft**."

"Rep. Steven M. Palazzo Holds A Hearing On National Aeronautics And Space

Administration Budget For F.Y. 2015," Roll Call, Inc., Political Transcript Wire, attached

hereto as Exhibit 16.

---

[5] Exhibits 12 through 15, attached hereto, are details of the NASA Budget Request, for each
of fiscal years 2011 – 2014, with the line item of "Commercial Crew" highlighted.  Exhibit
16 is the NASA FY 2015 budget request.

354671.1

### 5.      National Security Considerations are Not Present

In addition, at the hearing, the Government invoked "national security and national defense" and urged the Court to take those "into account," asserting that these were "the foundation" of override.  Transcript, at 59:18-60:17; 91:7-25.  No "national security" issue is present, in fact.  The Override Memo provides no information that could establish that "national security" issues are present here.  *See Reilly's,* 73 Fed. Cl. at 713 n. 12 (concluding that "the *post-hoc* invocation" of reasons, first raised in the override litigation, only serves to amplify that [the agency's] original rationale for overriding the stay has a decidedly hollow ring").  Indeed, the purpose of the ISS has been civil from inception and remains so.  Article 1.1 of the Space Station Agreement states that the object of the Agreement concerns "a permanently inhabited civil international Space Station, for peaceful purposes, in accordance with international law."

The Override Memorandum sought to use the contentions, that U.S. and international law would be violated should the CCtCap contracts be delayed by reason of the CICA stay, to support two showings under *Reilly's*.  The first is that the override is justified by adverse consequences and the second is that no reasonable alternatives are available other than to permit contract performance.  The record, as shown above, does not support these contentions and therefore the override cannot be justified on such grounds.  *Reilly's,* 73 Fed. Cl. at 712 (concluding that the agency's stated rationales for the override "wilt under scrutiny, particularly in the harsh light of the administrative record").

354671.1

**B.    The U.S. Has the Ability To Purchase Additional ISS Flights From Russia Until ISS Missions Can Be Flown By The U.S. Commercial Providers**

The Override Memo states that "the United States currently has no crew transportation to ISS after 2017."  Exh. 1, at 6.  "Failure to provide the CCtCap transportation service as soon as possible poses a safety risk to the ISS crew [and] jeopardizes continued operation of the ISS," the Override Memo contends.  *Id*. at 7.  These are dramatic statements, but they are not supported by the facts.  Similarly, the Override Memo also insists that the U.S. cannot consider a further purchase of seats on the Russian Soyuz vehicle after December 31, 2017.  NASA states that procuring additional crew transportation services from Russia "is uncertain and is not a reasonable alternative"  and that "there are no reasonable alternatives to obtain certified ISS transportation services beyond 2017 other than continuing performance of the CCtCap contracts."  *Id*. at 11, 12.

Purchase of one or perhaps more additional Soyuz seats is both a "reasonable" alternative and one that likely will be "necessary," whether or not the stay override remains in place.  That use of Soyuz is reasonable, from the standpoint of safety for crew and ISS operations, is conclusively established by the record of exclusive reliance upon the Soyuz since the end of the Space Shuttle Program in 2011 and the Soyuz's perfect record in fulfillment of that role.  Even the Override Memo recognizes, explicitly, that "[p]rocuring additional ISS crew transportation services from Russia may become necessary if the United States does not have another capability."  Override Memo, Exh. 1, at 11.

NASA states that the U.S. does not have contracts with Russia for ISS flights after 2017 and intimates that Russia may not agree to negotiate to provide them.  Override Memo, Exh. 1 at 2, 6, 9.  The record says otherwise.  The U.S. and Russia have an existing

12

agreement.  On April 30, 2013, NASA announced it had modified the contract to add $424

million for crew transportation services.  *See* "NASA Extends Crew Flight Contract with

Russian Space Agency," Release C123-027, Apr. 30, 2013, *at*

http://www.nasa.gov/home/hqnews/2013/apr/HQ_C13-027_Soyuz_Services.html.  The

Override Memo acknowledges the existence of this contract.  Override Memo, Exh. 1, at 2,

3.

    A current report of Russia's launch manifest shows that four Soyuz flights to

the ISS are planned for each of 2014, 2015, 2016, and 2017.  "Russian Launch Manifest (17

Oct 2014)," at http://www.sworld.com.au/steven/space/russia-man.txt.[6]  Two Soyuz flights

are shown for 2018.  While NASA has established a preference not to order additional

flights, it offers no evidence whatsoever that it cannot once again amend the existing Soyuz

contract to add one or more flights if, as the Override Memorandum acknowledges, it

becomes "necessary" to do so.  Such an amendment likely will become "necessary" for

reasons wholly unrelated to performance during the stay.  NASA will not fly crewed

missions to the ISS until after the new U.S. vehicles have earned flight safety certification.

Override Memo, Exh. 1, at 4.  All three proposers for the CCtCap contract share the

---

[6] References to manned Soyuz flights to the International Space Station are indicated, for
example, by the listing for "25 Sep 14" that states "Soyuz-FG" and "Soyuz TMA-14M
(S714, **ISS-40S**) (emphasis added). References to unmanned Progress flights to resupply the
International Space Station are referenced, for example, by the listing for "23 Jul 14" that
states "Soyuz U" and "Progress M-24M (P423, **ISS-56P**) (emphasis added).  For
information, both the Soyuz crewed vehicle and the Progress resupply vehicle are launched
on a rocket bearing the same name, Soyuz.  *See* "Soyuz (rocket family)," at
http://en.wikipedia.org/wiki/Soyuz_(rocket_family)**,** and "Russian Progress Spacecraft," at
http://www.nasa.gov/mission_pages/station/structure/elements/progress.html#.VEUI4fnF-
3A.

objective of certification before the end of 2017.  But delays are typically experienced in the development of new spaceflight systems. *Id.* at 3, 6, 10.

NASA has sufficient time to order an additional Soyuz flight as a prudent hedge against the risk of a crew transportation "gap" as might arise in 2018.  The Russian manifest indicates that the last Soyuz flight to the ISS in 2017 is planned to launch on November 30, 2017.  The first (of two) flights planned for 2018 is scheduled for March 30, 2018, and the second is set for six months later, on September 30, 2018.  Russian Manifest, *supra* at 3.  Following the pattern of recent years, where Soyuz launches occur every two or three months, and assuming a lead time of 3 years, 3 months from start of negotiations to flight readiness, the U.S. would need to contract with the Russian Space Agency, Roscosmos, by October 30, 2014, for a Soyuz flight on or about January 31, 2018, or by March 31, 2015, for a flight on or about June 30, 2018.[7]

**C.    The U.S. And Russia Continue To Cooperate In Civil Space Because Of Mutual Dependencies And Mutual Advantages**

An underlying theme of NASA's override justification is that Russia cannot be relied upon or expected to cooperate with the U.S. to make additional Soyuz seats available beyond the period, presently under contract, that extends through 2017.[8]  In the Override Memo, an official U.S. Government document, this point is made tactfully: "Uncertainties in

---

[7] As noted previously, Public Law. No. 112-273, enacted early in 2013, extended the INKSNA waiver through December 31, 2020, expressly addressing services that might be rendered on the ISS to meet U.S. obligations to cooperate to support the ISS.  *See also* Library of Congress, "H.R. 6586, Space Exploration Sustainability Act," 112th Congr., 2d Ssn., Jan 3, 2013, and Bill Summary, available at https://www.congress.gov/bill/112th-congress/house-bill/6586/actions.

[8] Left unaddressed is why NASA should rely upon Russia for seats through 2017, if the relationship is as bad as intimated (incorrectly) in the Override Memo and at the hearing.

the international political environment may further complicate the ability to purchase Soyuz services."  Override Memo, Exh. 1, at 3.  Later, NASA is more direct, as it states that that "uncertainties in the international political environment may further complicate the ability to purchase future Soyuz services.  This creates significant risk to the *safety of the crew* on board the ISS and *to ISS mission assurance*."  *Id*. at 6.  Similar but more provocative comments were made by Government and Boeing counsel at the hearing.  Transcript at 70:3-24; 97:24-98:5.

The invocation of a "safety" concern is linked to NASA's contentions that the stay, by causing a potential for delay in the availability of a certified U.S. crew transportation system, produces significant consequences adverse to the United States.  Override Memo, Exh. 1, at 7.  The threat is "escalated" to the point that NASA asserts that the "ISS cannot operate" without crew and assured crew transportation, suggesting that a U.S. vehicle is necessary to avoid the dangers.  *Id.* at 8.  Another reference to "uncertainties in the international political environment" is made to support the point that delays in the CCtCap contract would be against the best interests of the U.S. and its partners.  *Id*. at 9.  These concerns contribute to the conclusion of NASA that procuring further Soyuz service from Russia is "uncertain," "not a reasonable alternative," and "not in the best interests of the United States."  *Id*. at 11.

Thus a great deal of NASA's override justification hinges upon NASA's insistence that anything other than CCtCap crewed mission capability after 12/31/2007 would jeopardize the ISS and its crew and cause the U.S. to violate domestic law and international agreements, and that to procure any subsequent launch services from Russia is

not a reasonable alternative.  The record shows that these contentions are contradicted by multiple events, actions and positions taken by NASA.  As such, these contentions fail entirely to support the override determination.

The U.S. and Russia have cooperated on civil space matters since the Apollo-Soyuz Joint Spaceflight in 1975.  *See* http://history.nasa.gov/apollo/apsoyhist.html.  The cooperation in space ventures began in the Cold War, endured many "ups and downs" in the bilateral relationship, and has continued ever since.  E.g., "United States-Soviet Space Cooperation during the Cold War," Roald Sagdeev, University of Maryland, and Susan Eisenhower, The Eisenhower Institute, on the NASA website at

http://www.nasa.gov/50th/50th_magazine/coldWarCoOp.html.

This is not to say that the relationship has been without periods of tension – as the present period, where there is contention over Russia's actions in the Ukraine, is a period of diminished cooperation.  In April 2014, NASA announced that it was suspending many of its ongoing space engagements with the Russian federation.  But support for the ISS was specifically excluded, as NASA surely knows:

> "Statement regarding suspension of some NASA activities with Russian Government representatives:
>
> Given Russia's ongoing violation of Ukraine's sovereignty and territorial integrity, NASA is suspending the majority of its ongoing engagements with the Russian federation.  ***NASA and Roscosmos will, however, continue to work together to maintain safe and continuous operation of the International Space Station***."

NASA Statement, Apr. 2, 2014, at https://plus.google.com/+NASA/posts/eihoeSm5fVy (emphasis added).

16

354671.1

At the hearing, counsel for both the Government and Boeing cited, with alarm, statements attributed to a Deputy Prime Minister Rogozin of Russia to the effect that Russia would deny the U.S. the ability to use Russian rockets.  Transcript at 70:8-12, 15-21; 97:12-14.  No value should be given to these assertions.  The Russian government has <u>not</u> acted on the remarks of that individual.  The United States and SpaceX, both parties to this action, should be aware of the dimensions of U.S. sanctions that concern Mr. Rogozin.  In the matter, *Space Exportation Technologies, Corp. v. United States*, No. 14-354 (*available at* 2014 WL 1860048), Judge Braden issued an order on May 8, 2014, dissolving an injunction that briefly prohibited United Launch Alliance, LLC from purchasing rocket engines from a Russian company, NPO Ergomash.  On May 6, 2014, the Government filed a Motion to Dissolve the Preliminary Injunction, accompanied by declarations from the officials at the Departments of the Treasury and Commerce that these transactions would not contravene the Executive Order that imposed selective sanctions upon Russia following the Ukraine incursion.  2014 WL 1860048, at *1.

Actually, the U.S. and Russia have important areas of mutual dependency and advantage for space flight systems apart from the ISS. One such area is the RD-180 engine, which is purchased by United Launch Alliance from NPO Ergomash for the Atlas-V booster. The Atlas-V is the booster chosen by both Boeing and SNC to carry their CCtCap vehicles to orbit.  It also is used for military and classified payloads, including a May 22, 2014 launch for a payload for the National Reconnaissance Office (NRO).[9]  As of October 18, 2014, ULA

---

[9]  "United Launch Alliance Successfully Launches Four Missions in Just Seven Weeks," May 22, 2104,  at http://www.ulalaunch.com/ula-successfully-launches-

reported that "[c]urrently, there is no threat to the supply of the RD-180 engines and imports of the engine remain on schedule." *Id*. ULA is a joint venture between Lockheed Martin and Boeing, in which Boeing is a 50% partner.[10]

There is an important inconsistency in the way that risks associated with Russian space suppliers are treated in the CCtCap protest override, on the one hand, and how they were treated in the CCtCap Source Selection Statement, on the other. NASA seeks to justify the override because the United States cannot trust Russia to sell it one or more seats on Soyuz flights after 2018, even though Roscosmos has been the principal source of crew (and cargo) transport since the ISS began.[11] The CCtCap Source Selection Statement also addressed the issue of "engine availability" – reflecting, presumably, the concern whether present political tensions might cause Russia to stop the supply of RD-180 engines to ULA. For the source selection decision, the Source Selection Authority, Mr. Gerstenmaier, decided: "**Launch vehicle availability did not factor into my decision**." SSA, Exh. 2 at 21 (emphasis added). Mr. Gerstenmaier also signed the Override Memorandum, which emphasized uncertain availability of the Soyuz for ISS crew transport as reason that the CICA override was in the "best interests" of the United States and why Soyuz would be not

---

NROL33.aspx?title=United+Launch+Alliance+Successfully+Launches+Four+Missions+in+Just+Seven+Weeks+

[10] "Quick Facts – United Launch Alliance," at http://www.ulalaunch.com/about_quickfacts.aspx.

[11] Roscosmos also has delivered supplies and fuel to the ISS through dozens of missions flown with the unmanned Progress spacecraft. *See* "Russian Progress Spacecraft," at http://www.nasa.gov/mission_pages/station/structure/elements/progress.html. The Progress-55 resupply mission, launched from Russia in April 2014, undocked from the ISS on July 21, 2014. http://www.nasa.gov/content/russian-progress-craft-undocks-from-station-0/. Progress-56 was launched in July 2014 and Progress-57 is to launch on or about October 29, 2014. Russian Manifest, *supra* at 1.

be a "reasonable alternative" to allowing the stay to remain in place for the duration of SNC's GAO protest.  If the Russian political situation is not a factor that should have precluded an award to Boeing, whose launch vehicle relies on Russian rocket motors, then NASA cannot reasonably attempt to justify the Override by relying upon the same political situation to contend that a further Soyuz flight is not an available short-term alternative if a reinstated stay were to cause a short delay in CCtCap vehicle certification.

On the question of whether the override is justified by reference to the present tension between the U.S. and Russia, the evidence, including NASA's own source selection document in this procurement, does not support NASA's position.

### D.       In Fact, NASA Knows That Further Seats On Soyuz May Be Required Until U.S. Crewed Capability Is Ready – And Plans Accordingly

The Override Memo asserts that any delay to the CCtCap program would violate U.S. law, offend U.S. policy and contravene international agreements because the U.S. cannot expect Russia to sell Soyuz seats should the CCtCap vehicles not be ready at the end of 2017.  There is a certain unreality about this argument because, in fact, NASA recognizes and admits – in the Override Memo – that it "may become necessary" for the U.S. to procure additional ISS crew transportation services from Russia.  Override Memo, Exh. 1, at 11.  NASA's FY 2015 Budget summary states:

> "The Russian Space Agency, Roscosmos, currently provides ISS crew transportation.  NASA plans to continue purchasing crew transportation from Roscosmos until a domestic capability is available."

FY 2015 President's Budget Request Summary, National Aeronautics and Space Administration, Space Operations … ISS Crew and Cargo Transportation," at SO-25, at http://www.nasa.gov/sites/default/files/files/508_2015_Budget_Estimates.pdf.

354671.1

The President's budget submission does not treat achievement of a certified U.S. crew capability by as 2017 something that must be realized "at all costs."  As discussed previously, between FY 2011 and FY 2014 Congress underfunded the Commercial Crew Program, by comparison to NASA's budget requests, by more than $1 billion.  While U.S. policy, for some time, is to achieve U.S. crew capability "as soon as possible," that does not trump the statutory mandate of CICA that calls a 100-day stay of this procurement.  Nothing in NASA's 2015 budget or official statements to Congress make December 31, 2017 an essential date.

The record now includes NASA's "Model Contract" that each offeror was required to adopt.  It does ***not*** set flight safety certification in 2017 as a contractual ***requirement***.  Rather, it is repeatedly referenced only as a "***goal.***"  *See, e.g.,* Attachment L-01, Statement of Objectives, at 3 of 5.  Although all three offerors propose to meet that goal, even the final certification date offered remains a "delivery milestone," not a firm delivery date.  Clause L-21, Instructions for Milestones, Milestone Acceptance Criteria and Payment, Schedule (Applicable to CLIN 001), at (a)(1).  (A copy of that clause is Attachment 2 to this Memorandum).  *See Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 764-65 (Fed. Cir. 1987) (Government improperly terminated contractor for default for failure to meet milestones in a construction project).

This especially novel and challenging manned spaceflight program almost certainly will encounter delays – as NASA warns.  Thus certification in 2017 – with the override or without – is by no means assured.  NASA will not be able to rely upon having a CCtCap vehicle to use for crewed missions in 2018 until one or both awardees pass the final

safety certification milestone, which is ███████ as proposed by SpaceX and ████████ as proposed by Boeing.  Ordinary prudence and risk mitigation principles can be expected to lead NASA to modify its agreement with Roscosmos, prior to March, 2015, to provide for crew services to ISS prior to the summer of 2018.  NASA will not be able to wait until the proposed CCtCap certification dates, as they are too late to accommodate the 3 years needed between order and flight readiness and the additional time required to negotiate a new amendment.

None of NASA's contentions, as to "best interests" generally, or with respect to the "adverse consequences" and "reasonable alternative" factors from *Reilly*'s, hold up to analysis.  That they are contradicted by evidence known or available to the agency causes these contentions to fail under either *Reilly's* or the *Motor Vehicle Mfrs. Ass'n* tests.

## IV.   NASA'S CONCLUSIONS ON THE COST-BENEFIT COMPARISON UNDERSTATE THE COSTS TO NASA OF A TERMINATION AND OVERSTATE THE BENEFITS OF THE OVERRIDE

The facts on which NASA relies for the "cost considerations" sections of its Override Memo are either wrong or so incomplete as to be misleading.

### A.   NASA Seriously Understates Its Termination Liability

The Override Memo suggests that the maximum amount of NASA's override liability, in the event the GAO orders a new competition, is $129.3 million per contract.  Override Memo, Exh. 1, at 13.  At the argument, Boeing's attorney used the $129 million figure, suggesting that termination liability would never exceed that amount.  Transcript, at 99:4-100:12.   Government counsel even mentioned termination liability as low as ████ ██████ although recognizing it might grow. Transcript, at 102:16-20.  But careful

examination of the Override Memo, the contact's payment provisions, and, most important, Boeing's milestone payment provision, establish a far different story.

The Override Memo states that NASA's financial liability is capped by the "Limitation of Funds" Clause and notes that the amount currently obligated under that clause is $129.3 million per contract.  Override Memo, Exh. 1, at 13.  But it then adds a very significant sentence:  "Additional funding would be necessary to complete the milestones currently on contract between now and the resolution of the protest."  NASA hides the implication of that message by not including any numbers as to what those additional amounts might be.  But NASA's override decision is premised on its claim that it is critically importance to immediately accomplish the work that is scheduled to be done in the 100 day protest period, including but not limited to the Certification Baseline Review.  See Override Memo, Exh. 1, at 8-9.  So the message should be clear to the careful reader – NASA will have to promptly obligate to these contracts whatever funds are necessary to pay for the work done in the first 100 days.

That point is strengthened by an examination of the Limitation of Funds clause that NASA invokes.  That provision is set out at H.4 of the contract and a copy is provided as Attachment 1 to this Memorandum for the Court's convenience.  It provides that if the funds that NASA allocates to the Contract are not adequate at any time, the contractor need not go forward with its work.  Rather it may request a termination for convenience and NASA must oblige.  H.4(c)(4).  Hence, it is small wonder for NASA to recognize in its Override Memo that it will have to allocate more funds to the contract if $129.3 million is not enough to fund the work in the first 100 days.

22

354671.1

Most revealing is the milestone payment information from Boeing's contract, known to NASA and Boeing, but not SNC, at the time of last Friday's hearing.  Attachment J-03, Appendix A, provided to the Court as part of Mr. Herzfeld's email at 4:06 pm on Oct. 18, 2014, shows that Boeing's milestone payment for the CBR milestone alone was ███████

████    See p. 4 of 63.  But in addition, within the first 100 days Boeing had established

█████████████████████████████████████████████████████

████████████████████.[12]    Boeing's contractual milestones and the payments due for them are as follows:

[12] Clause L.21, Instructions for Milestones, Milestone Acceptance Criteria and Payment Schedule (Applicable to CLIN 001) permitted offerors to propose additional milestones and interim payment amounts associated with their completion.  Subparagraph (b) of this clause established a few constraints, no one of which precluded Boeing from setting the milestone payment schedule included in its contract.  A copy of the clause is Attachment 2 to this Memorandum.

23

████████████████████████████████



Source: Boeing Attachment J-03, Appendix A at 4, 9, 15, 17.

████████████████████████████████████████  Thus, under the NASA contract

with Boeing, NASA will owe that contractor ████████████████████████████

█████  for its performance in only the first 100 days of the DDT&E phase of CCtCap.

These milestones also help establish NASA's liability to Boeing if that

contract is terminated as a result of GAO corrective action.  All of the contracts here

incorporate the "Termination for Convenience" clause at FAR § 52.249-2.  See list of

incorporated clauses at Clause I.2.  Under that provision, in the event of a termination for

convenience, the contractor is entitled to recover, among other things, two amounts directly

related to the contract work done before the termination.  First is the contract price for

completed work.  FAR § 52.249-2(g)(1),  In this case that would be the amount of the interim

contract milestones.  The second is costs incurred in performance of the contract work,

including initial or preparatory costs, not included in the payment for the completed services,

i.e. the milestones.  FAR § 52.249-2(g)(2).  Thus, upon termination Boeing would be entitled

24

to a payment of ███████████████ for completed milestones and work in progress, and the Limitation of Funds clause would provide no protection to NASA for the value of the immediate work that it claims is so critical.  Should the GAO rule in favor of SNC's protest, Boeing could be eliminated from the competition.  ███████████████ to Boeing would have little benefit were that to occur.

SpaceX's CBR milestone ████████████████████████ ███████████████.  But, given the tight schedule, there can be no question that it will be working full speed during the 100 day period on satisfaction of its contract obligations.  As a result, it will certainly incur significant costs beyond the ███████████████████ and it will be entitled to recover those amounts, in addition to the milestone payment under 52.249-2(g)(2) if its contract were terminated.  Thus the Government's termination liability to SpaceX, while not ███████████████ as with Boeing, certainly will exceed $129.3 million ██████████████.  Like ███████████ payments to Boeing, that money will be wasted if SpaceX ultimately ends up without a contract after a GAO ruling requiring corrective action.

### B.   The Contractors Cannot Be Terminated For Default, And Will Be Fully Compensated If They Are Delayed, Because Of The Stay

SpaceX and Boeing have no risk of being held in default or suffering uncompensated costs if they are delayed in performance of their contracts while the stay is in place, assuming it is reinstated.  The standard contract for all parties incorporated the "Protests After Award" clause at FAR § 52.233-3.  See Clause I-2, Clauses Incorporated By Reference – Section I.  The clause provides the Government the right to issue a "stop work order" if there is a protest after award.  The clause recognizes that, if the contract is

25

eventually ended as a result of the protest, the contractor will recover under the Termination

for Convenience clause.  On the other hand, if the stop work is lifted, presumably because

the protest is withdrawn or denied, the "Contracting Officer shall make an equitable

adjustment in the delivery schedule or contract price or both" if the stop work has increased

the time required or costs incurred for performance of the contract.  FAR § 52.233-3(b).

Boeing and SpaceX are at no financial risk if the stay is reinstated.

> ### C.     NASA Overstates The Impact Of An Override

NASA has repeatedly argued that the override is critical to ensure U.S. crewed

space flight capability by the end of 2017.  At the hearing, Government Counsel estimated

that reinstating the stay for 76 days – a little over ten weeks –somehow would result in a ██

██████ program delay, an estimate apparently endorsed by the SSA, Mr. Gerstenmaier.

Transcript, at 101:17-102:10.  NASA suggests that such a delay would make it impossible to

have a certified CCtCap spacecraft by the end of 2017.

The contract documents disclosed this weekend at the Court's request suggest

that, even if that generous estimate of impact is accepted, the situation is not nearly so

critical.  Attachment J-03, Appendix A, provided in Mr. Herzfeld's email for all three

offerors, shows the scheduled dates for completion of each contractual milestone.  SpaceX's

contract schedule shows its completion of the final milestone in CLIN 0001, Certification

Review, in ████████.  SpaceX Attachment J-03, Appendix A at 40 of 41.  At that point,

SpaceX's schedule shows that it will have satisfied NASA's goal of a certified U.S. CCtCap

space vehicle.  In other words, █████████████████████████ as a result of a stay,

SpaceX's shows it ████████████████████.

26

███████████████████████████████████████

Boeing's schedule ████████████████████████. It

shows completion of the Certification Review Milestone in ███████ Boeing

Attachment J-03, Appendix A at 63 of 63.  Thus ████████████████

████████████████████████████████████████████████

████████

Of course it is possible, if not probable, that there will be other delays during

the course of performance.  It is for that reason that SNC believes that NASA's stress on

completion by the end of 2017 is unrealistic in any case.  The point remains, nonetheless,

that if the awarded contractor's schedules are taken seriously, the stay would not cause

sufficient delay to prevent NASA from having one, if not two U.S. companies certified for

crewed space flight by the end of 2017.

## V.   THE OVERRIDE WILL SERIOUSLY HARM THE PROSPECTS FOR ANY MEANINGFUL FUTURE COMPETITION AND DENY SNC ANY GENUINE OPPORTUNITY TO COMPETE FAIRLY SHOULD THE GAO RULE FAVORABLY ON ITS PROTEST

NASA promises that if GAO sustains the protest and orders a new

procurement, SNC will be able to compete and so will not be harmed.  The truth is that even

if SNC wins its GAO protest, SNC's competitive position will be severely harmed.  Absent

the stay, both Boeing and SpaceX will be working diligently for the next 76 days –

accomplishing important work on their contracts, including completion of the CBR

milestone.  Override Memo, Exh. 1, at 3-4.

The Government repeatedly argued at the hearing that despite lifting of the

stay, SNC would have a full and fair opportunity to compete if it wins the protest and the

GAO orders a new competition.  Transcript, at 71:14-21; 75:14-77:12.  But that is not

354671.1

possible, in fact, as is explained in accompanying Declaration of Mark Sirangelo, SNC's senior official associated with this project. *See* Sirangelo Declaration, at ¶¶ 2-3.  While GAO might order a new competition, SpaceX and Boeing will have significantly advanced relative to SNC in virtually every area of this complex work.  Those two competitors would have received very significant advantages over SNC in any further competition – advantages so great as to virtually preclude SNC from having any meaningful chance to prevail.  In this respect, by override of the stay, NASA's action causes injury to the procurement process.  The outcome of an override should not be to make the results of any conceivable GAO remedy a fait accompli that accomplishes the same result of the contested award decision.  But that is precisely the risk, if not the probability, here.  *See E-Management Consultants,* 84 Fed. Cl. at 5-6 (explaining the concerns that prompted Congress to include the automatic stay provision, including that, before CICA, agencies often rushed contract performance, and thus negated meaningful remedies in sustained GAO bid protests).

      Failure to reinstate the stay undeniably will enable Boeing and Space X to move ahead, gaining competitive advantage irrespective of the GAO outcome.  On SNC, the override has the opposite effect.  As explained by Mr. Sirangelo, without a stay critical partners in SNC's effort will certainly understand the obvious point that SNC's opportunity to win any re-competition ordered by GAO is very slim.  As a result, he expects that a denial of SNC's request for relief in this action quickly will lead to SNC losing both resources and slots currently being reserved for various key activities including fabrication and testing at third party facilities.  *Id.* at ¶¶ 6-8.

To make matters worse, without the stay, SNC will be at a tremendous funding disadvantage.  As discussed above, Boeing's contract shows that it will likely have earned ████████████████████████████████████████████████████████ before the last day on which the GAO could render a decision.  SpaceX's payment in the same period, at least ██████████████████████████ *See generally* Sirangelo Declaration, at ¶¶4-5, for the effect of significant  funding to Boeing and SpaceX. ███████████████████ ████████████████████████████████████████████████████████ ██████████ if it is to maintain its critical █████████████████████ with for the Atlas-V rocket. *Id. at* ¶¶ 9-10.  In short, SNC will be very badly hurt if Boeing and SpaceX are permitted to continue performance, and paid for doing so, while the GAO protest is pending. The outcome of a re-competition, if ordered, would be virtually a foregone conclusion.

Only if this Court rules that the override is unlawful will the stay be reinstated. Only by operation of the stay can the Court secure the possibility of re-competition as an effective remedy if GAO sustains the protest.  None of the competitors should continue to perform and receive funding over the next 76 days.  It is important to respect the purposes of Congress, in making the CICA stay "automatic," and to support the application of that purpose here.  The GAO is reviewing the award of an important and challenging advanced technology program.  SNC's protest, if successful, could lead to NASA's selection of it as one of the two providers on whom the nation will depend for ISS crew missions over coming years.  It serves the "best interests" of the United States to allow the GAO the remaining time to decide on the merits of SNC's protest without NASA spending █████████████████ ██████████████ on the two awardees during the protest period.

29

## VI.    CONCLUSION

The override of the CICA stay on the NASA awards of CCtCap contracts to Boeing and SpaceX is arbitrary and capricious, an abuse of discretion and otherwise not in accordance with law.  SNC respectfully requests the Court to issue an Order that the override is illegal so that, by operation of law, the CICA stay will be reinstated.

By: _____

Neil H. O'Donnell (Attorney of Record)
Robert S. Metzger
Dennis J. Callahan

ROGERS JOSEPH O'DONNELL
750 Ninth Street NW, Suite 710
Washington, DC 20001
Tel:  (202) 777-8950
Fax:  (202) 347-8429
Email:  nho@rjo.com

*Attorneys for Plaintiff Sierra Nevada Corporation*

30

354671.1