**FILED**

# ORIGINAL

OCT 1 5 2014

**U.S. COURT OF FEDERAL CLAIMS**

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

### BID PROTEST

**REDACTED VERSION**

| | |
|---|---|
| SIERRA NEVADA CORPORATION, )<br><br>Plaintiff, )<br><br>v. )<br><br>THE UNITED STATES, )<br><br>Defendant. ) | Case No. _____<br><br>Judge ____ 14 - 994C<br><br>**FILED UNDER SEAL** |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S APPLICATION AND

## MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF

TABLE OF CONTENTS

Page

STATEMENT OF THE CASE .................................................................................. 1

QUESTION PRESENTED ....................................................................................... 3

I.  STATEMENT OF FACTS ............................................................................. 4

    A.  The History of Crew Transport to the International Space
        Station ................................................................................................... 4

    B.  The Commercial Crew Program and Supporting Contracts .............. 5

    C.  The CCtCap Solicitation and Award................................................... 7

    D.  SNC's Bid Protest and Subsequent NASA Override.......................... 8

    E.  NASA's Override Memorandum ......................................................... 8

II.  ARGUMENT.................................................................................................. 9

    A.  Standard of Review ............................................................................. 9

    B.  SNC Is Likely to Prevail on the Merits ........................................... 13

        1.  The Override Is Not in the Best Interests of the United
            States.................................................................................... 14

            a.  NASA Has Not Shown "Adverse Consequences"
                Will Result from the Stay.......................................... 14

            b.  The Override is Not Justified by an Absence of
                Reasonable Alternatives............................................ 18

            c.  The Override Could Prove Very Costly But Not
                Beneficial to NASA .................................................. 22

            d.  Competition Will Be Harmed and the Integrity of
                the Procurement System Will Be Compromised if
                the Override is Sustained .......................................... 24

        2.  There are No Urgent and Compelling Circumstances to
            Justify the Override ............................................................. 26

    C.  Absent Enforcement of the Stay, SNC Will Suffer Immediate
        and Irreparable Injury........................................................................ 27

    D.  The Balance of Hardships Favors the Award of Injunctive Relief .... 28

    E.  Awarding Injunctive Relief Is in the Public Interest......................... 29

III.  CONCLUSION............................................................................................. 30

<u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Al Ghanim Combined Group Co. v. United States,*
  56 Fed. Cl. 502 (Fed. Cl. 2003).................................................................. 29

*Ala. Aircraft Indus., Inc. v. United States,*
  586 F.3d 1372 (Fed. Cir. 2009) ................................................................ 11

*Blue & Gold Fleet, L.P. v. United States,*
  492 F.2d 1308 (Fed. Cir. 2007) ................................................................ 10

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.,*
  419 U.S. 281 (1974) .................................................................................. 11

*Chapman Law Firm Co. v. United States,*
  65 Fed. Cl. 422 (Fed. Cl. 2005).................................................................... 9

*Citizens of Overton Park v. United States,*
  401 U.S. 402 (1971) .................................................................................. 10

*Dyncorp Intern'l v. United States,*
  113 Fed. Cl. 298 (Fed. Cl. 2013) .............................................................. 12

*E-Management Consultants, Inc. v. United States,*
  84 Fed. Cl. 1 (Fed. Cl. 2008) .................................................. 12, 13, 21,28

*FMC Corp. v. United States,*
  3 F.3d 424 (Fed. Cir. 1993) ...................................................................... 10

*Impreza Construzioni Geom. Domenico Garufi v. United States,*
  238 F.3d 11324 (Fed. Cir. 2001) .............................................................. 11

*Lear Siegler, Inc. Energy Prods. Div. v. Lehman,*
  842 F.2d 1102 (9th Cir. 1988) .................................................................. 25

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.,*
  463 U.S. 29 (1983)................................................................. 10, 11,12,21

*Nortel Gov't Solutions, Inc. v. United States,*
  84 Fed. Cl. 243 (Fed. Cl. 2008) .................................................................. 9

*PGBA, LLC v. United States,*
  389 F.3d 1219 (Fed. Cir. 2004).......................................................... 10, 29

*PGBA, LLC v. United States,*
  57 Fed. Cl. 655 (Fed. Cl. 2003) .......................................................... 25, 29

*Planetspace, Inc. v. United States,*
  86 Fed. Cl. 566 (2009) .............................................................................. 11

*PM Tech, Inc. v. United States,*
  95 Fed. Cl. 330 (Fed. Cl. 2010) ................................................................ 27

# TABLE OF AUTHORITIES
### (CONTINUED)

**Page(s)**

## FEDERAL CASES

*Reilly's Wholesale Produce, Inc. v. United States,*
  73 Fed. Cl. 705 (Fed. Cl. 2006) ...........................................................passim

*Sierra Club v. EPA,*
  671 F.3d 955 (9th Cir. 2012)............................................................ 23, 24

*Superior Helicopter, LLC v. United States,*
  78 Fed. Cl. 181 (Fed. Cl. 2007) ................................................. 14, 15, 17

*Supreme Foodservice GMBH v. United States,*
  109 Fed. Cl. 369 (Fed. Cl. 2013) .......................................................passim

*URS Federal Servs., Inc. v. United States,*
  102 Fed. Cl. 664 (Fed. Cl. 2011)............................................................ 11

## FEDERAL STATUTES

5 U.S.C. § 706(2)(a).............................................................................. 10

31 U.S.C. § 3553(c)(1)........................................................................... 12

31 U.S.C. § 3553(d)(3)(C)(i)(II) .............................................................. 27

Administrative Procedure Act. 28 U.S.C. § 1491(b)(4) .................................. 10

Competition in Contracting Act of 1984 ("CICA"), 31 U.S.C. § 3553(c)(l)................passim

## REGULATIONS

(4 C.F.R. § 21.9(a)) ................................................................................ 9


## OTHER AUTHORITIES

NASA OIG Report 13-022, "Status of NASA's Development of the Multi-Purpose
  Crew Vehicle," (Aug. 15, 2013) ............................................................. 20

NASA OIG Report, "Extending the Operational Life of the International Space Station
  Until 2014," ..................................................................................... 4

NASA OIG Report, "NASA's Management of the Commercial Crew Program," ................... 5

"NASA: Issues for Authorization, Appropriations, and Oversight in the 113th Congress,"
  Congressional Research Service Report R43144 ............................................... 4

Source Selection Statement. Exh. 2, Source Selection Statement ...................... 7,8

NASA Release 14-256, "NASA Chooses American Companies to Transport U.S.
    Astronauts to International Space Station" (Sept. 16, 2014) ("NASA CCtCAP Award
    Release"), available at http://goo.gl/c5M88v ................................................................. 6

Acquisition and Sourcing Management, U.S. Government Accountability Office,
    "Challenges in Completing and Sustaining the International Space Station," GA0-08-
    581 ................................................................................................................................ 4

H.R. Rep. No. 99-138 (1985)........................................................................................... 28

stay, should be circumvented to save 87 days at the front end of a lengthy, complex, expensive and risky program. Ten years after President Bush announced the Space Shuttle would be retired, and more than three years after crew were last carried by a Space Shuttle to the ISS, NASA now claims that the next 87 days are critically important, practically indispensable to achieving a capability for domestic crew transport by 2017 that the Agency has not had since 2011. As NASA knows very well, Congress has chosen not to fund the full budget NASA sought for the U.S. Commercial Crew Program (CCP) in either 2012 and 2013, even though NASA warned that less funding than requested would delay the program. What is most important is that the CCtCap contracts be awarded to the deserving parties. SNC believes that NASA should have chosen it as one of the two U.S. commercial crew providers. That is the subject of SNC's pending GAO protest. For all the reasons that CICA imposes an "automatic" stay with override a limited exception, the stay should remain in place here, and the override should be rejected, so that the GAO can complete its work without the waste of millions of dollars and severe bid protest prejudice to SNC's competitive prospects should the GAO rule in its favor.

## QUESTION PRESENTED

Whether SNC is entitled to a declaratory judgment, or a temporary restraining order (pending the issuance of a preliminary injunction), and a preliminary injunction (pending the entry of final judgment in this case), to prevent NASA from carrying out its arbitrary, capricious, and otherwise unlawful decision to override the CICA stay of contract performance when SNC timely filed a bid protest at GAO challenging the unlawful award of the CCtCap contracts to Boeing and SpaceX?

354671.1

I.      STATEMENT OF FACTS

   A.      The History of Crew Transport to the International Space Station

       The ISS was developed and has been supported by an international partnership

of nations, including the United States, Russia, Canada, the members of the European

Space Agency, and Japan.[1]  The U.S. alone has expended about $75 billion on the

development and support of the ISS over 30 years.[2]  The United States and Russia are the

largest contributors to the project.  The ISS has been manned since November 2000.[3]

       In the four years from December 1998 to November 2002, NASA completed

16 manned spaceflights to the ISS on the Space Shuttles Endeavor, Discovery and Atlantis.

Exh. 6, "List of Human Spaceflights to the International Space Station," ("ISS Spaceflights

List") available at http://goo.gl/tiVXlR.   On February 1, 2003, the Space Shuttle Columbia

was lost.  NASA did not launch another manned mission to the ISS until July 26, 2005, a gap

of over 2.5 years.  *Id.*  After resumption of Shuttle missions, NASA launched approximately

20 more manned Space Shuttle flights to the ISS.  *Id.*

---

[1]   Exh. 3, Testimony of Cristina T. Chaplain, Director of Acquisition and Sourcing
Management, U.S. Government Accountability Office, "Challenges in Completing and
Sustaining the International Space Station," GA0-08-581 T, before the House Committee on
Science and Technology, Subcommittee on Space and Aeronautics at 3 (Apr. 24, 2008)
("GAO Testimony"), available at http://www.gao.gov/new.items/d08581t.pdf .

[2]   Exh. 4, NASA OIG Report, "Extending the Operational Life of the International Space
Station Until 2014," at i (Sept. 18, 2014) ("2014 NASA OIG Report"), available at
http://oig.nasa.gov/audits/reports/FY14/IG-14-031.pdf.

[3]   Exh. 5, Daniel Gordon, "NASA: Issues for Authorization, Appropriations, and Oversight
in the 113th Congress," Congressional Research Service Report R43144 at 9 (July 11, 2013)
("CRS Report"), available at http://goo.gl/Pu0FYU.

354671.1

On January 14, 2004, President Bush announced that NASA would retire the three remaining space shuttles after the ISS was completed in 2010. Exh. 5, CRS Report at 3. Ultimately, the Space Shuttle Program was extended to accommodate delays in ISS construction, and the last manned U.S. spaceflight to the ISS was in July 2011. Exh. 4, 2014 NASA OIG Report at i, n. 1. Since then, all 11 spaceflights to the ISS have been in the Russian Soyuz spacecraft, and all 11 missions have included a U.S. astronaut. Exh. 6, ISS Spaceflights List. Since the Columbia disaster in 2003, U.S. astronauts have flown on 31 of 33 Soyuz missions to the ISS. *Id.*

There have been approximately 40 crewed Soyuz expeditions to the ISS since the first one launched on October 31, 2000. *Id.* These missions have transported approximately fifty (50) U.S. personnel and fifty-eight (58) Russian personnel. *Id.*

**B.    The Commercial Crew Program and Supporting Contracts**

NASA's Commercial Crew Program ("CCP") serves to develop a U.S. commercial crew transportation capability with the goal of achieving safe, reliable and cost-effective access to and from the ISS.[4]   Starting in 2010, SNC has participated in several previous phases of NASA's CCP funded by Space Act Agreements, which are not subject to the Federal Acquisition Regulations ("FAR").   These include:

- 2010: $20 million for Commercial Crew Development (CCDev1);

- 2011: $80 million (subsequently increased to $105.6 million) for Commercial Crew Development Round 2 (CCDev2);

- 2012: $227.5 million for Commercial Crew Integrated Capability (CCiCap), for which performance will continue into early 2015.

---

[4]   Exh. 7, NASA OIG Report, "NASA's Management of the Commercial Crew Program," at i (Nov. 13, 2013) ("2013 NASA OIG Report"), available at http://goo.gl/UBVDAS.

Exh. 7, 2013 NASA OIG Report, at Appendix B.

In 2013, NASA awarded SNC a $10 million Certification Products Contract (CPC) for development of certification plans for safe, crewed missions to the ISS, with a performance period of 2013-2014. *See id.* The CPC is a contracting action under the FAR and constitutes Phase 1 of the CCtCap element of the CCP. *See id.* Appendix C. Phase 1 has been completed. Phase 2 of CCtCap is the FAR procurement that precipitates this action.

Over the course of the CCP, NASA reports that it has awarded more than $8.2 billion in Space Act Agreements and contracts. The largest contracts, protested here, are the CCtCap contracts to Boeing and SpaceX, with maximum values of $4.2 billion and $2.6 billion, respectively.[5]

The CCP is a public-private partnership, where the commercial partner is responsible to develop its own spaceflight system, which it will own and operate. *See* Exh. 7, 2013 NASA OIG Report at 28. The industry partner is responsible both for the orbital vehicle, that will carry crew to and return to Earth from the ISS, as well as for the rocket system that will boost the orbital vehicle into orbit. *Id.* at 9. NASA is responsible for certifying the systems to ensure they are safe for human spaceflight and safe to operate in proximity to the ISS. *Id.* These are very difficult technical undertakings. NASA has never before qualified or certified a privately develop manned spacecraft and never before contracted with a private provider for manned spaceflight services.

The CCP encourages industry partners to innovate. While NASA sets high level requirements, each company decides how to meet the requirements. The two

---

[5]   Exh. 8, NASA Release 14-256, "NASA Chooses American Companies to Transport U.S. Astronauts to International Space Station" (Sept. 16, 2014) ("NASA CCtCAP Award Release"), available at http://goo.gl/c5M88v.

6

354671.1

companies that received CCtCap awards, Boeing and SpaceX, both use "capsule" designs to carry crew to the ISS and to return to Earth. *Id.* at 9. Boeing uses an existing and proven rocket, a variation of the Atlas-V. *Id.* SpaceX uses a rocket of its own design and manufacture, a version of the Falcon 9. *Id.* SNC uses a winged "lifting body" to carry crew, and also uses a variation of the Atlas-V. *Id.* All industry partners are expected to invest their own resources to contribute to development.

### C.   The CCtCap Solicitation and Award

Phase 2 of the CCtCap consists of the activities necessary to design, develop, test and evaluate, and certify crew transportation systems for the ISS. Exh. 2, Source Selection Statement at 1. NASA intends then to order 2-6 ISS missions from each certified system, under a separate contract line item number ("CLIN"). *Id.* at 2. NASA's certification under CCtCap means that the contractor's system has met NASA's safety requirements for transporting crew to the ISS. Exh. 1, Override Memo at 4.

NASA issued the CCtCap solicitation on November 19, 2013, and amended it in December 2013 and April 2014. *See* Exh. 2, Source Selection Statement at 4. NASA received CCtCap proposals from Boeing, SNC and Space X, by the January 22, 2014, due date. *Id.* at 5. Discussions were conducted with each Offeror during a 3-month period between April 21, 2014 and June 27, 2014. *Id.* Final proposal revisions were received from the three offerors on July 7, 2014. *Id.* at 6. Over two months later, on September 15, 2014, NASA selected Boeing and SpaceX for award. *Id.* at 29   On September 16, 2014, SNC received notice of the awards and of its non-selection for award. Override Memo at 5. In all, then, ten months elapsed between issuance of the CCtCap RFP on November 19, 2014, and the selection decision on September 15, 2014.

7

**D.      SNC's Bid Protest and Subsequent NASA Override**

After NASA debriefed SNC on September 19, 2014, SNC timely protested the contract awards to Boeing and SpaceX at the GAO on September 26, 2014.  Override Memo at 5.  Among other grounds, SNC protested that the Source Selection Statement reflects a selection decision that diverges from the solicitation's evaluation criteria.  Pursuant to the Competition in Contracting Act, upon receiving SNC's timely protest NASA stayed performance of the CCtCap contracts awarded to Boeing and SpaceX.  *Id.*  Thirteen days later, on October 9, 2014, NASA executed a "Determination to Continue Performance of Commercial Crew Transportation Capability (CCtCap) Contracts After Receipt of Government Accountability Office (GAO) Protest" (the "Override Memo").

The Override Memo states that NASA would issue notices to proceed to Boeing and SpaceX, and that NASA would notify GAO of its determination.  *Id.* at 14.  The Override Memo was signed by William P. McNally, NASA's Assistant Administrator of Procurement, and William H. Gerstenmaier, NASA's Associate Administrator, Human Exploration and Operations Mission Directorate.  *Id.*  Mr. Gerstenmaier also was the Source Selection Authority (SSA) who prepared and signed the Source Selection Statement.  Exh. 2, Source Selection Statement at 29.  On October 10, 2014, NASA provided the Override Memo to SNC, Boeing, and SpaceX.

**E.      NASA's Override Memorandum**

The Override Memo contains three sections, with Section II ("Continued Performance of the CCtCap Contracts Is in the Government's Best Interests") presenting the agency's justification for the override.  NASA's explanation follows the four guideposts for analyzing CICA stay overrides set forth in *Reilly's Wholesale Produce, Inc. v. United States,*

8

354671.1

73 Fed. Cl. 705, 711 (Fed. Cl. 2006).  NASA's application of the *Reilly's* guidance to this

procurement amounts to an assembly of conjecture, exaggeration and dramatization.  NASA

presents a litany of adverse consequences, absent alternatives, one-sided cost considerations,

and claims negligible impacts on competition.  The reasoning of NASA Override Memo,

however, does not withstand scrutiny and is not a proper basis under the APA for validating

the Agency's override decision.

## II.   ARGUMENT

### A.   Standard of Review

SNC has moved for both declaratory and injunctive relief.  There is a split in

this Court regarding which relief is appropriate in stay override matters.  Plaintiff believes

that for the reasons stated by the Court in *Supreme Foodservice GMBH v. United States,* 109

Fed. Cl. 369 (Fed. Cl. 2013), declaratory relief is sufficient.  *Id.* at 396-98 (analyzing the split

of authority);[6] *accord Nortel Gov't Solutions, Inc. v. United States,* 84 Fed. Cl. 243, 252

(Fed. Cl. 2008); *Chapman Law Firm Co. v. United States,* 65 Fed. Cl. 422, 424 (Fed. Cl.

2005).  The declaratory relief inquiry ends upon the finding of whether the agency's override

decision was arbitrary and capricious under the APA standard, discussed below.  The Court

in *Supreme Foodservice* was persuaded that because Congress dictated that the CICA stay

arise automatically upon a timely GAO filing, the plaintiff seeking to undo an agency's stay

override should not have to make the further showings required for injunctive relief.  109

Fed. Cl. at 396-97.

---

[6]   Given the short fuse inherent in actions challenging CICA stay overrides, and GAO's
100-day protest period (4 C.F.R. §21.9(a)), the Federal Circuit has not had an opportunity to
resolve these different views.

354671.1

If the Court reaches SNC's motion for preliminary injunctive relief, this Court must weigh the following four factors: (1) SNC's likelihood of success on the merits; (2) the immediate and irreparable injury to SNC if the court withholds equitable relief; (3) whether the balance of hardships to the parties favors the grant of injunctive relief, and (4) whether the public interest would be served by an injunction. *PGBA, LLC v. United States,* 389 F.3d 1219, 1228-29 (Fed. Cir. 2004). No single factor is determinative, and the "weakness of the showing regarding one factor may be overborne by the strength of the others." *FMC Corp. v. United States,* 3 F.3d 424, 427 (Fed. Cir. 1993). That said, the Federal Circuit has held that likelihood of success on the merits is the most important factor in a court's consideration of injunctive relief. *Blue & Gold Fleet, L.P. v. United States,* 492 F.2d 1308, 1312 (Fed. Cir. 2007). Applying these factors to the circumstances of this case, SNC is entitled to an injunction pending resolution of SNC's bid protest before the GAO.

In this context, SNC's likelihood of success on the merits is measured by the Administrative Procedure Act. 28 U.S.C. §1491(b)(4); 5 U.S.C. §706(2)(a). Under the APA's "arbitrary and capricious" standard, the Court conducts a "searching and careful," but narrow, review of the record to determine whether the agency considered the relevant factors or has made a clear error in judgment. *Citizens of Overton Park v. United States,* 401 U.S. 402, 416 (1971). The court considers whether the agency: (1) relied on factors not intended by Congress; (2) entirely failed to consider an important aspect of the problem; (3) offered an explanation that runs counter to the evidence; or (4) rendered a decision that is so implausible that agency expertise or a difference in view can't explain it. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.,* 463 U.S. 29, 43 (1983).

354671.1

The court cannot second-guess NASA, nor can it supply a rationale NASA did not articulate in the Override Memo. *See Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.,* 419 U.S. 281, 285-86 (1974). Rather, the court takes a "hard look" at the Override Memo, and examines whether NASA reviewed the relevant information and gave a rational and satisfactory explanation for the override. *See Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43; *Impreza Construzioni Geom. Domenico Garufi  v. United States,* 238 F.3d 11324, 1332 (Fed. Cir. 2001). NASA's override would be irrational, and subject to being voided, if its justification runs counter to the relevant evidence or was "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ala. Aircraft Indus., Inc. v. United States,* 586 F.3d 1372, 1375 (Fed. Cir. 2009).

For nearly a decade, the "hard look" this court takes at CICA stay override decisions has been guided, in most cases, by the factors articulated by Judge Allegra in *Reilly's Wholesale Produce v. United States,* 73 Fed. Cl. 705, 711 (Fed. Cl. 2006). *See, e.g., Supreme Foodservice,* 109 Fed Cl. at 386 (concluding that the *Reilly's* factors must be considered, and noting that "whether it is because the heads of procurement activity are on notice of our decisions, or due to the sheer logic of the factors ... it is appropriate that our court should expect each of them to be discussed in override decisions"); *URS Federal Servs., Inc. v. United States,* 102 Fed. Cl. 664 (Fed. Cl. 2011) (stating that *Reilly's* "simply represents a distillation of factors that the court would expect the federal agency decision-maker to consider before determining that an override either is 'in the best interests of the United States' or is 'urgent and compelling'").

In a small minority of cases this court has refused to apply *Reilly's* as an impermissible judicial gloss on the APA standards. *See Planetspace, Inc. v. United States,*

11

86 Fed. Cl. 566, 567 (2009); *Dyncorp Intern'l v. United States,* 113 Fed. Cl. 298, 302 n.4

(Fed. Cl. 2013).  It is easy to make too much of the different views, as the *Motor Vehicle*

*Mfrs. Association* and the *Reilly's* inquiries are quite similar.  For example, courts applying

the *Reilly's* framework have used it as a guide for identifying "important aspects of the

problem" under *Motor Vehicle Mfrs. Association.   See, e.g., E-Management Consultants,*

*Inc. v. United States,* 84 Fed. Cl. 1, 4 (Fed. Cl. 2008).  Similarly, familiarity with the

Congressional purpose behind the automatic stay would "naturally lead" to the

"identification of factors," such as an agency's desire to enter into a new contract, or

preference for a particular contractor, that "Congress did not intend agencies to rely on."  *See*

*Supreme Foodservice,* 109 Fed. Cl. at 385.

   The factors set forth in *Reilly's* are those that NASA has chosen to use to

structure its Override Memo.  These factors include: "(i) whether significant adverse

consequences will necessarily occur if the stay is not overridden; (ii) conversely, whether

reasonable alternatives to the override exist that would adequately address the circumstances

presented; (iii) how the potential cost of proceeding with the override, including the costs

associated with the potential that the GAO might sustain the protest, compare to the benefits

associated with the approach being considered for addressing the agency's needs, and (iv) the

impact of the override on competition and the integrity of the procurement system, as

reflected in the Competition in Contracting Act." *Reilly's*, 73 Fed. Cl. at 711 (citations and

footnotes omitted).

   By operation of the "automatic" stay, CICA establishes that it is in the

government's best interest to stay contract performance pending resolution of timely GAO

protests. 31 U.S.C. §3553(c)(1).  As such, deference typically accorded agency decision-

making in contract matters is subject, here, to a countervailing presumption, established by

Congress, and embodied in CICA, that the GAO bid protest mechanism has a positive effect

on the federal procurement system. *See E-Management Consultants, Inc.,* 84 Fed. Cl. at 5-6

("Any override of the automatic stay must be viewed in light of the importance of the

automatic stay to the general scheme Congress enacted in CICA."). In this regard, it bears

noting that what is "in the best interests of the United States" may differ from what NASA

perceives as being in *its* best interests, or that what is "urgent and compelling" in the

Agency's parochial view may not hold for the nation at large.

    **B.**    **SNC Is Likely to Prevail on the Merits**

        SNC's protest at the GAO is not at issue here and the merits of that protest

have no bearing upon the question presented to this Court. Instead, the merits inquiry

concerns whether the Agency has satisfied the APA and the tests articulated by *Reilly's* and

subsequent cases to justify the override of the CICA stay. Here, the override does not serve

the "best interest" of the United States and NASA has not shown requisite "urgent and

compelling circumstances."

        The Override Memo admits that the lead times for ordering seats on Soyuz ISS

spaceflights is at least three years (Override Memo at 7, 8) and that NASA has only

contracted for Soyuz seats through 2017. *Id.* at 2, 6, 9. NASA also acknowledges its

common experience of delays in the development of new spaceflight capabilities. *Id.* at 3, 7,

10. Together, these admissions mean that NASA soon will have to contract with Russia for

Soyuz seats, at least for 2018, even if the Agency prevails in defending its override decision

here. That is, given the schedule risk inherent in the development of new launch and

spacecraft capabilities, NASA will not know for many months, if not years, when the new

13

crew transportation systems will be available for use.  In the meantime, NASA will have to continue ordering Soyuz seats for missions in 2018.  In short, the record shows that NASA's supposed need to override the stay is premised on a contrived and arbitrary schedule that makes far too much of the 87-day interval (at most) affected by the stay.

Further, NASA's justification for overriding the automatic stay is belied by its decade-long approach to manned spaceflights.  The record shows that NASA has known for at least ten years that its sole remaining capability for manned spaceflights to the ISS, the Space Shuttle Program, would be abandoned.  In early 2004, President Bush announced that the Space Shuttles would be retired upon the completion of the ISS, then slated for 2010.  As it was, the Space Shuttles flew their last mission in July 2011.  This observation undermines NASA's contention that a mere 87-day delay in proceeding with the contract awards to Boeing and SpaceX will critically impair NASA's need to develop domestic crew transportation systems to shuttle astronauts to and from the ISS.  If the need for a U.S. crew transportation capability was truly so acute, NASA would have acted long ago and not (as it transpired) chosen to rely on the Soyuz vehicle for years.

1. **The Override Is Not in the Best Interests of the United States**

   a. **NASA Has Not Shown "Adverse Consequences" Will Result from the Stay**

If there are no "adverse consequences" from the stay, or if they are only speculative, the agency's case is necessarily weakened that the "best interests *of the United States*" are served by the override.  The seminal formulation set forth in *Reilly's* states that adverse consequences must "necessarily occur" in order to support a CICA stay override.  73 Fed. Cl. at 711.  Thus, in *Superior Helicopter, LLC v. United States,* 78 Fed. Cl. 181 (Fed.

14

Cl. 2007), it was not enough for the agency to show that there was a heightened risk of

severe forest fires in the season in question; rather, to justify the stay the agency had to offer

a credible explanation why the existing contract vehicle could not effectively secure fire

suppression helicopters to meet the anticipated demand.  *Id.* at 190.

Notwithstanding NASA's lengthy and sometimes repetitive exposition of the

numerous harms that might occur should the stay remain in place, upon examination it is

clear that there are few specifics, that the claimed harms are both speculative and remote, and

that NASA resolves all risks in favor of adverse consequence in order to inflate the supposed

harm that NASA claims it will suffer.

NASA's insistence that it can avoid further use of the Russian Soyuz vehicle

after 2017 only if it overrides the stay rings hollow.   NASA states that the U.S. does not

have contracts with Russia for ISS flights after 2017.  Override Memo at 2, 6, 9. That this has

occurred is NASA's responsibility, and NASA has acknowledged that it has the legal

authority to purchase more flights from Russia if the U.S. capability is not ready.  *Id.* at 11.

Indeed, U.S. astronauts have flown on 31 of 33 Soyuz missions since the Space Shuttle

Columbia disaster in 2003, and NASA has not made a credible case as to why this

longstanding practice must change.  *See* Exh. 6.

NASA suggests that the continuation of the stay "jeopardizes the safety of the

American and international partners' astronauts who serve on the ISS."  Override Memo at 7.

This attributes to the stay, affecting 87 days at the outset of a lengthy and highly complex

program, many consequences that are wholly conjectural, and fails to recognize any of the

many other causes that NASA acknowledges contribute to delay in launch vehicle

development, manufacturing and readiness for flight.  *See id.* at 3, 7, 10.  NASA's argument

15

also begs the question whether NASA, if it considered the risks of reliance upon Soyuz to be

so grave, jeopardized ISS astronauts' by retiring the Space Shuttles in 2011 and by not

planning for an earlier replacement of their capability.[7]

NASA's focus on the claimed need to have domestic ISS crew transportation

capability by the end of 2017 obscures the relevant timeframe. NASA frames the

comparison to contrast the 87 days yet to run on the CICA stay period to the end of 2017,

little more than three years away, when its present contract for Soyuz seats expires. NASA

has been without U.S. capability to carry crew to the ISS since 2011. It has pressed forward

with the Commercial Crew Program but not received the funding it requested from Congress

to complete that program on the schedule NASA desired. In both 2012 and 2013, Congress

provided $300 million less than the Administration's request, despite NASA's urgings that

reduced funding would delay U.S. commercial crew capability. Accordingly, the 87 days

left to run on the CICA stay should be placed into appropriate context. NASA has known for

a decade that it needs to replace the Shuttle with U.S. crew capability. The CCtCap program

itself, "best case," will take three years before either commercial provider has a certified

spacecraft to accept ISS missions.

Moreover, throughout the Override Memo, NASA recognizes the difficulty

and risk that accompany development of new launch systems and spacecraft, particularly

manned systems, admitting to frequent delays in such programs. The conjunction between

the historical experience, of technical obstacles and delays, and the immensity of the tasks

---

[7]   Similarly, NASA contends that delay prolongs ISS partner countries' dependence on only
one possible means of ISS transportation. Override Memo at 9. This argument overlooks
that all of the ISS partners, NASA included, have successfully relied upon Russia's Soyuz
vehicle as the single source for ISS crew transport for years. *See* Exh. 6. NASA provides no
information to establish that any of the ISS partner nations object to use of Soyuz.

ahead on CCtCap simply invalidate NASA's determination to assign pivotal significance to the 87-day CICA stay at the start of this multi-billion dollar program.

The Override Memo emphasizes that spaceflight programs such as CCtCap usually, if not invariably, experience delays. *See id.* at 3 (launch systems and spacecraft "historically…take[] longer than anticipated"); *id.* at 6 ("the Space Shuttle and the Soyuz experienced delays of months and years."); *id.* at 10 ("New space vehicle production is an inherently high-risk enterprise with a high probability of delay."). NASA strains to use the historical record of delays to its advantage, as if to say, "Because this program faces many risks, and schedule is far from certain, we can't tolerate a known 87-day delay at the start on top of every other source of delays of indeterminate length." NASA has it backwards: the very strong likelihood of significant delays, from future technical challenges, as well-recognized by NASA in the Override Memo, refutes NASA's effort to show that significant adverse programmatic consequences must "necessarily occur" if the stay remains in force. *Reilly's,* 73 Fed. Cl. at 711; *Superior Helicopter,* 78 Fed. Cl. at 190.

NASA ascribes undue significance to the preliminary Certification Baseline Review ("CBR") that it wants the awardees to accomplish within the stay period. Missions cannot be ordered until after the safety certification and flight tests. NASA admits that "the first ISS mission cannot be authorized until after the Certification Baseline Review (CBR) *and additional specified milestones have been successfully completed.* Override Memo at 8 (emphasis added). NASA aggrandizes the CBR as a "critical milestone setting the foundation for certification of these vehicles." Override Memo at 10. While the CBR is significant – certainly as to the advantages it will give the awardees notwithstanding SNC's unresolved protest – certification of the vehicles will require expenditure of billions of

17

354671.1

dollars and years of activity.  The timing of such events will not be resolved by achievement the CBR.

The CBR is just one of many performance waypoints in this program of great complexity and cost.  Even if the CBR is delayed, this does not establish that NASA (or its contractors) will lack the means to recover the lost time through a replan or selective acceleration of other project actions.  NASA says that a "massive effort will be necessary to expedite activities after the resolution of the protest to meet the 2017 schedule" (Override Memo at 10), but it offers little detail to support this assertion.  Moreover, NASA surely was aware of the possibility that its CCtCap decision would produce a protest, so the 100-day GAO stay could not have come as a "surprise."[8]

### b.   The Override is Not Justified by an Absence of Reasonable Alternatives

NASA asserts that it "carefully considered any possible alternatives" (Override Memo at 11), but it did not consider them either fully or reasonably.  *Cf. Reilly's*, 73 Fed. Cl. at 711 ("adverse consequences" of not overriding the stay should be compared to any "reasonable alternatives to the override … that would adequately address the circumstances presented").

It "may become necessary," NASA allows, for the U.S. to procure additional ISS crew transportation services from Russia on the Soyuz.  But this option "is uncertain and

---

[8]   NASA bears some responsibility for the present situation.  NASA took ten months from receipt of the CCtCap proposals to announce its selection decision.  Had it believed that every day was mission-critical, as it now contends, NASA could have shaved some time off its lengthy acquisition and evaluation process.  *Cf. The Analysis Group,* 2009 WL 3747171 at *4 (Nov. 5, 2009) (criticizing the government's delay in awarding the contract and leaving itself no choice but to override the stay, thus injuring the integrity of the bid protest process).

is not a reasonable alternative" to meet ISS crew transportation needs after 2017.  Override Memo at 11. NASA cites the long lead time for ordering seats on the Soyuz, and asserts that procuring Soyuz spaceflights requires waivers of U.S. law (including, ironically, CICA's restrictions on sole-source contracting) and NASA policy.  *Id.*

Belying the Override Memo, the public record demonstrates that Russia has reliably and safely transported NASA astronauts to the ISS since the first Soyuz voyage there in 2000 and and that NASA publicly contemplates ordering seats on the Soyuz beyond 2017. Indeed, NASA's Fiscal Year 2015 Budget Request states, "NASA plans to continue purchasing crew transportation services from [the Russian Space Agency] *until a domestic capability is available.*"  Exh. 10 (emphasis added).  NASA Administrator Charles Bolden echoed NASA's ability to contract for Soyuz seats beyond 2017 in his prepared remarks to Congress on NASA's FY15 budget request.  After expressing NASA's desire to end its reliance on Russia for ISS crew transport by the end of 2017, Administrator Bolden testified that "NASA may need to extend our current contract with the Russians and purchase more seats on the Soyuz spacecraft."  Exhibit 11.

It borders on the disingenuous for NASA to portray the prospect of ordering more Soyuz seats as having so many dire consequences.  Russia has flown more crew to the ISS than has NASA, and even when the Space Shuttle was active, NASA astronauts manned seats on the great majority of Soyuz spaceflights to the ISS.  NASA has relied exclusively upon Russia for transportation of U.S. crew to the ISS since 2011, when the Space Shuttle flew its last mission.  Since then, at least one NASA astronaut has flown on each of the 11

Soyuz launches to the ISS.[9] NASA currently has contracted with Russia for continued crew transportation through 2017. Override Memo at 2, 6, 9. NASA has not established that it cannot extend this contract and, indeed, the Agency acknowledges that it "may become necessary" if the U.S. does not have another capability. *Id.* at 11.

Against this deep record that Soyuz is a reliable and safe means to transport crew to the ISS and that Russia remains willing to sell more Soyuz seats, NASA offers only empty conjecture. NASA complains that "[p]rocuring a Soyuz service requires a long lead time" (*id.* at 11), but does not attempt to establish that the lead times have ever been different. Nor does NASA establish that the lead-times in fact are an obstacle. The same goes for NASA's objections that the Soyuz accommodates only three people. *Id.* This has been true since the first Soyuz flight. NASA protests that contracting with Russia is contrary to U.S. law and NASA policy, only to note the exception that these laws and policies do not apply at times when the U.S. lacks crew transport capabilities, the very circumstance that has obtained since 2011.

Next, NASA contends that the Orion Multi-Purpose Crew Vehicle that is currently in development, and will serve as back-up capability for human transport to the ISS, will not be operational until 2021, *i.e.,* too late to address ISS crew transport in 2018. The Orion is a curious choice to bolster NASA's claimed need for a CICA stay override. According to the NASA OIG, the Orion program was awarded eight years ago, and is already five years behind schedule. Exh. 9, NASA OIG Report 13-022, "Status of NASA's

---

[9]   NASA recognizes that U.S. statutes permit use of space transportation service from a non-U.S. source, such as Russia, where a waiver is approved. Override Memo at 11. NASA repeatedly warns of the risk of a "single point of failure" that is associated with Soyuz. Override Memo, at 3, 6, 7, 9. Yet, NASA has treated that risk as tolerable since the retirement of the Space Shuttle, and no Soyuz has failed with resulting injury to U.S. crew.

354671.1

Development of the Multi-Purpose Crew Vehicle," (Aug. 15, 2013) at 12, *available at*

http://goo.gl/fKkUCL.  While Orion, in contrast to the CCtCap vehicles, is a traditional,

NASA-funded and managed program, its program experience only disproved the

significance that NASA tries to attach to the at-most 87-day CICA to CCtCap performance.

Rather, and consistent with Override Memo's repeated observations that launch vehicle and

spacecraft programs have a very high likelihood of lengthy delays, the Orion experience

suggests that the seeming importance of an 87-day stay will prove insignificant.

In sum, the record makes clear that NASA did not objectively evaluate or

present the "reasonable alternative" of extending the contract with Russia for ISS crew

transport services beyond 2017; rather, NASA went out of its way to contrive reasons why

extending the Russian contract was prohibitively difficult.  In this regard, NASA's position is

identical to the agency stance that failed in *E-Management Services*.  There, the agency

contended that due to contract size limitation it could not extend the protesting incumbent's

IT contract and instead overrode the stay. 84 Fed. Cl. at 2-3.  Yet, emails produced in the

matter showed that the agency's contracting official had notified the Chief Information

Officer that the incumbent contract could be extended up to six months.  *Id.* at 8.  The court

granted E-Management's motion to declare the override void.  *Id.* at 11.  In doing so, the

court noted that the email evidence that contradicted the agency's override memorandum

weighed heavily in both the "adverse consequences" and "reasonable alternatives" inquiries

under *Reilly's* (*id.* at 7), and "ran counter to the evidence" under *Motor Vehicle Mfrs.*

*Association's* APA inquiry.  *Id.* at 8.

So too here, the public record in the form of NASA's official budget request

and its Administrator's testimony, and in the form of the longstanding practice of NASA

354671.1

contracting for seats on Russia's Soyuz spacecraft, contrast with the Override Memo's statements that extending the Soyuz contract is "uncertain and is *not a reasonable alternative*." Override Memo at 11 (emphasis added). NASA's Administrator has said otherwise to Congress and NASA's budget anticipates exactly this alternative. Administrator Bolden gave no hint of difficulty in extending the Russian contract when he testified to the House authorizing committee that "NASA may need to extend" it. Exhibit 11.

### c. The Override Could Prove Very Costly But Not Beneficial to NASA

NASA contends that is has "considered the costs of proceeding with the CCtCap contracts, including the costs associated with the potential that the GAO may sustain the protest, compared to the benefits and interests of the Government in proceeding with the contracts." Override Memo at 12. *Cf. Reilly's,* 73 Fed. Cl. at 711 (courts apply a cost-benefit analysis when reviewing stay overrides). NASA's consideration fails to demonstrate that it is in the "best interests of the United States" to override the stay, because the override could be *very* costly without corresponding benefit.

Should GAO sustain the protest, or should NASA be persuaded to take corrective action, several consequences are possible. These include the possible cancellation of one or both of the awarded contracts. NASA describes the work that both contractors will do in the first 90 days to include potentially expensive, major commitments, not all of which produce immediate value. NASA states that these initial activities "include detailed mission integration planning, development of software, development of qualification data, *capital equipment* and *long lead purchases*, and baselines for the ground and on-orbit infrastructure

22

to support processing of launch vehicles, spacecraft, flight operations and launch pad operations." Override Memo, at 9 (emphasis added).

What this means is that the awardees, *unless their performance is stayed*, will be spending or committing to great sums of money, much or all of which will forfeit its value if SNC's protest is sustained.[10]

NASA cites the Limitation of Funds cap of $129.3 million on funds currently obligated to *each* CCtCap contract. Override Memo at 13. Should it be necessary to cancel both the Boeing and SpaceX contracts, as conceivably could occur if the GAO sustains SNC's protest, then the override will cost the agency as much as $258.6 million. Against this huge amount at risk, NASA's case for the benefits gained by the stay, the "savings" of 87 days in a multi-year program, do not compare favorably.

NASA's "analysis" of the costs and benefits reflects a startling lack of perspective. The Agency's check-the-box approach leaves the unmistakable impression that NASA believes it satisfies its obligation to "consider" costs by merely admitting them. The Override Memo mentions the potential costs in the event of a re-competition – a stunning $129,300,000 per contractor – but says nothing about how these costs will produce any value if the GAO results disturbs the award either to Boeing or SpaceX. *Cf. Sierra Club v. EPA,* 671 F.3d 955, 968 (9th Cir. 2012) (explaining that agency action is arbitrary and capricious when the agency does not meaningfully comment on obviously relevant data).

In *Supreme Foodservice,* the court considered the threat of the government's termination liability to be sufficient to tip the cost-benefit analysis in the protester's favor.

---

[10] The expenditures also show the great competitive advantage that the awardees will realize by getting this work underway if the stay does not remain in place.

23

369 Fed. Cl. at 395.  There, the government had argued that its costs were negligible because the early period of the contract only involved the contractor's preparation to perform, and the contract called for government payments based on actual orders fulfilled.  *Id.*  The court rejected this rationale out-of-hand, reasoning that if the protest were sustained and a new contractor selected, the government would face termination-for-convenience charges to compensate the temporary contractor.  *Id.*  The same reasoning applies here with even greater force because the contract values are so high.  If in a re-competition, SNC is selected and Boeing or SpaceX is not, NASA very likely would face significant termination liability. And, like the awardee in *Supreme Foodservice*, it would not matter whether or how many payment milestones Boeing or SpaceX had hit – they would be entitled to compensation for work performed regardless.

Nor is NASA able to rescue its "Costs Considerations" argument by citing the benefits the U.S. will realize by foregoing the stay and permitting Boeing and SpaceX to continue to perform their contracts while the GAO protest is pending.  NASA claims that the benefits are that "[p]roceeding with the CCtCap contracts will ensure that the United States has reliable crew transportation when needed for its own astronauts and its international partners."  But this goes too far. The relationship between earlier accomplishment of CBR (the first program milestone), on the one hand, and actual achievement of crew vehicle safety certification and flight readiness, on the other is far too attenuated to give credit to this claim.

>            **d.    Competition Will Be Harmed and the Integrity of the
>                    Procurement System Will Be Compromised if the Override
>                    is Sustained**

NASA asserts that it recognizes the "overarching goal of the automatic suspension of performance is to preserve competition in contracting and to ensure a fair and

354671.1

effective process at the GAO." Override Memo at 13. *Cf. Reilly's,* 73 Fed. Cl. at 711. And, curiously, NASA seems to argue that its override actually honors and strengthens competition and the integrity of federal contracting by stating that CICA's override provision is an "integral part of the federal procurement process." Override Memo at 13. NASA then belies its true understanding of stay overrides as undermining competition and harmful to the integrity of the procurement system by noting that judicial review ensures that the override process is not abused. *Id.* NASA does not venture any more case-specific defense to its override other than to assert that SNC will be eligible to re-compete for awards should its GAO protest be sustained.

In *PGBA, LLC v. United States,* 57 Fed. Cl. 655 (Fed. Cl. 2003), this court noted that the CICA conferees designed the automatic stay provision to be a "key element" of the mechanism by which Congress enforces CICA's mandate for competition. *Id.* at 657. The stay accomplishes the important goal of preserving the status quo pending GAO's resolution of protest, and thereby ensures that the Comptroller General's recommendations will be considered by contracting agencies. *See PGBA*, 57 Fed. Cl. at 660 & n.8 (citing *Lear Siegler, Inc. Energy Prods. Div. v. Lehman,* 842 F.2d 1102, 1105 (9th Cir. 1988)). In *Lear Sigler,* the court noted that under pre-CICA practice, agencies would "rush into contract awards and get performance underway so that, by the time the Comptroller General's recommendation came out, it would be too late and costly to change contract awards, it such was the recommendation." 842 F.2d at 1105.

NASA's actions here are precisely the type of agency behavior the CICA stay was designed to prevent. NASA's supposed need to hurry performance of a contract that was ten years in the making is a self-inflicted circumstance. NASA exaggerates if not

354671.1

manufactures the supposed exigency.  Just as CICA was designed to block the agency

practice of rushing performance before anything could be done about improper awards

decisions, so too here NASA should not be allowed to circumvent the CICA stay.  In short,

NASA pays lip service to CICA's laudatory goals at the same time as it undermines the

purpose of the stay provision.  Therefore, declaratory or injunctive relief is in the public

interest.

There should be no doubt that competition will be injured if the override is

here sustained.  SNC's competitors will receive funding of a *quarter billion dollars,* or more,

and will gain a valuable head start on in-scope work.  Once received, as will occur unless the

stay is reinstated, these advantages cannot be retracted.  NASA and the public have an

interest in an effective competition if the GAO rules in SNC's favor.  But NASA's override,

unless rejected here, could render a future competition illusory or pre-ordained.

### 2.    There are No Urgent and Compelling Circumstances to Justify the Override

The Override Memo concludes with an assertion that "urgent and compelling

circumstances exist that will significantly and adversely affect the interests of the U.S. unless

the agency authorizes contract performance, notwithstanding the protest."  Override Memo at

14.  NASA makes this assertion half-heartedly at best.  Whereas the Override Memo

mentions "best interests" nine times in the argument, Section II, (*id.* at 6, 7 (twice), 9 (twice),

11 (twice), 12), it does not mention the "urgent and compelling" exception in the argument,

but only in the Memo's conclusion.

The "urgent and compelling" standard is a higher standard for NASA to meet

than "best interests," and requires a showing of "circumstances that *significantly* affect

26

interests of the United States. 31 U.S.C. §3553(d)(3)(C)(i)(II) (emphasis added); *see*

*Supreme Foodservice,* 109 Fed. Cl. at 387 (explaining the rationale supporting the greater

showing the government must make under the "urgent and compelling" standard). This court

has held that the types of circumstances that satisfy "urgent and compelling" standard

include the "threat of immediate harm to health, welfare, or safety." *PM Tech, Inc. v. United

States,* 95 Fed. Cl. 330, 346 (Fed. Cl. 2010) (citing CICA's legislative history that states the

"urgent and compelling" exception was meant to head off "public exigencies" that would

impart "serious financial injury" on the government). NASA does not even attempt to make

such a showing in its Override Memo, thus it cannot be the basis sustaining the override.

### C.   Absent Enforcement of the Stay, SNC Will Suffer Immediate and Irreparable Injury[11]

The harms to SNC of allowing the Boeing and SpaceX contracts to proceed

are self-evident and substantial. If SNC's GAO bid protest is sustained and the override is

not voided, the awardees will have performed for up to 100 days under a defectively awarded

contact, the thereby improperly will have gained a significant foothold in the CCP. They

will make progress in their design and engineering work, which will make it even harder for

SNC to have any fair competitive opportunity should the GAO sustain its protest. The finite

resource pool of top engineers, critical vendors and specialty suppliers is limited. Also, the

awardees may tie-up launch slots at the available test ranges and launch faciliites, and these

are in very short supply as well. Unless the stay is revived, Boeing and SpaceX will receive

$129.3 million, each, in early funding, secure critical relationships by leveraging their

---

[11]   Again, SNC does not believe the court needs to reach the injunctive relief factors, as
declaratory relief is sufficient here. *See* discussion *supra* Section II.A.

incumbency positions, get ahead in design and development, and thereby augment their capabilities should there be a re-competition.

These are precisely the types of harms the CICA stay is designed to avoid. The U.S. House of Representatives Report on the CICA legislation noted that the absence of a stay provision had been a "major deficiency" in the bid protest process. H.R. Rep. No. 99-138, at 4 (1985) (cited in *E-Management Consultants,* 84 Fed. Cl. at 6). The Report continued:

> Agencies, therefore, often proceeded with their contracts, simply ignoring the protest process. As a result, vendors were confronted with a *fait accompli* and often did not receive fair and equitable relief even when GAO decided in their favor…

*Id.* If the override holds and SNC's protest is sustained, in these circumstances the value of any GAO remedy will be impaired if not foreclosed. The result of re-competition may be a foregone conclusion, after the advantages the awardees will receive from their initial performance. At the least, there will be no "level playing field" in the re-competition, as CICA intends.

**D.     The Balance of Hardships Favors the Award of Injunctive Relief**

The harm to SNC, described above, far outweighs any arguable harm to the Government, Boeing, or SpaceX. If the development of a crew transportation system were actually delayed due to this Court's award of injunctive relief – a prospect that SNC respectfully submits is remote, given all the other sources of delay –NASA has the viable and longstanding option of extending its orders for seats on the Soyuz spaceflights.

NASA knows well and already anticipates that it will have to order Soyuz seats for 2018 long before the Agency knows whether either the Boeing or SpaceX

354671.1

spacecraft will be certified for operation in time to fulfill a crewed ISS mission in 2018. Given the three-year lead time for ordering seats on the Soyuz, to ensure continuing access of its astronauts to the ISS, NASA will need to take this action regardless of whether the CICA stay is in effect.  Thus, the award of injunctive relief here will not cause any meaningful harm to the Government.

Furthermore, neither Boeing nor SpaceX will suffer any harm on the same order as SNC from re-imposing the stay.  If SNC's GAO protest is denied, Boeing and SpaceX will have incurred only a short delay in what will be a program spanning many years.  The delay was 87 days when the override was issued; by the time of this filing, it will be 81 days, or less.  If SNC's GAO protest is sustained, however, Boeing and SpaceX cannot be deemed to have suffered any harm from the stay.  That is because SNC's allegations in the GAO action regarding the underlying violations of procurement laws will have been validated. See *Al Ghanim Combined Group Co. v. United States*, 56 Fed. Cl. 502, 520 (Fed. Cl. 2003) (when an award process is flawed, an awardee is not harmed when an injunction prevents the awardee's performance).

### E.    Awarding Injunctive Relief Is in the Public Interest

As this Court's discussion of the legislative history in *PGBA* makes clear, Congress has determined that the public interest is best served by maintaining a vigorous bid protest regime, preserved and buttressed by the automatic stay provisions. *See PGBA*, 57 Fed. Cl. at 660 & n.8.  In *CIGNA*, this Court went even further by determining that the Congressional mandate for competition is a relevant factor in an override decision and that the procuring agency there erred by failing to take it into account when it decided to override the automatic stay:

354671.1

> Nor did the override decision consider the statutory mandates
> for competition in both CICA and the [new Medicare law] and
> the adverse effect on competition that the override could effect.

*CIGNA*, 70 Fed. Cl. at 102.

In its decision to override expressly the CICA-mandated stay of the CCtCap contracts, NASA likewise failed to give any real consideration to the issue stated above. Hence, award of a temporary restraining order and preliminary injunction, to restore the CICA stay, is in the public interest.

## III.   CONCLUSION

Because NASA's decision to override the CICA-mandated stay of performance on the CCtCap contracts lacks the requisite justification, SNC is likely to prevail on the merits of its claim that NASA's override is are arbitrary, capricious, and contrary to law. Accordingly, SNC is entitled to declaratory judgment that NASA's override is illegal. Further, the result is no different if this court believes that this case should be analyzed under standards applicable to injunctive relief. Absent such relief, continued performance on the CCtCap contracts would inflict further irreparable harm on SNC beyond the harm that it has already suffered. By contrast, injunctive relief would cause no harm to NASA and may in fact benefit the Government by preserving a genuine opportunity for SNC to satisfy NASA's commercial crew transportation system needs.

SNC respectfully requests that this Court enter a declaratory judgment setting aside NASA's stay override decision. Additionally, SNC requests that this Court issue a temporary restraining order preventing NASA from continuing the performance of the CCtCap contracts by Boeing and SpaceX pending the issuance of a preliminary injunction, as

354671.1

well as a preliminary injunction preventing performance of the CCtCap contracts pending

final judgment.

Dated:  October 15, 2014                    Respectfully submitted,


By:_____

    Neil H. O'Donnell
    Dennis J. Callahan

    ROGERS JOSEPH O'DONNELL
    750 Ninth Street NW, Suite 710
    Washington, DC 20001
    Tel:  (202) 777-8950
    Fax:  (202) 347-8429
    Email:  nho@rjo.com

    *Attorneys for Plaintiff Sierra Nevada*
    *Corporation*

354671.1

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

## BID PROTEST

SIERRA NEVADA CORPORATION,       )
)
      Plaintiff,           )     Case No. _____
)
     v.               )     Judge _____
)
THE UNITED STATES,             )
)
      Defendant.         )
)

## CERTIFICATE OF SERVICE

I hereby certify that I have caused to be delivered, by hand, facsimile, or electronic means, on this 15th day of October, 2014, copies of (l) the Complaint, (2) Plaintiff's Application for a Temporary Restraining Order, (3) Proposed Temporary Restraining Order, (4) Motion for a Preliminary Judgment and Injunction Relief, (5) Proposed Order Granting Preliminary Injunction, (6) Proposed Order Granting Declaratory Judgment (7) Memorandum in Support of Plaintiff's Application for a Temporary Restraining Order and Motion for a Preliminary Injunction, (8) Plaintiff's Corporate Disclosure Statement, and (9) Plaintiff's Motion For Leave To File Documents Under Seal and Motion For A Protective Order on the following counsel:

A.     For the United States, the Dept. of Justice Commercial Litigation Branch;

B.     For the contracting agency, NASA, Karen M. Reilley;

354467.1

C.      For awardee SpaceX, Rick Vacura; and

D.      For awardee Boeing, Scott McCaleb.

Dated:  October 15, 2014                    Respectfully submitted,


By:_____
        Neil H. O'Donnell
        Dennis J. Callahan

        ROGERS JOSEPH O'DONNELL, P.C.
        750 Ninth Street NW, Suite 710
        Washington, DC 20001
        Tel:  (202) 777-8950
        Fax:  (202) 347-8429

        Counsels for Plaintiff Sierra Nevada
        Corporation

354467.1