# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SIERRA NEVADA CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant,

and

BOEING COMPANY and SPACE EXPLORATION TECHNOLOGIES CORP.,

Defendant-Intervenors.

## DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S APPLICATION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF AND DEFENDANT'S MOTION FOR JUDGMENT

JOYCE R. BRANDA
Acting Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

OF COUNSEL:

KAREN M. REILLEY                    KIRK T. MANHARDT
SCOTT W. BARBER                     Assistant Director
Office of the General Counsel
NASA Headquarters                   DANIEL S. HERZFELD
Washington, D.C. 20546              Trial Attorney
                                    Commercial Litigation Branch
                                    Civil Division
                                    Department of Justice
                                    P.O. Box 480, Ben Franklin Station
                                    Washington, D.C. 20044
                                    Tel. (202) 616-0344
                                    Fax. (202) 514-8640

October 20, 2014                    Attorneys for Defendant

Redacted Version

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ISSUES PRESENTED ........................................................................................ 3

STATEMENT OF THE CASE ............................................................................ 4

    I.     Nature Of The Case .............................................................................. 4

    II.    Statement Of Facts ............................................................................... 4

          A.    NASA Authorization Act & Solicitation .................................... 4

          B.    NASA Awards And Sierra Nevada's GAO Protest ..................... 7

          C.    NASA's Override Determination ............................................... 8

ARGUMENT ..................................................................................................... 11

    I.     Standard Of Review ............................................................................ 11

    II.    NASA'S Override Determination Was Proper And Sierra Nevada Cannot Prevail On The Merits ......................................................................... 13

          A.    Significant Adverse Consequences Will Occur If The Stay Remains ...... 13

          B.    No Reasonable Alternatives Exist ............................................ 15

          C.    The Benefits Of Proceeding With Performance Outweigh Potential Costs ........................................................ 18

          D.    The Override Neither Adversely Impacts Competition Nor The Integrity Of The Procurement System ......................... 20

    III.   Sierra Nevada Is Not Eentitled To Relief ........................................... 21

          A.    Sierra Nevada Must Satisfy The Injunctive Relief Factors And Cannot Rely On Declaratory Relief .................................. 22

          B.    Sierra Nevada Cannot Satisfy The Four Injunctive Relief Factors ........... 23

          C.    No Relief Should Issue Because Congress Has Stated That This Program Is A Matter Of National Security ............... 25

CONCLUSION & REQUEST FOR RELIEF ..................................................... 26

Redacted Version

## TABLE OF AUTHORITIES

**Cases**

*Advance Sys. Dev., Inc. v. United States,*
   72 Fed. Cl. 25 (2006) .................................................................................................. 22

*Air Transport Ass'n of Am., Inc. v. Export-Import Bank of the United States,*
   840 F. Supp. 2d 327 (D.D.C. 2012) ............................................................................ 23

*Automation Techs., Inc. v. United States,*
   72 Fed. Cl. 723 (2006) ................................................................................................ 22

*Bannum, Inc. v. United States,*
   404 F.3d 1346 (Fed. Cir. 2005) ............................................................................ 12, 20

*Beechcraft Defense Co. v. United States,*
   111 Fed. Cl. 24 (2013) ........................................................................................... 15, 16

*CIGNA Gov't Servs. v. United States,*
   70 Fed. Cl. 100 (2006) .......................................................................................... 22, 23

*EOD Tech., Inc. v. United States,*
   82 Fed. Cl. 12 (2008) .................................................................................................. 25

*FMC Corp. v. United States,*
   3 F.3d 424 (Fed. Cir. 1993) ........................................................................................ 21

*Glenn Defense Marine (Asia), PTE Ltd. v. United States,*
   720 F.3d 901 (Fed. Cir. 2013) .................................................................................... 11

*McAfee, Inc. v. United States,*
   111 Fed. Cl. 696 (2013) .............................................................................................. 25

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ...................................................................................................... 12

*Perez v. Ledesma,*
   401 U.S. 82 (1971) ...................................................................................................... 22

*PGBA, LLC v. United States,*
   389 F.3d 1219 (Fed. Cir. 2004) ............................................................................ 21, 22

*PGBA, LLC v. United States,*
   57 Fed. Cl. 655 (2003) ............................................................................................. 3, 20

*PlanetSpace, Inc. v. United States,*
   86 Fed. Cl. 566 (2009) .......................................................................................... 12, 15

Redacted Version

*PMTech, Inc. v. United States,*
    95 Fed. Cl. 330 (2010) ........................................................................................ 11, 12, 22

*Reilly's Wholesale Produce v. United States,*
    73 Fed. Cl. 705 (2006) ........................................................................................ 12

*Superior Helicopter, LLC v. United States,*
    78 Fed. Cl. 181 (2007) ........................................................................................ passim

*Supreme Foodservice GMBH v. United States,*
    109 Fed. Cl. 369 (2013) ...................................................................... 12, 20, 22, 23

*Tenacre Foundation v. INS,*
    78 F.3d 693 (D.C. Cir. 1996) ............................................................................. 24

*WRH Grp., Inc. v. United States,*
    115 Fed. Cl. 386 (2014) ..................................................................................... 24

## Statutes

National Aeronautics and Space Administration Authorization Act of 2010,
    Pub. L. No. 111-267, 124 Stat. 2806 ................................................................ passim

51 U.S.C. § 50131(a) ................................................................................................ 16

10 U.S.C. § 2304 ...................................................................................................... 25

28 U.S.C. § 1491(b)(4) ............................................................................................ 11, 25

31 U.S.C. § 3553(d)(3)(A) ....................................................................................... 2

31 U.S.C. § 3553(d)(3)(C)(i)(I) & (II) .................................................................... 1, 2

41 U.S.C. § 3301 ...................................................................................................... 25

42 U.S.C. § 18301(10) ............................................................................................. 5, 13, 16

42 U.S.C. § 18301(14) ............................................................................................. 5, 13

42 U.S.C. § 18301(7) ............................................................................................... 5, 14

42 U.S.C. § 18311(a) ............................................................................................... 4, 10,

42 U.S.C. § 18311(b) ............................................................................................... 5, 25

42 U.S.C. § 18351(a) ............................................................................................... 4

Redacted Version

42 U.S.C. § 18352(a) ................................................................................................ 10

42 U.S.C. §§ 18301(9) & (14) ................................................................................. 25

5 U.S.C. § 706 .......................................................................................................... 11

**Administrative Determinations**

*CACI Techs., Inc.,*
   B-408858 et al., 2013 CPD ¶ 283  (Comp. Gen. 2013) ........................................... 21

**Miscellaneous**

Adam Taylor, *Russia's Deputy PM tells U.S. astronauts to go to space on a trampoline; the joke may be on him,*
   WASH. POST, Apr. 30, 2014 ..................................................................................... 17

Redacted Version

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| SIERRA NEVADA CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | No. 14-994C |
| | ) | (Judge Horn) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| BOEING COMPANY and | ) | |
| SPACE EXPLORATION | ) | |
| TECHNOLOGIES CORP., | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S
APPLICATION AND MOTION FOR DECLARATORY AND
INJUNCTIVE RELIEF AND DEFENDANT'S MOTION FOR JUDGMENT**

Pursuant to Rules 7 & 65 of this Court and this Court's October 17, 2014 order,

defendant, the United States, respectfully responds in opposition to plaintiff Sierra Nevada

Corporation's ("Sierra Nevada") request for declaratory and injunctive relief ("SNC Memo")

challenging the National Aeronautics and Space Administration's ("NASA") determination to

authorize contract performance as provided by the Competition in Contracting Act ("CICA"), 31

U.S.C. § 3553(d)(3)(C)(i)(I) & (II), pending Sierra Nevada's Government Accountability Office

("GAO") protest. Defendant also moves for judgment.

**INTRODUCTION**

On September 26, 2014, Sierra Nevada filed a protest with the GAO challenging NASA's

contract awards to Boeing Company ("Boeing") and Space Exploration Technologies

Redacted Version

Corporation ("SpaceX"). Sierra invoked the CICA stay provision to stop performance of these contracts. After NASA stopped performance in response to the invocation of the stay provision per 31 U.S.C. § 3553(d)(3)(A), NASA issued its "Determination to Continue Performance of Commercial Crew Transportation Capability (CCtCap) Contracts After Receipt of Government Accountability Office (GAO) Protest" ("Override Determination") in accordance with 31 U.S.C. § 3553(d)(3)(C)(i)(I) & (II), and lifted the stop-work order for both Boeing and SpaceX on October 9, 2014. The Override Determination relied on a provision of CICA that permits an agency to continue performance "upon a written finding that (I) performance of the contract is in the best interests of the United States; or (II) urgent and compelling circumstances that significantly affect interests of the United States that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest." 31 U.S.C. § 3553(d)(3)(C)(i)(I) & (II).

Contrary to Sierra Nevada's contentions, NASA's Override Determination fully demonstrates that the override was in the best interests of the United States and urgent and compelling circumstances justified NASA's determination. NASA's Override Determination is necessary to implement the statutorily stated national policy of the United States to develop United States capability to transport astronauts to and from the International Space Station ("ISS") and to assure a redundancy to avoid sole reliance on the Russian Soyuz. *See* National Aeronautics and Space Administration Authorization Act of 2010 ("Authorization Act"), Pub. L. No. 111-267, § 2, 124 Stat. 2806, 2807-08 (Appendix ("A_") 15-56). This constitutes an issue of "national security." *Id.* at 2812. Sierra Nevada has failed (in both its brief and during oral argument) to respond to this statutory statement of national interest, which NASA's Override Determination relied upon as a significant basis of its decision.

Redacted Version

Moreover, Sierra Nevada has failed to demonstrate any prejudice from NASA's Override Determination. In particular, NASA has stated that it will follow the recommendation of the GAO, including a re-competition that could lead to award of a contract to Sierra Nevada. Because NASA has stated that it will follow GAO's recommendation, Sierra Nevada cannot demonstrate that NASA's actions of overriding the stay will lead to any harm the CICA stay is intended to mitigate. The CICA stay provision was designed to stop federal agencies from ignoring GAO's protest recommendation, particularly by performing the full contract before GAO could rule. *See PGBA, LLC v. United States*, 57 Fed. Cl. 655, 657 n.3 (2003) (discussing legislative history of CICA stay provision). Here, there will be no *fait accompli*, because Sierra Nevada will be able to compete for full contractual performance if that is GAO's recommendation. It can show no prejudice from NASA's actions.

NASA's Override Determination was reasonable and rational. For the reasons discussed more fully below, the United States respectfully requests that this Court deny Sierra Nevada's request for equitable relief and dismiss the complaint.

## ISSUES PRESENTED

1.      Whether NASA's written determination to override the CICA stay provides a rational basis to conclude that it is in the best interests of the United States to authorize performance of the CCtCap contracts pending a decision by GAO.

2.      Whether NASA's written determination to override the CICA stay provides a rational basis to conclude urgent and compelling circumstances warrant authorizing continued performance of the CCtCap contracts pending a decision by GAO.

Redacted Version

## STATEMENT OF THE CASE

### I. NATURE OF THE CASE

Sierra Nevada has filed this protest to challenge NASA's determination to override the CICA stay initially implemented based on Sierra Nevada's GAO protest. The override determination has permitted Boeing and SpaceX to begin performance of the CCtCap contracts that will lead to launches of NASA crew to the ISS after 2017.

### II. STATEMENT OF FACTS

#### A. NASA Authorization Act & Solicitation

On October 11, 2010, Congress enacted the Authorization Act, Pub. L. No. 111-267, 124 Stat. 2806 (A15-A56), which expressed the national policy and national security interests in having a United States-domestic space transportation system for crew and cargo. The Authorization Act expressed the national interest through Congressional findings and other provisions.

The Authorization Act stated that it is the national policy to maintain a United States commercial space capability: "It is the policy of the United States that reliance upon and use of non-United States human space flight capabilities shall be undertaken only as a contingency in circumstances where no United States-owned and operated human space flight capability is available, operational, and certified for flight by appropriate Federal agencies." Authorization Act, Pub. L. No. 111-267, § 201, 124 Stat. 2805, 2811 (codified at 42 U.S.C. § 18311(a)) ; *see also id.* § 501, at 2822 (codified at 42 U.S.C. § 18351(a) ("It shall be the policy of the United States, in consultation with its international partners in the ISS program, to support full and

Redacted Version

complete utilization of the ISS through at least 2020."). The Authorization Act recognized the "impending retirement of the Space Shuttle" in 2011 and that the "Russian Soyuz vehicle has allowed continued human presence on the ISS for United States crewmembers," but dependence upon the Soyuz was not sufficient. 124 Stat. at 2807 (codified at 42 U.S.C. § 18301(7)). The Authorization Act expressed a concern that there would be no redundancy without a United States system and such a system should be developed with expediency: "Without any other system, the United States and all the ISS partners will have no redundant system for human access to and from the ISS. It is therefore *essential* that a United States capability be developed *as soon as possible*." *Id.* at 2807 (codified at 42 U.S.C. § 18301(7)) (emphasis added).

Additionally, the Authorization Act reaffirmed the United States' commitment to supporting the ISS with a United States-based system and the need to rapidly develop such a system. In particular, "Congress reaffirms that NASA *shall* make use of United States commercially provided ISS crew transfer and crew rescue services to the *maximum extent practicable*." *Id.* at 2808 (codified at 42 U.S.C. § 18301(10)). Moreover, the Authorization Act states, "The United States must develop, *as rapidly as possible*, replacement vehicles capable of providing both human and cargo launch capability to low-Earth orbit and to destinations beyond low-Earth orbit." *Id.* (codified at 42 U.S.C. § 18301(14)) (emphasis added).

The Authorization Act also emphasizes Congress' determination that United States-maintained human space flight capability implicated national security. In particular, the Authorization Act reaffirmed a prior statutory commitment "that the United States shall maintain an uninterrupted capability for human space flight and operations in low-Earth orbit, and beyond, *as an essential instrument of national security* and of the capacity to ensure continued United States participation and leadership in the exploration and utilization of space." *Id.* at 2811-12

Redacted Version

(codified at 42 U.S.C. § 18311(b)) (emphasis added).

NASA has implemented this policy through the Commercial Crew Program, using research agreements with industry in 2010 and then using a two-phased contract approach beginning in 2012. Phase 1 involved the Certification Products Contract, which required the delivery and disposition of specified early lifecycle plans and products that address Crew Transportation Systems' compliance with NASA standards and requirements for ISS missions. *See* Request for Proposals No. NNK14467515R § C.1 ("Solicitation" or "RFP") (A63); Override Determination at 4 (A4). As contractors performed Phase 1, including Sierra Nevada, NASA issued the Solicitation at issue here on November 19, 2013 for Phase 2 – Commercial Crew Transportation Capability ("CCtCap"). *See* RFP § C.1 (A63); Override Determination at 5 (A5).

The CCtCap Solicitation (Phase 2) required offerors to complete the design, development, test, evaluation, and certification of an integrated Crew Transportation System capable of transporting NASA crew to and from the ISS. *See* RFP § C.1 (A63). The Solicitation also required offerors to provide space missions to the ISS including ground, launch, on-orbit, and return and recovery operations as ordered by NASA. *See id.* The Solicitation required offerors to submit proposals with milestones demonstrating that they could certify their systems and begin providing space missions no later than 2017. *See* RFP, Attachment L-01 (Statement of Objectives) at 3 (A93) ("The NASA goal is to grant the NASA certification of the [Commercial Transportation System] no later than (NLT) 2017."). The Solicitation stated that the milestone commitments would constitute binding contractual requirements. *See* RFP § L.20-4 (A86-A90) (stating that the proposed Attachment J-03, Contract Performance Work Statement, and its Appendix A, Milestone Acceptance Criteria and Payment Schedule shall become part of the contract); *id.* § C.1 (A63) (listing Attachment J-03, Contract Performance Work Statement, and

Redacted Version

its Appendix A, Milestone Acceptance Criteria and Payment Schedule under "Requirements" of the Statement of Work). Section C.1 is part of the awarded contracts, and requires performance of the contract in accordance with the milestones proposed by the contractor and incorporated into the contract at Attachment J-03, Appendix A.

## B.     NASA Awards And Sierra Nevada's GAO Protest

For Phase 2, the CCtCap contracts, NASA received proposals from Boeing, SpaceX, and Sierra Nevada. *See* Override Determination at 5. Each of the offerors submitted milestone plans to complete certification of their systems by 2017. *See* SpaceX Contract, Att. J-03, App. A at 40-41 (A282-83) (          milestone); Boeing Contract, Att. J-03, App. A at 62 (A174)          milestone); Sierra Nevada Proposal, Att. J-03, App. A at 32 (A239)          milestone).  NASA conducted several rounds of discussions with offerors before rendering a source selection decision.

On September 16, 2014, NASA awarded contracts to Boeing and SpaceX for a total maximum value of $6.8 billion. *See* Override Determination at 5 (A5).  On September 26, 2014, Sierra Nevada filed a protest with the GAO triggering the CICA stay.  NASA stopped performance in accordance with CICA. *See id.*  On October 9, 2014, NASA issued the Override Determination and lifted the stop-work order for both Boeing and SpaceX (also in accordance with CICA).

Boeing and SpaceX are continuing to perform their contracts to meet, among other milestones, the critical first significant milestone – the Certification Baseline Review. *See* Boeing Contract, Att. J-03, App. A, at 4-8 (A116-20); SpaceX Contract, Att. J-03, App. A, at 2-4 (A244-46). The contract requires  completion of this Certification Baseline Review and one or more other specified milestones proposed by the contractor, before NASA can begin ordering

Redacted Version

launch missions from the contractors. *See* RFP § H.19 (A64-66). Due to the urgency of this Certification Baseline Review milestone, the contract requires completion of the milestone within 90 days of contract award, as stated in the Override Determination. Both the Boeing and SpaceX contracts (and the Sierra Nevada proposal) provide for completion of the specified milestones in time to order the first launches in 2015. *See* Boeing Contract § B.4 (A111); SpaceX Contract § B.4 (A241); Sierra Nevada Proposal § B.4 (A205). Ordering launches in 2015 is necessary in order to perform the launches in 2017, because the contracts require launches to be ordered 24 to 32 months in advance of the launch. *See id.*[1]

### C.   NASA's Override Determination

NASA issued a 14-page well-reasoned document that explained why overriding the CICA stay is in the best interests of the United States and an urgent and compelling need. *See* Override Determination at 14 ("[I]t is hereby determined that it is in the best interests of the United States to continue performance of the CCtCap contracts, and urgent and compelling circumstances exist that will significantly and adversely affect the interests of the U.S. unless the agency authorizes contract performance, notwithstanding the protest.").

NASA explained the underlying statutory basis for the program and the need to move expeditiously given the national policy and national security concerns expressed by Congress. Override Determination at 1-3 (A1-3). NASA quoted from section 2 of the Act regarding the findings of Congress that a United States capability is "essential" and needs to be "developed as

---

[1] Sierra Nevada incorrectly states that "NASA cannot reasonably commit now to the future CCtCap vehicles for flights after 2017" and "no crewed missions can be ordered until all milestones are satisfied." Compl. ¶¶ 34, 69; SNC Memo at 17 ("Missions cannot be ordered until after the safety certification and flight tests."). To the contrary, as noted above, NASA can begin ordering missions for future launches in 2015 and must do so to launch in 2017.

Redacted Version

soon as possible" and that NASA should use United States firms to the "maximum extent practicable." *Id.* at 2 (A2). NASA cited and quoted its Memoranda of Understanding with the Japan, Canada, and Europe committing the United States to assure astronauts from these allies would be able to reach the ISS. *See id.*

As to Russia, NASA stated: "Uncertainties in the international political environment may further complicate the ability to purchase future Soyuz services." *Id.* at 3 (A3). NASA also specifically quoted the Authorization Act's statement that having a United States space flight capability is a matter of "national security." *Id.* NASA explained its two-phase process for procuring these services, noting that Phase 2 is for the CCtCap contracts awarded to Boeing and SpaceX. *See id.* at 3-5 (A3-5).

Next, NASA weighed each of the Court's *Reilly*'s factors, noting the importance of creating a redundant capability and its desire to not be "100% dependent on one vehicle, Russia's Soyuz, to fly any astronauts to and from the ISS." *Id.* at 6 (A6). More importantly, NASA explained that it would have no United States crew transportation after 2017 if it wholly stood down for the duration of the GAO proceeding. *See id.* at 6-7 (A6-7).

First, NASA explained that it needs to begin "critical path activities" to assure that it will have a safe, reliable, human-rated system to transport astronauts to and from the ISS. *See id.* at 7-8 (A7-8). In particular, to meet the milestones to meet the already-tight timeline, NASA explained that awardees need to start on the Certification Baseline Review: "All other work under the contract flows from this critical review." *Id.* at 8 (A8). NASA reiterated that delays in these critical activities would prevent redundancy and continue a "single point of failure" – contrary to the findings of the Authorization Act (noted above) – and would jeopardize United States compliance with its international agreements with Japan, Canada, and the European Space

Redacted Version

agency. *Id.* at 9 (A9). NASA also emphasized that CCtCap fulfills requirements that are not presently being met – the need to increase the crew size from six to seven to meet the Authorization Act's requirement to "maximize the productivity and use of the ISS" for scientific research – the seventh crew member will specifically be for science and research. *Id.* at 10 (A10) (citing and quoting Authorization Act, 124 Stat. at 2823 (codified at 42 U.S.C. § 18352(a)). NASA stated that the CICA stay would "create a more than day-for-day delay" in launching missions in 2017. *See id.*

Second, NASA considered reasonable alternatives to meet NASA's need for crew transportation to the ISS in 2017. *See id.* at 11 (A11). NASA concluded it had no reasonable alternative. There is no incumbent. Continued use of Russian Soyuz trips is uncertain and not a reasonable alternative to procuring services from United States commercial entities – the national policy that only the CCtCap contracts can meet. *See id.* (citing and quoting Authorization Act, 124 Stat. at 2811 (codified at 42 U.S.C. § 18311(a) ("It is the policy of the United States that reliance upon and use of non-United States human space flight capabilities shall be undertaken only as a contingency in circumstances where no United States-owned and operated human space flight capability is available, operational, and certified for flight by appropriate Federal agencies."))).

Third, NASA weighed the costs of proceeding with the Boeing and SpaceX contracts and determined that the benefits to United States interests outweigh any potential costs. In particular, NASA noted that its costs would be either costs of milestone payments or, at most, the termination costs that are subject to the Limitations of Funds obligated for each contract –$129.3 million for each contract at the time of the Override Determination. *See id.* at 12-13 (A12-13). NASA recognized the obligated amounts would increase to pay for the full costs of milestones.

Redacted Version

*See id.* at 13 (A13). NASA weighed the alternative costs of purchasing more seats on the Soyuz (approximately $76.3 per astronaut) and concluded that, even if authorized to purchase the seats, it would not be served by contracting with Russia rather than American companies. *See id.* Notwithstanding these costs and the possible negative programmatic impacts and further delays an adverse GAO decision would bring, NASA concluded that it would be far more adverse to stop work because doing so would almost guarantee the 2017 date could not be met. *See id.*

Fourth, NASA weighed the impact on competition and the integrity of the procurement system. NASA recognized that GAO might require a re-competition, and to give the full force to this consideration, notwithstanding all other concerns, NASA committed to allowing Sierra Nevada to re-compete in the event GAO were to make such a recommendation. *See id.* at 14 (A14).

Ultimately, NASA determined it was in the best interests of the United States and urgent and compelling circumstances dictated overriding the CICA stay to permit Boeing and SpaceX to perform the CCtCap contracts. *Id.*

## ARGUMENT

### I.    STANDARD OF REVIEW

This Court reviews a challenge to a procurement decision to determine whether "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Glenn Defense Marine (Asia), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013) (internal quotations omitted). The Court considers agency action to determine if it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See id.* (discussing that 28 U.S.C. § 1491(b)(4) adopts the standards in 5 U.S.C. § 706). The arbitrary and capricious standard is "highly deferential" and

Redacted Version

the "protestor bears the burden of proving that a significant error marred the procurement in question." *Id.* (citations and internal quotations omitted). This Court applies these standards to a challenge of an agency's CICA stay override. *See PMTech, Inc. v. United States*, 95 Fed. Cl. 330, 342 (2010). This Court must also determine whether a protester has been prejudiced by any such arbitrary and capricious agency action. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1353 (Fed. Cir. 2005) ("The trial court was required to determine whether these errors in the procurement process significantly prejudiced [protester].").

In determining whether an agency acted arbitrarily or capriciously, this Court has applied the Supreme Court's standard of review to determine whether an agency (1) relied upon factors that Congress did not intend it to consider, (2) entirely failed to contemplate an important aspect of the problem, (3) offered an explanation for its decision that runs counter to the evidence, or (4) offered an explanation so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *See PMTech*, 95 Fed. Cl. at 342-45 (discussing the standards set forth in *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Decisions of this Court have also utilized the so-called *Reilly's* four-factor test: (1) whether significant adverse consequences would occur absent the override; (2) whether reasonable alternatives to the override were available; (3) how the potential cost of proceeding with the override, including the costs associated with the potential that the GAO might sustain the protest, compared to the benefits associated with the approach being considered for addressing the agency's needs; and (4) the effects of the override on the competition and integrity of the procurement system. *See Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705, 711 (2006) (citations omitted) (recognizing that "override decisions are, by nature, fact specific . . ."); *see also Supreme Foodservice GMBH v. United States*, 109 Fed. Cl. 369, 386 (2013); *contra*

Redacted Version

*PlanetSpace, Inc. v. United States*, 86 Fed. Cl. 566, 567-68 (2009) (rejecting the use of the

*Reilly's* factors). The *Reilly's* factors should not be deemed dispositive, but merely as analytic

tools that may assist the Court in conducting the *State Farm* standard of review depending upon

the factual circumstances of a given case. Here, NASA used the *Reilly's* factors as an aid to its

Override.

## II.    NASA'S OVERRIDE DETERMINATION WAS PROPER AND SIERRA NEVADA CANNOT PREVAIL ON THE MERITS

### A.    Significant Adverse Consequences Will Occur If The Stay Remains

Contrary to Sierra Nevada's contentions, NASA has adequately stated the significant

adverse consequences that will result from allowing the stay to remain in effect. The override of

the stay is necessary to meet NASA's objective of having a United States-based service to

transport crews to and from the ISS in 2017. NASA seeks to implement statutory national

security policy, which Sierra Nevada simply ignores in its filings.

NASA cannot simply elect to continue using Russian Soyuz transportation to the ISS

because Congress has provided that NASA must develop and utilize a United States-based

transportation service "as rapidly as possible." Ignoring the law, Sierra Nevada asserts that

NASA can simply continue using the Russian Soyuz to transport astronauts to and from ISS as if

Russia were some kind of incumbent, existing contract holder for these services. *See* SNC

Memo at 14-17. As discussed above and stated in the Override Determination, the Authorization

Act requires NASA to use United States commercial services "to the maximum extent

practicable." Override Determination at 2 (A2); 124 Stat. at 2808 (codified at 42 U.S.C. §

18301(10)). The Authorization Act also requires NASA to develop "as rapidly as possible" a

United States-based shuttle replacement. 124 Stat. at 2808 (codified at 42 U.S.C. § 18301(14).

Redacted Version

Continued use of the Russian Soyuz does not meet the needs of the national interest as expressed in the Authorization Act to develop and use United States-based services. The CCtCap contracts implement the Authorization Act; continued use of the Russian Soyuz does not.

NASA also stated the need for redundancy in the Override Determination. Sierra Nevada asserts that NASA has no need to ensure redundancy, given that it has used the Russian Soyuz as the sole vehicle for the past several years. *See* SNC Memo at 16 n.7. Again, the Authorization Act states that it is "essential" for NASA to develop a "redundant" system "as soon as possible." 124 Stat. at 2807 (codified at 42 U.S.C. § 18301(7)). Continued reliance on the Russian Soyuz does not meet the Authorization Act's stated policy. Thus, the Override Determination's reliance on redundancy was a proper consideration.

Contrary to Sierra Nevada's assertions, the Certification Baseline Review is a critical element in assuring that NASA will be able to launch in 2017. Sierra Nevada asserts, "Missions cannot be ordered until after the safety certification and flight tests." SNC Memo at 17. That is incorrect. NASA can order missions in 2015 – the only condition precedent is a completed Certification Baseline Review. That is why the initial 90-day period of performance is so critical.[2]

The statutory requirement and lack of an incumbent contract to meet the Solicitation's

---

[2] Sierra Nevada also asserts that NASA is to blame for any adverse consequences based on allegedly taking its time to procure the CCtCap contract. *See* SNC Memo at 18 n.8. However, immediately after the 2010 Authorization Act announced national policy and the need for United States-based transportation, NASA has been working diligently to reach this point. The space shuttle was retired in 2011. NASA entered Space Act agreements with Sierra Nevada and SpaceX to facilitate industry development of commercial space services. Override Determination at 12. NASA also took a phased approached for this procurement – Sierra Nevada, SpaceX, and Boeing all had contracts in Phase 1. As they were performing that work, NASA began procurement for Phase 2 by issuing the Solicitation in November 2013. Override Determination at 4-5. The 11-month procurement schedule for the CCtCap is relatively fast, given the complexity and rounds of discussions with the offerors.

Redacted Version

implementation of the statute places this case in a different category from *Superior Helicopter, LLC v. United States*, 78 Fed. Cl. 181, 189-190 (2007), relied upon by Sierra Nevada. *See* SNC Memo at 14-15. There, an incumbent contract that met the needs of the agency arguably existed and the agency failed to explain why it needed to perform the "exclusive-use" contracts at issue. *See Superior Helicopter*, 78 Fed. Cl. at 190. Here, the Authorization Act compelled the use of *United States-based* services – the Russian Soyuz cannot meet that requirement.

Instead, this Court should look to *PlanetSpace*, 86 Fed. Cl. at 568, where the Court found NASA's override rational because it relied on "Presidential policy decisions concerning the shuttle program and international commitments pertaining to the space station." *Id.* Here, NASA is relying on policy required by Congress and NASA's commitments in the memoranda of understanding with Japan, Canada, and Europe. Thus, this Court should follow *PlanetSpace* and deny relief to the protester.

Finally, NASA considered the significant adverse concerns of a schedule slippage. NASA stated that it would create "more than a day-for-day delay to restart . . . ." Override Determination at 10 (A10). NASA expects that this delay would result in a four to six month impact to the current schedule, making it nearly impossible to meet the 2017 deadline. *See* Declaration of William H. Gerstenmaier ¶ 3 ("Gerstenmaier Dec.") (A297).

### B.    No Reasonable Alternatives Exist

An agency "is only required to consider *reasonable* alternatives to the override." *Beechcraft Defense Co. v. United States*, 111 Fed. Cl. 24, 33 (2013) (emphasis in original). Here, NASA considered alternatives to the override but none were deemed reasonable. Contrary to Sierra Nevada's assertion, the Russian Soyuz is not a *reasonable* alternative.

NASA's Override Determination considered and rejected the Russian Soyuz as a

Redacted Version

reasonable alternative, *see* Override Determination at 11 (A11), a determination supported by Congress's conclusions as enacted in the Authorization Act. As noted repeatedly above and in the Override Determination, the Authorization Act requires that NASA procure services from United States domestic providers: "Procuring a Soyuz service requires a long lead time, and is not in the best interests of the United States because it is contrary to United States law and space policy." *Id.* That is the purpose of the CCtCap contracts – the Soyuz cannot meet that requirement. Sierra Nevada never grapples with the Authorization Act, which is the established space policy and law of the United States.

Moreover, now that NASA has awarded contracts to domestic companies for these services, it makes it more difficult for NASA to obtain a waiver. *See* Gerstenmaier Dec. ¶ 7 (A298) ("For prior Soyuz purchases, NASA issued requests for information, and did not receive any responses from United States industry indicating they could provide this service. That is not likely the case now. NASA now has the CCtCap contracts with Boeing Company and Space Exploration Technologies Corporation to perform these requirements and an offer from Sierra Nevada Corporation to perform these requirements."). As the Override Determination states, the Commercial Space Act requires acquisition of "'space transportation services from United States commercial providers whenever such services are required in the course of its activities.'" Override Determination at 11 (A11) (citing and quoting 51 U.S.C. § 50131(a)). While a waiver may be obtained as asserted by Sierra Nevada, SNC Memo at 20 n.9, it is more difficult to do so particularly when the Commercial Space Act is read in conjunction with the Authorization Act, which also requires NASA to emphasize United States commercial development to the "maximum extent practicable." 124 Stat. at 2808 (codified at 42 U.S.C. § 18301(10)). The CCtCap contracts demonstrate a United States commercial capability to perform these services.

Redacted Version

NASA is not currently negotiating with Russia for additional launches using the Soyuz to meet NASA's needs after 2017. *See* Gerstenmaier Dec. ¶ 6 (A297). Usually such negotiations with Russia are challenging and require a contract to be placed 36 months before a mission. *See id.* As the Override Determination states: "Uncertainties in the international political environment may further complicate the ability to purchase future Soyuz services." *See* Override Determination at 3 (A3). Notably, NASA and the Russian space agency must work within the broader political environment between the United States and Russia. *See* Gerstenmaier Dec. ¶ 6 (A297). At the moment, that relationship is complicated, including threats from the Russian Deputy Prime Minister's to deny the United States use of Russian Soyuz transportation to the ISS: "The U.S. introduced sanctions against our space industry. God knows, we warned them: we respond to declarations w/ declarations, to actions w/ actions . . . . After analyzing the sanctions against our space industry, I suggest the U.S. delivers its astronauts to the ISS [international space station] with a trampoline." Adam Taylor, *Russia's Deputy PM tells U.S. astronauts to go to space on a trampoline; the joke may be on him*, WASH. POST, Apr. 30, 2014, *available at http://www.washingtonpost.com/blogs/worldviews/wp/2014/04/30/russias-deputy-pm-tells-u-s-astronauts-to-go-to-space-on-a-trampoline-the-joke-may-be-on-him/*.

Notwithstanding the current state of international relations, Sierra Nevada asserts that the "public record" demonstrates that NASA has committed to using the Russian Soyuz after 2017. *See* SNC Memo at 19. Not so. Sierra Nevada cites the Fiscal Year 2015 Budget Request stating that NASA intends to use the Soyuz "until a domestic capability is available." SNC Memo, Exh. 10. However, in the same Fiscal Year 2015 request, NASA stated its intent to have a domestic capability available by 2017, so there is no contradiction. A284-88. Sierra Nevada also cites NASA Administrator Bolden's testimony regarding the Fiscal Year 2015 budget to state that

17

Redacted Version

NASA may need to purchase more seats on the Soyuz. *See* SNC Memo at 19. However,

Administrator Bolden's testimony recognized the complicated relationship with Russia and what

would happen if Russia refused to sell seats to NASA:

> **Congressman Brooks:** Mr. Administrator, back to the issue with Russia
> and our ability to get to the International Space Station. What would be the
> consequences to the operational capabilities of the space station if within
> the next year, Russia chooses to deny us access by no longer allowing us
> to hitch a ride on their rockets?
>
> **Administrator Bolden:** As I mentioned before, because we provide
> navigation, communications, power, and as I responded to somebody else,
> station would probably -- and I hate to deal in conjecture -- the partners
> would probably have to shut the space station down.

A290-91. Thus, the public record is consistent with NASA's Override Determination – the

CCtCap contracts present the only viable alternative to assure United States commercial

transportation to ISS after 2017.[3]

## C. The Benefits Of Proceeding With Performance Outweigh Potential Costs

In weighing the potential costs and benefits of issuing an override, the agency does not

need to use strictly quantitative methods but may also consider qualitative benefits that weigh

against the costs. *See Superior Helicopter*, 78 Fed. Cl. at 193. Here, NASA weighed the

potential costs of having to terminate the contracts if GAO sustains the protest versus the

cascading delays and inability to meet the requirements of statutory policy. Sierra Nevada

merely disagrees with NASA's conclusion.

NASA recognized that it would be liable for termination costs up to the amount obligated

---

[3] During the October 17, 2014 hearing, counsel for Sierra Nevada asserted that NASA
appeared to have no concern about the use of Russian rocket engines in Boeing's proposed
rockets for the CCtCap. However, Boeing's proposal ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮. A292-95.

Redacted Version

under Boeing's and SpaceX's contracts. In particular, NASA initially had obligated $129.3 million on each contract, but recognized that "[a]dditional funding would be necessary to complete the milestones currently on the contracts between now and the resolution of the protest." Override Determination at 13 (A13). William Gerstenmaier, Associate Administrator for NASA's Human Exploration and Operations Mission Directorate signed the Override Determination. At the time he was aware of the contractual milestone payments that would come due during the course of the GAO proceedings, including understanding the magnitude of the additional funding that would be obligated. *See* Gerstenmaier Dec. ¶ 5 (A297). Currently, NASA has increased the aggregate amount obligated under the two contracts to $449 million. *Id.*

Against this magnitude of risk, NASA weighed the $76.3 million per astronaut cost of seats on the Russian Soyuz (even assuming such a contract could be negotiated). *See id.* at 13 (A13). At $76.3 million per astronaut, a six-person mission would be roughly the same costs as the potential termination costs involved in the Certification Baseline Review that will occur during the pendency of the GAO protest. NASA reasonably rejected this alternative.

Sierra Nevada denigrates the "benefits gained" from NASA's override of the stay, asserting that essentially nothing useful will occur during this period. However, as noted above, the Certification Baseline Review that is achieved in the first 100 days will permit NASA in 2015 to begin ordering missions for 2017. As noted above, Sierra Nevada's brief and complaint underplay the importance of the Certification Baseline Review by incorrectly asserting that "[m]issions cannot be ordered until after the safety certification of flight tests." SNC Memo at 17. Even if GAO sustains Sierra Nevada's protest, at least one of the current awardees is likely to retain an award and its completion of the Certification Baseline Review will provide some

19

CASE-HEADER

Redacted Version

advancement for the CCtCap program.

Ultimately, NASA reasonably balanced the significant costs of continued performance versus the Soyuz alternative and the risk of GAO sustaining Sierra Nevada's protest. Here, NASA properly weighed these risks. While an adverse GAO decision *could* negatively impact NASA's ability to meet the 2017 timeline, NASA's failure to override the stay would guarantee that NASA could not meet the 2017 timeline.

### D.     The Override Neither Adversely Impacts Competition Nor The Integrity Of The Procurement System

The overriding purpose of the CICA stay "is to preserve competition in contracting and ensure a fair and effective process at the GAO," thereby assuring that any contract award does not become a *fait accompli. Superior Helicopter*, 78 Fed. Cl. at 193-94 (internal citations and quotations omitted); *see also PGBA*, 57 Fed. Cl. at 657 n.3. NASA's Override Determination will not adversely impact Sierra Nevada's ability to be awarded a contract.

NASA has committed to follow GAO's recommendation:

> NASA understands the CICA direction that a decision by GAO to resolve a protest will not be influenced by the agency's decision to override the automatic contract suspension, and recognizes that a GAO decision could require re-competition. The agency has taken this into account and notes that proceeding with performance, in this situation where the agency is beginning a new and critical effort, will not eliminate the protester's opportunity to compete for the effort should a re-competition be required in the event of any potential corrective action recommended by GAO.

Override Determination at 14 (A14). Given that NASA has committed to follow GAO's recommendation and Sierra Nevada will have the opportunity to re-compete and be awarded a contract, Sierra Nevada cannot demonstrate any prejudice from NASA's Override Determination. *See Bannum*, 404 F.3d at 1353 (prejudice an element of every protest); *Supreme Foodservice*, 109 Fed. Cl. at 383(stating that prejudice must be found in CICA stay override protest).

Redacted Version

Sierra Nevada's parade of horribles of the impact of the override do not withstand scrutiny. During the October 17, 2014 hearing, Sierra Nevada asserted that it would not be able to obtain launch slots. However, Sierra Nevada's proposal states

. *See* A207. Sierra Nevada also asserts that the Override Determination will adversely impact its ability to recruit employees and maintain its supply chain. However, employees regularly move from a displaced contractor to a newly awarded contractor – this is fairly standard in the government contracting industry and the movement can go from one of the current awardees to Sierra Nevada, should it receive award. *Cf. CACI Techs., Inc.*, B-408858 *et al.*, 2013 CPD ¶ 283 at 8 (Comp. Gen. 2013) ("It is neither unusual nor inherently improper for an awardee to recruit and hire personnel previously employed by an incumbent contractor."). Finally, Sierra Nevada has not demonstrated how its supply chain would be impacted, particularly given that Sierra Nevada continues to receive NASA payments to develop its space transportation capability under its Space Act agreement. Thus, Sierra Nevada has not demonstrated it will be prejudiced by NASA's Override Determination.

## III. SIERRA NEVADA IS NOT ENTITLED TO RELIEF

To receive injunctive relief, a protester must demonstrate (1) that it is likely to succeed on the merits for preliminary relief (or actually succeed on the merits for permanent relief), (2) whether it will suffer irreparable harm, (3) whether the balance of hardships favors the grant of injunctive relief, and (4) whether it is in the public interest. *See PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (permanent relief); *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993) (preliminary relief). Contrary to Sierra Nevada's assertions, it must demonstrate it meets each of these factors if it seeks to have this Court compel NASA to stop

21

Redacted Version

performance of the CCtCap contracts. Moreover, Sierra Nevada cannot meet this injunctive

relief test. Finally, even if it could demonstrate the right to relief (either declaratory or

injunctive), this Court should deny relief based on the national security interest in continuing

performance of the CCtCap contracts.

### A.    Sierra Nevada Must Satisfy The Injunctive Relief Factors And Cannot Rely On Declaratory Relief

A protester must demonstrate the four injunctive relief factors to coerce the United States

to stop performance. *PGBA*, 389 F.3d at 1228. In contrast, "[a] declaratory judgment is merely

a declaration of legal status and rights; it neither mandates nor prohibits state action." *Perez v.*

*Ledesma*, 401 U.S. 82, 124 (1971). To stop performance on the ongoing CCtCap contracts, this

Court must enter injunctive relief because it will be compelling coercive action, it will not

merely be declaring the legal status and rights of the parties.

This Court must determine whether granting Sierra Nevada relief will constitute coercive

action. In *Superior Helicopter*, which involved a challenge to an agency's CICA stay override,

the Court followed the Federal Circuit's decision in *PGBA*: "The Federal Circuit . . . has

explained that if a declaratory judgment and an injunction would have the same practicable effect

in a case, consideration of declaratory relief under injunctive relief standards is appropriate."

*Superior Helicopter*, 78 Fed. Cl. at 194 (citing *PGBA*, 389 F.3d at 1228). In *PGBA* , the Federal

Circuit rejected an argument to grant declaratory "relief in the form of an order setting aside the

award and thereby stopping performance by [the agency and the awardee] under [the contract]"

because it was "tantamount to a request for injunctive relief." *PGBA*, 389 F.3d at 1228. The

Federal Circuit applied the injunctive relief factors in *PGBA*. *See id.*

Notwithstanding the Federal Circuit's decision in *PGBA* (and followed in *Superior*

Redacted Version

*Helicopter*) that coercive relief granted by the Court must weigh the four injunctive relief factors, recent decisions of this Court have concluded a protester in CICA stay override cases need not address the four injunctive relief factors. *See, e.g., Supreme Foodservice*, 109 Fed. Cl. at 396-97; *PMTech*, 95 Fed. Cl. at 347-48; *Automation Techs., Inc. v. United States*, 72 Fed. Cl. 723 (2006), *Advance Sys. Dev., Inc. v. United States*, 72 Fed. Cl. 25 (2006); *CIGNA Gov't Servs. v. United States*, 70 Fed. Cl. 100 (2006). In these cases, the Court reasoned it could provide declaratory relief where a protester had succeeded on the merits by demonstrating the agency acted arbitrarily and capriciously without addressing the remaining three injunctive relief factors. It stated that the CICA stay is merely a default statutory setting and when this Court issues a declaratory judgment invalidating the agency's override decision, the automatic stay is reinstated by operation of law. *See CIGNA*, 70 Fed. Cl. at 114 (granting "[p]laintiff's request for a declaratory judgment, declaring the override decision invalid, resulting in a reinstatement of the stay" and explaining that "the automatic stay in [the plaintiff's] GAO protest is reinstated de jure"); *see also Supreme Foodservice*, 109 Fed. Cl. at 397.

Here, NASA is performing the CCtCap contracts. To stop performance of these contracts requires coercive action. *PGBA* counsels that this Court weigh all four injunctive relief factors in this circumstance. Therefore, the United States respectfully requests that this Court apply the injunctive relief factors in this case in the event it reaches the issue of relief.

## B.    Sierra Nevada Cannot Satisfy The Four Injunctive Relief Factors

Sierra Nevada cannot meet any of the four factors.

First, for the reasons discussed above, Sierra Nevada cannot demonstrate that it is likely to succeed (much less actually succeed) on the merits. Sierra Nevada has not demonstrated that NASA's override decision is arbitrary and capricious. Even if the Court eschews the injunctive

Redacted Version

relief factors and looks solely at declaratory relief, Sierra Nevada has failed to demonstrate that NASA was arbitrary and capricious.

Second, Sierra Nevada cannot demonstrate irreparable harm. "The irreparable injury requirement erects a very high bar for a movant." *Air Transport Ass'n of Am., Inc. v. Export-Import Bank of the United States*, 840 F. Supp. 2d 327, 334 (D.D.C. 2012) (citation omitted). To constitute irreparable harm, Sierra Nevada's alleged injury must be "certain and great," not theoretical. *Tenacre Foundation v. INS*, 78 F.3d 693, 695 (D.C. Cir. 1996) (internal quotation omitted). Sierra Nevada asserts that it will lose launch slots (███████████████████████

███████████████████ ), it will lose employees (even though personnel move from one contractor to another when awards are disrupted by protests), it will encounter a disruption of its supply chain (even though it will continue to develop its solution under its Space Act agreement), and will otherwise not be on a level playing field with Boeing and SpaceX in a re-competition (even though NASA has specifically pledged to follow GAO's recommendation). *See* SNC Memo at 27-28. Sierra Nevada's assertions do not hold. Each example is unproven, speculative, and remote. Thus, Sierra Nevada cannot show irreparable harm.

Third, the balance of hardships favors the United States, Boeing, and SpaceX. *See WRH Grp., Inc. v. United States*, 115 Fed. Cl. 386, 404 (2014) (stating that balance of hardships should weigh protester's irreparable harm against hardships of United States and intervenors). There is no demonstrated irreparable harm to Sierra Nevada. However, an injunction would seriously impact the ability of NASA to meet the 2017 date, causing a four to six month delay in the program. *See* Gerstenmaier Dec. ¶ 3 (A297). A suspension of performance would also cause at least $40 million in contract inefficiencies and up to $100-$150 million in all other program inefficiencies. *See* Gerstenmaier Dec. ¶ 4 (A297). These hardships significantly outweigh any

Redacted Version

hardships to Sierra Nevada.

Fourth, Sierra Nevada has not shown that it is in the public interest to reinstate the CICA stay. To the contrary, as noted above, the Authorization Act states that the policy and national security interests of the United States is to develop a domestic, commercially operated transportation system that the United States must develop "as rapidly as possible." 124 Stat. at 2808, 2811-12 (codified at 42 U.S.C. §§ 18301 (14), 18311(b)).

Ultimately, Sierra Nevada has not demonstrated that it should receive equitable relief whether declaratory or injunctive.

### C.     No Relief Should Issue Because Congress Has Stated That This Program Is A Matter Of National Security

In exercising jurisdiction over protests, this Court "shall give due regard to the interests of national defense and national security . . . ." *See* 28 U.S.C. § 1491(b)(4). In some circumstances, this Court has refused to provide relief based on national security interests even though a protester was otherwise entitled to relief. *See, e.g., McAfee, Inc. v. United States*, 111 Fed. Cl. 696, 715 (2013) ("In this instance, the public's interest in maintaining national security outweighs adherence to the competitive procurement mandate in CICA, 41 U.S.C. § 3301, 10 U.S.C. § 2304, and the FAR, insofar as injunctive relief is concerned."); *see also EOD Tech., Inc. v. United States*, 82 Fed. Cl. 12, 22-23 (2008) (weighing national security interests in reviewing CICA stay override). Here, the Authorization Act includes a provision that specifically states that the program (implemented, in part, by the CCtCap contracts) is a matter of "national security." 124 Stat. at 2812 (codified at 42 U.S.C. § 18311(b)) (stating that "the United States shall maintain an uninterrupted capability for human space flight and operations in low-Earth orbit and beyond, as an *essential instrument of national security*") (emphasis added).

Redacted Version

Thus, because NASA's CCtCap contracts serve a national security need, this Court should deny

any relief to Sierra Nevada.

## CONCLUSION & REQUEST FOR RELIEF

For the foregoing reasons, the United States respectfully requests that this Court deny

Sierra Nevada's request for equitable relief and uphold NASA's Override Determination.

Respectfully submitted,

JOYCE R. BRANDA
Acting Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

OF COUNSEL:

Karen M. Reilley
Scott W. Barber
Office of the General Counsel
NASA Headquarters
Washington, D.C. 20546

s/ Kirk T. Manhardt
KIRK T. MANHARDT
Assistant Director

s/ Daniel S. Herzfeld
DANIEL S. HERZFELD
Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice
Civil Division
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-0344
Fax: (202) 514-8640

October 16, 2014

Attorneys for Defendant